No. 20-1321

# United States Court of Appeals
# for the Federal Circuit

NATIONAL ORGANIZATION OF VETERANS' ADVOCATES, INC.,

*Petitioner*,

v.

SECRETARY OF VETERANS AFFAIRS,

*Respondent*.

Petition for Review of Changes to Department of Veterans Affairs Manual M21-1
Pursuant to 38 U.S.C. § 502.

**OPENING BRIEF OF PETITIONER
ON HEARING EN BANC**

Roman Martinez
Blake E. Stafford
Shannon Grammel
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
roman.martinez@lw.com

June 22, 2020          *Counsel for Petitioner*

# CERTIFICATE OF INTEREST

Counsel for Petitioner certifies the following:

1. Full Name of Party represented by me:

    National Organization of Veterans' Advocates, Inc.

2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is:

    None.

3. Parent corporations and publicly held companies that own 10 percent or more of stock in the party:

    None.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

    N/A.

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. *See* Fed. Cir. R. 47.4(a)(5) and 47.5(b).

    *NOVA v. Secretary of Veterans Affairs*, No. 17-1839.

    *Military-Veterans Advocacy Inc. v. Secretary of Veterans Affairs*, No. 20-1537.

Dated: June 22, 2020

Respectfully submitted,

*/s/ Roman Martinez*
Roman Martinez
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

*Counsel for Petitioner National Organization of Veterans' Advocates, Inc.*

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ..............................................................i

TABLE OF AUTHORITIES ..................................................................v

STATEMENT OF RELATED CASES ...................................................1

STATEMENT OF JURISDICTION.......................................................1

STATEMENT OF THE ISSUES..........................................................1

INTRODUCTION ..................................................................................2

STATEMENT OF THE CASE................................................................4

    A.    This Court's Jurisdiction To Review VA Actions ................................4

    B.    Timeliness Of Section 502 Petitions ...................................9

    C.    NOVA's Challenges To M21-1 Manual Provisions ...........................10

SUMMARY OF ARGUMENT ..............................................................14

ARGUMENT ........................................................................................17

I.    SECTION 502 GRANTS THIS COURT JURISDICTION TO REVIEW THE CHALLENGED M21-1 MANUAL PROVISIONS............17

    A.    Section 502's Cross-Reference To 5 U.S.C. § 552(a)(1) Authorizes Review ..........................................................17

        1.    The Ordinary Meaning Of "General Applicability" Is Dispositive ...............................................18

        2.    Section 552(a)(1)(D)'s History Confirms That "General Applicability" Takes Its Ordinary Meaning .............................23

        3.    Congress And Federal Agencies Have Endorsed The Ordinary Meaning Of "General Applicability" .......................28

        4.    *DAV* Incorrectly Treats Sections 552(a)(1) And 552(a)(2) As Mutually Exclusive And Should Be Overruled..................32

        5.    VA's Designation Of The M21-1 Manual As Not "Binding" On The Board Is Irrelevant.......................................38

B.  Section 502's Cross-Reference To 5 U.S.C. § 553 Also Authorizes Review ..............................................................45

C.  Pre-Enforcement Review Of Manual Provisions Under Section 502 Provides A Vital Safeguard Against Unlawful VA Action .........49

II.  RULE 47.12(a)'S 60-DAY DEADLINE IS INVALID AND UNENFORCEABLE ......................................................................52

A.  Section 2401(a) Establishes A Default Six-Year Limitations Period For Section 502 Petitions ...........................................52

B.  Rule 47.12(a) Cannot Override Section 2401(a) ...............................54

CONCLUSION ...........................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Azar v. Allina Health Services*,
139 S. Ct. 1804 (2019).................................................................39, 40, 46, 47

*Block v. Secretary of Veterans Affairs*,
641 F.3d 1313 (Fed. Cir. 2011) .................................................................53, 58

*Brown v. Gardner*,
513 U.S. 115 (1994)...................................................................................47, 50

*Brown v. Secretary of Veterans Affairs*,
124 F.3d 227, 1997 WL 488930 (Fed. Cir. 1997).....................................55, 58

*Chippewa Dialysis Services v. Leavitt*,
511 F.3d 172 (D.C. Cir. 2007).........................................................................23

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012).........................................................................................21

*Coalition for Common Sense in Government Procurement v.
Secretary of Veterans Affairs*,
464 F.3d 1306 (Fed. Cir. 2006) .........................................................................6

*Crown Coat Front Co. v. United States*,
386 U.S. 503 (1967).........................................................................................52

*Culbertson v. Berryhill*,
139 S. Ct. 517 (2019).......................................................................................19

*Disabled American Veterans v. Secretary of Veterans Affairs*,
327 F.3d 1339 (Fed. Cir. 2003) ..........................................................................6

*Disabled American Veterans v. Secretary of Veterans Affairs*,
859 F.3d 1072 (Fed. Cir. 2017) ................................................................*passim*

*FCC v. AT&T Inc.*,
562 U.S. 397 (2011).........................................................................................27

*Food Marketing Institute v. Argus Leader Media*,
    139 S. Ct. 2356 (2019)......................................................................18

*Gray v. McDonald*,
    27 Vet. App. 313 (2015) ...................................................................50

*Gray v. Secretary of Veterans Affairs*,
    875 F.3d 1102 (Fed. Cir. 2017) ...............................................*passim*

*Gray v. Secretary of Veterans Affairs*,
    884 F.3d 1379 (Fed. Cir. 2018) ...........................................7, 10, 34

*Gray v. Wilkie*,
    139 S. Ct. 2764 (2019).................................................................3, 7

*Gray v. Wilkie*,
    139 S. Ct. 451 (2018)........................................................................7

*Henderson v. Shinseki*,
    562 U.S. 428 (2011).................................................................4, 7, 47

*Herron v. Heckler*,
    576 F. Supp. 218 (N.D. Cal. 1983) .................................................35

*Hibbs v. Winn*,
    542 U.S. 88 (2004)...........................................................................56

*Holmberg v. Armbrecht*,
    327 U.S. 392 (1946).........................................................................58

*Hudgens v. McDonald*,
    823 F.3d 630 (Fed. Cir. 2016) .......................................11, 12, 13, 22

*Jackson v. Crosby*,
    375 F.3d 1291 (11th Cir. 2004) .......................................................57

*Johnson v. McDonald*,
    762 F.3d 1363 (Fed. Cir. 2014) .......................................................50

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019).....................................................................44

*LeFevre v. Secretary, Department of Veterans Affairs*,
    66 F.3d 1191 (Fed. Cir. 1995) ...................................................19

*Martin v. O'Rourke*,
    891 F.3d 1338 (Fed. Cir. 2018) ....................................8, 9, 51

*Mason v. Shinseki*,
    743 F.3d 1370 (Fed. Cir. 2014) ......................................11

*Mathis v. Shulkin*,
    137 S. Ct. 1994 (2017)...............................................2, 50

*Military Order of the Purple Heart of the USA v. Secretary of
Veterans Affairs*,
    580 F.3d 1293 (Fed. Cir. 2009) ....................................6, 36

*Mims v. Arrow Financial Services, LLC*,
    565 U.S. 368 (2012).........................................................56

*Morton v. Ruiz*,
    415 U.S. 199 (1974).........................................................37

*National Organization of Veterans' Advocates, Inc. v. Secretary of
Veterans Affairs*,
    260 F.3d 1365 (Fed. Cir. 2001) ..........................................6

*National Organization of Veterans' Advocates, Inc. v. Secretary of
Veterans Affairs*,
    330 F.3d 1345 (Fed. Cir. 2003) ..............................5, 51, 59

*Nguyen v. United States*,
    824 F.2d 697 (9th Cir. 1987) ..........................................19

*Norton v. Southern Utah Wilderness Alliance*,
    542 U.S. 55 (2004)...........................................................26

*O2 Micro International Ltd. v. Monolithic Power Systems, Inc.*,
    467 F.3d 1355 (Fed. Cir. 2006) ...................................56, 57

*Overton v. Wilkie*,
    30 Vet. App. 257 (2018) ..................................................43

Page(s)

*Paluch v. Secretary Pennsylvania Department Corrections*,
442 F. App'x 690 (3d Cir. 2011) ..................................................57

*In re Paoli Railroad Yard PCB Litigation*,
221 F.3d 449 (3d Cir. 2000) ........................................................57

*Paralyzed Veterans of America v. Secretary of Veterans Affairs*,
345 F.3d 1334 (Fed. Cir. 2003) ....................................................6

*Perez v. Mortgage Bankers Association*,
575 U.S. 92 (2015)...............................................................*passim*

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
572 U.S. 663 (2014)..............................................3, 17, 54, 58

*Planned Parenthood of Central New Jersey v. Attorney General of New Jersey*,
297 F.3d 253 (3d Cir. 2002) ........................................................57

*Preminger v. Secretary of Veterans Affairs*,
517 F.3d 1299 (Fed. Cir. 2008) ..............................9, 16, 53, 58

*Preminger v. Secretary of Veterans Affairs*,
632 F.3d 1345 (Fed. Cir. 2011) ..................................10, 48, 50

*Procopio v. Secretary of Veterans Affairs*,
943 F.3d 1376 (Fed. Cir. 2019) ..............................................35, 36

*Procopio v. Wilkie*,
913 F.3d 1371 (Fed. Cir. 2019) ..................................................47

*Ray v. Wilkie*,
31 Vet. App. 58 (2019) ................................................................50

*Rinebolt v. Wilkie*,
No. 16-2971, 2019 WL 98023 (Vet. App. Jan. 4, 2019) ..................43

*Rotkiske v. Klemm*,
140 S. Ct. 355 (2019)..................................................................54

*Sandifer v. United States Steel Corp.*,
571 U.S. 220 (2014)....................................................................49

*SCA Hygiene Products Aktiebolag v. First Quality Baby Products, LLC*,
 137 S. Ct. 954 (2017) .......................................................................54, 57, 58

*Sebelius v. Cloer*,
 569 U.S. 369 (2013) ..................................................................................49

*Smith v. Shinseki*,
 647 F.3d 1380 (Fed. Cir. 2011) .........................................................10, 11, 44

*Snyder v. Secretary of Veterans Affairs*,
 858 F.3d 1410 (Fed. Cir. 2017) .................................................................36

*Splane v. West*,
 216 F.3d 1058 (Fed. Cir. 2000) .................................................................41

*Star Athletica, L.L.C. v. Varsity Brands, Inc.*,
 137 S. Ct. 1002 (2017) ..............................................................................14

*Steel Co. v. Citizens for a Better Environment*,
 523 U.S. 83 (1998) ....................................................................................52

*Syncor International Corp. v. Shalala*,
 127 F.3d 90 (D.C. Cir. 1997) .....................................................................40

*Taggart v. Lorenzen*,
 139 S. Ct. 1795 (2019) ..............................................................................25

*Tax Analysts & Advocates v. IRS*,
 505 F.2d 350 (D.C. Cir. 1974) ...................................................................21

*Thun v. Shinseki*,
 572 F.3d 1366 (Fed. Cir. 2009) ............................................................11, 44

*[Title Redacted]*,
 No. 19-14 957, 2020 WL 1543152 (Bd. Vet. App. Jan. 7, 2020) ....................44

*Turner v. Shulkin*,
 29 Vet. App. 207 (2018) ........................................................................42, 50

*United States v. Hvass*,
 355 U.S. 570 (1958) ..................................................................................59

Page(s)

*Vietnam Veterans of America v. Secretary of the Navy*,
843 F.2d 528 (D.C. Cir. 1988)......................................................39, 40

*Warder v. Shalala*,
149 F.3d 73 (1st Cir. 1998)..................................................................41

*Washington-Southern Navigation Co. v. Baltimore & Philadelphia*
*Steamboat Co.*,
263 U.S. 629 (1924)..............................................................................52

*Willy v. Coastal Corp.*,
503 U.S. 131 (1992)..............................................................................56

## STATUTES AND REGULATIONS

2 U.S.C. § 1407(c)(3)..............................................................................55

5 U.S.C. § 551(4) ...............................................................................5, 30

5 U.S.C. § 552(a)(1)................................................................................20

*5 U.S.C. § 552(a)(1)(D)* .................................................................*passim*

5 U.S.C. § 552(a)(2)(C) ...........................................................................6

5 U.S.C. § 553(b)(A).......................................................................*passim*

5 U.S.C. § 553(d)(1)..................................................................................5

5 U.S.C. § 553(d)(2)..........................................................2, 5, 16, 46, 49

5 U.S.C. § 801(a)(1)(A)............................................................................30

5 U.S.C. § 804(3)(A)................................................................................30

7 U.S.C. § 2461 .......................................................................................55

28 U.S.C. § 1296(b) ................................................................................55

28 U.S.C. § 2071(a) ...................................................................17, 56, 57

28 U.S.C. § 2072(b) ................................................................................56

28 U.S.C. § 2401(a) ............................................................52

38 U.S.C. § 502 ...........................................................1, 2, 4, 45, 49

38 U.S.C. § 5104B ..............................................................8

38 U.S.C. § 5104C ..............................................................8

38 U.S.C. § 5108 .................................................................8

38 U.S.C. § 7101(a) ............................................................8

38 U.S.C. § 7104(c) ...........................................................42

38 U.S.C. § 7252(a) ............................................................8

38 U.S.C. § 7261(a) ............................................................8

38 U.S.C. § 7292 .................................................................8

38 U.S.C. § 7292(d) ............................................................8

41 U.S.C. § 7107(a)(1) .......................................................55

42 U.S.C. § 1395hh(a)(2) ..................................................46

42 U.S.C. § 1395hh(e)(1)(A) .............................................46

Pub. L. No. 74-220, 49 Stat. 500 (1935)...........................23

Pub. L. No. 75-158, 50 Stat. 304 (1937)...........................24

Pub. L. No. 79-404, 60 Stat. 237 (1946)......................24, 26

Pub. L. No. 89-487, 80 Stat. 250 (1966)...........................27

Pub. L. No. 100-687, 102 Stat. 4105 (1988)........................4

Pub. L. No. 115-55, 131 Stat. 1105 (2017).........................8

1 C.F.R. § 1.1 .....................................................................28

1 C.F.R. § 11.2 (1966) ......................................................30

**Page(s)**

1 C.F.R. § 40.9 (1966) ............................................................24

10 C.F.R. § 205.85 ..................................................................21

17 C.F.R. § 202.2 ....................................................................21

18 C.F.R. § 385.1901(b)(2) ....................................................21

26 C.F.R. § 301.6110-2(d) ......................................................21

26 C.R.R. § 301.6110-2(f) ......................................................21

29 C.F.R. § 790.17(d) .............................................................20

32 C.F.R. § 701.64(a)(4) (2018) .............................................29

38 C.F.R. § 4.71a .............................................................11, 13

142 Cong. Rec. 8201 (1996) ..............................................21, 31

2 Fed. Reg. 2450 (Nov. 12, 1937) ..........................................24

11 Fed. Reg. 9833 (Sept. 7, 1946) ..........................................24

24 Fed. Reg. 2343 (Mar. 26, 1959) .........................................24

40 Fed. Reg. 36,325 (Aug. 20, 1975) .....................................29

72 Fed. Reg. 3432 (Jan. 25, 2007) ...........................31, 32, 41

80 Fed. Reg. 42,040 (July 16, 2015) ......................................12

82 Fed. Reg. 35,719 (Aug. 1, 2017) ..................................13, 14

83 Fed. Reg. 62,249 (Dec. 3, 2018) ........................................29

## OTHER AUTHORITIES

*Attorney General's Manual on the Administrative Procedure Act*
    (1947) ...........................................................................26, 28

*Attorney General's Memorandum on the Public Information Section*
    *of the Administrative Procedure Act* (June 1967) .................20, 27, 28

Angela Drake et al., *Review of Recent Veterans Law Decisions of the Federal Circuit*, 69 Am. U. L. Rev. 1343 (2020)................................9

*Eleventh Annual Judicial Conference of the United States Court of Appeals for the Federal Circuit*, 153 F.R.D. 177 (June 18, 1993)....................55

Fed. Cir. R. 15 ................................................................................55

Fed. Cir. R. 47.12(a) ..................................................................10, 55

Fed. Cir. R. 47.12(a) (1997)..............................................................55

Fed. R. App. P. 15(a)(1).....................................................................59

Fed. R. App. P. 47(a)(1).....................................................................56

Fed. R. Civ. P. 83(a)(1)......................................................................56

Government Accountability Office, *Opinion on Whether Trinity River Record of Decision Is a Rule* (May 14, 2001), https://www.gao.gov/assets/210/201768.pdf.....................................31

H.R. Rep. No. 79-1980 (1946).............................................................25

H.R. Rep. No. 100-963, pt. 1 (1988) ................................................5, 59

IRS Chief Counsel's Classification of Records Under the Freedom of Information Act (June 30, 1967), *reprinted in IRS Disclosure: Hearings Before the S. Subcomm. on Administrative Practice and Procedure of the Senate Judiciary Comm.*, 93d Cong. (1974)....................29, 30

Ronald M. Levin, *Rulemaking and the Guidance Exception*, 70 Admin. L. Rev. 263 (2018)................................................................41

*New Oxford American Dictionary* (3d ed. 2010)................................19, 45

James T. O'Reilly, *Administrative Rulemaking* (2020 ed., Westlaw)....................22

Office of Audits and Evaluations, VA Office of Inspector General, *Veterans Benefits Administration: Review of Timeliness of the Appeals Process* (Mar. 28, 2018), https://www.va.gov/oig/pubs/VAOIG-16-01750-79.pdf ......................9

6 *Oxford English Dictionary* (2d ed. 1989) .............................................19

1 Richard J. Pierce, *Administrative Law Treatise* (5th ed. 2010) ...........................39

S. Rep. No. 88-1219 (1964) ...........................................................20, 27, 28

S. Rep. No. 89-813 (1965) .............................................................27

Peter L. Strauss, *Publication Rules in the Rulemaking Spectrum: Assuring Proper Respect for an Essential Element*, 53 Admin. L. Rev. 803 (2001) ...............................................41

U.S. Court of Appeals for the Federal Circuit, *Notice of Proposed Amendments to the Federal Circuit Rules of Practice* (Apr. 24, 2020) ..............................................10

U.S. Court of Appeals for Veterans Claims, *Fiscal Year 2019 Annual Report* (2019), http://uscourts.cavc.gov/documents/FY2019AnnualReport.pdf .........................8

3 U.S. Dep't of Veterans Affairs, *FY 2021 Budget Submission* (Feb. 2020), https://www.va.gov/budget/docs/summary/ fy2021VAbudgetvolumeIIIbenefitsBurialProgramsAndDeptmental Administration.pdf ...............................................7

*Webster's Second New International Dictionary* (1943)..................................18, 19

*Webster's Third New International Dictionary* (1961) ...............................18, 19, 45

## STATEMENT OF RELATED CASES

The following cases implicate the same issue concerning this Court's jurisdiction under 38 U.S.C. § 502: *National Organization of Veterans' Advocates, Inc. v. Secretary of Veterans Affairs*, No. 17-1839; *Military-Veterans Advocacy Inc. v. Secretary of Veterans Affairs*, No. 20-1537.

## STATEMENT OF JURISDICTION

This Court has jurisdiction to adjudicate the petition for review under 38 U.S.C. § 502.

## STATEMENT OF THE ISSUES

1.     Whether this Court has jurisdiction under 38 U.S.C. § 502 to review provisions of the Department of Veterans Affairs' Adjudication Procedures Manual M21-1 that are binding on the agency's initial adjudicators but not on the Board of Veterans' Appeals, and whether this Court should overrule *Disabled American Veterans v. Secretary of Veterans Affairs*, 859 F.3d 1072 (Fed. Cir. 2017).

2.     Whether the time for filing a direct action for judicial review under 38 U.S.C. § 502 is governed by the 60-day deadline specified by Federal Circuit Rule 47.12(a) or only by the six-year statute of limitations in 28 U.S.C. § 2401(a).

**INTRODUCTION**

The Department of Veterans Affairs (VA) has a single overriding mission—to care for the brave men and women who have risked their lives to serve and protect our Nation. The unfortunate reality, though, is that VA often falls short of that noble goal. Plagued by delays and inaction, VA's disability claims system is infamously backlogged and inefficient, with hundreds of thousands of veterans waiting for their claims to be adjudicated in an agency process that averages nearly six years to run its course. And VA regularly promulgates rules that misinterpret federal laws and violate the core requirements of the Administrative Procedure Act (APA)—usually in ways that do "nothing to assist, and much to impair, the interests of those the law says [VA] is supposed to serve." *Mathis v. Shulkin*, 137 S. Ct. 1994, 1995 (2017) (Gorsuch, J., dissenting from denial of certiorari).

Both questions presented for en banc review address the circumstances in which veterans can invoke this Court's statutory jurisdiction to enforce their rights and hold VA accountable when the agency loses its way. The Veterans' Judicial Review Act (VJRA) vests this Court with jurisdiction to hear preenforcement challenges to any VA action "to which section 552(a)(1) or 553 of title 5 (or both) refers." 38 U.S.C. § 502. These cross-references give this jurisdictional provision a broad scope, reaching any substantive rule, generally applicable interpretive rule, and general statement of policy. *See* 5 U.S.C. §§ 552(a)(1)(D), 553(b)(A), (d)(2).

And because Section 502 does not contain its own limitations period, the six-year limitations period in 28 U.S.C. § 2401(a) applies. The specialized review mechanism codified in Section 502 thus allows veterans to challenge unlawful VA rules directly in an Article III court, without having to slog through the painfully slow disability claims process.

This Court has mistakenly erected two roadblocks to that review mechanism. *First*, the Court held in *Disabled American Veterans v. Secretary of Veterans Affairs* (*DAV*), 859 F.3d 1072 (Fed. Cir. 2017), and then reaffirmed in *Gray v. Secretary of Veterans Affairs*, 875 F.3d 1102 (Fed. Cir. 2017), that Section 502 jurisdiction does not extend to provisions contained in VA's Adjudication Procedures Manual M21-1 (M21-1 Manual). The Supreme Court ultimately vacated the *Gray* decision, *Gray v. Wilkie*, 139 S. Ct. 2764 (2019), and *DAV* should now meet the same fate. Section 502's text, history, and purpose all make clear that this Court has jurisdiction to review generally applicable interpretive rules set forth in the M21-1 Manual.

*Second*, this Court has promulgated Federal Circuit Rule 47.12(a), which creates a 60-day deadline for filing Section 502 actions. That deadline impermissibly overrides the six-year statute of limitations in Section 2401(a), which this Court has held applies to Section 502 actions. Needless to say, "courts are not at liberty to jettison Congress' judgment on the timeliness of suit." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 667 (2014). Rule 47.12(a) is invalid.

The en banc Court should restore the full scope of Section 502 jurisdiction by eliminating the barriers imposed by *DAV* and Rule 47.12(a).

## STATEMENT OF THE CASE

### A.   This Court's Jurisdiction To Review VA Actions

1.    In 1988, Congress enacted the VJRA, Pub. L. No. 100-687, 102 Stat. 4105, to authorize judicial review of "the adjudication of veterans' benefits claims" in a way that is "decidedly favorable to veterans." *Henderson v. Shinseki*, 562 U.S. 428, 440-41 (2011).   Most importantly, the VJRA authorized veterans to bring preenforcement challenges to the validity of any VA substantive rule, interpretive rule, or general policy statement directly in this Court.   That authorization is codified in 38 U.S.C. § 502, which provides in pertinent part:

> An action of the [VA] Secretary to which section 552(a)(1) or 553 of title 5 (or both) refers is subject to judicial review.   Such review shall be in accordance with [the judicial review provisions of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706] and may be sought only in the United States Court of Appeals for the Federal Circuit.

38 U.S.C. § 502.

The scope of Section 502's jurisdictional grant is undeniably broad—it encompasses *any* VA action "to which section 552(a)(1) or 553 of title 5 (or both) refers."   *Id.*   Section 552(a)(1) is a provision of the Freedom of Information Act (FOIA) that requires publication in the Federal Register of various types of agency

4

pronouncements, including "substantive rules" and "statements of general policy or interpretations of general applicability formulated and adopted by the agency." 5 U.S.C. § 552(a)(1)(D).

Section 553 is the APA provision governing agency rulemaking. Like Section 552(a)(1)(D), Section 553 refers to both "substantive rule[s]" (which the statute says can be promulgated only following notice and comment), and "interpretative rules" and "statements of policy" (which are exempted from those notice-and-comment requirements). *Id.* § 553(b)(A), (d)(1)-(2).[1]

By broadly cross-referencing Sections 552(a)(1) and 553, "Congress has declared its preference for preenforcement review of agency rules." *Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*, 330 F.3d 1345, 1347 (Fed. Cir. 2003). Indeed, the purpose of Section 502 was to ensure that VA follows its APA "responsibilities . . . with respect to agency rules and interpretations of agency authority." H.R. Rep. No. 100-963, pt. 1, at 27 (1988). And Section 502 has generally fulfilled that purpose, providing the jurisdictional basis for a long list of

---

[1] The terms "interpretative" and "interpretive" are interchangeable. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 & n.1 (2015). The APA defines "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4).

cases in which this Court has overturned unlawful VA rules and policies under the APA.[2]

In *DAV* and *Gray*, however, this Court held that Section 502's cross-reference to Section 552(a)(1) does not allow preenforcement review of any M21-1 Manual provision, "regardless of the extent to which [it] might be considered interpretive or a statement of policy." *Gray*, 875 F.3d at 1108 (citing *DAV*, 859 F.3d at 1078). In doing so, the Court agreed with VA's argument that Sections 552(a)(1) and (a)(2) are mutually exclusive and that, while the Manual "contains interpretive rules arguably covered by subsection (a)(1), the [M]anual is more specifically referenced in subsection (a)(2)," which "refers to 'administrative staff manuals.'" Gov't Br. 31, *DAV*, 859 F.3d 1072 (No. 16-1493), 2016 WL 5845985 (*DAV* Gov't Br.) (quoting 5 U.S.C. § 552(a)(2)(C)); *see DAV*, 859 F.3d at 1078 (finding VA's argument "persuasive[]"); *Gray*, 875 F.3d at 1107-08. Judge Dyk properly rejected this "mutually exclusive" theory in *Gray* and explained why Section 502 authorizes review of Manual provisions. 875 F.3d at 1112-16 (Dyk, J., dissenting in part and

---

[2] *See, e.g.*, *Military Order of the Purple Heart of the USA v. Sec'y of Veterans Affairs*, 580 F.3d 1293, 1296-98 (Fed. Cir. 2009); *Coal. for Common Sense in Gov't Procurement v. Sec'y of Veterans Affairs*, 464 F.3d 1306, 1318-19 (Fed. Cir. 2006); *Paralyzed Veterans of Am. v. Sec'y of Veterans Affairs*, 345 F.3d 1334, 1347 (Fed. Cir. 2003); *Disabled Am. Veterans v. Sec'y of Veterans Affairs*, 327 F.3d 1339, 1348-49 (Fed. Cir. 2003); *Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*, 260 F.3d 1365, 1368 (Fed. Cir. 2001).

concurring in the judgment); *see Gray v. Sec'y of Veterans Affairs*, 884 F.3d 1379, 1382 (Fed. Cir. 2018) (Dyk, J., joined by Newman and Wallach, JJ., dissenting from denial of rehearing en banc) (same).

The Supreme Court granted certiorari in *Gray* to review this holding, *Gray v. Wilkie*, 139 S. Ct. 451 (2018), but after the parties filed their opening merits briefs, this Court resolved the underlying merits issue in that case, thereby mooting the jurisdictional dispute. All the Supreme Court could do was vacate the panel's decision, *Gray*, 139 S. Ct. at 2764, which left *DAV* on the books.

2. Apart from Section 502, the VJRA also vests this Court with jurisdiction to review the denial of individual benefits claims. Such claims originate in one of 56 VA regional offices, where regional officers have a statutory duty to assist veterans in developing their claims. *See Henderson*, 562 U.S. at 431. And for most veterans, this first step is also the last—more than 94 percent of all benefits claims conclude at the regional-office level. *See* 3 U.S. Dep't of Veterans Affairs, *FY 2021 Budget Submission* 169, 278 (Feb. 2020), https://www.va.gov/budget/docs/summary/fy2021VAbudgetvolumeIIIbenefitsBuri alProgramsAndDeptmentalAdministration.pdf (adjudicating more than 1.3 million disability claims in 2019 while receiving only 78,344 appeals). Indeed, recent amendments to the VJRA encourage veterans to stay at the regional office level even after benefits are initially denied, as they can appeal that denial to a "higher-level

adjudicator" within the office or have regional officers assist them in developing "supplemental" claims. *See* Veteran Appeals Improvement and Modernization Act of 2017, Pub. L. No. 115-55, § 2(g)-(i), 131 Stat. 1105, 1107-09 (codified at 38 U.S.C. §§ 5104B, 5104C, 5108).

Veterans seeking to challenge the regional office's determination must present their claim to the Board of Veterans' Appeals (Board), 38 U.S.C. § 7101(a), and then to the U.S. Court of Appeals for Veterans Claims (Veterans Court), *id.* § 7252(a), before they can be heard in this Court, *id.* § 7292(d). In the course of reviewing individual claims decisions, the Veterans Court and this Court have authority to adjudicate questions of law, including the validity of particular VA rules and policies to the extent they are implicated in each case. *See id.* §§ 7261(a), 7292.

Needless to say, this path to judicial review of unlawful VA rules and policies is far slower and less efficient than direct judicial review under Section 502. It has historically "take[n] over *five and a half years* on average" for an individual benefits case to be resolved by the Board, and then an *additional* year or more for it to be fully adjudicated by the Veterans Court. *Martin v. O'Rourke*, 891 F.3d 1338, 1350 (Fed. Cir. 2018) (Moore, J., concurring); U.S. Court of Appeals for Veterans Claims, *Fiscal Year 2019 Annual Report* 4-5 (2019), http://uscourts.cavc.gov/documents/FY2019AnnualReport.pdf. Indeed, the process takes so long that thousands of veterans die each year while awaiting final resolution

of their claims, *see* Angela Drake et al., *Review of Recent Veterans Law Decisions of the Federal Circuit*, 69 Am. U. L. Rev. 1343, 1346 (2020), which in many cases threatens to extinguish their rights even to fully deserved benefits, *see Martin*, 891 F.3d at 1350 (Moore, J., concurring) (noting that only "a spouse, minor children, or dependent parents" can receive a veteran's posthumous benefits).

To its credit, VA has itself admitted that the appeals process for benefits claims is "broken" and deeply "frustrating" to veterans. Office of Audits and Evaluations, VA Office of Inspector General, *Veterans Benefits Administration: Review of Timeliness of the Appeals Process* 15 (Mar. 28, 2018), https://www.va.gov/oig/pubs/VAOIG-16-01750-79.pdf.

**B.    Timeliness Of Section 502 Petitions**

Section 502 "does not contain its own statute of limitations." *Preminger v. Sec'y of Veterans Affairs* (*Preminger I*), 517 F.3d 1299, 1307 (Fed. Cir. 2008). Accordingly, this Court held in *Preminger I* that Section 502 challenges to VA actions are subject to the statute of limitations in 28 U.S.C. § 2401(a), which provides that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."

In 1993, however, this Court also promulgated a local rule stating that an "action for judicial review under 38 U.S.C. § 502 of a rule and regulation of the

Department of Veterans Affairs must be filed with the clerk of court *within 60 days* after the issuance of the rule or regulation or denial of a request for amendment or waiver of the rule or regulation." Fed. Cir. R. 47.12(a) (emphasis added). This Court has applied Rule 47.12(a) to hold that a Section 502 petition filed after 60 days is "untimely" and "preclude[s] judicial review." *Preminger v. Sec'y of Veterans Affairs* (*Preminger II*), 632 F.3d 1345, 1352-53 & n.10 (Fed. Cir. 2011).[3]

## C. NOVA's Challenges To M21-1 Manual Provisions

On the merits, Petitioner National Organization of Veterans' Advocates, Inc. (NOVA) is here challenging two VA rules promulgated in the M21-1 Manual. Petition for Review 7-15 (Petition), ECF No. 1-2. That Manual contains "all of [VA's] policies and procedures for adjudicating claims for VA benefits." *Gray*, 884 F.3d at 1382 (Dyk, J., dissenting from denial of rehearing en banc) (citation omitted). It is "published by VA in order to provide guidance to its adjudicators" in regional offices, *Smith v. Shinseki*, 647 F.3d 1380, 1384 (Fed. Cir. 2011), and its provisions are "binding" on those adjudicators, *Gray*, 875 F.3d at 1106.

VA often uses the M21-1 Manual to announce or amend its interpretations of key statutes and regulations. *See, e.g.*, *id.* at 1106-07; *Smith*, 647 F.3d at 1384-85;

---

[3] On April 24, 2020, the Court proposed moving Rule 47.12's 60-day deadline to Federal Circuit Rule 15. *See* U.S. Court of Appeals for the Federal Circuit, *Notice of Proposed Amendments to the Federal Circuit Rules of Practice* 8 (Apr. 24, 2020).

*Thun v. Shinseki*, 572 F.3d 1366, 1369 (Fed. Cir. 2009). Given that more than 94 percent of benefits claims have historically ended at the regional-office level, *see supra* at 7, the M21-1 Manual "constitute[s] the last word for the vast majority of veterans," *Gray*, 875 F.3d at 1114 (Dyk, J., dissenting in part and concurring in the judgment). And even beyond the regional offices, VA regularly demands (and receives) deference to the interpretations set forth in the M21-1 Manual when litigating before this Court.[4] VA has thus appropriately "concede[d]" that the "impact" of the M21-1 Manual "is both real and far reaching." *Id.* at 1107-08 (majority opinion).

The first challenged Manual provision is the Knee Replacement Rule, which VA promulgated on November 21, 2016, as Section III.iv.4.A.3.e of the Manual ("Evaluations for Knee Replacement"). Appx25-26. VA later moved the Rule to Section III.iv.4.A.6.a. Appx108-109. The Rule addresses the treatment of partial knee replacements under Diagnostic Code (DC) 5055, 38 C.F.R. § 4.71a, which assigns disability ratings for a "[k]nee replacement."

In *Hudgens v. McDonald*, this Court held that DC 5055 covers both full *and* partial knee replacements. 823 F.3d 630, 639 (Fed. Cir. 2016). In doing so, the Court rejected VA's interpretation of DC 5055 as covering only total knee

---

[4] *See, e.g.*, *Mason v. Shinseki*, 743 F.3d 1370, 1374-75 (Fed. Cir. 2014); *Smith*, 647 F.3d at 1385; *Thun*, 572 F.3d at 1369.

replacements. *Id.* at 637-38. VA had advanced that interpretation in its merits brief and in an "interpretive guidance" issued less than two weeks before that brief was filed. *See* Agency Interpretation of Prosthetic Replacement of a Joint, 80 Fed. Reg. 42,040, 42,040 (July 16, 2015) (2015 Interpretive Guidance). This Court rejected the 2015 Interpretive Guidance as a convenient "*post hoc* rationalization" inconsistent with (1) DC 5055's text, (2) the pro-veteran canon of construction, and (3) VA's longstanding interpretation of DC 5055 as applying to both total and partial knee replacements. *Hudgens*, 823 F.3d at 637-39.

Shortly after this Court's ruling, VA decided that "guidance should be inserted in the Manual" to address "the court decision in *Hudgens*." Appx160. It did so by purporting to cabin this Court's broad interpretation of DC 5055 to claims filed before July 16, 2015—the publication date of the 2015 Interpretive Guidance. The Knee Replacement Rule thus instructs VA adjudicators to apply the narrower interpretation reflected in VA's 2015 Interpretive Guidance to claims filed after its publication date. Appx108-109.

Notably, the Rule does not identify any part of this Court's decision in *Hudgens* as providing that temporal limitation or otherwise allowing VA to apply its flawed interpretation of DC 5055 to claims filed after the 2015 Interpretive Guidance. To the contrary, *Hudgens* conclusively held that DC 5055 covers both full *and* partial knee replacements. Moreover, it conclusively rejected the narrower

construction reflected in the 2015 Interpretive Guidance. 823 F.3d at 637-39. *Hudgens* bars VA from applying that Guidance to *any* veteran, regardless of when his or her claim is filed. The Knee Replacement Rule violates *Hudgens* and is unlawful. *See* Petition 8-11.

The second Manual provision NOVA challenges here is the Knee Joint Stability Rule, which VA promulgated on April 13, 2018, in Section III.iv.4.A.6.d of the Manual ("Handling Joint Stability Findings"). Appx110-111. That Rule addresses the rating schedule for knee instability under DC 5257, 38 C.F.R. § 4.71a.

DC 5257 assigns disability ratings to knee injuries depending on the extent to which the injury hampers the stability of the affected knee. *Id.* Specifically, it assigns a 10 percent disability rating for "Slight" instability, a 20 percent disability rating for "Moderate" instability, and a 30 percent disability rating for "Severe" instability. *Id.*

In 2017, VA published a notice of proposed rulemaking in the Federal Register stating that it was planning to issue a "substantive" rule amending DC 5257 to make the schedule more "objective." 82 Fed. Reg. 35,719, 35,720-23 (proposed Aug. 1, 2017). VA's proposed "substantive" rule would have replaced the terms "Slight," "Moderate," and "Severe" with specific medical criteria. *Id.* at 35,723. One of those criteria was the "grade" of knee instability, which would have been assigned based on the measurement of joint translation—that is, the amount of

movement that occurs within the joint. *Id.* Along with the other specified medial criteria, the grade of joint instability would have dictated the disability rating assigned.

VA received several comments in response to the proposed rulemaking, nearly all unfavorable. As relevant here, multiple commenters complained that the measurement-based schedule for grading knee instability was too subjective and prone to error, insofar as it is affected by the amount of pressure applied by the physician. They also complained that the new schedule focused too narrowly on a rigid measurement, and thus would not account for the actual, functional loss suffered by veterans. *See* Petition 13 n.3 (citing comments).

VA never formally adopted the proposed rule nor responded to the comments, and it appears to have essentially abandoned the proposed rulemaking. Instead, VA simply inserted a version of the measurement-based grading schedule directly into its Manual, in the form of the Knee Joint Stability Rule. *See* Appx110. The Rule is arbitrary and capricious and must be set aside. *See* Petition 11-15.

## SUMMARY OF ARGUMENT

"The controlling principle in this case is the basic and unexceptional rule that courts must give effect to the clear meaning of statutes as written." *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1010 (2017) (citation omitted). Under the clear meaning of 38 U.S.C. § 502 and its cross-references to 5 U.S.C.

§§ 552(a)(1) and 553, this Court has jurisdiction to review the challenged M21-1 Manual provisions.  And under the clear meaning of 28 U.S.C. § 2401(a), NOVA's challenges are timely.

I.      Both of the M21-1 Manual provisions at issue in this case set forth VA's understanding of the meaning of governing legal rules—and each applies broadly to every veteran who seeks benefits for knee replacements or knee instability.  This Court has jurisdiction under Section 502 to review those provisions for two independent reasons.

*First*, Section 502 gives this Court jurisdiction to review any VA action referred to in Section 552(a)(1), which includes "interpretations of general applicability."  5 U.S.C. § 552(a)(1)(D).  As a matter of ordinary meaning, an interpretation of a legal provision is "of general applicability" if it applies to an entire class of people affected by the provision, and is not limited to specific individuals or factual circumstances.  That understanding of the term is consistent with Section 552(a)(1)'s history and purpose, and it tracks the settled administrative-law definition of "general applicability" repeatedly applied by Congress and federal agencies at least since the 1930s.  *DAV*'s holding that generally-applicable interpretive rules embedded in the Manual are categorically excluded from Section 552(a)(1)—simply because they are expressly mentioned in Section 552(a)(2)—misinterprets the statute and should be overturned.

*Second*, Section 502 gives this Court jurisdiction to review any VA action to which Section 553 "refers." Section 553 unambiguously—and repeatedly—refers to interpretive rules. It specifies that interpretive rules need not go through notice-and-comment or be published 30 days before their effective date. 5 U.S.C. § 553(b)(A), (d)(2). The Government itself has described Section 553 as "expressly" excluding interpretive rules from the APA's notice-and-comment requirements. Section 502's cross-reference to Section 553 thus provides an alternative and independent basis for jurisdiction in this case.

Applying the ordinary meaning of Sections 502, 552(a)(1), and 553 also has salutary results. VA has an unfortunate history of adopting legally dubious rules and policies. Section 502 serves as a vital check on VA. It is critical that veterans be able to bring preenforcement challenges to unlawful rules and policies without having to endure years of painstakingly slow adjudication before the agency and Veterans Court.

II.     This case was timely filed under 28 U.S.C. § 2401(a), which establishes a default six-year limitations period for "every civil action commenced against the United States." As this Court has recognized, Section 2401(a)'s limitations period unambiguously applies to petitions for review under Section 502. *Preminger I*, 517 F.3d at 1307. And although this case is *not* timely under this Court's Rule 47.12(a)—which purports to impose a 60-day deadline for challenging VA action

under Section 502—that makes no difference, because Rule 47.12(a) is invalid and unenforceable. The Rules Enabling Act provides that court-created rules "shall be consistent with Acts of Congress," 28 U.S.C. § 2071(a), and the Supreme Court has made clear that courts may not "jettison Congress' judgment on the timeliness of suit," *Petrella*, 572 U.S. at 667. Rule 47.12(a) impermissibly shrinks the six-year limitations period imposed by Congress by more than 97 percent. This Court should strike down Rule 47.12(a)'s 60-day deadline.

## ARGUMENT

## I. SECTION 502 GRANTS THIS COURT JURISDICTION TO REVIEW THE CHALLENGED M21-1 MANUAL PROVISIONS

Section 502 gives this Court jurisdiction to review any "action of the [VA] Secretary to which section 552(a)(1) or 553 of title 5 (or both) refers." A straightforward reading of the cross-references to Section 552(a)(1) and Section 553 demonstrates that each independently authorizes review of the M21-1 Manual provisions challenged in this case. To the extent this Court held otherwise in *Disabled American Veterans v. Secretary of Veterans Affairs* (*DAV*), 859 F.3d 1072 (Fed. Cir. 2017), that decision should be overruled.

### A. Section 502's Cross-Reference To 5 U.S.C. § 552(a)(1) Authorizes Review

Section 502's cross-reference to Section 552(a)(1) creates jurisdiction to review, among other things, "interpretations of general applicability formulated and

adopted by [VA]." 5 U.S.C. § 552(a)(1)(D). The ordinary meaning, history, and purpose of Section 552(a)(1)(D) all demonstrate that the challenged Manual provisions are "interpretations of general applicability," because they explain VA's understanding of regulations and statutes in terms that apply to entire classes of veterans.

### 1. The Ordinary Meaning Of "General Applicability" Is Dispositive

a. Section 552(a)(1)(D)'s key phrase—"interpretations of general applicability"—is not defined elsewhere in FOIA. As the Supreme Court has made clear, "undefined terms in FOIA" receive their "'ordinary, contemporary, common meaning.'" *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2362 (2019) (citation omitted).

An "interpretation" is simply an "[e]xplanation" of the "meaning" of something. *Webster's Second New International Dictionary* 1299 (1943) (*Webster's Second*); *see Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 103 (2015) ("interpret" means to "'ascertain the meaning and significance of thoughts expressed in words'" (citation omitted)). In context, Section 552(a)(1)'s reference to "interpretations" plainly refers to interpretations of legal rules, such as those set forth in statutes, regulations, or court decisions.

The ordinary meaning of "general" is "applicable or relevant to the whole rather than to a limited part, group, or section." *Webster's Third New International*

*Dictionary* 944 (1961) (*Webster's Third*). When it describes a rule or law, "general" means "[a]pplicable to a variety of cases." 6 *Oxford English Dictionary* 430 (2d ed. 1989); *see Webster's Second* 1043 ("Pertaining to, affecting, or applicable to, each and all of the members of a class, kind, or order," as in "a *general* law").

Finally, "applicable" means "capable of being applied" or "having relevance." *Webster's Third* 105; *see also New Oxford American Dictionary* 76 (3d ed. 2010) ("relevant or appropriate").

Accordingly, an "interpretation[] of general applicability" is an agency's explanation of the meaning of a legal provision or rule relevant to an entire category or class of people, not just specific individuals or fact patterns. Or as the Ninth Circuit has put it, the "rather obvious definition" of "interpretation of 'general' applicability" in Section 552(a)(1)(D) is an interpretation "neither directed at specified persons nor limited to particular situations." *Nguyen v. United States*, 824 F.2d 697, 700 (9th Cir. 1987); *see also, e.g.*, *LeFevre v. Sec'y, Dep't of Veterans Affairs*, 66 F.3d 1191, 1196-97 (Fed. Cir. 1995) (explaining that a rule was "'of general applicability'" because it "prescribed the basis on which [VA] would adjudicate every claim . . . involving the issue" (internal alteration omitted)).

b.     This interpretation is reinforced "by 'the structure of the statute and its other provisions.'" *Culbertson v. Berryhill*, 139 S. Ct. 517, 522 (2019) (citation omitted). Specifically, the proviso at the end of Section 552(a)(1) "deem[s]"

materials "published in the Federal Register" if they are "incorporated by reference therein" and are "reasonably available to the *class of persons* affected thereby." 5 U.S.C. § 552(a)(1) (emphasis added). This proviso thus contemplates that Section 552(a)(1) will apply to materials affecting *classes* of persons, as opposed to specific individuals.

c. Giving "interpretations of general applicability" its ordinary meaning faithfully serves Congress's goal of "the guidance of the public." *Id.* By requiring formal publication of interpretations that will apply to entire classes of parties, Section 552(a)(1) gives the public notice of how the agency understands—and will apply—potentially ambiguous statutory and regulatory provisions. It thereby enables the public "readily to gain access to the information necessary to deal effectively and upon equal footing with the Federal agencies." *Attorney General's Memorandum on the Public Information Section of the Administrative Procedure Act* 4 (June 1967) (*FOIA Memorandum*) (quoting S. Rep. No. 88-1219, at 3 (1964)).

At the same time, Section 552(a)(1)(D) does not require publication of the countless party- and fact-specific interpretations that agencies adopt every day. Section 552(a)(1) excludes, for example, the numerous opinion letters issued by the Department of Labor. Although such letters often contain agency "interpretation[s]," they are in the form of "opinions as to the application of the law to particular facts presented by specific inquiries." 29 C.F.R. § 790.17(d). Such

case-specific interpretations are quintessentially of particular (rather than general) applicability. *See, e.g.*, *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 168 (2012) (describing and distinguishing opinion letters based on their specific facts).

Likewise excluded are Internal Revenue Service (IRS) letter rulings and technical advice memoranda, which contain interpretations based on specific sets of facts. *See* 26 C.F.R. § 301.6110-2(d), (f). As the IRS has conceded, these guidance documents contain "interpretations which have been adopted by the agency" and therefore fit within Section 552(a)(2)(B). *Tax Analysts & Advocates v. IRS*, 505 F.2d 350, 352-53 (D.C. Cir. 1974). But because they are limited to specific facts and individuals, they are not "of general applicability" and so are outside the scope of Section 552(a)(1)(D). *See, e.g.*, 142 Cong. Rec. 8201 (1996) (describing "IRS private letter rulings" as "classic examples of rules of particular applicability").

Countless other examples of case-specific agency interpretations also exist. *See, e.g.*, 10 C.F.R. § 205.85 (authorizing case-specific "interpretation[s]" by Department of Energy); 17 C.F.R. § 202.2 (Securities and Exchange Commission); 18 C.F.R. § 385.1901(b)(2) (Federal Energy Regulatory Commission). The ordinary meaning of "general applicability" appropriately excludes these myriad fact- and party-specific interpretations from Section 552(a)(1)(D)'s publication requirement.

d.     Under the plain meaning of "interpretations of general applicability," this Court has jurisdiction to review the Manual provisions challenged here.  Both provisions are "interpretations":  The Knee Replacement Rule sets forth VA's narrow construction of the term "knee replacement" in DC 5055 and its interpretation of *Hudgens v. McDonald*, 823 F.3d 630 (Fed. Cir. 2016); and the Knee Joint Stability Rule purports to define the terms "[s]light," "[m]oderate," and "[s]evere" instability in DC 5257 for purposes of the disability ratings. *See supra* at 11-14.  These Manual provisions accordingly identify "'the meaning'" VA ascribes to "'statutes and rules which it administers.'"  *Mortg. Bankers*, 575 U.S. at 97, 103 (citations omitted); *cf.* James T. O'Reilly, *Administrative Rulemaking* § 3:26 (2020 ed., Westlaw) ("Interpretive rules" interpret "statutes, legislative rules, other interpretative rules, or judicial or administrative decisions or rulings.").

Moreover, both Manual provisions are "of general applicability":  They are not limited to specific individuals or set of facts, but rather apply equally to any veteran claiming disability for a knee replacement or for knee instability.

Because these provisions are interpretations of general applicability, they are subject to judicial review in this Court under Section 502's cross-reference to Section 552(a)(1)(D).[5]

---

[5]     Although the challenged Manual provisions are best classified as interpretations of general applicability, they could also arguably qualify as

## 2. Section 552(a)(1)(D)'s History Confirms That "General Applicability" Takes Its Ordinary Meaning

The ordinary meaning of "general applicability" is sufficient to resolve this case. That ordinary meaning is reinforced by the background against which Congress enacted FOIA in 1966. When Congress employed the "general applicability" formulation in Section 552(a)(1)(D), it did not write on a clean slate. That phrase had already repeatedly been used, in multiple statutes and regulations, to cover any interpretation not limited to named individuals or particular facts. Congress embraced that settled understanding of "general applicability" in Section 552(a)(1)(D).

a. The relevant history begins with Congress's 1935 enactment of the Federal Register Act (FRA), which created the Federal Register. The FRA required the publication there of "such documents or classes of documents as the President shall determine from time to time have *general applicability* and legal effect." Pub. L. No. 74-220, § 5(a)(2), 49 Stat. 500, 501 (1935) (emphasis added). In 1937, Congress amended the FRA to require the regular codification of all agency

---

"statements of general policy," 5 U.S.C. § 552(a)(1)(D), which are statements advising the public of the agency's "position with respect to how it will treat" a "governing legal norm," *Chippewa Dialysis Servs. v. Leavitt*, 511 F.3d 172, 176 (D.C. Cir. 2007) (citation omitted); *cf. id.* at 176-77 (explaining how an unpublished "guideline of general applicability" "could qualify" as an "interpretative rule" or a "statement of policy"). Either way, the Manual provisions are VA actions referred to in Section 552(a)(1)(D).

documents "hav[ing] *general applicability* and legal effect" in what would become the Code of Federal Regulations.  Pub. L. No. 75-158, § 11(a), 50 Stat. 304, 304 (1937) (emphasis added).

That same year, the Administrative Committee on the Federal Register issued regulations implementing the FRA's new codification requirement.    Those regulations explained that agency documents "of general applicability" were those "relevant or applicable to the general public, the members of a class, or the persons of a locality, *as distinguished from named individuals or organizations*."  2 Fed. Reg. 2450, 2451-52 (Nov. 12, 1937) (emphasis added).  The Committee later issued additional regulations making clear that the exact same definition of "general applicability" also governed the FRA's publication requirement.  *See* 11 Fed. Reg. 9833, 9836 (Sept. 7, 1946); 24 Fed. Reg. 2343, 2346, 2354 (Mar. 26, 1959); *see also* 1 C.F.R. § 40.9 (1966).

Just like the FRA and its implementing regulations, the original 1946 APA also made clear that an agency statement "of general applicability" is one that addresses a class rather than specific named persons.  Section 2(c) of the APA defined "rule" as "any agency statement of general or *particular* applicability" designed to implement, interpret, or prescribe law or policy.  Pub. L. No. 79-404, § 2(c), 60 Stat. 237, 237 (1946) (emphasis added).  Congress included the phrase "or particular" in that definition to "assure coverage of rule making addressed to named

persons." H.R. Rep. No. 79-1980, at 49 & n.1 (1946) (Comm. Amendment). In doing so, it implicitly recognized that rules of "general applicability" are those *not* "addressed to named persons." The APA's distinction between rules of general and particular applicability thus tracked the distinction as understood under the FRA.

When Congress enacted Section 552(a)(1)(D) as part of FOIA in 1966, it acted against the statutory and regulatory backdrop established by the FRA and APA. For nearly 30 years, the settled understanding was that agency statements "of general applicability" were those directed generally to classes or categories of individuals or conduct—and not addressed to named individuals or specific fact patterns. Congress endorsed that settled understanding by incorporating the same language in Section 552(a)(1)(D)'s publication requirement for interpretive rules. *See, e.g.*, *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) ("When a statutory term is 'obviously transplanted from another legal source,' it 'brings the old soil with it.'" (citation omitted)).

b. The textual evolution of the publication requirement from the APA to FOIA further confirms that an "interpretation of general applicability" encompasses an interpretation not directed to specific individuals or targeted to a particular set of facts. Indeed, FOIA's legislative history could hardly be clearer on this point.

FOIA's publication requirement traces back to Section 3(a)(3) of the original APA, which required agencies to publish in the Federal Register, among other

things, "substantive rules adopted as authorized by law and statements of general policy or *interpretations* formulated and adopted by the agency for the guidance of the public, *but not rules addressed to and served upon named persons in accordance with law.*"  60 Stat. at 238 (emphasis added).  This provision thus required publication of interpretations that would apply *generally*, but not those governing only specific individuals.

The *Attorney General's Manual on the Administrative Procedure Act* (1947) (*APA Manual*)—a resource generally considered "persuasive" in interpreting the APA, *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004)—reinforces that understanding.  The *APA Manual* explained that in light of the exemption for "rules addressed to and served upon named persons," Section 3(a)(3) did not require publication of "[a]n advisory interpretation relating to a specific set of facts."  *APA Manual* 22-23.  "For example," the *APA Manual* continued, an agency's response "to an inquiry from a member of the public as to the applicability of a statute to a specific set of facts need not be published."  *Id.* at 23.  By contrast, general interpretations of a provision governing an entire class of people potentially affected by that provision *would* have to be published.

When Congress enacted FOIA in 1966, it amended the APA's publication requirement and introduced the "of general applicability" language now at issue in this case.  As relevant here, FOIA modified Section 3(a)(3) to require publication of:

> substantive rules *of general applicability* adopted as authorized by law, and statements of general policy or interpretations *of general applicability* formulated and adopted by the agency ~~for the guidance of the public, but not rules addressed to and served upon named persons in accordance with law~~.

Pub. L. No. 89-487, § 3, 80 Stat. 250, 250 (1966) (FOIA additions in italics and deletions in strikethrough). The revised language was codified and appears in the current version of Section 552(a)(1)(D).

Notably, FOIA's legislative history makes clear that Congress's addition of the phrase "of general applicability"—and its deletion of the exception for "rules addressed to and served upon named persons in accordance with law"—made no substantive change in the law. Indeed, the 1965 Senate Judiciary Committee report described FOIA's amendment as a "technical change" and explained that "[Section 3(a)'s] phrase '* * * but not rules addressed to and served upon named persons in accordance with law * * *' was stricken" as unnecessary "because section 3(a) as amended only requires the publication of rules of general applicability." S. Rep. No. 89-813, at 6 (1965); *see* S. Rep. No. 88-1219, at 4 (1964) ("[O]nly rules, statements of policy, and interpretations of *general* applicability should be published in the Federal Register; those of *particular* applicability are legion in number and have no place in the Federal Register and are presently excepted but by more cumbersome language." (emphasis added)). Thus, as explained in the *Attorney General's FOIA Memorandum*—a "reliable guide in interpreting FOIA," *FCC v. AT&T Inc.*, 562

U.S. 397, 409 (2011)—FOIA's change to the APA publication requirement was "formal only," with "of general applicability" added to "exclude rules addressed to and served upon named persons." *FOIA Memorandum* 10 (citation omitted).

FOIA's history thus shows that Congress viewed the "general applicability" language as expressing the same idea as the original APA requirement, but in a less "cumbersome" way. S. Rep. No. 88-1219, at 4. Just like the APA language that it replaced, Section 552(a)(1)'s "of general applicability" formulation served to exclude interpretations addressed to "named persons" or "relating to a specific set of facts." *APA Manual* 22-23.

### 3. Congress And Federal Agencies Have Endorsed The Ordinary Meaning Of "General Applicability"

In the five-plus decades since FOIA became law, that settled understanding of "general applicability" has endured. Congress and the Executive Branch have repeatedly recognized that this formulation encompasses interpretations applicable to a class of people, but not to named individuals or specific facts. A handful of important examples proves the point.

*First*, the opening provision of the Code of Federal Regulations reaffirms the longstanding FRA definition, defining the phrase "[d]ocument having general applicability and legal effect" to mean "any document [with legal effect] . . . relevant or applicable to the general public, members of a class, or persons in a locality, as distinguished from named individuals or organizations." 1 C.F.R. § 1.1. Although

28

originally adopted for purposes of the FRA's publication and codification requirements, that definition is equally well-suited to defining the identical "general applicability" language in Section 552(a)(1)(D).

The Government itself has agreed. For example, for more than 40 years, the United States Navy expressly applied 1 C.F.R. § 1.1's definition of "general applicability" when determining what interpretive statements must be published in the Federal Register under Section 552(a). 40 Fed. Reg. 36,325, 36,325 (Aug. 20, 1975) (codified at 32 C.F.R. § 701.64(a)(4) (2018)). The Navy's approach is straightforward and correct: There is no plausible reason "general applicability" would mean anything different under FOIA than what it means in the FRA.[6]

The Navy is not alone. The IRS expressed the same commonsense understanding in a memorandum issued shortly after FOIA's enactment. *See* IRS Chief Counsel's Classification of Records Under the Freedom of Information Act (June 30, 1967), *reprinted in IRS Disclosure: Hearings Before the S. Subcomm. on Administrative Practice and Procedure of the Senate Judiciary Comm.*, 93d Cong. 231 (1974). Among other things, that memorandum analyzed whether IRS revenue

---

[6] Although the Navy recently repealed 32 C.F.R. part 701, subpart E, on the ground that it concerned only internal Navy procedures, 83 Fed. Reg. 62,249, 62,249 (Dec. 3, 2018), the Navy did not suggest that it has abandoned its longstanding view that 1 C.F.R. § 1.1's definition of "general applicability" applies to Section 552(a)(1)(D)'s publication requirement.

rulings were "interpretations of general applicability" under Section 552(a)(1)(D). *Id.* at 246-48. Conceding that revenue rulings were "interpretations," the IRS examined whether they were generally applicable. "The relevant definition," the agency determined, "is supplied by the Federal Register Act," under which "documents have general applicability: 'if they are relevant or applicable to the general public, the members of a class, or the persons of a locality, as distinguished from named individuals or organizations.'" *Id.* at 247 (quoting 1 C.F.R. § 11.2 (1966)). The IRS concluded that revenue rulings would normally not satisfy this definition because a ruling "is limited and applicable only to the stated factual basis described therein." *Id.* If, however, "a revenue ruling were to promulgate a rule which is not limited by stated facts and circumstances, it might possess 'general applicability.'" *Id.*

*Second*, Congress has also reaffirmed the longstanding view of what counts as a rule of "general applicability" in subsequent legislation. The Congressional Review Act of 1996 (CRA) requires agencies to submit any "rule" to Congress for consideration (and possible veto) before it takes effect. 5 U.S.C. § 801(a)(1)(A). Although the CRA generally adopts the APA's broad definition of "rule" (which includes rules of either "general or particular applicability," *id.* § 551(4)), the CRA expressly exempts "rule[s] of particular applicability" from its submission-to-Congress requirement, *id.* § 804(3)(A).

The CRA's sponsors explained that the carve-out for rules of particular applicability would exempt "letter rulings or other opinion letters to individuals who request a specific ruling on the facts of their situation," because such rulings "are classic examples of rules of particular applicability." 142 Cong. Rec. at 8201. These and other rules directed "to a particular person or particular entities" fall outside the CRA's ambit. *Id.*; *see also* Government Accountability Office, *Opinion on Whether Trinity River Record of Decision Is a Rule* 9 (May 14, 2001), https://www.gao.gov/assets/210/201768.pdf (embracing this interpretation of the CRA).

*Third*, the Executive Branch has also recently reaffirmed the settled understanding of what counts as a "generally applicable" rule. Since 2007, the President has required federal agencies to follow the Office of Management and Budget (OMB) "Final Bulletin for Agency Good Guidance Practices," which establishes "policies and procedures" concerning "significant guidance documents." 72 Fed. Reg. 3432, 3432 (Jan. 25, 2007). Because OMB limited the definition of "significant guidance documents" to those having "general applicability," OMB has explained that the Final Bulletin's policies and procedures do not apply to "correspondence such as opinion letters or letters of interpretation prepared for or in response to an inquiry from an individual person or entity." *Id.* at 3435. Accordingly, OMB noted, the Bulletin's requirements "should not inhibit the

beneficial practice of agencies providing informal guidance to help specific parties."
*Id.*

In sum, Congress and federal agencies have spent decades applying a consistent understanding of what "general applicability" means in the context of administrative law.  Just as its plain text indicates, an "interpretation of general applicability" is an interpretation that is not directed toward a specific individual or set of facts, but instead applies to the public at large or members of a class.  That settled understanding should govern this Court's interpretation of Section 552(a)(1)(D).

### 4. *DAV* Incorrectly Treats Sections 552(a)(1) And 552(a)(2) As Mutually Exclusive And Should Be Overruled

In an effort to thwart review of Manual provisions under Section 502's cross-reference to Section 552(a)(1), VA has intermittently advanced two arguments.  The first appeared in VA's briefing before the panels in *DAV* and *Gray*.  There, VA's core argument against Section 502 jurisdiction over the challenged M21-1 Manual provisions was that because "administrative staff manuals" are "more specifically" referenced in Section 552(a)(2)(C), the Manual is necessarily categorically excluded from Section 552(a)(1)—even when specific Manual provisions promulgate generally-applicable interpretive rules.  *See DAV* Gov't Br. 31-32; Gov't Br. 33-34, *Gray v. Sec'y of Veterans Affairs*, 875 F.3d 1102 (Fed. Cir. 2017) (No. 16-1782), 2016 WL 6883023 (*Gray* Gov't Panel Br.).  In VA's view, Sections 552(a)(1) and

(a)(2)(C) were mutually exclusive: Anything "specifically" included in (a)(2) is thereby necessarily excluded from (a)(1). *Gray* Gov't Panel Br. 33-34; *DAV* Gov't Br. 31-32. As VA explained, because "section 502 jurisdiction only extends to actions to which [Section 552](a)(1) refers," it "does not extend to actions referred to in (a)(2)." *Gray* Gov't Panel Br. 33.

The *DAV* panel found VA's reasoning "persuasive[]," 859 F.3d at 1078, and accordingly refused to exercise jurisdiction over a challenge to a Manual provision based on "the notion that § 552(a)(1) and § 552(a)(2) are mutually exclusive," *Gray*, 875 F.3d at 1114 (Dyk, J., dissenting in part and concurring in the judgment). According to *DAV*, Section 502 "expressly exempt[s]" agency promulgations that "more readily" "fall under" Section 552(a)(2) "as compared to" Section 552(a)(1). 859 F.3d at 1075, 1077-78. And because "Congress explicitly designated administrative staff manuals as agency actions falling under § 552(a)(2)," *DAV* reasoned, this Court lacks jurisdiction to review promulgations that are "contained within" the M21-1 Manual. *Id.* at 1076-78.[7] Bound by this reasoning, the *Gray*

---

[7] *DAV* identified two additional characteristics of the challenged Manual provisions, but neither had any bearing on its conclusion. First, *DAV* observed that VA had "not published" the Manual provisions "in the Federal Register." 859 F.3d at 1078. That observation is circular—the question is whether the provisions fell within Section 552(a)(1) such that VA *should* have published them. Second, *DAV* observed that the Manual is "not binding on the Board," *id.*, but it seems to have done so only to determine "whether a particular provision is substantive or

panel similarly refused to exercise jurisdiction over a challenge to a Manual provision, explaining that *DAV* "compel[led]" the conclusion that Manual provisions "'fall within § 552(a)(2)—not § 552(a)(1)'"—"regardless of the extent to which [they] might be considered interpretive or a statement of policy." *Gray*, 875 F.3d at 1108 (quoting *DAV*, 859 F.3d at 1078).

As Judge Dyk persuasively explained in his *Gray* dissent, "*DAV* was wrongly decided." *Id.* at 1110. Neither party in that case thoroughly explored the textual, structural, or historical arguments set forth above, and the Court accordingly did not grapple with those arguments. Moreover, the Government's briefs to the Supreme Court in *Gray* expressly repudiated the mutual-exclusivity theory on which it had prevailed in this Court. *See* Br. in Opp. 22-23, *Gray v. Wilkie*, 139 S. Ct. 2764 (2019) (No. 17-1679), 2018 WL 4298030 (*Gray* Br. in Opp.) (noting that "documents covered by Section 552(a)(1) . . . can also fall within Section 552(a)(2)"); *see also* Gov't Br. 40-41, *Gray*, 139 S. Ct. 2764 (No. 17-1679), 2019 WL 259742 (*Gray* Gov't Br.).

As a textual matter, "neither the language of the provisions nor the [statute's] structure" indicates that an agency action must fall into *either* (a)(1) *or* (a)(2), but not both. *Gray v. Sec'y of Veterans Affairs*, 884 F.3d 1379, 1380-81 (Fed. Cir. 2018)

---

interpretive for purposes of the APA," *id.* at 1077 (citation omitted), not to determine whether a provision falls under Section 552(a)(1) for purposes of FOIA.

(Taranto, J., concurring in denial of rehearing en banc). To the contrary, it is quite plain that certain types of agency statements fit within *both* (a)(1) *and* (a)(2). For example, (a)(1) expressly covers "descriptions of [an agency's] central and field organization" and "rules of procedure," but such information is also regularly addressed in agency manuals and staff instructions encompassed by (a)(2). *See Gray*, 875 F.3d at 1115 (Dyk, J., dissenting in part and concurring in the judgment); *see also, e.g.*, *Herron v. Heckler*, 576 F. Supp. 218, 232-33 (N.D. Cal. 1983) (holding that provisions of agency manual "clearly fall within *both*" Sections 552(a)(1)(D) and 552(a)(2)(C)).

This Court has itself confirmed the possibility of overlap, regularly exercising Section 502 jurisdiction to review VA promulgations that fall within one of Section 552(a)(1)'s provisions and *also* fall within Section 552(a)(2)(C)'s broader reference to "instructions to staff that affect a member of the public." For example, this Court recently exercised Section 502 jurisdiction to review a VA "memorandum [that] ordered '[VA regional offices] and [the Board] to stay decisions regarding [certain] claims for disability compensation.'" *Procopio v. Sec'y of Veterans Affairs*, 943 F.3d 1376, 1379-80 (Fed. Cir. 2019) (citation omitted). This memorandum, the Court explained, was an "interpretation of general applicability" that "f[e]ll under § 552(a)(1)(D)" because it "explain[ed] the Secretary's understanding" of a statute.

*Id.* at 1380. But it was *also* indisputably an "instruction[] to staff" and so *also* would fall under Section 552(a)(2)(C).[8]

The potential for overlap between Section 552(a)(1) and Section 552(a)(2) is also perfectly consistent with Section 552's structure and purpose. Agency pronouncements can be governed by the requirements of both (a)(1) and (a)(2) without conflict or absurdity. Suppose, for instance, that an agency writes a staff manual that contains, among other things, statements of general policy. The manual as a whole must be "ma[d]e available for public inspection" under Section 552(a)(2); the statements of general policy must also be "publish[ed] in the Federal Register" under Section 552(a)(1).

*DAV*'s mutual-exclusivity holding, by contrast, undermines the statute's structure and purpose. Section 552(a)(1) is designed to force agencies to formally publish, in the Federal Register, generally applicable rules and policies. If, as *DAV* presumes, anything described in Section 552(a)(2) is necessarily *not* subject to (a)(1), then agencies can evade the publication requirement simply by embedding

---

[8]  *See also, e.g.*, *Snyder v. Sec'y of Veterans Affairs*, 858 F.3d 1410, 1413 (Fed. Cir. 2017) (holding that General Counsel opinions directed to the Board—which are indisputably "instructions to staff"—fall within Section 552(a)(1)(D)); *Military Order of the Purple Heart of the USA v. Sec'y of Veterans Affairs*, 580 F.3d 1293, 1295-96 (Fed. Cir. 2009) (same for "Fast Letters" to VA staff imposing "procedural" rules on VA regional offices).

materials that would otherwise fall under (a)(1) "within an administrative staff manual." 859 F.3d at 1078. That surely cannot be correct.[9]

On top of everything else, *DAV*'s mutual-exclusivity theory of Section 552(a) is also inconsistent with the Supreme Court's decision in *Morton v. Ruiz*, 415 U.S. 199 (1974). *See Gray*, 875 F.3d at 1115 (Dyk, J., dissenting in part and concurring in the judgment). There, the Court addressed whether a provision of a Bureau of Indian Affairs manual was subject to Section 552(a)(1)'s publication requirement. *Ruiz*, 415 U.S. at 231-33. Although the agency described the manual as "solely an internal-operations brochure," the Court found that it actually contained "important" agency policies concerning benefits eligibility that fell within Section 552(a)(1) and therefore should have been published in the Federal Register. *Id.* at 232-35. *Ruiz* thus confirms what the statutory text makes plain: Section 552(a)(2)'s reference to administrative manuals does not categorically exempt materials within such manuals from Section 552(a)(1).

---

[9] In *Gray*, VA embraced the notion that it can unilaterally thwart judicial review simply by embedding important rules in its M21-1 Manual. *See* Oral Arg. 32:39-32:55, *Gray*, 875 F.3d 1102 (No. 16-1782) (arguing that "publish[ing] [the challenged provision] in the administrative staff manual is a choice the agency is entitled to make," that VA's choice "has certain effects," and that one of those effects "is that it divests [this Court] from direct review under [Section] 502"); *id.* at 36:44-36:57 ("The [Section 502] question is where do they publish it. If they choose to publish it in the Federal Register, then it is reviewable, because it would be under [Section] 552(a)(1), so it would be within this court's [Section] 502 jurisdiction. But where they choose to put it in an administrative staff manual, it is not.").

For all these reasons, *DAV*'s mutual-exclusivity holding is mistaken. That case should now be overruled.

### 5. VA's Designation Of The M21-1 Manual As Not "Binding" On The Board Is Irrelevant

Faced with glaring defects in its mutual-exclusivity theory, VA has conjured a new theory: To constitute an interpretation "of general applicability" under Section 552(a)(1)(D), the interpretation must "have a 'binding effect.'" VA Opp. to Hrg. En Banc 10-11 (quoting *Gray* Gov't Br. 33). And because VA has decided that M21-1 Manual provisions "do not bind the Board," VA claims that interpretations promulgated in the Manual cannot "be described as having 'general applicability.'" *Id.* at 10 (quoting *Gray* Br. in Opp. 20-21). This new theory has no basis in the statute and makes no sense under administrative-law first principles. The Court should reject it.

a. For starters, VA's focus on whether the Manual "binds" the Board is utterly disconnected from the statutory text. Nothing in Section 552(a)(1)(D) suggests that the phrase "general applicability" turns on whether the interpretation is "binding" on certain agency decisionmakers. VA has offered no authority adopting that atextual proposition, and we are aware of none.[10] In fact, the Supreme

_____

[10] *DAV* did cite authority for the proposition that because M21-1 Manual provisions are not conclusively binding on the Board, they are not "substantive" (i.e., legislative) rules under the APA. 859 F.3d at 1077. But whether or not a rule is

Court recently said just the opposite, observing that "many [Medicare] manual instructions surely qualify as guidelines *of general applicability*" for purposes of the Medicare statute, *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1814 n.1 (2019) (emphasis added)—even though the manual at issue was "not binding in final agency review," Gov't Br. 22, *Allina Health*, 139 S. Ct. 1804 (No. 17-1484), 2018 WL 5962884 (*Allina Health* Gov't Br.); *see also id.* at 5-6, 38-39, 41-42 (same).

Moreover, VA's novel interpretation flouts more than 80 years of consistent legislative and regulatory usage of the "general applicability" phrase, all of which confirm that an interpretation of "general applicability" is an interpretation not limited to particular facts or persons. *See supra* at 23-32. The absence of any textual or historical support for interpreting "general applicability" to mean "binding" is enough to reject it.

b.    More fundamentally, VA's interpretation contradicts the basic administrative-law principle that *no* interpretive rule—whether generally applicable or not—legally binds an agency. *See, e.g.*, *Vietnam Veterans of Am. v. Sec'y of the Navy*, 843 F.2d 528, 537 (D.C. Cir. 1988) (rejecting "suggesti[on] that an interpretive rule or policy statement might bind the agency"); 1 Richard J. Pierce,

---

*legislative* under the APA is a different question from whether or not an interpretive rule is *generally applicable* under FOIA  *See supra* at 33 n.7.

*Administrative Law Treatise* § 6.6, at 474 (5th ed. 2010) ("Ordinarily, interpretive rules do not bind an agency.").

Among the chief defining characteristics of interpretive rules is that they lack "the force and effect of law," and thus can be adopted, amended, or repealed "freely," without notice-and-comment procedures. *Mortg. Bankers*, 575 U.S. at 102-03; *see* 5 U.S.C. § 553(b)(A). Because an agency can revise its interpretive rules at any time, it is not bound by them in the same way that it is bound by its legislative rules. Rather, "the agency remains free in any particular case to diverge from whatever outcome . . . [an] interpretive rule might suggest." *Vietnam Veterans*, 843 F.2d at 537.

Indeed, the Government itself recently—and correctly—told the Supreme Court that under "well-settled administrative-law" principles, "interpretive rules . . . by definition have no binding legal effect." *Allina Health* Gov't Br. 35. Instead, they are "*nonbinding* agency interpretations of the statutes and regulations it administers." *Id.* (emphasis added). It makes no sense to say that nonbinding agency interpretations are "generally applicable" only if binding.[11]

---

[11] Further undermining VA's effort to equate "general" with "binding" is the statute's neighboring reference to "statements of *general* policy," 5 U.S.C. § 552(a)(1)(D) (emphasis added), which are undoubtedly nonbinding. *See, e.g.*, *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997). Because the term "general" presumably carries "a consistent meaning throughout" the statute, *Allina Health*, 139 S. Ct. at 1812, that term cannot mean binding.

To be sure, interpretive rules *can* be made binding on certain agency employees, such as the Board or employees in VA's regional offices. As OMB explained in its 2007 Final Bulletin, "agencies can appropriately bind their employees to abide by agency policy"—as expressed in interpretive rules and policy statements—"as a matter of their supervisory powers over such employees." 72 Fed. Reg. at 3437; *see also, e.g.*, *Splane v. West*, 216 F.3d 1058, 1064 (Fed. Cir. 2000) ("[T]he interpretive rule . . . was certainly binding on agency officials insofar as any directive by an agency head must be followed by agency employees.").

But even where an "interpretative rule binds an agency's employees, . . . it does not bind the agency itself." *Warder v. Shalala*, 149 F.3d 73, 82 (1st Cir. 1998) (citation omitted). Senior agency decisionmakers are always free to deviate from an interpretive rule and must consider arguments in favor of doing so. *See* 72 Fed. Reg. at 3436 (guidance documents must "not foreclose consideration by the agency of positions advanced by affected private parties"); *see also* Peter L. Strauss, *Publication Rules in the Rulemaking Spectrum: Assuring Proper Respect for an Essential Element*, 53 Admin. L. Rev. 803, 818-19 (2001); Ronald M. Levin, *Rulemaking and the Guidance Exception*, 70 Admin. L. Rev. 263, 305-07, 346-48 (2018). At VA, for example, the Secretary always has authority to modify or abandon an interpretive rule—even in the midst of an adjudication to which the rule applies—regardless of whether the rule is deemed "binding" on lower-level

decisionmakers.  *See, e.g.*, 38 U.S.C. § 7104(c) (VA General Counsel opinions are binding on the Board); *Turner v. Shulkin*, 29 Vet. App. 207, 215-16 (2018) (noting that Secretary can change official VA position in General Counsel opinions, "even in litigation").

Because *no* interpretive rules are formally binding on final agency decisionmakers, that characteristic cannot distinguish interpretive rules that are of general applicability from those that are not.  VA's reliance on this characteristic is thus fundamentally misplaced.  Whether an interpretation is generally applicable does not depend on whether it formally binds particular agency decisionmakers.  Rather, as the statutory language indicates, it depends on whether the interpretation is limited to specific individuals or facts.

c.      To the extent the Court looks beyond Section 552(a)(1)(D)'s text—and past bedrock rules of administrative law—and considers the extent to which the M21-1 Manual is binding as a *practical* matter, that simply confirms that the Manual provisions challenged here are subject to this Court's review.  In the real world, interpretations in the Manual are virtually always followed by VA and its various components, including the Board.

Everyone agrees that the Manual is "binding" on adjudicators in VA regional offices.  *Gray*, 875 F.3d at 1106; *see Gray* Gov't Br. 33.  Because fewer than six percent of the benefits decisions move past this initial stage, *see supra* at 7, the

Manual's provisions "constitute the last word for the vast majority of veterans," *Gray*, 875 F.3d at 1114 (Dyk, J., dissenting in part and concurring in the judgment). Indeed, even after an initial denial of benefits, recent amendments to the VJRA incentivize veterans to stay at the regional office level—where the Manual will continue to govern—by offering higher-level review and by permitting supplemental claims that the agency must assist in developing. *See supra* at 7-8. Thus, the Manual governs most cases, and VA has offered no principled reason—let alone a reason grounded in Section 552(a)(1)(D)—why it should matter whether the Manual "binds" some lower-level decisionmakers (regional officers) but not others (the Board).

Even for the few decisions that are appealed to the Board, the Manual regularly dictates the Board's analysis. The Veterans Court has made clear that the Board must consider "any relevant provisions contained in the M21-1 [Manual]" when adjudicating a benefits appeal. *Overton v. Wilkie*, 30 Vet. App. 257, 264 (2018); *see, e.g.*, *Rinebolt v. Wilkie*, No. 16-2971, 2019 WL 98023, at *6 (Vet. App. Jan. 4, 2019) (Board's "failure to address [relevant Manual] provisions" was reversible error). And while the Board may not be *formally* bound by the Manual, it will undoubtedly carry significant weight. One need look no further than the Knee Joint Stability Rule at issue in this case. Although VA issued a proposed rule revising DC 5271, it abandoned that rulemaking and chose instead to simply insert

the rule into the Manual. *See supra* at 13-14. The Board has since held that "the M21-1 [Manual] may be relied upon" in applying DC 5271 precisely because the Manual implements the proposed rule, which the Board apparently views as "expressing [VA's] intent to codify" that rule. *[Title Redacted]*, No. 19-14 957, 2020 WL 1543152, at *13-14 (Bd. Vet. App. Jan. 7, 2020).

Finally, this Court has given conclusive *Auer* deference to Manual provisions, repeatedly holding that "VA interpretations of its own regulations in its Adjudication Procedures Manual are 'controlling' as long as they are not 'plainly erroneous or inconsistent with the regulation.'" *Smith v. Shinseki*, 647 F.3d 1380, 1385 (Fed. Cir. 2011) (quoting *Thun v. Shinseki*, 572 F.3d 1366, 1369 (Fed. Cir. 2009)). Granting this sort of deference to an interpretive rule makes it in practice "'every bit as binding as a substantive rule.'" *Kisor v. Wilkie*, 139 S. Ct. 2400, 2435 (2019) (Gorsuch, J., concurring in the judgment) (quoting *Mortg. Bankers*, 575 U.S. at 111 (Scalia, J., concurring in part and concurring in the judgment)).

In sum, the Manual is formally binding on all frontline adjudicators who resolve the vast majority of benefits claims. And it is also effectively binding as a practical matter. Thus, even if the Government is right that an interpretation "of general applicability" must be binding, Manual provisions can readily satisfy that test. Under any interpretation of Section 552(a)(1)(D), this Court has jurisdiction to resolve NOVA's challenge.

**B.     Section 502's Cross-Reference To 5 U.S.C. § 553 Also Authorizes Review**

This Court has jurisdiction for a second, independent reason:  Section 502 makes reviewable any action to which 5 U.S.C. § 553 "refers."  Section 553 repeatedly refers to "interpretative rules" without Section 552(a)(1)(D)'s qualifier that such rules be "of general applicability" (the phrase triggering VA's meritless "binding" theory).  Thus, regardless of whether the Manual's provisions are binding, this Court has jurisdiction to review interpretive rules contained in the Manual under Section 502's cross-reference to Section 553.  This Court has never ruled on—let alone rejected—this alternative theory of jurisdiction.

1.     Section 502 makes reviewable any action "to which section 552(a)(1) *or 553* of title 5 (or both) *refers*."  38 U.S.C. § 502 (emphasis added).  To "refer to" something is simply to "mention or allude to" it.  *New Oxford* 1466; *see Webster's Third* 1907 (to "point" or "allude" to).

Under that definition, Section 553 "refers" to interpretive rules by twice expressly mentioning them.  *First*, Section 553(b) sets forth a general requirement that agencies must publish a notice of any proposed rulemaking in the Federal Register.  It then goes on to say that, "[e]xcept when notice or hearing is required by statute," this requirement "does not apply . . . to *interpretative rules*, [or] *general statements of policy*."  5 U.S.C. § 553(b)(A) (emphasis added).  *Second*, Section 553(d) states that rules must generally be published 30 days before their effective

45

date.  It then expressly exempts from this requirement, *inter alia*, "*interpretative rules* and *statements of policy*."  *Id.* § 553(d)(2) (emphasis added).

Any speaker of the English language would agree that these provisions "refer[]" to interpretive rules and policy statements.  Indeed, the Government itself has acknowledged that Section 553 directly refers to interpretive rules, explaining to the Supreme Court that Section 553 "*expressly* and *categorically* exempts . . . interpretive rules from the [APA's] notice-and-comment rulemaking procedures." Gov't Reply Br. 1-2, *Mortg. Bankers*, 575 U.S. 92 (Nos. 13-1041, 13-1052), 2014 WL 5862162 (emphasis added); *see also id.* at 4 (same).  The only way to "expressly exempt" something is to "refer[]" to it.

The Supreme Court's recent decision in *Allina Health* exemplifies this commonsense usage of the term "refers."  In describing a Medicare statute that required notice-and-comment for certain "rule[s], requirement[s], or other statement[s] of policy," 42 U.S.C. § 1395hh(a)(2), the Court observed that "the statute . . . *refers* to 'statements of policy,'" *Allina Health*, 139 S. Ct. at 1811 (emphasis added).  Similarly, in describing a different provision precluding retroactive application of certain changes to "regulations, manual instructions, interpretative rules, statements of policy, or guidelines of general applicability," 42 U.S.C. § 1395hh(e)(1)(A), the Court likewise acknowledged that this "provision *refers* to 'regulations, manual instructions, interpretative rules, statements of policy,

or guidelines of general applicability,'" *Allina Health*, 139 S. Ct. at 1814 n.1 (emphasis added). And it further noted that "statements of policy" and "interpretive rules" are—"by definition"—"grouped" together and "treated" the same in Section 553. *Id.* at 1811 (citing 5 U.S.C. § 553(b)(A)). There is no world in which Section 553 could "defin[e]," "group[]," and require identical "treat[ment]" for interpretive rules and policy statements without "*refer[ring]*" to those items—which is all that Section 502 requires.

2.     Section 502's plain text thus unambiguously reaches the interpretive rules "refer[red]" to in Section 553. But any doubt on that score would be resolved by the longstanding interpretive "canon that provisions for benefits to members of the Armed Services are to be construed in the beneficiaries' favor." *Henderson v. Shinseki*, 562 U.S. 428, 441 (2011) (citation omitted) (applying canon to statutory deadline for appealing Board decisions); *see also, e.g.*, *Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("[I]nterpretive doubt is to be resolved in the veteran's favor."); *Procopio v. Wilkie*, 913 F.3d 1371, 1382-83, 1386-87 (Fed. Cir. 2019) (en banc) (O'Malley, J., concurring) (detailing the "pro-veteran canon").

Section 502 is undeniably a statute enacted for the benefit of veterans. As a core component of the VJRA—a law designed to be "decidedly favorable to veterans," *Henderson*, 562 U.S. at 441—Section 502 allows veterans to bring speedy preenforcement challenges to rules and policies that unlawfully prevent them from

obtaining benefits without having to spend years slogging through the individual claims process. Accordingly, under the pro-veteran interpretive canon, any question about the reach of Section 502's key term ("refers") should be resolved in veterans' favor, by allowing them to challenge a broader range of VA actions—including interpretive rules.

3. As explained above, the challenged Manual provisions in this case undoubtedly qualify as interpretive rules. Under the APA, "interpretive rules" are "statement[s] of general or particular applicability and future effect" that "advise the public of the agency's construction of the statutes and rules which it administers." *Mortg. Bankers*, 575 U.S. at 95-97 (alteration in original) (citations omitted). Here, the Manual provisions are statements by the agency that advise the public of its interpretations of DC 5055 and DC 5257. *See supra* at 22. Accordingly, they are VA actions to which Section 553 "refers."

4. Ignoring the plain meaning of the statutory text, VA seems to believe that "the scope of section 553" is limited to "substantive rules." VA Opp. to Hrg. En Banc 3. VA urged a similarly atextual argument in *Gray*, claiming that Section 553 does not "refer[]" to interpretive rules or policy statements because Section 553 "*excludes* them from notice-and-comment requirements." *Gray* Gov't Br. 41, 43-44. But Section 553 is not limited to legislative rules. *See Preminger v. Sec'y of Veterans Affairs* (*Preminger II*), 632 F.3d 1345, 1351 (Fed. Cir. 2011) (rejecting

VA's argument that Section 502's cross-reference to Section 553 "is limited to legislative rules").  And the argument is nonsensical on its own terms—it is difficult to understand how a statute can "exclude" something without "refer[ring]" to it.

The Court should reject VA's invitation to disregard the statutory text. Section 553 unambiguously "refers" to both interpretive rules and policy statements, and that is all Section 502 requires.

### C. Pre-Enforcement Review Of Manual Provisions Under Section 502 Provides A Vital Safeguard Against Unlawful VA Action

As explained above, ordinary principles of statutory interpretation resolve this case.  The challenged Manual provisions qualify as "interpretations of general applicability," 5 U.S.C. § 552(a)(1)(D), as well as "interpretative rules," *id.* § 553(d)(2).  They are therefore actions "to which section 552(a)(1) or 553 of title 5 (or both) refers" and "subject to judicial review" in this Court.  38 U.S.C. § 502. Because that conclusion is not remotely absurd, the Court's "sole function" is to "enforce [the statute] according to its terms."  *Sebelius v. Cloer*, 569 U.S. 369, 381 (2013) (citation omitted).  Indeed, "[t]he role of this Court is to apply the statute as it is written—even if . . . some other approach might accord with good policy." *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 231 (2014) (citation omitted).

In point of fact, though, giving Section 502 and its cross-references their full breadth *does* accord with good policy.  Judicial review in this Court is essential to curbing VA's unfortunate penchant for adopting unlawful rules and interpretations

that have "no basis in the relevant statutes" and do "nothing to assist, and much to impair, the interests of those the law says [VA] is supposed to serve." *Mathis v. Shulkin*, 137 S. Ct. 1994, 1995 (2017) (Gorsuch, J., dissenting from denial of certiorari).

VA's regulatory track record is appallingly poor.  Sometimes VA enacts a rule that simply "flies against the plain language of the statutory text," *Brown*, 513 U.S. at 122, or that attempts to "manufacture an ambiguity in language where none exists in order to redefine the plain language" of a governing statute, *Johnson v. McDonald*, 762 F.3d 1363, 1366 (Fed. Cir. 2014).  Or VA dispenses with clarity altogether, "intentionally" promulgating a rule so "untenable" and "vague[]" that its later application amounts to "the equivalent of 'because I say so' or 'we know it when we see it.'" *Ray v. Wilkie*, 31 Vet. App. 58, 71 (2019) (citations and footnote omitted). Other times VA's action lacks "any rhyme or reason" and can only be described as "irrational," "aimless and adrift," and "just as arbitrary" as "flipping a coin." *Gray v. McDonald*, 27 Vet. App. 313, 322-25 (2015).  And still other times VA appears hopelessly "confused," taking a position contrary to "common sense," *Turner*, 29 Vet. App. at 216-17, or one that "reflects a lack of grasp of the APA" itself, *Preminger II*, 632 F.3d at 1351.[12]

---

[12]  NOVA submitted an amicus brief in *Kisor* providing copious examples of cases in which VA rules have been rejected as arbitrary, capricious, and/or contrary

Precisely because VA gets it wrong so often, Congress has authorized direct review of VA's generally applicable rules, ensuring that this Court will step in to protect veterans when the agency goes astray. Section 502 reflects Congress's "preference for preenforcement review of [VA] rules." *Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*, 330 F.3d 1345, 1347 (Fed. Cir. 2003). That preference is eminently reasonable. There is no reason to impose on veterans the "substantial and unnecessary burden" of enduring "protracted agency adjudication" before obtaining judicial review "of a purely legal question that is already ripe for [this Court's] review." *Gray*, 875 F.3d at 1110 (Dyk, J., dissenting in part and concurring in the judgment).

And "substantial burden" is putting it mildly. VA's individual claims process has been fairly characterized as a "bureaucratic labyrinth, plagued by delays and inaction," where "many veterans find themselves trapped for years." *Martin v. O'Rourke*, 891 F.3d 1338, 1349 (Fed. Cir. 2018) (Moore, J., concurring). It can take approximately *six years* for an individual benefits case to wind its way through the regional office, the Board, and the Veterans Court before it can (finally) end up here. *See supra* at 8. And each year, thousands of veterans die before their claims and appeals are finally resolved. *See supra* at 8-9.

---

law for these reasons. *See* NOVA Amicus Br. 8-23, *Kisor*, 139 S. Ct. 2400 (No. 18-15), 2019 WL 423415.

Veterans should not have to endure years of wandering through VA's "labyrinth" to obtain relief from unlawful rules that Congress plainly authorized this Court to review under Section 502—regardless of whether VA decides to promulgate those rules in the M21-1 Manual.

## II. RULE 47.12(a)'S 60-DAY DEADLINE IS INVALID AND UNENFORCEABLE

In addition to *DAV*, this Court has erected another improper impediment to Section 502 review of VA actions: Federal Circuit Rule 47.12(a), which imposes a 60-day deadline for seeking such review. That deadline is inconsistent with the applicable six-year limitations period set forth in 28 U.S.C. § 2401(a), which applies to "every civil action commenced against the United States." Section 2401(a)'s six-year limitations period trumps the inconsistent 60-day deadline in Rule 47.12(a). The 60-day deadline is invalid and unenforceable.[13]

### A. Section 2401(a) Establishes A Default Six-Year Limitations Period For Section 502 Petitions

Section 2401(a) "provides a time limit upon bringing civil actions against the United States." *Crown Coat Front Co. v. United States*, 386 U.S. 503, 510 (1967). By its terms, that limit applies to "*every civil action* commenced against the United

---

[13] Rule 47.12(a)'s 60-day deadline is not a jurisdictional requirement. *See Wash.-S. Nav. Co. v. Balt. & Phila. Steamboat Co.*, 263 U.S. 629, 635 (1924) ("[N]o rule of court can enlarge or restrict jurisdiction."). This Court must therefore resolve the Section 502 jurisdictional issue before addressing Rule 47.12(a)'s validity. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-102 (1998).

States." 28 U.S.C. § 2401(a) (emphasis added). It provides that, with certain limited exceptions not applicable here, every such action "shall be barred unless the complaint is filed *within six years* after the right of action first accrues." *Id.* (emphasis added).

A petition for review under Section 502 plainly qualifies as a "civil action commenced against the United States." 28 U.S.C. § 2401(a). Moreover, Section 502 "does not contain its own statute of limitations." *Preminger v. Sec'y of Veterans Affairs* (*Preminger I*), 517 F.3d 1299, 1307 (Fed. Cir. 2008). It is thus "quite clear," *Block v. Sec'y of Veterans Affairs*, 641 F.3d 1313, 1319 (Fed. Cir. 2011), that the default six-year "limitations [period] in section 2401 applies [to Section 502 petitions]." *Preminger I*, 517 F.3d at 1307. As this Court has rightly held, when Congress enacted the VJRA, it "did not intend to exempt actions under section 502 from the general six-year statute of limitations in 28 U.S.C. § 2401 for actions against the United States." *Block*, 641 F.3d at 1319. Indeed, the Government itself has long maintained that Section 2401(a)'s six-year limitations period governs Section 502 actions.[14]

---

[14] *See, e.g.*, Gov't Br. 20-24, *Block*, 641 F.3d 1313 (No. 10-7045), 2010 WL 4639159; Gov't Br. 49, *Preminger I*, 517 F.3d 1299 (No. 07-7008), 2007 WL 624123; Gov't Br. 18-19, *Brown v. Sec'y of Veterans Affairs*, 124 F.3d 227 (Fed. Cir. 1997) (No. 95-7067), 1996 WL 33453790.

Congress's language and intent must be respected. Like other statutory limitations periods, Section 2401(a)'s six-year deadline "reflects a congressional decision" regarding "the timeliness of covered claims." *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 137 S. Ct. 954, 960 (2017). It is based on a congressional "value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones." *Rotkiske v. Klemm*, 140 S. Ct. 355, 361 (2019) (citation omitted). The balancing of such interests is a task for "Congress, not this Court." *Id.* It is simply "not within the Judiciary's ken to debate the wisdom" of a statutory limitations period. *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 686 (2014).

Under Section 2401(a), a petition under Section 502 must be filed "within six years after the right of action first accrues." Here, VA promulgated the challenged rules in 2016 and 2018—both well within Section 2401(a)'s six-year limitations period. NOVA's petition is therefore timely.

### B.    Rule 47.12(a) Cannot Override Section 2401(a)

Notwithstanding the six-year limitations period Congress has designated for Section 502 actions, this Court has promulgated Federal Circuit Rule 47.12(a). That rule provides that an "action for judicial review under 38 U.S.C. § 502 of a rule and regulation of the Department of Veterans Affairs must be filed with the clerk of court

*within 60 days* after issuance of the rule or regulation or denial of a request for amendment or waiver of the rule or regulation." Fed. Cir. R. 47.12(a) (emphasis added).

Rule 47.12(a) was "prompted by" Congress's enactment of the VJRA. *Eleventh Annual Judicial Conference of the U.S. Court of Appeals for the Federal Circuit*, 153 F.R.D. 177, 187 (June 18, 1993). The Court appeared to believe that the absence of a specific limitations period in Section 502 authorized it to fill the void with its own deadline. As the Court later explained, because "section 502 does not provide an express time limit on action for review, we have promulgated Fed. Cir. Rule 47.12(a) (1997) (the Rule), for that purpose." *Brown v. Sec'y of Veterans Affairs*, 124 F.3d 227, 1997 WL 488930, at *1 (Fed. Cir. 1997).[15]

Rule 47.12(a) dramatically shrinks the window Congress provided for filing a Section 502 challenge by more than 97 percent—from 2190 days to 60 days. It has no statutory basis in Section 502, and is inconsistent with Section 2401(a). As such, Rule 47.12(a) is invalid and cannot be enforced.

---

[15] It is unclear why this Court settled on 60 days as the appropriate time limit. Tellingly, this Court's Rules list various deadlines for challenges to other agency actions—including actions by the Secretary of Labor (30 days), Secretary of Agriculture (60 days), Office of Compliance (OOC) (90 days), and Board of Contract Appeals (BCA) (120 days). Fed. Cir. R. 15 Practice Notes. But all of *those* deadlines are established by statute. *See, e.g.*, 28 U.S.C. § 1296(b) (Secretary of Labor); 7 U.S.C. § 2461 (Secretary of Agriculture); 2 U.S.C. § 1407(c)(3) (OOC); 41 U.S.C. § 7107(a)(1) (BCA). Rule 47.12(a)'s 60-day deadline alone is not.

Under the Rules Enabling Act, this Court has the power to "prescribe rules for the conduct of [its] business." 28 U.S.C. § 2071(a). Such rules, however, "shall be consistent with Acts of Congress and rules of practice and procedure prescribed [by the Supreme Court under 28 U.S.C. § 2072]." 28 U.S.C. § 2071(a); *cf. id.* § 2072(b) ("Such rules shall not abridge, enlarge or modify any substantive right."). And local rules may neither "restrict the jurisdiction conferred by a statute," *Willy v. Coastal Corp.*, 503 U.S. 131, 135 (1992), nor allow a court to decline to exercise the jurisdiction Congress has given it, *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 376 (2012).[16]

Thus, when a court-created local rule conflicts with an act of Congress, the local rule must give way. *See Hibbs v. Winn*, 542 U.S. 88, 98-99 (2004); *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1365 (Fed. Cir. 2006) ("[W]e do not doubt our power . . . to refuse to enforce a local rule that" conflicts with federal law.). Local rules must be consistent with both the letter and the spirit of federal law. A local rule will therefore be invalid not only if it is "directly contradictory to a federal rule" or statute, but also if it "is inconsistent with the

---

[16] By the same token, the Federal Rules of Appellate and Civil Procedure—prescribed by the Supreme Court under Section 2072—similarly require that local rules be consistent with federal statutes. *See* Fed. R. App. P. 47(a)(1) ("A local rule must be consistent with—but not duplicative of—Acts of Congress . . . ."); Fed. R. Civ. P. 83(a)(1) (similar).

purposes of a federal rule" or statute. *O2 Micro*, 467 F.3d at 1365. A contrary approach "would give judges a 'legislation-overriding' role that is beyond the Judiciary's power." *SCA Hygiene*, 137 S. Ct. at 960.

Courts of appeals regularly apply these established principles to invalidate court-created rules that are inconsistent with federal law—including court-created rules purporting to set or modify timing requirements. *See, e.g.*, *Paluch v. Sec'y Pa. Dep't Corr.*, 442 F. App'x 690, 693 (3d Cir. 2011) ("Local Rule 7.10['s 14-day limitations period] did not apply to the extent that it cut short Paluch's opportunity to seek reconsideration under Rule 59(e)['s]" 28-day limit.); *Jackson v. Crosby*, 375 F.3d 1291, 1296 (11th Cir. 2004) ("Local Rule 4.20, to the extent it is inconsistent with [Federal] Rule [of Civil Procedure] 6(e), is therefore invalid."); *Planned Parenthood of Cent. N.J. v. Attorney Gen. of N.J.*, 297 F.3d 253, 257, 259-60 (3d Cir. 2002) ("[L]ocal rule" extending "the time for filing a fee application beyond that prescribed in Fed. R. Civ. P. 54(d)" is "invalid"); *In re Paoli R.R. Yard PCB Litig.*, 221 F.3d 449, 459 (3d Cir. 2000) ("[T]he Local Rule" setting a limitations period "is inconsistent with the Federal Rule and hence is void.").

Here, under these established principles, Rule 47.12(a)'s 60-day deadline plainly is not "consistent with Acts of Congress," 28 U.S.C. § 2071(a), and therefore not valid. In Section 502, Congress gave this Court broad jurisdiction over preenforcement challenges to VA actions. Congress also made the policy decision

57

that—as with all other suits against the federal government—such challenges would be subject to Section 2401(a)'s six-year limitations period.  *See Block*, 641 F.3d at 1319; *Preminger I*, 517 F.3d at 1307.  In other words, Congress has designated that veterans have six years to bring challenges under Section 502.  This Court may not defy that designation—by local rule or otherwise.  *See Holmberg v. Armbrecht*, 327 U.S. 392, 395 (1946) ("The Congressional statute of limitation is definitive.").

Without any statutory authorization, however, this Court has shrunk the window of time for challenging VA actions under Section 502 from 2190 days to 60 days—by more than 97 percent.  The Court purported to impose this tight filing deadline to fill a perceived gap left by Section 502's silence on the applicable statute of limitations.  *See Brown*, 1997 WL 488930, at *1.  But that perceived gap was illusory.  Where—as here—"Congress enacts a statute of limitations, it speaks directly to the issue of timeliness" and there is "no gap to fill."  *SCA Hygiene*, 137 S. Ct. at 960-61.  In enacting Section 502, Congress meant for "the general six-year statute of limitations in 28 U.S.C. § 2401 for actions against the United States" to apply.  *Block*, 641 F.3d at 1319; *see Preminger I*, 517 F.3d at 1307.  Rule 47.12(a)'s 60-day deadline cannot supplant that express statutory limitations period.  This Court is "not at liberty to jettison Congress' judgment on the timeliness of suit."  *Petrella*, 572 U.S. at 667.

Rule 47.12(a)'s drastic reduction in the time for filing a Section 502 challenge is also invalid because it undercuts Section 502's purpose. As explained above, Section 502 reflects Congress's "preference for preenforcement review" of erroneous VA actions. *Nat'l Org. of Veterans' Advocates*, 330 F.3d at 1347. That provision is designed to spare veterans the hardship that accompanies VA's all too frequent failure to follow its APA "responsibilities . . . with respect to agency rules and interpretations of agency authority." H.R. Rep. No. 100-963, pt. 1, at 27 (1988). By dramatically shrinking the window for veterans to challenge unlawful VA actions under Section 502, however, Rule 47.12(a) subverts that provision's broad grant of jurisdiction to this Court to hear such challenges—and, in so doing, leaves too many veterans out of luck.

Subjecting Section 502 actions to Section 2401(a)'s six-year limitations period—and not to Rule 47.12(a)'s 60-day deadline—is also consistent with Federal Rule of Appellate Procedure 15. That Rule provides that "[r]eview of an agency order is commenced by filing, *within the time prescribed by law*, a petition for review with the clerk of a court of appeals authorized to review the agency order." Fed. R. App. P. 15(a)(1) (emphasis added). Local rules—like Rule 47.12(a)—that are unmoored from a statute are not "law." *See United States v. Hvass*, 355 U.S. 570, 575 (1958) ("The phrase 'a law of the United States,' . . . includes . . . Rules and Regulations which have been lawfully authorized and have a clear legislative

base.").  In this context, then, "the time prescribed by law" is the time prescribed by Section 2401(a): six years.

For these reasons, the 60-day deadline in Federal Circuit Rule 47.12(a) is invalid and cannot be enforced.

## CONCLUSION

For the foregoing reasons, this Court should hold that Section 502 authorizes jurisdiction over petitions to review interpretive rules contained in the M21-1 Manual, and that Rule 47.12(a)'s 60-day time limit for filing Section 502 petitions is invalid and unenforceable.

Dated:  June 22, 2020

Respectfully submitted,

*/s/ Roman Martinez*
Roman Martinez
Blake E. Stafford
Shannon Grammel
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
roman.martinez@lw.com

*Counsel for Petitioner*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a) because it contains 13,973 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

I further certify that this brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5), (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: June 22, 2020                    _/s/ Roman Martinez_____
                                        Roman Martinez

# ADDENDUM

# TABLE OF CONTENTS

*National Organization of Veterans' Advocates, Inc.*
*v. Secretary of Veterans Affairs*
**No. 20-1321**

## I. ADDENDUM PURSUANT TO CIRCUIT RULE 28(a)(11)

| Page No. | Date | Description |
|----------|------|-------------|
| Appx1 | 11/21/2016 | M21-1 Manual, Part III, Subpart iv, Chapter 4, Section A, Topic 3, including in relevant part, Subtopic e, "Evaluations for Knee Replacement," Key Changes, dated November 21, 2016 |
| Appx64 | 04/13/2018 | M21-1 Manual, Part III, Subpart iv, Chapter 4, Section A, Topic 6, including in relevant part, Subtopic d, "Handling Joint Stability Findings," Key Changes, dated April 13, 2018 |

## II. ADDENDUM PURSUANT TO FEDERAL RULE OF APPELLATE PROCEDURE 28(f)

| Page No. | Description |
|----------|-------------|
| Add-1 | 5 U.S.C. § 551(4)-(5), (13) |
| Add-2 | 5 U.S.C. § 552(a)(1)-(3) |
| Add-5 | 5 U.S.C. § 553 |
| Add-7 | 5 U.S.C. § 801 |
| Add-11 | 5 U.S.C. § 804 |
| Add-12 | 28 U.S.C. § 2071 |

| Page No. | Description |
|----------|-------------|
| Add-13 | 28 U.S.C. § 2072 |
| Add-14 | 28 U.S.C. § 2401 |
| Add-15 | 38 U.S.C. § 502 |
| Add-16 | Federal Register Act, Pub. L. No. 74-220, §§ 5-6, 49 Stat. 500 (1935) |
| Add-18 | Act to Amend the Federal Register Act, Pub. L. No. 75-158, § 11(a), 50 Stat. 304 (1937) |
| Add-19 | 1 C.F.R. § 1.1 |
| Add-20 | Fed. R. App. P. 15 |
| Add-22 | Fed. Cir. R. 47.12 |

# ADDENDUM
# PURSUANT TO CIRCUIT RULE 28(a)(11)

# Key Changes

| | |
|---|---|
| **Changes Included in This Revision** | The table below describes the changes included in this revision of Veterans Benefits Manual M21-1, Part III, "General Claims Process," Subpart iv, "General Rating Process." |

*Notes*:
- Unless otherwise noted, the term "claims folder" refers to the official, numbered, Department of Veterans Affairs (VA) repository – whether paper or electronic – for all documentation relating to claims that a Veteran and/or his/her survivors file with VA.
- Minor editorial changes have also been made to
  – add references
  – reassign alphabetical designations to individual blocks, where necessary, to account for new and/or deleted blocks within a topic, and
  – bring the document into conformance with M21-1 standards.

| **Reason(s) for Notable Change** | **Citation** |
|---|---|
| To add a new Block e on knee replacements discussing the court decision in *Hudgens v. McDonald*. | M21-1, Part III, Subpart iv, Chapter 4, Section A, Topic 3, Block e (III.iv.4.A.3.e) |

| | |
|---|---|
| **Rescissions** | None |
| **Authority** | By Direction of the Under Secretary for Benefits |
| **Signature** | |
| | Beth Murphy, Director Compensation Service |
| **Distribution** | LOCAL REPRODUCTION AUTHORIZED |

# Section A.  Musculoskeletal Conditions

## Overview

**In This Section** This section contains the following topics:

| Topic | Topic Name |
|-------|------------|
| 1 | Evaluating Joint Conditions, Painful Motion, and Functional Loss |
| 2 | Evaluating Musculoskeletal Disabilities of the Upper Extremities |
| 3 | Evaluating Musculoskeletal Disabilities of Spine and Lower Extremities |
| 4 | Congenital Musculoskeletal Conditions |
| 5 | Rheumatoid Arthritis (RA) |
| 6 | Degenerative Arthritis |
| 7 | Limitation of Motion (LOM) in Arthritis Cases |
| 8 | Examples of Rating Decisions for LOM in Arthritis Cases |
| 9 | Osteomyelitis |
| 10 | Examples of the Proper Rating Procedure for Osteomyelitis |
| 11 | Muscle Injuries |
| 12 | Miscellaneous Musculoskeletal Considerations |

# 1. Evaluating Joint Conditions, Painful Motion, and Functional Loss

| | |
|---|---|
| **Introduction** | This topic contains information on evaluating joint conditions, painful motion, and functional loss, including |

- assigning multiple LOM evaluations for a joint
- assigning a noncompensable evaluation when scheduler 0-percent criteria are not specified
- considering pain when assigning multiple LOM evaluations for a joint
- example of compensable limitation of two joint motions
- example of compensable limitation of one motion with pain in another motion
- example of noncompensable limitation of two motions with pain
- considering functional loss due to pain when evaluating joint conditions
- establishing the minimum compensable evaluation under 38 CFR 4.59
- assessing medical evidence for functional loss due to pain
- entering *DeLuca* and *Mitchell* data in Evaluation Builder
- example of evaluating a joint with full range of motion (ROM) and functional loss due to pain
- example of evaluating a joint with LOM and functional loss due to pain
- inappropriate situations for using functional loss to evaluate musculoskeletal conditions
- example of evaluating joints with arthritis by x-ray evidence only with other joint(s) affected by non-arthritic condition, and
- definition of
  – major joints
  – minor joints, and
  – minor joint groups.

| | |
|---|---|
| **Change Date** | October 27, 2016 |

| | |
|---|---|
| **a. Assigning Multiple LOM Evaluations for a Joint** | In VAOPGCPREC 9-2004 Office of General Counsel (OGC) held that separate evaluations under 38 CFR 4.71a, Diagnostic Code (DC) 5260, (limitation of knee flexion) and 38 CFR 4.71a, DC 5261, (limitation of knee extension) can be assigned without pyramiding. Despite the fact that knee flexion and extension both occur in the same plane of motion, limitation of flexion (bending the knee) and limitation of extension (straightening the knee) represent distinct disabilities. |

***Important***:
- The same principle and handling apply ***only*** to
  – qualifying elbow and forearm movement DCs, flexion (38 CFR 4.71a, DC 5206), extension (38 CFR 4.71a, DC 5207), and impairment of either

supination or pronation ([38 CFR 4.71a, DC 5213](#)), and
- qualifying hip movement DCs, extension ([38 CFR 4.71a, DC 5251](#)), flexion ([38 CFR 4.71a, DC 5252](#)), and abduction, adduction or rotation ([38 CFR 4.71a, DC 5253](#)).
- Always ensure that multiple evaluations do not violate the amputation rule in [38 CFR 4.68](#).

*Note*:  The Federal Circuit has definitively ruled that multiple evaluations for the shoulder under [38 CFR 4.71a, DC 5201,](#) are not permitted.  In *[Yonek v. Shinseki](#),* 22 F.3d 1355 (Fed. Cir. 2013) the court held that a Veteran is entitled to a single rating under [38 CFR 4.71a, DC 5201,](#) even though a shoulder disability results in limitation of motion (LOM) in both flexion (raising the arm in front of the body) and abduction (raising the arm away from the side of the body).

*References*:  For more information on
- pyramiding of evaluations, see
  - [38 CFR 4.14](#), and
  - *[Esteban v. Brown](#)*, 6 Vet.App. 259 (1994)
- painful motion in multiple evaluations for joint LOM, see M21-1, Part III, Subpart iv, 4.A.1.c
- assignment of separate evaluations for disabilities of the elbow, forearm, and wrist, see M21-1, Part III, Subpart iv, 4.A.2.c, and
- examples of actual LOM of two knee motions, see M21-1, Part III, Subpart iv, 4.A.1.d.

---

**b. Assigning a Noncompensable Evaluation When Schedular 0-Percent Criteria Are Not Specified**

For those joint motions where the 0-percent evaluation criteria is not defined by regulation, any LOM for that specific movement will be assigned a separate noncompensable disability evaluation.  The motions include

- [38 CFR 4.71a, DC 5207](#), limitation of extension of the elbow
- [38 CFR 4.71a, DC 5213](#), impairment of supination and pronation of the forearm
- [38 CFR 4.71a, DC 5251](#), limitation of extension of the hip
- [38 CFR 4.71a, DC 5252](#), limitation of flexion of the hip, and
- [38 CFR 4.71a, DC 5253](#), impairment of rotation, adduction, or abduction of the hip.

*Example*:  A Department of Veterans Affairs (VA) examination shows a Veteran has flexion of the hip limited to 60 degrees.  [38 CFR 4.71a, DC 5252](#) does not define the criteria for assignment of a 0-percent disability evaluation.  Normal range of motion (ROM) for flexion of the hip is 125 degrees.  Since there is limited flexion, but not to the extent that the criteria for the schedular 10-percent evaluation is met, and because there is no defined schedular 0-percent evaluation criteria, a 0-percent evaluation is warranted for limited flexion of the hip under [38 CFR 4.71a, DC 5252](#).

---

**c. Considering Pain When Assigning Multiple LOM Evaluations for a Joint**

When considering the role of pain in evaluations for multiple motions of a single joint, the following guidelines apply.

- When more than one qualifying joint motion is actually limited to a compensable degree and there is painful but otherwise noncompensable limitation of the complementary movement(s), ***only one compensable evaluation can be assigned***.
  - *Mitchell v. Shinseki*, 25 Vet.App. 32 (2011) reinforced that painful motion is the equivalent of limited motion only based on the specific language and structure of 38 CFR 4.71a, DC 5003, not for the purpose of 38 CFR 4.71a, DC 5260, and 38 CFR 4.71a, 5261.  For arthritis, if one motion is actually compensable under its 52XX-series DC, then a 10-percent evaluation under 38 CFR 4.71a, DC 5003, is not available and the complementary motion cannot be treated as limited at the point where it is painful.
  - 38 CFR 4.59 does not permit separate compensable evaluations for each painful joint *motion*.  It only provides that VA policy is to recognize actually painful motion as entitled to at least the minimum compensable evaluation for the *joint*.
- When each qualifying joint motion is painful but motion is not actually limited to a compensable degree under its applicable 52XX-series DC, ***only one compensable evaluation can be assigned***.
  - Assigning multiple compensable evaluations for pain is pyramiding.
  - A joint affected by arthritis established by x-ray may be evaluated as 10-percent disabling under 38 CFR 4.71a, DC 5003.
  - For common joint conditions that are not evaluated under the arthritis criteria such as a knee strain or chondromalacia patella, a 10-percent evaluation can be assigned for the joint based on pain on motion under 38 CFR 4.59.  Do not apply instructions from Note (1) under 38 CFR 4.71a, DC 5003, for non-arthritic conditions, since the instructions are strictly limited to arthritic conditions.  See example in M21-1, Part III, Subpart iv, 4.A.1.n.

*References*:  For more information on
- pyramiding of evaluations, see
  - 38 CFR 4.14, and
  - *Esteban v. Brown*, 6 Vet.App. 259 (1994)
- assigning multiple evaluations for a single joint, see M21-1, Part III, Subpart iv, 4.A.1.a, and
- examples of evaluations for which one or both joint motions are not actually limited to a compensable degree but there is painful motion, see M21-1, Part III, Subpart iv, 4.A.1.e and f.

---

**d. Example 1: Compensable Limitation of Two Joint**

*Situation*:  Evaluation of chronic knee strain with the following examination findings

| | |
|---|---|
| **Motions** | • Flexion is limited to 45 degrees.<br>• Extension is limited by 10 degrees.<br>• There is no pain on motion.<br>• There is no additional limitation of flexion or extension on additional repetitions or during flare-ups. |

***Result***:  Assign a 10-percent evaluation under 38 CFR 4.71a, DC 5260, and a separate 10-percent evaluation under 38 CFR 4.71a, DC 5261.

***Explanation***:  Each disability (limitation of flexion and limitation of extension) warrants a separate evaluation and the evaluations are for distinct disability.

---

**e.  Example 2: Compensable Limitation of One Motion With Pain in Another Motion**

***Situation***:  Evaluation of knee tenosynovitis with the following examination findings

• Flexion is limited to 45 degrees with pain at that point and no additional loss with repetitive motion.
• Extension is full to the 0-degree position, but active extension was limited by pain to 5 degrees.

***Result***:  Assign a 10-percent evaluation under 38 CFR 4.71a, DC 5260 and a noncompensable evaluation under 38 CFR 4.71a, DC 5261.

***Explanation***:
• Flexion is compensable under 38 CFR 4.71a, DC 5260, but extension remains limited to a noncompensable degree under 38 CFR 4.71a, DC 5261.
• Under *Mitchell v. Shinseki*, 25 Vet.App. 32 (2011), the painful extension could only be considered limited for the purpose of whether a 10-percent evaluation can be assigned for the joint under 38 CFR 4.71a, DC 5003, which is not applicable in this example because a compensable evaluation was already assigned for flexion under 38 CFR 4.71a, DC 5260.
• 38 CFR 4.59 does not support a separate compensable evaluation for painful extension.  The regulation states that the intention of the rating schedule is to recognize actually painful joints due to healed injury as entitled to at least the minimum compensable evaluation for the joint, not for each painful movement.
• If the fact pattern involved chondromalacia patella or a knee strain rather than tenosynovitis the result would be the same.

---

**f.  Example 3: Noncompensable Limitation of Two Motions With Pain**

***Situation***:  Evaluation of knee arthritis shown on x-ray with the following examination findings.

• Flexion is limited to 135 degrees with pain at that point.
• Extension is full to the 0-degree position with pain at that point.
• There is no additional loss of flexion or extension on repetitive motion.

***Result***:  Assign one 10-percent evaluation for the knee under 38 CFR 4.71a, DC 5003.

***Explanation***:
- There is limitation of major joint motion to a noncompensable degree under 38 CFR 4.71a, DC 5260, and 38 CFR 4.71a, DC 5261, x-ray evidence of arthritis and satisfactory evidence of painful motion.  Painful motion is limited motion for the purpose of applying 38 CFR 4.71a, DC 5003.  Therefore, a 10-percent evaluation is warranted for the joint.
- Assigning two compensable evaluations, each for pain, would be pyramiding.
- Neither 38 CFR 4.71a, DC 5003, nor 38 CFR 4.59 permits separate 10-percent evaluations for painful flexion and extension; they provide for a 10-percent evaluation for a joint.
- If the fact pattern involved chondromalacia patella or a knee strain rather than arthritis you would still assign a 10-percent evaluation, not separate evaluations.  However, the authority would be 38 CFR 4.59 and you should use 38 CFR 4.71a, DC 5260, rather than 38 CFR 4.71a, DC 5003.

---

**g.  Considering Functional Loss Due to Pain When Evaluating Joint Conditions**

Functional loss due to pain is a factor in the evaluation of musculoskeletal conditions under any DC that involves LOM.  Consider the following factors when evaluating functional loss due to pain.

***Notes***:
- Painful motion of a joint is indicative of disability and warrants at least the minimum compensable evaluation for the joint.
  - The pain may be caused by the actual joint, connective tissues, nerves, or muscles.
  - The medical nature of the particular disability determines whether the DC is based on LOM.
  - Pain on palpation is not the same as painful motion of a joint and does not warrant assignment of a compensable evaluation under 38 CFR 4.59 for painful motion.  However, pain on palpation of the joint may be considered in determining the evaluation to be assigned for the joint.
- Pain on weight bearing or nonweight-bearing is not the same as painful motion of a joint, and does not warrant assignment of a compensable evaluation under 38 CFR 4.59 for painful motion.  Medical evidence must demonstrate actual painful motion to warrant a compensable evaluation under 38 CFR 4.59.
- When pain results in loss of motion of a joint, the joint should be evaluated based on the additional loss of motion.
  - For joint conditions where multiple evaluations are possible due to LOM in different motions, assignment of an additional separate evaluation for LOM due to pain of a joint requires that the limitation must at least meet the level of the minimum schedular evaluation for the affected joint.
  - For painful motion to be the basis for a higher evaluation than the one

based solely on actual LOM, the pain must actually limit motion at the corresponding compensable level.

– When pain results in additional functional loss during flare-ups or upon repeated use over a period of time, evaluate the joint based on the resulting LOM.

*References*:  For more information on
- functional loss, see
  – 38 CFR 4.40
  – *DeLuca v. Brown,* 8 Vet.App. 202 (1995), and
  – *Mitchell v. Shinseki,* 25 Vet.App. 32 (2011)
- disability of the joints, see 38 CFR 4.45
- painful motion, see 38 CFR 4.59, and
- multiple evaluations for musculoskeletal disability, see
  – VAOPGCPREC 9-98, and
  – VAOPGCPREC 9-2004.

---

**h. Establishing the Minimum Compensable Evaluation Under 38 CFR 4.59**

When applying the provisions of 38 CFR 4.59, assign at least the minimum compensable rating for the joint specified *under the appropriate DC* for the joint involved.

*Example 1*:  Assume a shoulder strain with forward elevation and abduction limited to 145 degrees with acceptable evidence of pain while performing each motion, starting at 140 degrees.  Assign a 20-percent evaluation under 38 CFR 4.71a, DC 5201.  Under 38 CFR 4.59 there is actually painful motion and joint or periarticular pathology (a strain).  Therefore the intention of the rating schedule is that the decision maker will assign the minimum compensable evaluation provided under the DC appropriate to the disability at issue.  The lowest specified compensable evaluation for shoulder motion under the DC is 20 percent.

*Example 2*:  Assume the same facts as in Example 1, but the diagnosis is traumatic arthritis of the shoulder based on x-rays.  Assign a 20-percent evaluation under 38 CFR 4.71a, DC 5010-5201 with application of 38 CFR 4.59.  The ROM does not meet the criteria for a 20-percent evaluation under 38 CFR 4.71a, DC 5201 because arm motion is not limited at shoulder height.  However, pursuant to 38 CFR 4.59 there is actually painful motion and joint or periarticular pathology (arthritis).  Therefore the intention of the rating schedule is that the decision maker will assign the minimum compensable evaluation provided under the DC appropriate to the disability at issue.  The lowest specified compensable evaluation for shoulder motion under 38 CFR 4.71a, DC 5201 is 20 percent.

Although the diagnosis was traumatic arthritis, using 38 CFR 4.71a, DC 5010-5201 is more advantageous to the Veteran.  However in some cases a 10-percent evaluation under the arthritis criteria may be appropriate.  See Example 3.

***Example 3***:  Assume the same facts as in Example 2 except that there was no pain on motion.  There was a minor amount of swelling of the shoulder.  Assign a 10-percent evaluation under 38 CFR 4.71a, DC 5010.  There is x-ray evidence of traumatic arthritis and motion that is noncompensable under the applicable DC.  There is no evidence of painful motion so 38 CFR 4.59 is not applicable.  Ratings for traumatic arthritis under 38 CFR 4.71a, DC 5010 are rated using the criteria of 38 CFR 4.71a, DC 5003, which requires that LOM be "objectively confirmed" by findings such as swelling, spasm, or satisfactory evidence of painful motion.  In this case there was objective evidence supporting the LOM – namely the minor swelling of the shoulder.

***Example 4***:  For a claimant with residuals of right ring finger fracture resulting in painful motion of the ring finger, the appropriate DC for the joint involved would be 38 CFR 4.71a, DC 5230, and as this DC only provides for a noncompensable rating, 38 CFR 4.59 does not entitle a claimant to a compensable rating.

***Important***:  This guidance resulted from the decision in *Sowers v. McDonald*, 27 Vet.App. 472 (2016).  Therefore this guidance applies to claims pending on or after May 23, 2016.

---

**i. Assessing Medical Evidence for Functional Loss Due to Pain**

Medical evidence used to evaluate functional impairment due to pain must account for painful motion, pain on use, and pain during flare-ups or with repeated use over a period of time.

As a part of the assessment conducted in accordance with *DeLuca v. Brown*, 8 Vet.App. 202 (1995), the medical evidence must
- clearly indicate the exact degree of movement at which pain limits motion in the affected joint, and
- include the findings of at least three repetitions of ROM.

Per *Mitchell v. Shinseki*, 25 Vet.App. 32 (2011), when pain is associated with movement, an examiner must opine or the medical evidence must show whether pain could significantly limit functional ability
- during flare-ups, or
- when the joint is used repeatedly over a period of time, and
- if there is functional impairment found during flare-ups or with repeated use over a period of time, the examiner must provide, if feasible, the degree of additional LOM due to pain on use or during flare-ups.

***Important***:  If the examiner is unable to provide any of the above findings, he or she must
- indicate that he/she cannot determine, without resort to mere speculation, whether any of these factors cause additional functional loss, and
- provide the rationale for this opinion.

***Note***:  Per *Jones (M.) v. Shinseki*, 23 Vet.App. 382 (2010), the VA may only

accept a medical examiner's conclusion that an opinion would be speculative if

- the examiner has explained the basis for such an opinion, identifying what facts cannot be determined, or
- the basis for the opinion is otherwise apparent in VA's review of the evidence.

***Reference***:  For more information on evaluating functional impairment due to pain, see M21-1, Part III, Subpart iv, 4.A.1.g.

---

**j. Entering *DeLuca* and *Mitchell* Data in the Evaluation Builder**

The findings of De*Luca* repetitive ROM testing or the functional loss expressed in the *Mitchell* opinion will be used to evaluate the functional impairment of a joint due to pain.

- Only the most advantageous finding will be utilized to evaluate the joint condition.
- Do not "add" the LOM on *DeLuca* exam to the LOM expressed in a *Mitchell* opinion.

***Note***:  For purposes of data entry in the Evaluation Builder tool, if evaluating a joint where data fields are present for only initial ROM and for *DeLuca* (but not for *Mitchell*), enter either the *DeLuca* or the *Mitchell* data in the *DeLuca* field, whichever results in the higher disability evaluation.

***Examples***:  For examples of how to evaluate functional loss due to pain, refer to M21-1, Part III, Subpart iv, 4.A.1.k-l.

***Reference***:  For more information on the *Deluca* and *Mitchell* cases, see M21-1, Part III, Subpart iv, 4.A.1.i.

---

**k. Example of Evaluating a Joint with Full ROM and Functional Loss Due to Pain**

***Situation***:  Evaluation of a knee condition with normal initial ROM and additional functional loss indicated on *DeLuca* and *Mitchell* assessments.

- Examination reveals normal ROM for extension of the knee, but pain on motion is present.
- In applying the *DeLuca* repetitive use test, the examiner determines that after repetitive use extension of the knee is additionally limited, and the post-test ROM is to 10 degrees due to pain.
- The examiner provides a *Mitchell* assessment that during flare-ups the extension of the knee would be additionally limited to 15 degrees due to pain.

***Result***:  Assign one 20-percent disability evaluation under 38 CFR 4.71a, DC 5261 for limited extension of the knee.

***Explanation***:  15-degree limitation of extension, expressed in the *Mitchell* opinion, is the most advantageous assessment of functional loss for extension

of the knee in this scenario.  Therefore, the knee will be evaluated based on extension limited to 15 degrees, resulting in a 20-percent evaluation under 38 CFR 4.71a, DC 5261.

*Reference*:  For more information on the *Deluca* and *Mitchell* cases, see M21-1, Part III, Subpart iv, 4.A.1.i.

---

**l.  Example of Evaluating a Joint With LOM and Functional Loss Due to Pain**

*Situation*:  Evaluation of a knee condition with limited initial ROM and additional functional loss indicated on *DeLuca* and *Mitchell* assessments.

- Flexion of the knee is limited to 70 degrees with pain on motion during initial examination.
- In applying the *DeLuca* repetitive use test, the examiner determines that after repetitive use flexion of the knee is additionally limited, and the post-test ROM is 50 degrees as a result of pain with repetitive use.
- The examiner provides a *Mitchell* assessment that during flare-ups the estimated ROM for flexion of the knee would be 30 degrees due to pain.

*Result*:  Assign one 20-percent disability evaluation under 38 CFR 4.71a, DC 5260 for limited flexion of the knee.

*Explanation*:  Flexion of the knee would be assessed at 30 degrees, as the ROM estimated in the *Mitchell* assessment is the most advantageous representation of the Veteran's limitation of flexion.

*Reference*:  For more information on the *Deluca* and *Mitchell* cases, see M21-1, Part III, Subpart iv, 4.A.1.i.

---

**m. Inappropriate Situations for Using Functional Loss to Evaluate Musculoskeletal Conditions**

Functional loss as discussed in 38 CFR 4.40, 38 CFR 4.45, and 38 CFR 4.59 is not used to evaluate musculoskeletal conditions that do not involve ROM findings.

*Example*:  An evaluation under 38 CFR 4.71a, DC 5257 for lateral knee instability does not involve ROM findings.  Therefore, the functional loss provisions are inapplicable.

A finding of crepitus/joint crepitation alone is not sufficient to assign a compensable evaluation for a joint under 38 CFR 4.59.

The regulation alludes to crepitus (a clinical sign of a crackling or grating feeling or sound in a joint) as indicative of a point of contact that is diseased but crepitus is not synonymous with painful motion, which is required for the application of 38 CFR 4.59.

*Reference*:  For additional information on the historical application of 38 CFR 4.40, and 38 CFR 4.45 to evaluations for intervertebral disc syndrome (IVDS), refer to VAOPGCPREC 36-1997.

| **n. Example of Evaluating Joints with Arthritis by X-Ray Evidence Only with Other Joint(s) Affected by Non-arthritic Condition** | **Example**:  Veteran is rated 10 percent for bilateral arthritis of the elbows confirmed by x-ray evidence, without limited or painful motion or incapacitating exacerbations.  Veteran subsequently files a claim for service connection (SC) for chondromalacia of the right knee and is awarded a 20-percent evaluation based on VA examination, which revealed limitation of flexion of the right knee to 30 degrees. |
|---|---|
| | **Analysis**:  A 10-percent evaluation for bilateral arthritis of the elbows and a separate 20-percent evaluation for right knee chondromalacia is justified.  In this case, the rating does not violate Note (1) under 38 CFR 4.71a, DC 5003, because the knee condition is not an arthritic condition. |
| | **Reference**:  For additional information on ratings not permissible under Note (1) under 38 CFR 4.71a, DC 5003, see M21-1, Part III, Subpart iv, 4.A.8.d. |

| **o. Definition: Major Joints** | The term **major joint** means |
|---|---|
| | - a shoulder
- an elbow
- a wrist
- a hip
- a knee, or
- an ankle.

**Reference**:  For more information on major joints, see 38 CFR 4.45(f). |

| **p. Definition: Minor Joints** | The term **minor joint** means |
|---|---|
| | - an interphalangeal joint (of the hand or foot)
- a metacarpal joint (hand)
- a metatarsal joint (foot)
- a carpal joint (hand)
- a tarsal joint (foot)
- cervical vertebrae
- dorsal vertebrae
- lumbar vertebrae
- the lumbosacral articulation, or
- a sacroiliac joint.

**References**:  For more information on
- the definition of a minor joint, see 38 CFR 4.45(f)
- the definition of minor joint groups, see M21-1, Part III, Subpart iv, 4.A.1.q
- the joints of the hand see M21-1, Part III, Subpart iv, 4.A.2.f, and
- identifying the digits of the foot, see M21-1, Part III, Subpart iv, 4.A.3.p. |

**q. Definition: Minor Joint Groups**

A ***minor joint group*** means

- multiple involvements of the interphalangeal, metacarpal and carpal joints of the same upper extremity, namely, combinations of
  – distal interphalangeal (DIP) joints
  – proximal interphalangeal (PIP) joints
  – metacarpophalangeal (MCP) joints, and/or
  – carpometacarpal (CMC) joints
- multiple involvements of the interphalangeal, metatarsal and tarsal joints of the same lower extremity, namely, combinations of
  – interphalangeal (IP) joints
  – metatarsophalangeal (MTP) joints, and/or
  – transverse tarsal joints
- the cervical vertebrae
- the dorsal (thoracic) vertebrae
- the lumbar vertebrae or
- the lumbosacral articulation together with both sacroiliac joints.

***References***:  For more information on
- the definition of minor joint groups, see 38 CFR 4.45(f)
- evaluations for LOM, painful motion and arthritis of the fingers, see M21-1, Part III, Subpart iv, 4.A.2.n
- arthritis and pain on motion or use of the toes, see M21-1, Part III, Subpart iv, 4.A.3.t and u, and
- arthritis where a compensable evaluation cannot be assigned under another DC, see M21-1, Part III, Subpart iv, 4.A.7.b.

# 2. Evaluating Musculoskeletal Disabilities of the Upper Extremities

**Introduction**

This topic contains information on evaluating musculoskeletal disabilities of the upper extremities, including

- considering separate evaluations for disabilities of the shoulder and arm
- example of separate evaluations for disabilities of the shoulder and arm
- assigning separate evaluations for disabilities of the elbow, forearm, and wrist
- example of separate evaluations for multiple disabilities of the elbow, forearm, and wrist
- considering impairment of supination and pronation of the forearm
- identifying digits of the hand
- anatomy of the hand
- anatomical position of the hand and fingers
- range of motion of the index, long, ring, and little fingers
- rating Dupuytren's contracture of the hand
- evaluating amputations of multiple fingers
- evaluating amputations of single fingers
- evaluating ankylosis of one or more fingers, and
- compensable evaluations for LOM, painful motion, and arthritis of the fingers.

**Change Date**

September 23, 2016

**a. Considering Separate Evaluations for Disabilities of the Shoulder and Arm**

Separate evaluations may be given for disabilities of the shoulder and arm under 38 CFR 4.71a DCs 5201, 5202, or 5203 if the manifestations represent separate and distinct symptomatology that are neither duplicative nor overlapping.

*Reference*:  For additional information concerning separate and distinct symptomatology, refer to
- 38 CFR 4.14, and
- *Esteban v. Brown*, 6 Vet.App. 259 (1994).

**b. Example of Separate Evaluations for Disabilities of the Shoulder and Arm**

*Situation*:  A Veteran was involved in an automobile accident that resulted in multiple injuries to the upper extremities.  The Veteran sustained the following injuries

- a humeral fracture resulting in restriction of arm motion at shoulder level, and

- a clavicular fracture resulting in malunion of the clavicle.

***Result***:
- assign a 20-percent evaluation for the impairment of the humerus under 38 CFR 4.71a, DC 5202-5201, and
- assign a separate 10-percent evaluation for malunion of the clavicle under 38 CFR 4.71a, DC 5203.

***Notes***:
- The hyphenated evaluation DC is assigned under 38 CFR 4.71a, DC 5202-5201 because the humerus impairment affects ROM.
- The separate evaluation for the clavicle disability is warranted because this disability does not affect ROM.

***Exception***:  Multiple evaluations cannot be assigned under 38 CFR 4.71a, DC 5201 for limited flexion and abduction of the shoulder.

***Reference***:  For additional information on evaluating shoulder conditions, see *Yonek v. Shinseki,* 22 F.3d 1355 (Fed. Cir. 2013).

---

**c. Assigning Separate Evaluations for Disabilities of the Elbow, Forearm, and Wrist**

Impairments of the elbow, forearm, and wrist will be assigned separate disability evaluations.  The motions of these joints are all viewed as clinically separate and distinct.  Assign separate evaluations for impairment under the following DCs.

- elbow flexion under 38 CFR 4.71a, DC 5206
- elbow extension under 38 CFR 4.71a, DC 5207
- forearm supination and pronation under 38 CFR 4.71a, DC 5213, and
- wrist flexion or ankylosis under 38 CFR 4.71a, DC 5214 or 38 CFR 4.71a, DC 5215.

***Reference***:  For additional information on assigning separate evaluations for elbow motion, see M21-1, Part III, Subpart iv. 4.A.1.a.

---

**d. Example of Separate Evaluations for Disabilities of the Elbow, Forearm, and Wrist**

***Situation***:  A Veteran sustained multiple injuries to the right upper extremity in a vehicle rollover accident.  The following impairments are due to the service-connected (SC) injuries:

- elbow flexion limited to 90 degrees
- elbow extension limited to 45 degrees
- full ROM on supination and pronation with painful supination, and
- full ROM of the wrist with pain on dorsiflexion.

***Result***:  Assign the following disability evaluations
- 20 percent for limited elbow flexion under 38 CFR 4.71a, DC 5206
- 10 percent for limited elbow extension under 38 CFR 4.71a, DC 5207

- 10 percent for painful forearm supination under [38 CFR 4.71a, DC 5213](#), and
- 10 percent for painful wrist motion under [38 CFR 4.71a, DC 5215](#).

*Explanation*:
- Compensable LOM of elbow flexion and extension is present. Separate evaluations are warranted for elbow flexion and extension.
- Motion of the forearm is separate and distinct from elbow motion. Therefore, a separate evaluation is warranted for painful supination.
- Motion of the wrist is separate and distinct from forearm motion. Therefore, a separate evaluation is warranted for painful motion of the wrist.

*Note*:  If elbow flexion is limited to 100 degrees and elbow extension is limited to 45 degrees, assign a single 20-percent disability evaluation under [38 CFR 4.71a, DC 5208](#).

*References*:  For more information on
- separate evaluations for motion of a single joint, see
  - [VAOPGCPREC 9-2004](#), and
  - M21-1, Part III, Subpart iv, 4.A.1.a
- separate evaluations for the elbow, forearm, and wrist, see M21-1, Part III, Subpart iv, 4.A.2.c
- evaluating painful motion of a joint, see
  - [38 CFR 4.59](#), and
  - M21-1, Part III, Subpart iv, 4.A.1.c, and
- considering impairment of supination and pronation of the forearm, see M21-1, Part III, Subpart iv, 4.A.2.e.

---

**e. Considering Impairment of Supination and Pronation of the Forearm**

When preparing rating decisions involving impairment of supination and pronation of the forearm, consider the following facts:

- Full pronation is the position of the hand flat on a table.
- Full supination is the position of the hand palm up.
- When examining limitation of pronation, the
  - arc is from full supination to full pronation, and
  - middle of the arc is the position of the hand, palm vertical to the table.

Assign the lowest, 20-percent evaluation when pronation cannot be accomplished through more than the first three-quarters of the arc from full supination.

Do *not* assign a compensable evaluation for both limitation of pronation and limitation of supination of the same extremity.

*Reference*:  For more information on painful motion, see
- [38 CFR 4.59](#), and
- M21-1, Part III, Subpart iv, 4.A.1.c.

**f. Identifying Digits of the Hand**

Follow the guidelines listed below to accurately specify the injured digits of the hand.

- The digits of the hand are identified as
  – thumb
  – index
  – long
  – ring, or
  – little.
- Do not use numerical designations for either the fingers or the joints of the fingers.
- Each digit, except the thumb, includes three phalanges
  – the proximal phalanx (closest to the wrist)
  – the middle phalanx, and
  – the distal phalanx (closest to the tip of the finger).
- The joint between the proximal and middle phalanges is called the ***proximal interphalangeal*** or ***PIP*** joint.
- The joint between the middle and distal phalanges is called the ***distal interphalangeal*** or ***DIP*** joint.
- The thumb has only two phalanges, the proximal phalanx and the distal phalanx.  Therefore, each thumb has only a single joint, called the ***interphalangeal*** or ***IP*** joint.
- The joints connecting the phalanges in the hands to the metacarpals are the ***metacarpophalangeal*** or ***MCP*** joints.
- Designate either right or left for the digits of the hand.

*Note*:  If the location of the injury is unclear, obtain x-rays to clarify the exact point of injury.

***References***:  For
- more information on determining dominant handedness, see <u>38 CFR 4.69</u>, and
- an exhibit of the anatomy of the hand, see M21-1, Part III, Subpart iv, 4.A.2.g.

**g. Anatomy of the Hand**

The following image is a reproduction of Plate III following 38 CFR 4.71a, DC 5156. It illustrates the bones of the hand, as well as the PIP and DIP joints.



---

**h. Anatomical Position of the Hand and Fingers**

The normal anatomical position of the hand (called the position of function of the hand in the rating schedule) and fingers is with the

- wrist dorsiflexed 20 to 30 degrees
- MCP and PIP joints flexed to 30 degrees, and
- thumb abducted and rotated so that the thumb pad faces the finger pads.

*Reference*: For more information on the normal anatomical position of the hand and fingers, see note (1) preceding 38 CFR 4.71a, DC 5216.

---

**i. Range of Motion of the Index, Long, Ring, and Little**

For the index, long, ring, and little fingers, zero degrees of flexion represents the fingers fully extended, making a straight line with the rest of the hand.

For these digits, the

| Fingers | • MCP joint has a range of zero to 90 degrees of flexion |
| | • PIP joint has a range of zero to 100 degrees of flexion, and |
| | • DIP joint has a range of zero to 70 or 80 degrees of flexion. |

**Fingers**

- MCP joint has a range of zero to 90 degrees of flexion
- PIP joint has a range of zero to 100 degrees of flexion, and
- DIP joint has a range of zero to 70 or 80 degrees of flexion.

*Reference*:  For more information on the range of motion of the index, long, ring, and little fingers, see note (1) preceding 38 CFR 4.71a, DC 5216.

---

**j.  Rating Dupuytren's Contracture of the Hand**

The rating schedule does not specifically list Dupuytren's contracture as a disease entity; therefore, assign an evaluation on the basis of limitation of finger movement.

---

**k.  Evaluating Amputations of Multiple Fingers**

The evaluation levels for amputations of multiple fingers are contained in 38 CFR 4.71a, DC 5126 to 5151.

Consider and apply the following principles as applicable when evaluating amputations of multiple fingers:

- Amputations other than at the PIP joints or through the proximal phalanges will be rated as ankylosis of the fingers.
  - Amputations at distal joints, or through distal phalanges (other than negligible losses) will be rated as favorable ankylosis of the fingers.
  - Amputation through middle phalanges will be rated as unfavorable ankylosis of the fingers.
- If there is amputation or resection of metacarpal bones (where more than one-half the bone is lost) in multiple fingers injuries add (not combine) 10 percent to the specified evaluation for the finger amputations subject to the amputation rule (at the forearm level).
- When an evaluation is assigned under 38 CFR 4.71a, DC 5126 to 5130 there will also be entitlement to special monthly compensation.
- Loss of use of the hand exists when no effective function remains other than that which would be equally well served by an amputation stump with a suitable prosthetic appliance.

---

**l.  Evaluating Amputations of Single Fingers**

The rating schedule provisions for amputations of single fingers are at 38 CFR 4.71a, DC 5152 to 5156.

---

**m.  Evaluating Ankylosis of One or More Fingers**

The rating schedule provisions for ankyloses of one or more fingers are at 38 CFR 4.71a, DC 5216 to 5227.

When considering an evaluation for ankylosis of the index, long, ring or little finger, evaluate as:

- *favorable ankylosis* if **either** the MCP **or** PIP joint is ankylosed, **and** there is

a gap of two inches (5.1 cm.) *or less* between the fingertip(s) and the proximal transverse crease of the palm, with the finger(s) flexed to the extent possible
- *unfavorable ankylosis* if
  – *either* the MCP *or* PIP joint is ankylosed, *and* there is a gap of *more than* two inches (5.1 cm.) between the fingertip(s) and the proximal transverse crease of the palm, with the finger(s) flexed to the extent possible, *or*
  – *both* the MCP *and* PIP joints of a digit are ankylosed (even if each joint is individually fixed in a favorable position), *or*
- *amputation without metacarpal resection at the PIP joint or proximal thereto* ([38 CFR 4.71a, DC 5153 to 5156](#)) if both the MCP and PIP joints of a digit are ankylosed, *and* either is in extension or full flexion, *or* there is rotation or angulation of a bone.

When considering an evaluation for ankylosis of the thumb, evaluate as:

- *favorable ankylosis* if *either* the carpometacarpal *or* IP joint is ankylosed, *and* there is a gap of two inches (5.1 cm.) *or less* between the thumb pad and fingers with the thumb attempting to oppose the fingers
- *unfavorable ankylosis* if
  – *either* the carpometacarpal *or* IP joint is ankylosed, *and* there is a gap of *more than* two inches (5.1 cm.) between the thumbpad and the fingers, with the thumb attempting to oppose the fingers, *or*
  – *both* the capometacarpal *and* IP joints are ankylosed (even if each joint is individually fixed in a favorable position), *or*
- *amputation at the carpometacarpal joint or joint or through proximal phalange* ([38 CFR 4.71a, DC 5152](#)) if both the carpometacarpal and IP joints are ankylosed, *and* either is in extension or full flexion, *or* there is rotation or angulation of a bone.

*Note*: Only joints in the position specified in M21-1, Part III, Subpart iv, 4.A.1.h-i are considered in a favorable position.

*Reference*: For more information on evaluation of ankylosis of the fingers, see the notes prior to [38 CFR 4.71a, DC 5216](#).

---

**n. Compensable Evaluations for LOM, Painful Motion and Arthritis of the Fingers**

When considering evaluations for the fingers based on LOM or painful motion, a compensable evaluation can be assigned for any of the following:

- LOM of the thumb as specified in [38 CFR 4.71a, DC 5228](#).
- LOM of the index or long finger as specified in [38 CFR 4.71a, DC 5229.](#)
- X-ray evidence of arthritis or other condition rated under the criteria of [38 CFR 4.71a, DC 5003](#), affecting a *group* of minor joints of the fingers of *one* hand. There must be
  – noncompensable LOM in more than one of the joints comprising the group of affected minor joints, *and*
  – findings such as swelling, muscle spasm or satisfactory evidence of

painful motion in the affected minor joints of the joint group.
- Painful noncompensable motion of two or three of the fingers listed in the first two bullets above (thumb, index finger, long finger) of the same hand due to joint or periarticular pathology pursuant to 38 CFR 4.59.
- X-ray-*only* evidence of arthritis (where there is no LOM) under the criteria of 38 CFR 4.71a, DC 5003, affecting *two or more groups* of minor joints – namely the fingers of *both* hands or a group of minor joints in one hand in combination with another group of minor joints.

With regard to the third and fourth bullets above
- The Federal Circuit held in *Spicer v. Shinseki*, 752 F.3d 1367 (Fed. Cir. 2014) that the minor joint *group* of IP joints of a hand is compensably disabled *only when two or more* joints in the group are affected by LOM.
- The Court of Appeals for Veterans Claims held in *Sowers v. McDonald*, 27 Vet.App. 472 (2016) that *where the DC does not provide for a compensable evaluation*, 38 CFR 4.59 *does not require that a compensable evaluation be assigned*.
- Only the thumb, index finger and long finger DCs specify a compensable evaluation. Therefore 38 CFR 4.59 can only potentially apply to those fingers and at least two of the fingers must be involved in order to find that a group of minor joints is affected by noncompensable but painful motion due to joint or periarticular pathology.

***References***: For more information on
- identifying the digits of the hand and the finger joints, see M21-1, Part III, Subpart iv, 4.A.2.f
- anatomy of the hand, see M21-1, Part III, Subpart iv, 4.A.2.g
- the definition of minor joint, see M21-1, Part III, Subpart iv, 4.A.1.p
- the definition of a group of minor joints, see M21-1, Part III, Subpart iv, 4.A.1.q
- range of motion of the index, long, ring and little fingers, see M21-1, Part III, Subpart iv, 4.A.2.i
- assigning evaluations under 38 CFR 4.71a, DC 5003 when a compensable rating based on LOM cannot be assigned under another DC, see M21-1, Part III, Subpart iv, 4.A.7.b, and
- inability to use 38 CFR 4.59 to establish a minimum compensable evaluation for a fracture of a single ring finger, see M21-1, Part III, Subpart iv, 4.A.1.h.

# 3. Evaluating Musculoskeletal Disabilities of the Spine and Lower Extremities

| | |
|---|---|
| **Introduction** | This topic contains information on evaluating musculoskeletal disabilities of the spine and lower extremities, including |

- evaluating manifestations of spine diseases and injuries
- definition of incapacitating episode of IVDS
- example of evaluating IVDS
- evaluating ankylosing spondylitis
- <mark>evaluations for knee replacement</mark>
- evaluating noncompensable knee conditions
- definition of lateral instability of the knee
- separate evaluations for knee instability and LOM
- separate evaluations – LOM and meniscus disabilities
- separate evaluations, knee instability and meniscus disabilities
- separate evaluations – genu recurvatum
- evaluating shin splint
- moderate and marked LOM of the ankle
- considering ankle instability
- evaluating plantar fasciitis
- identifying the digits of the foot
- definition of metatarsalgia or Morton's disease
- evaluating metatarsalgia or Morton's disease
- pyramiding of metatarsalgia and either plantar fasciitis or pes planus
- evaluating arthritis of the minor joints of the toes
- pain on motion or use of the toes, and
- considering toe injuries under 38 CFR 4.71a, DC 5884.

| | |
|---|---|
| **Change Date** | September 23, 2016 November 21, 2016 |

| | |
|---|---|
| **a. Evaluating Manifestations of Spine Diseases and Injuries** | Evaluate diseases and injuries of the spine based on the criteria listed in the 38 CFR 4.71a, General Rating Formula for Diseases and Injuries of the Spine (General Rating Formula).  Under this criteria, evaluate conditions based on chronic orthopedic manifestations (for example, painful muscle spasm or LOM) and any associated neurological manifestations (for example, footdrop, muscle atrophy, or sensory loss) by assigning separate evaluations for the orthopedic and neurological manifestations. |

Evaluate IVDS under 38 CFR 4.71a, DC 5243, either based on the General Rating Formula or the Formula for Rating IVDS Based on Incapacitating Episodes (Incapacitating Episode Formula), whichever formula results in the higher evaluation when all disabilities are combined under 38 CFR 4.25.

Variations of diagnostic terminology exist for IVDS. When used in the clinical setting, the following terminology is consistent with the general designation of IVDS:

- slipped or herniated disc
- ruptured disc
- prolapsed disc
- bulging or protruded disc
- degenerative disc disease
- sciatica
- discogenic pain syndrome
- herniated nucleus pulposus, and
- pinched nerve.

***Notes***:
- When an SC thoracolumbar disability is present and objective neurological abnormalities or radiculopathy are diagnosed but the medical evidence does not identify a specific nerve root, rate the lower extremity radiculopathy under the sciatic nerve, [38 CFR 4.124a, DC 8520](#).
- If an evaluation is assigned based on incapacitating episodes, a separate evaluation may not be assigned for LOM, radiculopathy, or any other associated objective neurological abnormality as it would constitute pyramiding.
- Apply the previous provisions of [38 CFR 3.157 (b)](#) (prior to March 24, 2015) when determining the effective date for neurological abnormalities of the spine that are identified by requisite records prior to March 24, 2015.

***Example***: Veteran has been SC for degenerative disc disease (DDD) since 2012. Upon review of a claim for increase received on June 2, 2015, it is noted in VA medical records that the Veteran received treatment for bladder impairment secondary to DDD on July 7, 2014. Because the VA medical records constitute a claim for increase under rules in effect prior to March 24, 2015, it is permissible to apply previous rules from [38 CFR 3.157 (b)](#) in adjudicating the bladder impairment issue.

***References***: For more information on
- assigning disability evaluations for
  - peripheral nerve disabilities to include radiculopathy, see M21-1, Part III, Subpart iv, 4.G.4, and
  - progressive spinal muscular atrophy, see M21-1, Part III, Subpart iv, G.4.1.c, and
- the historic application of [38 CFR 4.71a, DC 5285](#), for demonstrable deformity of a vertebral body, refer to [VAOPGCPREC 03-2006.](#)

---

**b. Definition: Incapacitating**     By definition, an incapacitating episode of IVDS requires bedrest prescribed by a physician.

**Episode of IVDS**

In order to evaluate IVDS based on incapacitating episodes, there must be evidence the associated symptoms required bedrest as prescribed by a physician. The medical evidence of prescribed bedrest must be

- of record in the claims folder, *or*
- reviewed and described by an examiner completing a Disability Benefits Questionnaire (DBQ).

*Note*: If the records do not adequately document prescribed bedrest, use the General Rating Formula to evaluate IVDS and advise the Veteran to submit medical evidence documenting the periods of incapacitating episodes requiring bedrest prescribed by a physician.

---

**c. Example of Evaluating IVDS**

*Situation*: A Veteran's IVDS is being evaluated.

- LOM warrants a 20-percent evaluation based under the general rating formula
- mild radiculopathy of the left lower extremity warrants a 10-percent evaluation as a neurological complication, and
- medical evidence shows incapacitating episodes requiring bedrest prescribed by a physician of four weeks duration over the past 12 months which would result in a 40-percent evaluation based on the incapacitating episode formula.

*Result*: Assign a 40-percent evaluation based on incapacitating episodes.

*Explanation*:
- Evaluating IVDS using incapacitating episodes results in the highest evaluation.
- Since incapacitating episodes are used to evaluate IVDS, the associated LOM and neurological signs and symptoms will not be assigned a separate evaluation.

*References*: For additional information on
- evaluating spinal conditions, see M21-1, Part III, Subpart iv, 4.A.3.a, and
- determining whether evidence is sufficient to evaluate based on incapacitating episodes of IVDS, see M21-1, Part III, Subpart iv, 4.A.3.b.

---

**d. Evaluating Ankylosing Spondylitis**

Ankylosing spondylitis may be evaluated as an active disease process or based upon LOM of the spine.

The table below describes appropriate action for evaluating ankylosing spondylitis.

| If ankylosing spondylitis is ... | Then ... |
|---|---|

| | |
|---|---|
| an active process | evaluate under 38 CFR 4.71a, DC 5009 (using the criteria in 38 CFR 4.71a, DC 5002). |
| inactive | • evaluate under 38 CFR 4.71a, DC 5240 based on chronic residuals affecting the spine, and<br>• separately evaluate other affected joints or body systems under the appropriate DC. |

**e. Evaluations for Knee Replacement**

Total knee replacements are evaluated under 38 CFR 4.71a, DC 5055.

For guidance on rating action for claims involving partial knee replacement see the table below.

| If a claim for evaluation of a partial knee replacement was ... | Then ... |
|---|---|
| filed and decided on or after July 16, 2015 | do not assign an evaluation under 38 CFR 4.71a, DC 5055.<br><br>***Explanation***:  Effective July 16, 2015, 38 CFR 4.71a was revised to clarify in a note that the provisions of 38 CFR 4.71a, DC 5055 apply only to total knee replacement. |
| • filed before July 16, 2015, and<br>• pending (not finally adjudicated) on that date | the case must be evaluated under 38 CFR 4.71a, DC 5055 if this would be more favorable than another applicable DC.<br><br>***Explanation***:  This result is required by<br>• *Hudgens v. McDonald*, 823 F.3d 630 (Fed. Cir. 2016), and<br>• M21-1, Part IV, Subpart ii, 2.K.6. |
| • filed before July 16, 2015, and<br>• finally adjudicated before that date | do not revise the decision as clearly and unmistakably erroneous whether it<br>• assigned an evaluation under 38 CFR 4.71a, DC 5055, or<br>• found that an evaluation could not be assigned under 38 CFR 4.71a, DC 5055.<br><br>***Explanation***: The regulation action effective July 16, 2015, explained |

<table>
<tr><td></td><td>that VA's long standing policy was that partial knee replacements could not be evaluated under 38 CFR 4.71a, DC 5055. However, the Court in *Hudgens v. McDonald*, 823 F.3d 630 (Fed. Cir. 2016) found that prior to the revision the regulation was ambiguous as to whether it covered partial knee replacements and they noted conflicting decisions had been issued.</td></tr>
</table>

**References**: For more information on

- handling requests for separate knee evaluations in cases of total knee replacement, see M21-1, Part III, Subpart iv, 4.A1.g
- evaluations for partial knee replacements, see *Hudgens v. McDonald*, 823 F.3d 630 (Fed. Cir. 2016)
- changes of law, precedential court decisions and claim pendency, see M21-1, Part IV, Subpart ii, 2.K.6
- determining the effective date of a convalescence rating for a joint replacement, see M21-1, Part IV, Subpart ii, 2.J.4.e, and
- rating issues for DCs, such as 38 CFR 4.71a, DC 5055, that provide for definite periods of convalescence, see M21-1, Part IV, Subpart ii, 2.J.5.

---

**ef. Evaluating Noncompensable Knee Conditions**

Evaluate a noncompensable knee condition by analogy to 38 CFR 4.71a, DC 5257 if

- there is no associated arthritis
- the schedular criteria for a noncompensable evaluation under 38 CFR 4.71a, DC 5260 or DC 5261 are not met, *and*
- the condition cannot be appropriately evaluated under 38 CFR 4.71a, DC 5258, 5259, 5262, or 5263.

**References**: For more information on
- using analogous DCs, see 38 CFR 4.20, and
- when to assign a zero-percent evaluation, see 38 CFR 4.31.

---

**fg. Definition: Lateral Instability of the Knee**

**Lateral instability**, as referred to in 38 CFR 4.71a, DC 5257 includes evaluations based on posterior or anterior instability.

*Note*: **Medial instability** is a direction of lateral instability, and when present due to SC knee injury, should be evaluated under 38 CFR 4.71a, DC 5257.

---

**gh. Separate Evaluations for Knee Instability**

A separate evaluation for knee instability may be assigned in addition to any evaluation(s) assigned based on limitation of knee motion. OGC has issued

| and LOM | Precedent Opinions that an evaluation under 38 CFR 4.71a, DC 5257, does not pyramid with evaluations based on LOM. |
|---|---|

*Exception*:  Do not rate instability separately from a total knee replacement.
- The 30-percent and 100-percent evaluations under 38 CFR 4.71a, DC 5055, are minimum and maximum evaluations and, as such, encompass all identifiable residuals post knee replacement – including LOM, instability, and functional impairment.
- The 60-percent and intermediate evaluations by their plain text provide the exclusive methods by which residuals can be evaluated at 40 or 50 percent and contemplate instability.
- Post arthroplasty, there may be instability with weakness (giving way) and pain.
- Note that the only way to obtain an evaluation in excess of 30 percent under 38 CFR 4.71a, DC 5262 (one of the specified bases for an intermediate evaluation under 38 CFR 4.71a, DC 5055) is if there is nonunion with loose motion and need for a brace.  This clearly suggests instability is incorporated in the intermediate criteria.

*Important*:  The rating activity must pay close attention to the combined evaluation of the knee disability prior to replacement surgery and to follow all required due process and protected evaluation procedures.

*References*:  For more information on
- pyramiding and separating individual decisions in a rating decision, see M21-1, Part III, Subpart iv, 6.C.5.d
- separate evaluation of knee instability, see
  – VAOPGCPREC 23-97, and
  – VAOPGCPREC 9-98, and
- due process issues pertinent to knee replacements including
  – change of DC for a protected disability evaluation, see
    - 38 CFR 3.951
    - M21-1, Part III, Subpart iv, 8.C.1.k, and
    - M21-1, Part IV, Subpart ii, 2.J.5, and
  – reduction procedures that would apply prior to assignment of a post-surgical minimum evaluation lower than the running award rate, see
    - 38 CFR 3.105(e)
    - M21-1, Part III, Subpart iv, 8.D.1
    - M21-1, Part IV, Subpart ii, 3.A.3, and
    - M21-1, Part IV, Subpart ii, 2.J.

| **h̶i. Separate Evaluations – LOM and Meniscus Disabilities** | Do not assign separate evaluations for |
|---|---|

- a meniscus disability
  – 38 CFR 4.71a, DC 5258 (dislocated semilunar cartilage), or
  – 38 CFR 4.71a, DC 5259 (symptomatic removal of semilunar cartilage), *and*

- LOM of the same knee
  - [38 CFR 4.71a, DC 5260,](#) (limitation of flexion) or
  - [38 CFR 4.71a, DC 5261,](#) (limitation of extension).

*Explanation*: LOM of the knee is contemplated by the meniscus DCs.
- Although [38 CFR 4.71a, DC 5258](#), refers to "dislocated" cartilage and "locking" of the knee the rating criteria contemplate LOM of the knee through functional impairment with use (namely pain and effusion).
- [38 CFR 4.71a, DC 5259,](#) provides for a compensable evaluation for a "symptomatic" knee post removal of the cartilage. [VAOPGCPREC 9-98](#) states "DC 5259 requires consideration of [38 CFR 4.40](#) and [38 CFR 4.45](#) because removal of semilunar cartilage may result in complications producing loss of motion."

| | |
|---|---|
| **i̶j. Separate Evaluations, Knee Instability and Meniscus Disabilities** | Do not assign separate evaluations for<br><br>- subluxation or lateral instability under [38 CFR 4.71a, DC 5257](#), and<br>- a meniscus disability<br>  - [38 CFR 4.71a, DC 5258](#), or<br>  - [38 CFR 4.71a, DC 5259](#)<br><br>*Explanation*: The criteria for both of those codes contemplate instability.<br>- Dislocation and locking under [38 CFR 4.71a, DC 5258](#) is consistent with instability.<br>- The broad terminology of "symptomatic" under [38 CFR 4.71a, DC 5259](#) also contemplates instability. |
| **j̶k. Separate Evaluations – Genu Recurvatum** | When evaluating genu recurvatum, which involves hyperextension of the knee beyond 0 degrees of extension, under [38 CFR 4.71a, DC 5263](#)<br><br>- do *not also* evaluate separately under [38 CFR 4.71a, DC 5261](#), but<br>- *do* evaluate separately under other evaluations *if* manifestations that are not overlapping, such as limitation of flexion under [38 CFR 4.71a, DC 5260,](#) are attributed to genu recurvatum, and<br>- do *not* evaluate separately under [38 CFR 4.71a, DC 5257](#); however, if instability is manifested from genu recurvatum at the "moderate" or "severe" level, evaluate under [38 CFR 4.71a, DC 5263-5257](#). |
| **k̶l. Evaluating Shin Splints** | Evaluate shin splints analogously with [38 CFR 4.71a, DC 5262](#). The table below explains the process and necessary considerations for evaluating shin splints. |

| Step | Action |
|---|---|
| 1 | Is a chronic disability present? |

| | | |
|---|---|---|
| | | • If *yes*, go to Step 2.<br>• If *no*, deny SC. |
| | 2 | • Determine whether the shin splint disability affects the right, left, or bilateral extremity(ies).<br>• Go to Step 3. |
| | 3 | • Determine whether shin splints affect the knee or the ankle.<br>• Go to Step 4. |
| | 4 | Has SC been established for a knee or ankle joint condition affecting the same joint as the shin splints?<br><br>• If *yes*<br>– grant SC for the shin splints<br>– assign a single evaluation for the symptoms of the shin splint condition with the symptoms caused by the other SC knee or ankle joint condition, and<br>– evaluate the predominant symptoms under the most favorable DC(s) for that joint.<br>▪ If the shin splints are the predominant disability, go to Step 5.<br>▪ If the other SC disability of the knee or ankle joint is the predominant disability, evaluate under the criteria for the other SC disability and go to Step 6.<br>• If *no*<br>– award SC for the shin splints under <u>38 CFR 4.71a, DC 5299-5262</u>, and<br>– go to Step 5.<br><br>***Note***: For all awards of SC for shin splints, in the DIAGNOSIS field in the Veterans Benefits Management System-- Rating (VBMS-R) indicate<br>• which side (right or left) is affected, and<br>• whether there is knee or ankle involvement.<br><br>***Example***: *shin splints, right lower extremity, with ankle impairment.* |
| | 5 | • Access the Musculoskeletal - Other calculator within VBMS-R<br>• Choose SHIN SPLINTS from diagnosis drop down.<br>• Go to Step 6. |
| | 6 | • Utilize information from the DBQ and/or other medical evidence of record to determine whether the associated knee or ankle symptoms are mild, moderate, or severe, and<br>• choose the corresponding level of symptoms. |

**=m. Moderate and Marked LOM of the Ankle**

Consider the following when evaluating LOM of the ankle under <u>38 CFR 4.71a, DC 5271</u>:

• An example of moderate limitation of ankle motion is

– less than 15 degrees dorsiflexion, or
– less than 30 degrees plantar flexion.
- An example of marked LOM is
  – less than five degrees dorsiflexion, or
  – less than 10 degrees plantar flexion.

**~~m~~n. Considering Ankle Instability**

Do not assign separate evaluations for LOM and instability of the ankle.

DCs for the ankle, including 38 CFR 4.71a, DC 5271 and 38 CFR 4.71a, DC 5262, include broad language that does not explicitly include consideration of any particular ankle symptomatology.

**~~n~~o. Evaluating Plantar Fasciitis**

Evaluate plantar fasciitis analogous to pes planus, 38 CFR 4.71a, DC 5276.

The most common symptom seen with plantar fasciitis is heel pain. The following considerations apply when evaluating the heel pain

- 38 CFR 4.59 is not applicable because the heel is not a joint.
- Heel pain is consistent with the criteria for a moderate disability under 38 CFR 4.71a, DC 5276 based on pain on manipulation and use of the feet.
- Moderate disability under 38 CFR 4.71a, DC 5276 warrants assignment of a 10-percent evaluation for heel pain without application of 38 CFR 4.59.

*Note*:  When SC is established for pes planus and plantar fasciitis, evaluate the symptoms of both conditions together under 38 CFR 4.71a, DC 5276.

**~~o~~p. Identifying the Digits of the Foot**

Follow the guidelines listed below to accurately specify the injured digits of the foot.

- Refer to the digits of the foot as
  – first or great toe
  – second
  – third
  – fourth, or
  – fifth.
- Each digit, except the great toe, includes three phalanges
  – the proximal phalanx (closest to the ankle)
  – the middle phalanx, and
  – the distal phalanx (closest to the tip of the toe).
- The joint between the proximal and middle phalanges is called the ***proximal interphalangeal*** (PIP) joint.
- The joint between the middle and distal phalanges is called the ***distal interphalangeal*** (DIP) joint.
- The great toes each have only two phalanges, the proximal phalanx and the distal phalanx.  Therefore, each great toe has only a single joint, called the

*interphalangeal* (IP) joint.
- The joints connecting the phalanges in the feet to the metatarsals are the *metatarsophalangeal* (MTP) joints.
- Designate either right or left for the digits of the foot.

*Note*: If the location of the injury is unclear, obtain x-rays to clarify the exact point of injury.

| | |
|---|---|
| **~~p~~q. Definition of Metatarsalgia or Morton's Disease** | *Metatarsalgia* means pain in the forefoot – under the metatarsal heads.<br><br>*Morton's Disease* or *Morton's Neuroma* refers to a painful lesion of a plantar interdigital nerve. |
| **~~q~~r. Evaluating Metatarsalgia or Morton's Disease** | Anterior metatarsalgia of any type, to include cases due to Morton's Disease, will be evaluated under 38 CFR 4.71a, DC 5279.<br><br>The DC provides for an evaluation of 10 percent regardless of whether the condition is unilateral or bilateral. |
| **~~r~~s. Pyramiding of Metatarsalgia and Either Plantar Fasciitis or Pes Planus** | Do not assign separate evaluations for metatarsalgia and plantar fasciitis or pes planus. The evaluation criteria are similar enough that providing separate evaluations will compensate the same facet of disability, violating the prohibition against pyramiding in 38 CFR 4.14.<br><br>A 10-percent evaluation under 38 CFR 4.71a, DC 5279 is assigned solely for having pain under the metatarsal heads which would necessarily mean pain with manipulation and use.<br><br>The criteria for pes planus or plantar fasciitis for a 10-percent evaluation in 38 CFR 4.71a, DC 5276 include "pain on manipulation and use of the feet, unilateral or bilateral." The criteria for higher evaluations including findings of findings such as accentuated pain on manipulation and use or extreme tenderness of the "plantar surfaces of the feet."<br><br>Combine the evaluations under 38 CFR 4.71a, DC 5276. Do not rate by analogy when there is an applicable DC. However if one or both conditions resulted from an injury to the foot, you may also assign an evaluation for the combined conditions under 38 CFR 4.71a, DC 5284. |
| **s~~t~~. Evaluating Arthritis of the Minor Joints of the Toes** | For guidance on evaluating arthritis of a group of minor joints of the toes refer to the table below. |

| If arthritis ... | Then ... |
|---|---|

| | |
|---|---|
| • affects a group of minor joints in one foot<br>• is documented by x-ray evidence<br>• results in LOM, **and**<br>• is confirmed by satisfactory evidence of painful motion, pain on use or other findings such as swelling | assign a 10-percent evaluation under 38 CFR 4.71a, DC 5003. |
| • affects minor joint groups in *both* feet, **and**<br>• is documented by x-ray evidence, **but**<br>• does not result in LOM | assign a 10-percent evaluation under 38 CFR 4.71a, DC 5003.<br><br>*Exception*: Assign a 20-percent evaluation if there are occasional incapacitating exacerbations). |

*References*: For more information on
- assigning evaluations under 38 CFR 4.71a, DC 5003 when a compensable rating cannot be assigned under a DC for LOM of a joint, see M21-1, Part III, Subpart iv, 4.A.7.b, and
- treating motion as limited where it becomes painful for the purpose of applying 38 CFR 4.71a, DC 5003, pursuant to the holding in *Mitchell v. Shinseki*, 25 Vet.App. 32 (2011), see M21-1, Part III, Subpart iv, 4.A.1.c.

---

**~~t~~u. Pain on Motion or Use of the Toes**

In cases involving conditions other than arthritis ***do not*** automatically assign a 10-percent evaluation based on painful motion with joint or periarticular pathology under 38 CFR 4.59.

*Explanation*: The Court of Appeals for Veterans Claims held in *Sowers v. McDonald*, 27 Vet.App. 472 (2016) that *where a DC does not provide for a compensable evaluation for a joint*, 38 CFR 4.59 *does not require that a compensable evaluation be assigned*.

*Important*: This guidance does not mean that a compensable evaluation cannot be assigned based on toe pain where diagnostic criteria contemplate it – such as in cases of pain under the metatarsal heads from metatarsalgia.

---

**~~u~~v. Considering Toes Injuries Under 38 CFR 4.71a, DC 5284**

In cases where either arthritis or another foot disability is involved

- consider functional impairment, and
- determine whether, depending on the nature of the disability and history of injury, it is more advantageous to evaluate the condition under 38 CFR 4.71a, DC 5284 ("Other Foot Injuries").

## 4. Congenital Musculoskeletal Conditions

| | |
|---|---|
| **Introduction** | This topic contains information on congenital conditions, including<br><br>• recognizing variations in musculoskeletal development and appearance, and<br>• considering notable congenital or developmental defects. |
| **Change Date** | December 13, 2005 |
| **a. Recognizing Variations in Musculoskeletal Development and Appearance** | Individuals vary greatly in their musculoskeletal development and appearance.  Functional variations are often seen and can be attributed to<br><br>• the type of individual, and<br>• his/her inherited or congenital variations from the normal. |
| **b. Considering Notable Congenital or Developmental Defects** | Give careful attention to congenital or developmental defects such as<br><br>• absence of parts<br>• subluxation (partial dislocation of a joint)<br>• deformity or exostosis (bony overgrowth) of parts, and/or<br>• accessory or supernumerary (in excess of the normal number) parts.<br><br>Note congenital defects of the spine, especially<br><br>• spondylolysis<br>• spina bifida<br>• unstable or exaggerated lumbosacral joints or angle, or<br>• incomplete sacralization.<br><br>*Notes*:<br>• Do not automatically classify spondylolisthesis as a congenital condition, although it is commonly associated with a congenital defect.<br>• Do not overlook congenital diastasis of the rectus abdominus, hernia of the diaphragm, and the various myotonias.<br><br>*Reference*:  For more information on congenital or developmental defects, see 38 CFR 4.9. |

# 5. RA

**Introduction**    This topic contains information about RA, including

- characteristics of RA
- periods of flares and remissions of RA
- clinical signs of RA
- radiologic changes found in RA
- disability factors associated with RA, and
- points to consider in rating decisions involving joints affected by RA.

**Change Date**    May 11, 2015

**a. Characteristics of RA**    The following are characteristics of rheumatoid arthritis (RA), also diagnosed as atrophic or infectious arthritis, or arthritis deformans:

- the onset
  – occurs before middle age, and
  – may be acute, with a febrile attack, and
- the symptoms include a usually laterally symmetrical limitation of movement
  – first affecting PIP and MCP joints
  – next causing atrophy of muscles, deformities, contractures, subluxations, and
  – finally causing fibrous or bony ankylosis (abnormal adhesion of the bones of the joint).

*Important*:  Marie-Strumpell disease, also called rheumatoid spondylitis or ankylosing spondylitis, is *not* the same disease as RA.  RA and Marie-Strumpell disease have separate and distinct clinical manifestations and progress differently.

*Reference*:  For more information on evaluating ankylosing spondylitis, see M21-1, Part III, Subpart iv, 4.A.3.d.

**b. Periods of Flares and Remissions of RA**    The symptoms of RA come and go, depending on the degree of tissue inflammation.  When body tissues are inflamed, the disease is active.  When tissue inflammation subsides, the disease is inactive (in remission).

Remissions can occur spontaneously or with treatment, and can last weeks, months, or years.  During remissions, symptoms of the disease disappear, and patients generally feel well.  When the disease becomes active again (relapse), symptoms return.

*Note*:  The return of disease activity and symptoms is called a flare.  The course of RA varies from patient to patient, and periods of flares and remissions are typical.

**c.  Clinical Signs of RA**

The table below contains information about the clinical signs of RA.

| Stage of Disease | Symptoms |
|---|---|
| Initial | • periarticular and articular swelling, often free fluid, with proliferation of the synovial membrane, and<br>• atrophy of the muscles.<br><br>*Note*:  Atrophy is increased to wasting if the disease is unchecked. |
| Late | • deformities and contractures<br>• subluxations, or<br>• fibrous or bony ankylosis. |

**d.  Radiologic Changes Found in RA**

The table below contains information about the radiologic changes found in RA.

| Stage of Disease | Radiologic Changes |
|---|---|
| Early | • slight diminished density of bone shadow, and<br>• increased density of articular soft parts without bony or cartilaginous changes of articular ends.<br><br>*Note*:  RA and some other types of infectious arthritis do not require x-ray evidence of bone changes to substantiate the diagnosis, since x-rays do not always show their existence. |
| Late | • diminished density of bone shadow<br>• loss of bone substance or articular ends, and<br>• subluxation or ankylosis. |

**e.  Disability Factors Associated With RA**

Give special attention to the following disability factors associated with RA in addition to, or in advance of, demonstrable x-ray changes:

• muscle spasms
• periarticular and articular soft tissue changes, such as
  – synovial hypertrophy
  – flexion contracture deformities
  – joint effusion, and
  – destruction of articular cartilage, and

- constitutional changes such as
  – emaciation
  – dryness of the eyes and mouth (Sjogren's syndrome)
  – pulmonary complications, such as inflammation of the lining of the lungs or lung tissue
  – anemia
  – enlargement of the spleen
  – muscular and bone atrophy
  – skin complications, such as nodules around the elbows or fingers
  – gastrointestinal symptoms
  – circulatory changes
  – imbalance in water metabolism, or dehydration
  – vascular changes
  – cardiac involvement, including pericarditis
  – dry joints
  – low renal function
  – postural deformities, and
  – low-grade edema of the extremities.

*Reference*:  For more information on the features of RA, see
http://www.niams.nih.gov/Health_Info/Rheumatic_Disease/default.asp.

| | |
|---|---|
| **f.  Points to Consider in Rating Decisions Involving Joints Affected by RA** | In the DIAGNOSIS field of the rating decision, state which joints are affected by RA as evidenced by any of the following findings:<br><br>- synovial hypertrophy or joint effusion<br>- severe postural changes; scoliosis; flexion contracture deformities<br>- ankylosis or LOM of joint due to bony changes, and/or<br>- destruction of articular cartilage. |

# 6. Degenerative Arthritis

**Introduction**

This topic contains information about degenerative arthritis, including

- characteristics of degenerative arthritis
- diagnostic symptoms of degenerative arthritis
- radiologic changes found in degenerative arthritis
- symptoms of degenerative arthritis of the spine and pelvic joints, and
- points to consider in the rating decision for degenerative and traumatic arthritis.

**Change Date**

January 11, 2016

**a. Characteristics of Degenerative Arthritis**

The following are characteristics of degenerative arthritis, also diagnosed as osteoarthritis or hypertrophic arthritis:

- The onset generally occurs after the age of 45.
- It has no relation to infection.
- It is asymmetrical (more pronounced on one side of the body than the other).
- There is limitation of movement in the late stages only.

**b. Diagnostic Symptoms of Degenerative Arthritis**

Diagnostic symptoms of degenerative arthritis include

- the presence of Heberden's nodes or calcific deposits in the terminal joints of the fingers with deformity
- ankylosis, in rare cases
- hyperostosis and irregular, notched articular surfaces of the joints
- destruction of cartilage
- bone eburnation, and
- the formation of osteophytes.

*Note*: The flexion contracture deformities and severe constitutional symptoms described under RA do not usually occur in degenerative arthritis.

**c. Radiologic Changes Found in Degenerative Arthritis**

The table below contains information about the radiologic changes found in degenerative arthritis.

| Stage | Radiologic Changes |
|-------|--------------------|
| Early | delicate spicules of calcium at the articular margins without |

| | |
|---|---|
| | • diminished density of bone shadow, and<br>• increased density of articular of parts. |
| Late | • ridging of articular margins<br>• hyperostosis<br>• irregular, notched articular surfaces, and<br>• ankylosis only in the spine. |

**d. Symptoms of Degenerative Arthritis of the Spine and Pelvic Joints**

Degenerative arthritis of the spine and pelvic joints is characterized clinically by the same general characteristics as arthritis of the major joints except that

- limitation of spine motion occurs early
- chest expansion and costovertebral articulations are not usually affected
- referred pain is commonly called "*intercostal neuralgia*" and "*sciatica*," and
- localized ankylosis may occur if spurs on bodies of vertebrae impinge.

**e. Points to Consider in the Rating Decision for Degenerative and Traumatic Arthritis**

Degenerative and traumatic arthritis require x-ray evidence of bone changes to substantiate the diagnosis.

*Note*: In evaluating arthritis of the spine, the principles for extending SC to joints affected by the subsequent development of degenerative arthritis (as contemplated under 38 CFR 4.71a, DC 5003), is not dependent on the choice of DC.

*Example*: Veteran is SC for degenerative arthritis of the spine under 38 CFR 4.71a, DC 5242 and subsequently develops degenerative arthritis in the right elbow, with no intercurrent cause noted. In this case, the principles of extending SC to joints, as contemplated in 38 CFR 4.71a, DC 5003, also apply even though the Veteran is rated under 38 CFR 4.71a, DC 5242. Thus, SC for arthritis of the right elbow may be established.

*Reference*: For more information on considering x-ray evidence when evaluating arthritis and non-specific joint pain, see
- 38 CFR 4.71a, DC 5003, and
- M21-1, Part III, Subpart iv, 3.D.4.g.

# 7. LOM in Arthritis Cases

**Introduction**    This topic contains information on LOM due to arthritis, including

- arthritis compensable under DCs based on ROM
- joint conditions not compensable under DCs not based on ROM
- reference for rating decisions involving LOM
- arthritis previously rated as a single disability
- using DCs 5013 through 5024 in rating decisions, and
- considering the effects of a change of diagnosis in arthritis cases.

**Change Date**    September 23, 2016

**a. Arthritis Compensable Under DCs Based on ROM**

For a joint or group of joints affected by degenerative arthritis (or a condition evaluated using the arthritis criteria such as traumatic arthritis), first attempt to assign an evaluation using the DC for ROM of the affected joint (38 CFR 4.71a, DC 5200-series).

When the requirements for compensable LOM of a joint are met under a DC other than 38 CFR 4.71a, DC 5003, hyphenate that DC in the conclusion with a preceding "5003-."

***Example***:  Degenerative arthritis of the knee manifested by limitation of knee extension justifying a 10-percent evaluation under 38 CFR 4.71a, DC 5261 would use the hyphenated DC "5003-5261."

***Exception***:  If other joints affected by arthritis are compensably evaluated in the same rating decision, use only the DC appropriate to these particular joints which supports the assigned evaluation and omit the modifying "5003."

**b. Joint Conditions Not Compensable Under DCs Not Based on ROM**

Whenever LOM due to arthritis is noncompensable under codes appropriate to a particular joint, assign 10 percent under 38 CFR 4.71a, DC 5003 for each major joint or group of minor joints affected by limited or painful motion as prescribed under 38 CFR 4.71a, DC 5003.

If there is no limited or painful motion, but there is x-ray evidence of degenerative arthritis, assign under 38 CFR 4.71a, DC 5003 either a 10-percent evaluation or a 20-percent evaluation for occasional incapacitating exacerbations, based on the involvement of two or more major joints or two or more groups of minor joints.

***Important***:  Do *not* combine under 38 CFR 4.25 a 10- or 20-percent evaluation that is based solely on x-ray findings with evaluations that are based on limited or painful motion.  See example in M21-1, Part III, Subpart

iv, 4.A.8.d.

**c. Reference: Rating Decisions Involving LOM**

For more information on rating decisions involving LOM, see M21-1, Part III, Subpart iv, 4.A.7.

**d. Arthritis Previously Rated as a Single Disability**

The rating activity may encounter cases for which arthritis of multiple joints is rated as a single disability.

Use the information in the table below to process cases for which arthritis was previously evaluated as a single disability but the criteria for assignment of separate evaluations for affected joints was met at the time of the prior decision.

| If … | Then … |
|---|---|
| • the separate evaluation of the arthritic disability results in no change in the combined degree previously assigned, and<br>• a rating decision is required | reevaluate using the current procedure with the same effective date as previously assigned. |
| reevaluating the arthritic joint separately results in an increased combined evaluation | apply 38 CFR 3.105(a) to retroactively increase the assigned evaluation. |
| reevaluating the arthritic joint separately results in a reduced combined evaluation | • request an examination, and<br>• if still appropriate, propose reduction under 38 CFR 3.105(a) and 38 CFR 3.105(e).<br><br>***Exception***:  Do not apply 38 CFR 3.105(a) if the assigned percentage is protected under 38 CFR 3.951.<br><br>***Reference***:  For more information on protected rating decisions, see M21-1, Part III, Subpart iv, 8.C. |

**e. Using DCs 5013 Through 5024 in Rating Decisions**

Use the table below to evaluate cases that use 38 CFR 4.71a, DCs 5013 through 5024.

| If the DC of the case is … | Then … |
|---|---|
| gout under 38 CFR 4.71a, DC 5017 | evaluate the case as RA, 38 CFR 4.71a, 5002. |
| • 38 CFR 4.71a, 5013 | evaluate the case according to the criteria for |

| | through 5016, and | limited motion or painful motion under 38 CFR 4.71a, DC 5003, degenerative arthritis. |
| • 38 CFR 4.71a, DC 5018 through 5024 | | |
| | | **Note**: The provisions under 38 CFR 4.71a, DC 5003, regarding a compensable minimum evaluation of 10 percent for limited or painful motion apply to these DCs and no others. |
| | | **Reference**: For more information on evaluations of 10 and 20 percent based on x-ray findings, see 38 CFR 4.71a, DC 5003, Note (2). |

**f. Considering the Effects of a Change in Diagnosis in Arthritis Cases**

A change of diagnosis among the various types of arthritis, particularly if joint disease has been recognized as SC for several years, has no significant bearing on the question of SC.

**Note**: In older individuals, the effects of more than one type of joint disease may coexist.

**Reference**: For information on evaluating RA, see 38 CFR 4.71a, DC 5002.

# 8.  Examples of Rating Decisions for LOM in Arthritis Cases

**Introduction**     This exhibit contains four examples of rating decisions for LOM in arthritis cases including

- example of degenerative arthritis with separately compensable joints affected
- example of degenerative arthritis evaluated based on x-ray evidence only
- example of noncompensable degenerative arthritis of a single joint, and
- example of degenerative arthritis evaluated based on x-ray evidence only and another compensable evaluation.

**Change Date**     January 11, 2016

**a.  Example of Degenerative Arthritis With Separately Compensable Joints Affected**

*Situation*:  The Veteran has residuals of degenerative arthritis with limitation of abduction of the right shoulder (major) to 90 degrees and limitation of flexion of the right knee to 45 degrees.

*Coded Conclusion*:
1. SC (VE INC)
5003-5201          Degenerative arthritis, right shoulder (dominant)
20% from 12-14-03

5260                  Degenerative arthritis, right knee
10% from 12-14-03

COMB              30% from 12-14-03

*Rationale*:  The shoulder and knee separately meet compensable requirements under 38 CFR 4.71a, DCs 5201 and 38 CFR 4.71a, DC 5260, respectively.

**b.  Example of Degenerative Arthritis Evaluated Based on X-Ray Evidence Only**

*Situation*:  The Veteran has x-ray evidence of degenerative arthritis of both knees without

- limited or painful motion of any of the affected joints, or
- incapacitating episodes.

*Coded Conclusion*:
1. SC (PTE INC)
5003                  Degenerative arthritis of the knees, x-ray evidence

10% from 12-30-01

*Rationale*:  There is no limited or painful motion in either joint, but there is x-ray evidence of arthritis in more than one joint to warrant a 10-percent evaluation under 38 CFR 4.71a, DC 5003.

**c.  Example of Noncompensable Degenerative Arthritis of a Single Joint**

*Situation*:  The Veteran has x-ray evidence of degenerative arthritis of the right knee without limited or painful motion.

*Coded Conclusion*:
1. SC (PTE INC)
5003                          Degenerative arthritis, right knee, x-ray evidence only
0% from 12-30-01

*Rationale*:  There is no limited or painful motion in the right knee or x-ray evidence of arthritis in more than one joint to warrant a compensable evaluation under 38 CFR 4.71a, DC 5003.

**d.  Example of Degenerative Arthritis Evaluated Based on X-Ray Evidence Only and Another Compensable Evaluation**

*Situation*:  The Veteran has x-ray evidence of degenerative arthritis of both knees without limited or painful motion or incapacitating exacerbations.  The Veteran also has residuals of degenerative arthritis with limitation of abduction of the right shoulder (major) to 90 degrees.

*Coded Conclusion*:
1. SC (VE INC)
5003-5201          Degenerative arthritis, right shoulder (dominant)
20% from 12-14-03

5260               Degenerative arthritis, right knee
0% from 12-14-03

5260               Degenerative arthritis, left knee
0% from 12-14-03

COMB               20% from 12-14-03

*Rationale*:  Since the shoulder condition meets compensable requirements under 38 CFR 4.71a, DCs 5201, each knee condition must be evaluated under separate DCs.  Based on Note (1) under 38 CFR 4.71a, DC 5003, ratings of

arthritis based on x-ray findings only (without limited or painful motion or incapacitating exacerbations) ***cannot*** be combined with ratings of arthritis based on limitation of motion.

---

# 9. Osteomyelitis

**Introduction**
This topic contains information about osteomyelitis, including

- requiring constitutional symptoms for assignment of a 100-percent or 60-percent evaluation under DC 5000
- historical evaluations for osteomyelitis
- assigning historical evaluations for osteomyelitis
- the reasons to discontinue a historical evaluation for osteomyelitis
- assigning a 10-percent evaluation for active osteomyelitis, and
- application of the amputation rule to evaluations for osteomyelitis.

**Change Date**
May 11, 2015

**a. Requiring Constitutional Symptoms for Assignment of a 100-Percent or 60-Percent Evaluation Under DC 5000**
Constitutional symptoms are a prerequisite to the assignment of either the 100-percent or 60-percent evaluations under 38 CFR 4.71a, DC 5000.

Since both the 60- and 100-percent evaluations are based on constitutional symptoms, neither is subject to the amputation rule.

***Reference***: For more information on the amputation rule, see 38 CFR 4.68.

**b. Historical Evaluations for Osteomyelitis**
Both the 10-percent evaluation and that part of the 20-percent evaluation that is based on "other evidence of active infection within the last five years" are

- historical evaluations, and
- based on recurrent episodes of osteomyelitis.

***Note***: The 20-percent historical evaluation based on evidence of active infection within the past five years *must* be distinguished from the 20-percent evaluation authorized when there is a discharging sinus.

**c. Assigning Historical Evaluations for Osteomyelitis**
An initial episode of active osteomyelitis is *not* a basis for either of the historical evaluations.

Assign the historical evaluation as follows

- When the first *recurrent* episode of osteomyelitis is shown
- – assign a 20-percent historical evaluation, and
- – extend the evaluation for five years from the date of examination showing the osteomyelitis to be inactive.

- Assign a closed evaluation at the expiration of the five-year extension.
- Assign the 10-percent historical evaluation only if there have been two or more recurrences of active osteomyelitis following the initial infection.

**d. Reasons to Discontinue a Historical Evaluation for Osteomyelitis**

Do *not* discontinue the historical evaluation, even if treatment includes saucerization, sequestrectomy, or guttering, because the osteomyelitis is not considered cured.

*Exception*:  If there has been removal or radical resection of the affected bone
- consider osteomyelitis cured, and
- discontinue the historical evaluation.

**e. Assigning a 10-Percent Evaluation for Active Osteomyelitis**

When the evaluation for amputation of an extremity or body part affected by osteomyelitis would be 0 percent, assign a 10-percent evaluation if there is active osteomyelitis.

*References*:  For more information on
- applying the amputation rule to evaluations for active osteomyelitis, see M21-1, Part III, Subpart iv, 4.A.9.f, and
- evaluating osteomyelitis, see 38 CFR 4.71a, DC 5000.

**f. Application of the Amputation Rule to Evaluations for Osteomyelitis**

Use the following table to determine how the amputation rule affects evaluations assigned for osteomyelitis.

| If the osteomyelitis evaluation is ... | Then the amputation rule ... |
|---|---|
| 10 percent based on active osteomyelitis of a body part where the amputation evaluation would normally be 0 percent | does not apply. |
| • 10 percent based on active osteomyelitis of a body part where the amputation evaluation would normally be 0 percent, or <br> • 30 percent or less under 38 CFR 4.71a, DC 5000, *and* <br> • the 10-percent evaluation is combined with evaluations for <br> – ankylosis <br> – limited motion <br> – nonunion or malunion <br> – shortening, or <br> – other musculoskeletal impairment | applies to the combined evaluation. |

| | |
|---|---|
| 60 percent based on constitutional symptoms of osteomyelitis, per 38 CFR 4.71a, DC 5000 | does not apply since the 60-percent evaluation is based on constitutional symptoms. |

**_Reference_**:  For more information on the amputation rule, see
- 38 CFR 4.68, and
- M21-1, Part III, Subpart iv, 4.A.12.d.

# 10. Examples of the Proper Rating Procedure for Osteomyelitis

| | |
|---|---|
| **Introduction** | This exhibit contains eight examples of the proper procedure for rating osteomyelitis, including<br><br>• example of evaluating osteomyelitis based on a history of a single active initial episode<br>• example of evaluating an active initial episode of osteomyelitis<br>• example of evaluating osteomyelitis following review exam for initial active episode<br>• example of evaluating osteomyelitis with current discharging sinus<br>• example of evaluating osteomyelitis with a historical evaluation following a single recurrence with scheduled reduction due to inactivity<br>• example of evaluating a recurrence of osteomyelitis<br>• example of evaluating osteomyelitis following second recurrence, and<br>• example of evaluating osteomyelitis following curative resection of affected bone. |
| **Change Date** | May 11, 2015 |
| **a. Example of Evaluating Osteomyelitis Based on a History of a Single Active Initial Episode** | *Situation*:  The Veteran was diagnosed with osteomyelitis in service with discharging sinus.  At separation from service the osteomyelitis was inactive with no involucrum or sequestrum.  There is no evidence of recurrence.<br><br>*Result*:  As there has been no recurrence of active osteomyelitis following the initial episode in service, the historical evaluation of 20 percent is not for application.  The requirements for a 20-percent evaluation based on activity are not met either.<br><br>　　*Coded Conclusion*:<br>　　1. SC (PTE INC)<br>　　5000　　　　　　　　　　Osteomyelitis, right tibia<br>　　0% from 12-2-93 |
| **b. Example of Evaluating an Active Initial Episode of Osteomyelitis** | *Situation*:  Same facts as example shown in M21-1, Part III, Subpart iv, 4.A.10.a, but the Veteran had a discharging sinus at the time of separation from service.<br><br>*Result*:  The Veteran meets the criteria for a 20-percent evaluation based on a discharging sinus.  Schedule a future examination to ascertain the date of inactivity.<br><br>　　*Coded Conclusion*: |

|  |  |
|---|---|
| 1. SC (PTE INC) | |
| 5000 | Osteomyelitis, right tibia, active |
| 20% from 12-2-93 | |

**c. Example of Evaluating Osteomyelitis Following Review Exam for Initial Active Episode**

*Situation*: Same facts as example shown in M21-1, Part III, Subpart iv, 4.A.10.b. Subsequent review examination reveals the sinus tract was healed and there is no other evidence of active infection.

*Result*: Since the Veteran has not had a recurrent episode of osteomyelitis since service, a historical evaluation of 20 percent is not for application. Take rating action under 38 CFR 3.105(e).

*Coded Conclusion*:
1. SC (PTE INC)
5000                         Osteomyelitis, right tibia, inactive
20% from 12-2-93
0% from 3-1-95

**d. Example of Evaluating Osteomyelitis With Current Discharging Sinus**

*Situation*: Same facts as example shown in M21-1, Part III, Subpart iv, 4.A.10.b. The Veteran is hospitalized July 2l, 1996, with active osteomyelitis of the right tibia shown with discharging sinus. There is no involucrum, sequestrum, or constitutional symptom. Upon release from the hospital the discharging sinus is still present.

*Result*: Assign the 20-percent evaluation based on evidence showing draining sinus from the proper effective date. Schedule a future examination to ascertain date of inactivity.

*Coded Conclusion*:
1. SC (PTE INC)
5000                         Osteomyelitis, right tibia, active
0% from 3-1-95
20% from 7-21-96

**e. Example of Evaluating Osteomyelitis With a Historical Evaluation Following a Single Recurrence With Scheduled Reduction Due to Inactivity**

*Situation*: Same facts as example shown in M21-1, Part III, Subpart iv, 4.A.10.d. A routine future examination was conducted on July 8, 1997, showing the osteomyelitis to be inactive. There was no discharging sinus, no involucrum, sequestrum, or constitutional symptom. The most recent episode of active osteomyelitis (July 21, 1996) constitutes the first "recurrent" episode of active osteomyelitis.

*Result*: Continue the previously assigned 20-percent evaluation, which was awarded on the basis of discharging sinus as a historical evaluation for five years from the examination showing inactivity.

       *Coded Conclusion*:
       1. SC (PTE INC)
       5000               Osteomyelitis, right tibia, inactive
       20% from 7-21-96
       0% from 7-8-02

**f. Example of Evaluating a Recurrence of Osteomyelitis**

*Situation*:  Same facts as example shown in M21-1, Part III, Subpart iv, 4.A.10.e.  In October 1999, the Veteran was again found to have active osteomyelitis with a discharging sinus, without involucrum, sequestrum, or constitutional symptoms.

*Result*:  Continue the 20-percent evaluation.  Reevaluation is necessary to remove the future reduction to 0 percent, and to schedule a future examination to establish the date of inactivity.

       *Coded Conclusion*:
       1. SC (PTE INC)
       5000               Osteomyelitis, right tibia, active
       20% from 7-21-96

**g. Example of Evaluating Osteomyelitis Following Second Recurrence**

*Situation*:  Same facts as example shown in M21-1, Part III, Subpart iv, 4.A.10.f.  A review examination was conducted on April 8, 2000.  The examination showed the discharging sinus was inactive, and there was no other evidence of active osteomyelitis.  The most recent episode of osteomyelitis (October 1999) constitutes the second "recurrent" episode of active osteomyelitis.

*Result*:  The historical evaluations of 20 and 10 percent both apply.

       *Coded Conclusion*:
       1. SC (PTE INC)
       5000               Osteomyelitis, right tibia, inactive
       20% from 7-21-96
       10% from 4-8-05

**h. Example of Evaluating Osteomyelitis Following Curative Resection of Affected Bone**

*Situation*:  Same facts as example shown in M21-1, Part III, Subpart iv, 4.A.10.g.  The Veteran was hospitalized June 10, 2002, with a recurrent episode of active osteomyelitis.  A radical resection of the right tibia was performed and at hospital discharge (June 21, 2002), the osteomyelitis was shown to be cured.

*Result*:  Assign a temporary total evaluation of 100 percent under 38 CFR 4.30 with a 1-month period of convalescence.  Following application of 38 CFR 3.105(e), reduce the evaluation for osteomyelitis to zero percent as an evaluation for osteomyelitis will not be applied following cure by removal or radical resection of the affected bone.

***Coded Conclusion***:
1. SC (PTE INC)
5000                        Osteomyelitis, right tibia, P.O.
20% from 7-21-96
100% from 6-10-02 (Par. 30)
20% from 8-1-02
0% from 10-1-02

# 11. Muscle Injuries

**Introduction**

This topic contains information about rating muscle injuries, including

- types of muscle injuries
- standard muscle strength grading system for examinations
- identification of muscle groups (MGs) in examination reports
- general criteria for muscle evaluations
- fractures associated with gunshot wound (GSW) and shell fragment wounds (SFW)
- determining whether 38 CFR 4.55 applies to muscle injuries
- applying 38 CFR 4.55 to muscle injuries
- evaluating joint manifestations and muscle damage acting on the same joint
- evaluating damage to multiple muscles within the same MG
- considering peripheral nerve involvement in muscle injuries
- evaluating muscle injuries with peripheral nerve conditions of different etiology
- evaluating scars associated with muscle injuries, and
- applying the amputation rule to muscle injuries.

**Change Date**

May 11, 2015

**a. Types of Muscle Injuries**

A missile that penetrates the body results in two problems

- it destroys muscle tissue in its direct path by crushing it, then
- the temporary cavitation forces stretch the tissues adjacent to the missile track and result in additional injury or destruction.

Muscles are much more severely disrupted if multiple penetrating projectiles strike in close proximity to each other. Examples of this type of injury are

- explosive device injuries
- deforming or fragmenting rifle projectiles, or
- any rifle projectile that strikes bone.

For additional information regarding types of injuries, the effects of explosions and projectiles, and symptoms and complications, refer to the table below.

| Type of Injury | Initial Effects | Signs, Symptoms, and Complications |
|---|---|---|
| gunshots | Entrance and exit wounds result. The amount of damage and relative size of entrance | • Exit wounds are generally larger than entrance wounds, and |

| | | |
|---|---|---|
| | and exit wounds depends on many factors such as<br><br>• caliber of bullet<br>• distance from victim<br>• organs, bone, blood vessels, and other structures hit. | • bullets are essentially sterile when they reach the body but carry particles into wound which could be sources of infection. |
| fragments from explosive devices | Most result in decreased tissue penetration compared to denser rifle bullets. | Multiple fragments in a localized area result in tissue disruption affecting a wide area. |
| tears and lacerations | Muscles that become isolated from nerve supply by lacerations will be non-functional. | • Torn muscle fibers heal with very dense scar tissue, but the nerve stimulation will not cross this barrier.<br>• Parts of muscle isolated from the nerve will most likely remain non-contractile resulting in a strength deficit proportional to amount of muscle tissue disrupted.<br>• Treatment for small tears is symptomatic.<br>• Large tears/lacerations may require reconstruction. |
| through and through wound | Injuring instrument enters and exits the body. | Two wounds result<br>• entrance wound, and<br>• exit wound. |

***References***:  For more information on
• muscle groups (MGs) and corresponding DCs, see 38 CFR 4.73
• anatomical regions of the body, see 38 CFR 4.55(b), and
• gunshot wounds (GSWs) with pleural cavity involvement, see 38 CFR 4.97, DC 6840-6845, Note (3).

---

**b. Standard Muscle Strength Grading System for Examinations**

Refer to the following table for information about how muscle strength is evaluated on an examination.

| Numeric | Corresponding Strength | Indications on Exam |
|---|---|---|

| Grade | Assessment | |
|-------|-----------|---|
| (0) | absent | no contraction felt |
| (1) | trace | muscle can be felt to tighten but no movement is produced |
| (2) | poor | muscle movement is produced against gravity but cannot overcome resistance |
| (3) | fair | muscle movement is produced against gravity but cannot overcome resistance |
| (4) | good | muscle movement is produced against resistance, however, less than normal resistance |
| (5) | normal | muscle movement can overcome a normal resistance |

**c. Identification of MG in Examination Reports**

The examination report must include information to adequately identify the MG affected by either

- specifically noting which MG is affected, or
- noting which muscles are involved so that the name of the muscles may be used to identify the MG affected.

**d. General Criteria for Muscle Evaluations**

Evaluation of muscle disabilities is the result of a multi-factorial consideration. However, there are hallmark traits that are suggestive of certain corresponding evaluations. Refer to the following table for additional information regarding these hallmark traits and the suggested corresponding disability evaluation.

| If the evidence shows a history of ... | Then consider evaluating the muscle injury as ... |
|----------------------------------------|--------------------------------------------------|
| open comminuted fracture *with* <br><br> • muscle damage, or <br> • tendon damage | severe. <br><br> *Note*: This level of impairment is specified by regulation at 38 CFR 4.56(a). |
| through and through or deep penetrating wound by small high velocity missile or large low velocity missile *with* <br><br> • debridement <br> • prolonged infection, or <br> • sloughing of soft parts, and <br> • intermuscular scarring | at least moderately severe. |
| through and through injury *with* | no less than moderate. |

| muscle damage | |
|---|---|
| | **Note**: This level of impairment is specified by regulation at 38 CFR 4.56(b). |
| retained fragments in muscle tissue | at least moderate. |
| deep penetrating wound *without*<br><br>• explosive effect of high velocity missile,<br>• residuals of debridement, or<br>• prolonged infection | at least moderate. |

**Important**: No single factor is controlling for the assignment of a disability evaluation for a muscle injury. The entire evidence picture must be taken into consideration.

**Reference**: For more information on assigning disability evaluations for muscle injuries, see
• *Troph v. Nicholson*, 20 Vet.App. 317 (2006)
• *Robertson v. Brown*, 5 Vet.App. 70 (1993)
• *Jones v. Principi*, 18 Vet.App. 248 (2004), and
• 38 CFR 4.55.

**e. Fractures Associated With GSW/SFW**

All fractures associated with a GSW and/or shell fragment wound (SFW) will be considered open because all of them involve an opening to the outside. Most GSW/SFW fractures are also comminuted due to the shattering nature of the injury.

**f. Determining Whether 38 CFR 4.55 Applies to Muscle Injuries**

38 CFR 4.55 applies to certain combinations of muscle injuries and joint conditions. Consider the provisions of 38 CFR 4.55 if

• there are multiple MGs involved
• the MG acts on a joint or joints, and/or
• there is peripheral nerve damage to the same body part affected by the muscle.

**g. Applying 38 CFR 4.55 to Muscle Injuries**

If more than one MG is injured or affected or if the injured MG acts on a joint, conduct a preliminary review of the evidence to gather information needed to properly apply the provisions of 38 CFR 4.55. The information needed will include

• whether the affected MGs are in the same or different anatomic regions
• whether the MGs are acting on a single joint or multiple joints, and
• whether the joint or joints is/are ankylosed.

After the preliminary review is complete, use the evidence gathered and apply the following table to determine how [38 CFR 4.55](#) affects the evaluation of the muscle injury.

| Step | Action |
|------|--------|
| 1 | Does the MG(s) act on an ankylosed joint? <br><br> • If *yes*, go to Step 2. <br> • If *no*, go to Step 4 |
| 2 | For MG(s) that act on an ankylosed joint, is the joint an ankylosed knee *and* is MG XIII disabled? <br><br> • If *yes*, grant separate evaluations for the ankylosed knee and the MG XIII injury. For the MG XIII injury, assign the next lower level than that which would otherwise be assigned. Then go to Step 3. <br> • If *no*, then is the ankylosed joint the shoulder *and* are MGs I and II *severely* disabled? <br> – If *yes*, then assign a single evaluation for the muscle injury and the shoulder ankylosis under DC 5200. The evaluation will be at the level of unfavorable ankylosis. <br> – If *no*, then no evaluation will be assigned for the muscle injury. The combined disability arising from the ankylosis and the muscle injury will be evaluated as ankylosis. |
| 3 | For the injury to MG XIII with an associated ankylosed knee, are there other MG injuries in the same anatomical region affecting the pelvic girdle and/or thigh? <br><br> • If *no*, then no additional change to the evaluation for the muscle injury is warranted. <br> • If *yes*, do the affected MG injuries act on the ankylosed knee? <br> – If *yes*, then no separate evaluation for the muscle injury to a MG other than MG XIII can be assigned, as indicated in Step 2. <br> – If *no*, then for the MG XIII injury that acts on the knee and the injury to another MG of the pelvic girdle and thigh acting on a different joint, is the different joint ankylosed? <br> ▪ If *yes*, then no separate evaluation can be assigned for the other MG injury of the pelvic girdle and thigh, as indicated in Step 2. No further action is warranted. <br> ▪ If *no*, then assign a single evaluation for the MG XIII injury and the injury to the other MG of the pelvic girdle and thigh anatomical region by determining the most severely injured MG and increasing by one level. |
| 4 | For muscle injury(ies) acting on unankylosed joint(s), is a single MG injury involved? <br><br> • If *yes*, then grant a single evaluation for the muscle injury. |

| | |
|---|---|
| | • If *no*, then are the MG injuries in the same anatomical region?<br>  – If *yes*, go to Step 5.<br>  – If *no*, go to Step 6 |
| 5 | Do the MGs in the same anatomical region act on a single joint?<br><br>• If yes, are the MGs involved MG I and II acting on a shoulder joint?<br>  – If *yes*, then<br>    ▪ assign separate disability evaluations for the MGs, but<br>    ▪ the combined evaluation cannot exceed the evaluation for unfavorable ankylosis of the shoulder.<br>  – If *no*, then for the muscles in the same anatomical region acting on a single joint,<br>    ▪ assign separate disability evaluations for the MGs, but<br>    ▪ the combined evaluation must be less than the evaluation that would be normally assigned for unfavorable anklyosis of the joint involved.<br>• If *no*, for the MGs in the same anatomical region acting on different joints, are the MG injuries compensable?<br>  – If *yes*, then assign a single disability evaluation for the affected MGs by<br>    ▪ determining the evaluation for the most severely injured MG, and<br>    ▪ increasing by one level and using as the combined evaluation.<br>  – If *no*, then assign a noncompensable evaluation for the combined MG injuries. |
| 6 | For MG injuries in different anatomical areas, is a single unankylosed joint affected?<br><br>• If yes, are MG I and II affected and acting upon the shoulder?<br>  – If *yes*, then<br>    ▪ assign separate disability evaluations for the muscle injuries, but<br>    ▪ the combined evaluation cannot exceed the evaluation for unfavorable ankylosis of the shoulder.<br>  – If *no*, for the MG injuries in different anatomical areas affecting a single unankylosed joint (not including MG I and II acting on the shoulder)<br>    ▪ assign separate disability evaluations for the muscle injuries, but<br>    ▪ the combined evaluation must be lower than the evaluation that would be assigned for unfavorable ankylosis of the affected joint.<br>• If *no*, then for MG injuries in different anatomical areas acting on different unankylosed joints, assign separate disability evaluations for each MG injury. |

*References*:  For additional information on
- evaluating joint manifestations and muscle damage acting on the same joint, see M21-1, Part III, Subpart iv, 4.A.11.h, and
- evaluating peripheral nerve involvement in muscle injuries, see M21-1 Part III, Subpart iv, 4.A.11.j.

**h.  Evaluating Joint Manifestations and Muscle Damage Acting on the Same Joint**

A separate evaluation for joint manifestations and muscle damage acting on the same joint are prohibited if both conditions result in the same symptoms.

Although LOM is not directly discussed in 38 CFR 4.56, the DC provisions within 38 CFR 4.73 describing the functions of various MGs are describing motion.

- The muscles move the joint.
- If the joint manifestation is LOM, that manifestation is already compensated through the evaluation assigned by a muscle rating decision.
- Evaluating the same symptoms under multiple DCs is prohibited by 38 CFR 4.14.

*Note*:  Consider the degree of disability under the corresponding muscle DC and joint DC and assign the higher evaluation.

*Exception*:  Per 38 CFR 4.55(c)(1), if MG XIII is disabled and acts on an ankylosed knee, separate disability evaluations can be assigned for the muscle injury and the knee ankylosis.  However, the evaluation for the MG injury will be rated at the next lower level than that which would have otherwise been assigned.

*Reference*:  For additional information concerning evaluating muscle injuries and joint conditions, see M21-1, Part III, Subpart iv, 4.A.11.f-g.

**i.  Evaluating Damage to Multiple Muscles Within the Same MG**

A separate evaluation cannot be assigned for each muscle within a single MG.  Muscle damage to any of the muscles within the group must be included in a single evaluation assigned for the MG.

**j.  Considering Peripheral Nerve Involvement in Muscle Injuries**

When there is nerve damage associated with the muscle injury, use the following table to determine appropriate actions to take to evaluate the nerve damage and the muscle injury.

| If ... | Then ... |
|---|---|
| • the nerve damage is in the same body part as the muscle injury, *and* | assign a single evaluation for the combined impairment by |

| | determining whether the nerve code or the muscle code will result in a higher evaluation. Assign the higher evaluation. |
|---|---|
| • the muscle injury and the nerve damage affect the same functions of the affected body part | *Note*: If the muscle and nerve evaluations are equal, evaluate with the DC with the highest maximum evaluation available. |
| • the nerve damage is in the same body part as the muscle injury, *and*<br>• the muscle injury and the nerve damage affect entirely different functions of the affected body part | assign separate evaluations for the nerve damage and the muscle injury. |

**k. Evaluating Muscle Injuries with Peripheral Nerve Conditions of Different Etiology**

The provisions of 38 CFR 4.55 preclude the combining of a muscle injury evaluation with a peripheral nerve paralysis evaluation involving the same body part when the same functions are affected. A muscle injury and a peripheral nerve paralysis of the same body part, originating from separate etiologies, may not be rated separately.

- The exception to this rule is only when entirely different functions are affected.
- Etiology of the disability is irrelevant in rendering a determination regarding combining evaluations for muscle injuries and peripheral nerve paralysis.

*Example*: A Veteran is SC for GSW to the right leg MG XI at 10 percent. He develops SC diabetic peripheral neuropathy many years later. The peripheral neuropathy affects the external popliteal nerve. Since MG XI and the external popliteal nerve both control the same functions, dorsiflexion of the foot and extension of the toes, only a single disability evaluation can be assigned under either 38 CFR 4.73, DC 5311 or 38 CFR 4.73, DC 8521, whichever is more advantageous.

**l. Evaluating Scars Associated With Muscle Injuries**

Use the following table to determine appropriate action to take when evaluating scars associated with muscle injuries.

| If ... | Then ... |
|---|---|
| there is scarring associated with the muscle injury | assign a separate evaluation for the scar, even if noncompensable. |
| there is painful or unstable scarring associated with the muscle injury | assign a separate compensable disability evaluation under 38 CFR 4.118, DC 7804. |
| there is scarring that results in | do not assign a separate evaluation if |

| functional loss under 38 CFR 4.118, DC 7805 that is compensable | the body part affected and the functional impairment resulting from the scar are the same as the part and function affected by the muscle injury. |

**Reference**:  For more information on assigning separate evaluations for the muscle injury and associated scarring, see
- *Esteban v. Brown*, 6 Vet.App. 259 (1994)
- *Jones v. Principi*, 18 Vet.App. 248 (2004), and
- 38 CFR 4.14.

---

**m.  Applying the Amputation Rule to Muscle Injuries**

The amputation rule applies to musculoskeletal conditions and any associated peripheral nerve injuries.  Therefore, when assigning separate evaluations for the muscle injury, peripheral nerve injury directly related to that muscle injury must be considered in applying the amputation rule.

**References**:  For more information on
- the amputation rule, see 38 CFR 4.68, and
- evaluating peripheral nerve disabilities associated with muscle injuries, see M21-1, Part III, Subpart iv, 4.A.11.j.

---

# 12. Miscellaneous Musculoskeletal Considerations

**Introduction**

This topic contains general guidance on evaluating musculoskeletal conditions, including

- SC for fractures
- SC for osteopenia
- evaluating fibromyalgia
- applying the amputation rule, and
- considering conflicting decisions regarding loss of use (LOU) of an extremity.

**Change Date**

February 1, 2016

**a. SC for Fractures**

Decision makers must not automatically award SC for fracture or fracture residuals based on a mere service treatment record (STR) reference to a fracture.

- Where SC of a fracture or fracture residuals is *claimed*, SC will be established when sufficient evidence, such as x-rays, a surgical report, casting, or a physical evaluation board report, documents the fracture.
- If SC of a fracture has not been claimed and objective evidence such as x-ray report documents an in-service fracture, invite a claim for SC for the fracture.

The following considerations apply when granting SC for a fracture:

- SC will be established for a healed fracture even without current residual limited motion or functional impairment of a joint.
- Assign a DC consistent with the location of the fracture. The fracture will be rated as noncompensable in the absence of any disabling manifestations.

**Reference**: For more information about unclaimed chronic disabilities found in STRs, see M21-1, Part IV, Subpart ii, 2.A.

**b. SC for Osteopenia**

Osteopenia is clinically defined as mild bone density loss that is often associated with the normal aging process. Low bone density does not necessarily mean that an individual is losing bone, as this may be a normal variant.

Osteopenia is comparable to a laboratory finding which is not subject to SC compensation.

Use the following table to determine the appropriate action to take when SC for osteopenia has been granted.

| If ... | Then ... |
|---|---|
| SC for osteopenia was granted by rating decision dated *prior to* December 19, 2013 (the date on which guidance was issued to clarify the proper procedures for considering SC for osteopenia) | • do not sever SC, as it was properly established based on guidance available at the time the decision was made,<br>• do not reduce the previously assigned evaluation unless the condition has improved, and<br>• consider claims for increased evaluation and schedule examination as warranted based on the facts of the case.<br><br>*Note*: Provisions of 38 CFR 3.951 and 38 CFR 3.957 regarding protection of SC remain applicable. |
| SC for osteopenia was granted by rating decision dated *on or after* December 19, 2013 | propose to sever SC based on a finding of clear and unmistakable error (CUE). |

*Note*: Osteoporosis, in contrast to osteopenia, is considered a disease entity characterized by severe bone loss that may interfere with mechanical support, structure, and function of the bone. SC for osteoporosis under 38 CFR 4.71a DC 5013 is warranted when the requirements are otherwise met.

---

**c. Evaluating Fibromyalgia**

The criteria for evaluation of fibromyalgia under 38 CFR 4.71a, DC 5025 does not exclude assignment of separate evaluations when disabilities are diagnosed secondary to fibromyalgia. This includes, but is not limited to, disability diagnoses for which symptoms are included in the evaluation criteria under 38 CFR 4.71a, DC 5025, such as

- depression
- anxiety
- headache, and
- irritable bowel syndrome.

*Notes*:
- If signs and symptoms are not sufficient to warrant a diagnosis of a separate condition, then they are evaluated with the musculoskeletal pain and tender points under 38 CFR 4.71a, DC 5025.
- The same signs and symptoms cannot be used to assign separate evaluations under different DCs, per 38 CFR 4.14.

*Reference*: For more information on evaluating chronic pain syndrome

(somatic symptom disorder), see M21-1, Part III, Subpart iv, 4.H.1.j.

| | |
|---|---|
| **d. Applying the Amputation Rule** | The combined evaluation for disabilities of an extremity shall not exceed the evaluation for the amputation at the elective level, were amputation to be performed.  The amputation rule is included in the musculoskeletal section of the rating schedule and, consequently, applies only to musculoskeletal disabilities and not to disabilities affecting other body systems.

*Exceptions*:
- Any peripheral nerve injury associated with the musculoskeletal injury will be considered when applying the amputation rule.
- Actual amputation with associated painful neuroma will be evaluated at the next-higher site of elective reamputation.

*Note*:  The amputation rule does not apply to bilateral evaluations under DCs 5276 to 5279.

*References*:  For more information on the
- amputation rule, see
  – 38 CFR 4.68, and
  – *Moyer v. Derwinski*, 2 Vet.App. 289 (1992)
- application of the amputation rule to rating decisions for osteomyelitis, see M21-1, Part III, Subpart iv, 4.A.9.f
- application of the amputation rule to rating decisions for muscle injuries, see M21-1, Part III,  Subpart iv, 4.A.11.m, and
- VBMS-R amputation rule instructions, see the VBMS-R Job Aid. |
| **e. Considering Conflicting Decisions Regarding LOU of an Extremity** | Forward the claims folder to the Director, Compensation Service (211B), for an advisory opinion under M21-1, Part III, Subpart vi, 1.A.2.a to resolve a conflict if

- the Insurance Center determines LOU of two extremities prior to rating consideration involving the same issue, and
- the determination conflicts with the proposed rating decision.

*Note*:  This issue will generally be brought to the attention of the rating activity as a result of the type of personal injury, correspondence, or some indication in the claims folder that the insurance activity is involved. |

# Key Changes

| Changes Included in This Revision | The table below describes the changes included in this revision of Veterans Benefits Manual M21-1, Part III, "General Claims Process," Subpart iv, "General Rating Process." |
|---|---|

***Notes***:

- M21-1, Part III, Subpart iv, Chapter 4, Section A (III.iv.4.A) previously contained guidance on evaluating pain, joint conditions, and functional loss, rating musculoskeletal disabilities of the spine and upper and lower extremities, congenital musculoskeletal conditions, arthritis, osteomyelitis, and muscle injuries.
  - Information on rating arthritis, osteomyelitis, and muscle injuries (old III.iv.4.A.6-12) is relocated to III.iv.4.B.
  - The remaining content (old III.iv.4.A.1-5 and 13) is being retained and reorganized as shown in the table below.
- Unless otherwise noted, the term "claims folder" refers to the official, numbered, Department of Veterans Affairs (VA) repository – whether paper or electronic – for all documentation relating to claims that a Veteran and/or his/her survivors file with VA.
- Minor editorial changes have also been made to
  - improve clarity and readability
  - add references
  - update incorrect or obsolete references
  - reassign alphabetical designations to individual blocks, where necessary, to account for new and/or deleted blocks within a topic
  - update the labels of individual blocks and the titles of topics to more accurately reflect their content, and
  - bring the document into conformance with M21-1 standards.

| Reason(s) for Notable Change | Citation |
|---|---|
| • To relocate guidance on evaluating painful motion of minor joints and joint groups from old M21-1, Part III, Subpart iv, Chapter 4, Section A, Topic 1, Block j (III.iv.4.A.1.j) to a new Block p.<br>• To clarify and reorganize guidance on proper evaluation of fingers and toes when painful motion is present.<br>• To remove the examples for relocation to a new Block q. | III.iv.4.A.1.p |
| • To add a new Block q for relocation of examples of painful motion of minor joints, previously located in old III.iv.4.A.1.j.<br>• To clarify proper procedures for use of diagnostic code (DC) 5280 when considering painful motion. | III.iv.4.A.1.q |
| To add a new Block r with guidance on application of painful motion to DC 5276. | III.iv.4.A.1.r |

| | Citation |
|---|---|
| To add a new Block s with guidance on the Evaluation Builder workaround for painful motion of the fingers. | III.iv.4.A.1.s |
| To add a new Block t with guidance on the Evaluation Builder workaround for painful motion of the feet. | III.iv.4.A.1.t |
| To add a new Block n to incorporate the definition of ankyloses of the joints. | III.iv.4.A.2.n |
| To add a new Block d to incorporate guidance on handling joint stability findings. | III.iv.4.A.6.d |
| • To relocate old III.iv.4.A.4.i to a new Block f.<br>• To completely revise the guidance on handling meniscal disabilities to reflect the policy change effected by *Lyles v. Shulkin*, 29 Vet.App. 107 (2017). | III.iv.4.A.6.f |
| • To relocated old III.iv.4.A.4.j to a new Block g.<br>• To remove the guidance on the prohibition of separate evaluations for instability and meniscal disabilities as effective by the Lyles holding.<br>• To add examples of proper evaluations of meniscal disabilities. | III.iv.4.A.6.g |
| To add a new Block h with guidance on the Evaluation Builder workaround for meniscal disabilities. | III.iv.4.A.6.h |
| To add a new Block c to clarify guidance on assigning separate evaluation for co-existing foot disabilities. | III.iv.4.A.7.c |
| • To add information from the August 2014 Compensation Bulletin Addendum and the November 2015 Quality Call concerning application of the amputation rule.<br>• To change the order of old Blocks d and e. | III.iv.4.A.8.e |

| Reason(s) for Change | Citation |
|---|---|
| To add language within the notes section to clarify that objective evidence of painful motion is not required under 38 CFR 4.59. | III.iv.4.A.1.a |
| To clarify that the *DeLuca* holding is not limited in impact to painful motion. | III.iv.4.A.1.c |
| To clarify that the *Mitchell* holding is not limited in impact to painful motion. | III.iv.4.A.1.e |
| To add language to refer readers to correlated information concerns applicability of guidance to specific DCs. | III.iv.4.A.1.i |
| To reorder old III.iv.4.a.1.k to new Block j and old III.iv.4.a.1.l to new Block k based on the relocation of old III.iv.4.a.1.j elsewhere in the topic. | III.iv.4.A.1.j and k |
| To add a new Block l to outline the steps to take to apply 38 CFR 4.59. | III.iv.4.A.1.l |
| To add a new Topic 4 for relocation of information on disabilities of the hands, previously included at III.iv.4.A.3. | III.iv.4.A.4 |
| To relocate old III.iv.4.A.3.f-i to new Blocks a-d. | III.iv.4.A.4.a-d |
| To relocate old III.iv.4.A.3.k-m to new Blocks e-g. | III.iv.4.A.4.e-g |
| • To relocate old III.iv.4.A.3.n to a new Block h.<br>• To add painful motion as another method in which a finger disability can warrant a compensable evaluation.<br>• To reword the guidance on the *Spicer* holding for the purpose of clarification only. | III.iv.4.A.4.h |

| | |
|---|---|
| To relocate old III.iv.4.A.3.j to a new Block i. | III.iv.4.A.4.i |
| To add a new Topic 6 for relocation of information on disabilities of the legs, previously included in old III.iv.4.A.4. | III.iv.4.A.6 |
| To relocate old III.iv.4.A.4.e-g to new Blocks a-c. | III.iv.4.A.6.a-c |
| • To relocate old III.iv.4.A.4.h to a new Block e. <br> • To reword the guidance on intermediate evaluations for knee replacements for the purpose of clarification only. | III.iv.4.A.6.e |
| To relocate old III.iv.4.A.4.k-p to new Blocks i-n. | III.iv.4.A.6.i-n |
| To add a new Topic 7 for relocation of information on disabilities of the feet, previously included in III.iv.4.A.4. | III.iv.4.A.7 |
| To relocate old III.iv.4.A.4.w to a new Block a. | III.iv.4.A.7.a |
| To relocate old III.iv.4.A.4.r to a new Block b. | III.iv.4.A.7.b |
| To relocate old III.iv.4.A.4.v to a new Block d. | III.iv.4.A.7.d |
| To relocate old III.iv.4.A.4.q to a new Block e. | III.iv.4.A.7.e |
| To relocate old III.iv.4.A.4.s-u to new Blocks f-h. | III.iv.4.A.7.f-h |
| To remove old III.iv.4.A.5 on congenital musculoskeletal conditions as the information has been relocated to new III.iv.4.A.8. | -- |
| To remove old Topics 6-12 for relocation to III.iv.4.B. | -- |
| To reorder old III.iv.4.a.13.e to new Block d and old III.iv.4.a.13.d to new Block e. | III.iv.4.A.8.d and e |
| To relocate old III.iv.4.A.5.a to an new Block g. | III.iv.4.A.8.g |
| To relocate old III.iv.4.A.5.b to a new Block h. | III.iv.5.A.8.h |

**Authority**      By Direction of the Under Secretary for Benefits

**Signature**

Beth Murphy, Director
Compensation Service

**Distribution**      LOCAL REPRODUCTION AUTHORIZED

# Section A.  Musculoskeletal Conditions

## Overview

**In This Section**    This section contains the following topics:

| Topic | Topic Name |
|---|---|
| 1 | Evaluating Painful Motion |
| 2 | Evaluating Joint Conditions and Functional Loss |
| 3 | Evaluating Musculoskeletal Disabilities of the ~~Upper Extremities~~Arms |
| 4 | Evaluating Musculoskeletal Disabilities of the Hands |
| 5~~4~~ | Evaluating Musculoskeletal Disabilities of Spine ~~and Lower Extremities~~ |
| 6 | Evaluating Musculoskeletal Disabilities of the Legs |
| 7 | Evaluating Musculoskeletal Disabilities of the Feet |
| ~~5~~ | ~~Congenital Musculoskeletal Conditions~~ |
| ~~6~~ | ~~Rheumatoid Arthritis (RA)~~ |
| ~~7~~ | ~~Degenerative Arthritis~~ |
| ~~8~~ | ~~Limitation of Motion (LOM) in Arthritis Cases~~ |
| ~~9~~ | ~~Examples of Rating Decisions for LOM in Arthritis Cases~~ |
| ~~10~~ | ~~Osteomyelitis~~ |
| ~~11~~ | ~~Examples of the Proper Rating Procedure for Osteomyelitis~~ |
| ~~12~~ | ~~Muscle Injuries~~ |
| 8~~13~~ | Miscellaneous Musculoskeletal Considerations |

# 1. Evaluating Painful Motion

**Introduction**     This topic contains information on evaluating painful motion, including

- establishing the minimum compensable evaluation under 38 CFR 4.59
- precedential court holdings impacting 38 CFR 4.59
- assessing functional loss due to pain per *DeLuca v. Brown*
- applicability of 38 CFR 4.59 beyond arthritis per *Burton v. Shinseki*
- assessing functional loss due to pain per *Mitchell v. Shinseki*
- satisfactory evidence of painful motion per *Petitti v. McDonald*
- selecting a diagnostic code (DC) and minimum compensable evaluation for 38 CFR 4.59 per *Sowers v. McDonald*
- assessing joint disabilities for pain per *Correia v. McDonald*
- selecting a DC for application of 38 CFR 4.59 per *Southall-Norman v. McDonald*
- •
- evaluating painful motion of minor joints or joint groups under 38 CFR 4.59
- assessing medical evidence for functional loss due to pain
- entering *DeLuca* and *Mitchell* data in Evaluation Builder, and
- applying 38 CFR 4.59
- examples of considering
  − 38 CFR 4.59 for shoulder disabilities
  − non-objective pain under 38 CFR 4.59, and
  − pain with passive range of motion (ROM) under 38 CFR 4.59
- evaluating painful motion of minor joints or joint groups under 38 CFR 4.59
- examples of painful motion of minor joints
- example of painful motion and DC 5276, and
- evaluation builder workaround for painful motion of the
  − fingers, and
  − feet.

**Change Date**     October 24, 2017 April 13, 2018

**a. Establishing the Minimum Compensable Evaluation Under 38 CFR 4.59**

An actually painful joint can be a basis for assignment of a compensable evaluation even though the specific criteria for a compensable evaluation listed in a diagnostic code (DC) for the joint are not met.

The regulatory language at 38 CFR 4.59 provides that

- pain of a joint due to joint or periarticular (structures surrounding the joint) pathology is indicative of disability, and
- an actually painful joint justifies the assignment of the minimum compensable evaluation for the joint under the applicable diagnostic code (DC).

Guidance for assessment of a disability to determine whether painful motion exists is also included in 38 CFR 4.59.  Particularly, ~~38 CFR 4.59~~this regulation

- describes ways in which painful motion can be discerned, such as
  – facial expression
  – wincing, etc., on pressure of manipulation
  – muscle spasms, or
  – crepitation in tendons, ligaments, or joint structures
- requires that the findings be noted in the medical evidence to assist the rating authority in assigning a disability rating that adequately accounts for painful motion, and
- explains the kinds of test results that must be obtained to permit an adjudicator to assess the effect of painful motion, including range of motion (ROM) tests
  – for passive and active motion
  – in both weight-bearing and nonweight-bearing circumstances, and
  – for the opposite undamaged joint for comparison purposes, if possible.

*Notes*:
- 38 CFR 4.71a, DC 5002 and 5003 (and several other DCs that incorporate the criteria from those DCs by reference) provide that where limitation of motion (LOM) of joint(s) is noncompensable under DCs specific to the involved joint(s), a compensable evaluation can be assigned for the LOM if objectively confirmed by findings such as satisfactory evidence of painful motion.  ~~However~~In contrast, 38 CFR 4.59 provides an alternate basis for assigning a compensable evaluation for disabilities rated under those DCs on the basis of credible lay evidence of painful motion.  The minimum compensable evaluation may be assigned under 38 CFR 4.59 based on subjective painful motion, and does not require objective evidence of painful motion.
- Multiple precedential decisions of the Court of Appeals for Veterans Claims (CAVC) have impacted the application of 38 CFR 4.59, as discussed at M21-1, Part III, Subpart iv, 4.A.1.b ~~it~~.  These holdings must be applied in determining whether the minimum compensable evaluation for a disability based on painful motion is warranted under 38 CFR 4.59.

*Reference*:  For more information on considering painful motion when assigning multiple LOM evaluations for a joint, see M21-1, Part III, Subpart iv, 4.A.2.c.

---

**b.  Precedential Court Holdings Impacting 38 CFR 4.59**

Multiple precedential decisions have impacted the application of 38 CFR 4.59.  Refer to the table below for a listing of impactful precedential court holdings, a brief description of the impact, and the applicability date (date of decision) for each.  More detailed explanations for each holding and its impact on the application of 38 CFR 4.59 in claims processing can be found

in M21-1, Part III, Subpart iv, 4.A.1.c-i.

| Holding | Summary of Impact | Date of Decision |
|---------|-------------------|------------------|
| *DeLuca v. Brown*, 8 Vet.App. 202 (1995) | Clarified exam requirements to assess the impact of pain on functional impairment including additional loss of motion due to pain. | December 22, 1995 |
| *Burton v. Shinseki*, 25 Vet.App. 1 (2011) | 38 CFR 4.59 is not limited in applicability to arthritis claims. | August 4, 2011 |
| *Mitchell v. Shinseki*, 25 Vet.App. 32 (2011) | Clarified<br><br>• exam requirements for assessing impact of painful motion with use and during flare-ups, and<br>• that when assigning a disability evaluation based on loss of range of motion (ROM), painful motion is not considered the same as limited motion unless the pain actually causes a loss of motion. | August 23, 2011 |
| *Petitti v. McDonald*, 27 Vet.App. 415 (2015) | • 38 CFR 4.59 does not require objective evidence of painful motion for assignment of a minimal compensable evaluation for a joint.<br>• 38 CFR 4.71a, DC 5002 does require objective evidence of painful motion. | October 28, 2015 |
| *Sowers v. McDonald*, 27 Vet.App. 472 (2016) | 38 CFR 4.59 is<br><br>• limited by the DC applicable to the claimant's disability, and<br>• inapplicable to a DC that does not provide a compensable evaluation.<br><br>***Note***:  The *Sowers* holding influenced a subsequent policy decision to assign the minimum compensable evaluation under the corresponding DC for painful motion under 38 CFR 4.59. | February 12, 2016<br><br>***Note***:  The policy decision to assign the minimum compensable evaluation under the corresponding DC for painful motion under 38 CFR 4.59 is effective May 23, 2016. |
| *Correia v. McDonald*, 28 | • Clarified exam requirements for ROM testing to evaluate | July 5, 2016 |

| | joint disabilities for painful motion in weight-bearing, nonweight-bearing, with active and passive motion, and in comparison to the opposite joint.<br>• Directed that pain with passive motion (even in the absence of another indication of painful motion) is sufficient to satisfy the criteria for entitlement to the minimum compensable evaluation under 38 CFR 4.59. | |
| --- | --- | --- |
| Vet.App. 158 (2016) | | |
| *Southall-Norman v. McDonald*, 28 Vet.App. 346 (2016) | 38 CFR 4.59 is not limited to DCs involving limited ROM. | December 15, 2016 |

**Reference**:  For more information on assignment of effective dates associated with precedential court decisions, see M21-1, Part III, Subpart iv, 5.C.7.l-q.

---

**c. Assessing Functional Loss Due to Pain Per Deluca v. Brown**

In *DeLuca v. Brown*, 8 Vet.App. 202 (1995), the CAVC held that in examinations of musculoskeletal disabilities, the examiner must be asked to give an opinion on whether pain could significantly limit functional ability during flare-ups or with repeated use over a period of time.

This information must be portrayed in terms of the degree of additional ROM lost due to pain on use or during flare-ups.

***Impact on application of 38 CFR 4.59***:
• Examinations must address the *DeLuca* criteria.
• The *DeLuca* holding is not limited in impact to painful motion.  The holding impacts consideration of functional impairment due to pain and other factors as discussed in 38 CFR 4.40, 38 CFR 4.45, and M21-1, Part III, Subpart iv, 4.A.2.
• Decision makers must properly assess the *DeLuca* findings in conjunction with 38 CFR 4.40, 38 CFR 4.45, and 38 CFR 4.59.  The disability is evaluated based on most severe loss of motion due to pain or following repetitive motion testing.
• The *Deluca* decision was effective December 22, 1995.

**Note**:  The *DeLuca* holding had limited impact on the application of 38 CFR 4.59 other than the fact that it may elicit evidence concerning the presence of pain.  However, *DeLuca* does impact application of 38 CFR 4.40 and 38 CFR 4.45.  In *DeLuca*, CAVC also clarified that the plain language of 38 CFR 4.45 does not limit the evaluation criteria contained therein to muscle injuries.

**Reference**:  For more information on assessing examinations for adequacy in

conjunction with the *DeLuca* holding, see
- M21-1, Part III, Subpart iv, 4.A.1.j-k-i, and
- M21-1, Part III, Subpart iv, 3.D.4.g-h.

| **d. Applicability of 38 CFR 4.59 Beyond Arthritis Per Burton v. Shinseki** | Although the first sentence of 38 CFR 4.59 refers only to arthritis, the CAVC held in *Burton v. Shinseki*, 25 Vet.App. 1 (2011) that the regulation is, in fact, also applicable to joint conditions other than arthritis. |
|---|---|

**Impact on application of *38 CFR 4.59*:**
- Do not limit assignment of the minimum compensable evaluation under 38 CFR 4.59 to DCs involving arthritis.
- The *Burton* holding affirmed the Department of Veterans Affairs' (VA's) longstanding policy on the application of 38 CFR 4.59 to disabilities in addition to arthritis.
- The *Burton* holding is effective August 4, 2011.

| **e. Assessing Functional Loss Due to Pain Per Mitchell v. Shinseki** | In *Mitchell v. Shinseki*, 25 Vet.App. 32 (2011), the CAVC held that pain alone does not constitute a functional loss under VA regulations that evaluate disability based upon ROM loss. Thus, when assigning a disability evaluation based on loss of ROM, painful motion is not considered the same as limited motion unless the pain actually causes a loss of motion. |
|---|---|

The CAVC also held that
- if pain is associated with movement, the examiner must give an opinion on whether pain could significantly limit functional ability during flare-ups or when the joint is used repeatedly over a period of time, and
- the opinion must, if feasible, be expressed in terms of the degree of additional ROM loss due to pain on use or during flare-ups.

**Impact on application of *38 CFR 4.59*:**
- Examinations must address the *Mitchell* criteria.
- When painful motion on repeated use over time or during a flare-up results in additional loss of ROM, then the condition should be evaluated based on the additional loss of ROM.
- ROM must be actually limited. Do not assign an evaluation for loss of ROM based on the point at which pain accompanies motion unless the pain actually causes reduced ROM on objective assessment.
- The *Mitchell* holding is not limited in impact to painful motion. The holding impacts consideration of functional impairment due to pain and other factors as discussed in 38 CFR 4.40, 38 CFR 4.45, and M21-1, Part III, Subpart iv, 4.A.2.c.
- The *Mitchell* holding is effective August 23, 2011.

**Reference**: For more information on assessing examinations for adequacy in conjunction with the *Mitchell* holding, see
- M21-1, Part III, Subpart iv, 4.A.1.j-k, and

- M21-1, Part III, Subpart iv, 3.D.4.g-h.

---

**f. Satisfactory Evidence of Painful Motion Per Petitti v.McDonald**

In *Petitti v. McDonald*, 27 Vet.App. 415 (2015), the CAVC held that 38 CFR 4.59 does not require *objective* evidence of painful motion for assignment of a minimal compensable evaluation of a joint. This guidance applies to all musculoskeletal disabilities irrespective of the DC that has already been assigned to the disability.

*Note*: Apply the historical criteria for acceptance of an informal claim under 38 CFR 3.157, as discussed in M21-1, Part III, Subpart iv, 5.C.9, when a report of examination or hospitalization at a VA or uniform services facility shows the presence of painful motion of a service-connected (SC) disability evaluated as noncompensable on before March 24, 2015.

***Impact on application of 38 CFR 4.59***:
- Under 38 CFR 4.59, objective evidence of painful motion is not required for assignment of the minimum compensable evaluation for the musculoskeletal disability. Lay evidence of painful motion is sufficient.
  – Lay testimony may consist of a Veteran's own statement to the extent that the statement describes symptoms capable of lay observation.
  – Lay testimony may consist of a description by another person detailing observations of a Veteran's difficulty walking, standing, sitting, or undertaking other activity.
- The following are examples (not an all-inclusive list) of symptoms sufficient to assign the minimum compensable evaluation for the joint under 38 CFR 4.59:
  – pain with weight-bearing or nonweight-bearing
  – pain with passive ROM
  – pain reported during repeated use, or
  – pain reported during flare-ups.
- The following are examples (not an all-inclusive list) of symptoms that can support a claimant's report of painful motion but are not sufficient evidence, by themselves, to support assignment of the minimum compensable evaluation under 38 CFR 4.59:
  – crepitus/joint crepitation (a clinical sign of a crackling or grating feeling or sound in a joint), and
  – pain on palpation.
- An examiner's opinion that painful motion would be present with repeated use over time or during flare-ups (as required in the *Mitchell* opinion) may be sufficient lay evidence to support a finding of painful motion, if found credible.
- A finding of painful motion under 38 CFR 4.59 based on lay or subjective reporting of pain is contingent on a credibility assessment as discussed at M21-1, Part III, Subpart iv, 5.A.2.b.
- Prior to the *Petitti* holding, longstanding VA policy was that objective evidence of painful motion was required to assign the minimum compensable evaluation under 38 CFR 4.59.

**Appx73**

- The *Petitti* holding is effective October 28, 2015.

**Reference**:  For more information on assignment of effective dates associated with
- informal claims accepted under 38 CFR 3.157, see M21-1, Part III, Subpart iv, 5.C.9, and
- precedential court decisions, see M21-1, Part III, Subpart iv, 5.C.l-p.

---

**g. Selecting a DC and Minimum Compensable Evaluation for 38 CFR 4.59 Per Sowers v. McDonald**

In *Sowers v. McDonald*, 27 Vet.App. 472 (2016), the CAVC held that 38 CFR 4.59 is limited by the DC applicable to the claimant's disability, and where that DC does not provide a compensable rating, 38 CFR 4.59 does not apply.

**Example**:  Painful motion of a right ring finger fracture that is rated under 38 CFR 4.71a, DC 5230 would not receive a compensable evaluation under 38 CFR 4.59 because this DC does not contain a compensable evaluation.

**Important**:  In *Sowers*, the CAVC did not specifically hold that the minimum compensable evaluation must be assigned under the applicable DC for the disability involved.  However, the holding did influence a subsequent policy determination that the minimum compensable evaluation under the DC must be assigned when painful motion is demonstrated under 38 CFR 4.59.  This policy is effective May 23, 2016.
- This policy particularly affects painful motion of the shoulder evaluated under 38 CFR 4.71a, DC 5201.  Under this DC, painful motion of the shoulder warrants assignment of a 20-percent evaluation.
- This decision represents a change in longstanding VA policy in which the minimum compensable evaluation was interpreted as a 10-percent evaluation irrespective of the DC involved.

***Impact on application of 38 CFR 4.59***:
- Effective February 12, 2016, the Sowers holding requires that 38 CFR 4.59 must be applied based on the DC applicable to the disability.  In other words, the DC most appropriate to the disability being evaluated must be selected, and then 38 CFR 4.59 must be applied accordingly.
- Effective May 23, 2016, the minimum compensable evaluation refers to the lowest evaluation specified under the DC most applicable to the disability.

---

**h. Assessing Joint Disabilities for Pain Per Correia v. McDonald**

In *Correia v. McDonald*, 28 Vet.App. 158 (2016), the CAVC held that the final sentence of 38 CFR 4.59 requires that certain ROM testing be conducted to assess for pain whenever possible in evaluating joint disabilities.  Particularly,

- the joints involved must be tested for pain
  – on both active and passive motion, and
  – in weight-bearing and nonweight-bearing, and

- the ROM of the opposite, undamaged joint must be assessed for comparison, if possible.

CAVC also held that pain with passive motion, and not just active motion, warrants entitlement to the minimum compensable evaluation under 38 CFR 4.59.

*Note*: If the examiner cannot assess the motion of the opposite, undamaged joint, *and an opposite joint does exist*, the examiner should explain why the assessment is not possible. Examples of situations in which ROM of the opposite, undamaged joint cannot be assessed for comparison include (but are not limited to) the
- spinal disabilities, since there is no opposite joint
- disabilities wherein the opposite, undamaged joint has been amputated, or
- disabilities wherein the opposite joint is damaged or disabled and would not be an effective comparison to ascertain the degree of impairment of the SC joint.

***Impact on application of 38 CFR 4.59***:
- Examinations must address the *Correia* criteria.
- Assign the minimum compensable evaluation when there is evidence of painful motion with
  – active or passive motion, and/or
  – with weight-bearing or nonweight-bearing.
- Prior to the *Correia* holding, longstanding Veterans Benefits Administration policy was that only pain with active motion triggers application of 38 CFR 4.59.
- The *Correia* holding is effective July 5, 2016.

---

**i. Selecting a DC for Application of 38 CFR 4.59 Per Southall-Norman v. McDonald**

In *Southall-Norman v. McDonald*, 28 Vet.App. 346 (2016), the CAVC held that 38 CFR 4.59 is

- not limited to the evaluation of musculoskeletal disabilities under DCs predicated upon ROM measurements, and
- applicable to the evaluation of musculoskeletal disabilities involving actually painful, unstable, or malaligned joints or periarticular regions, regardless of whether the DC under which the disability is evaluated is predicated upon ROM measurements.

***Examples***:
- 38 CFR 4.59 supports assignment of a 10-percent evaluation where great/first toe malalignment (hallux valgus) is actually painful, even though the regulatory criteria of 38 CFR 4.71a, DC 5280 do not mention ROM and the specified 10-percent criteria under that DC (operated with resection of the metatarsal head or severe, if equivalent to amputation of the great toe) are not met. Refer to M21-1, Part III, Subpart iv, 4.A.1.p-q for more information on the application of 38 CFR 4.59 to 38 CFR 4.71a, DC 5280.

- 38 CFR 4.59 supports assignment of a 10-percent evaluation where there is pain from a flat foot or feet (pes planus) even though the regulatory criteria of 38 CFR 4.71a, DC 5276 do not specifically mention ROM, the specified 10-percent criteria under that DC are not met, and the DC provides for a lower, zero percent, evaluation. Refer to M21-1, Part III, Subpart iv, 4.A.1.r for more information on the application of 38 CFR 4.59 to 38 CFR 4.71a, DC 5276.

**Impact on application of _38 CFR 4.59_:**
- When musculoskeletal disability involves joint or periarticular pathology that is painful, 38 CFR 4.59 is applicable when painful motion is present without regard to whether the DC used for evaluation involves ROM.
- The _Southall-Norman_ holding represents a change to longstanding VA policy which directed that 38 CFR 4.59 applies only to DCs involving ROM.
- The _Southall-Norman_ holding is effective December 15, 2016.

---

| | |
|---|---|
| **k. j. Assessing Medical Evidence for Functional Loss Due to Pain** | Medical evidence used to evaluate functional impairment due to pain must account for painful motion, pain on use, and pain during flare-ups or with repeated use over a period of time. |

As a part of the assessment conducted in accordance with _DeLuca v. Brown_, 8 Vet.App. 202 (1995), the medical evidence must

- clearly indicate the exact degree of movement at which pain limits motion in the affected joint, and
- include the findings of at least three repetitions of ROM.

Per _Mitchell v. Shinseki_, 25 Vet.App. 32 (2011), when pain is associated with movement, an examiner must opine or the medical evidence must show whether pain could significantly limit functional ability

- during flare-ups, or
- when the joint is used repeatedly over a period of time, and
- if there is functional impairment found during flare-ups or with repeated use over a period of time, the examiner must provide, if feasible, the degree of additional LOM due to pain on use or during flare-ups.

Per _Correia v. McDonald_, 28 Vet.App. 158 (2016)

- the joints involved must be tested for pain
  – on both active and passive motion, and
  – in weight-bearing and nonweight-bearing, and
- if possible, the ROM of the opposite, undamaged joint must be assessed for comparison.

**_Important_**: If the examiner is unable to provide any of the above findings, he

or she must
- indicate that he/she cannot determine, without resort to mere speculation, whether any of these factors cause additional functional loss, and
- provide the rationale for this opinion.

*Note*:  Per *Jones (M.) v. Shinseki,* 23 Vet.App. 382 (2010), the VA may only accept a medical examiner's conclusion that an opinion would be speculative if
- the examiner has explained the basis for such an opinion, identifying what facts cannot be determined, or
- the basis for the opinion is otherwise apparent in VA's review of the evidence.

*Reference*:  For more information on reviewing musculoskeletal examination reports for sufficiency, see M21-1, Part III, Subpart iv, 3.D.4.g-h.

---

**l.k.  Entering DeLuca and Mitchell Data in the Evaluation Builder**

The findings of De*Luca* repetitive ROM testing or the functional loss expressed in the *Mitchell* opinion will be used to evaluate the functional impairment of a joint due to pain.

- Only the most advantageous finding will be utilized to evaluate the joint condition.
- Do not "add" the LOM on *DeLuca* exam to the LOM expressed in a *Mitchell* opinion.

*Note*:  For purposes of data entry in the Evaluation Builder tool, if evaluating a joint where data fields are present for only initial ROM and for *DeLuca* (but not for *Mitchell*), enter either the *DeLuca* or the *Mitchell* data in the *DeLuca* field, whichever results in the higher disability evaluation.

*References*:  For more information on the
- *Deluca* holding, see
  - M21-1, Part III, Subpart iv, 4.A.1.c, and
  - *DeLuca v. Brown,* 8 Vet.App. 202 (1995), and
- *Mitchell* holding, see
  - M21-1, Part III, Subpart iv, 4.A.1.e, and
  - *Mitchell v. Shinseki,* 25 Vet.App. 32 (2011), and
- evaluating joint conditions and functional loss, see M21-1, Part III, Subpart iv, 4.A.2.

---

**l.  Applying 38 CFR 4.59**

Refer to the table below for procedures for assessing the applicability of and applying 38 CFR 4.59.

| Step | Action |
|------|--------|
| 1 | Determine the DC most applicable to the disability based on either |

| | | |
|---|---|---|
| | | • the disability and corresponding DC as specifically listed in the Rating Schedule, or<br>• application of 38 CFR 4.20 for selection of the most appropriate analogous DC.<br><br>Proceed to Step 2.<br><br>**Note**: Per *Sowers v. McDonald*, 27 Vet.App. 472 (2016), 38 CFR 4.59 is limited by the DC applicable to the claimant's disability. |
| | 2 | Review findings on examination to determine whether painful motion is present.  If painful motion is<br><br>• present, proceed to Step 3, or<br>• not present, do not apply 38 CFR 4.59.<br><br>**Note**: Per *Petitti v. McDonald*, 27 Vet.App. 415 (2015), 38 CFR 4.59 does not require objective evidence of painful motion for assignment of a minimal compensable evaluation for a joint. |
| | 3 | If the DC<br><br>• involves joint or periarticular pathology, go to Step 4, or<br>• does not involve joint or periarticular pathology, then application of 38 CFR 4.59 is not warranted.<br><br>**Note**: Per *Southall-Norman v. McDonald*, 28 Vet.App. 346 (2016), 38 CFR 4.59 is not limited to DCs involving limited ROM. |
| | 4 | Review the available evaluations under the selected DC.  If the selected DC<br><br>• allows for assignment of a compensable evaluation, then assign the minimum compensable evaluation for painful motion if other symptoms do not warrant a higher evaluation, or<br>• does not allow for a compensable evaluation, then do not assign a compensable evaluation under 38 CFR 4.59.<br><br>**Note**:  The holding in *Sowers v. McDonald*, 27 Vet.App. 472 (2016) influenced a subsequent policy decision to assign the minimum compensable evaluation under the corresponding DC for painful motion under 38 CFR 4.59. |

**m.  Examples -- Considering 38 CFR 4.59 for Shoulder Disabilities**

The following examples demonstrate the proper procedures for considering 38 CFR 4.59 when evaluating shoulder disabilities.

*Example 1*:  Assume a shoulder strain with forward elevation and abduction limited to 145 degrees with credible evidence of pain while performing each

motion, starting at 140 degrees. Assign a 20-percent evaluation under 38 CFR 4.71a, DC 5201. Under 38 CFR 4.59 there is actually painful motion and joint or periarticular pathology (a strain). Therefore the intention of the rating schedule is that the decision maker will assign the minimum compensable evaluation provided under the DC appropriate to the disability at issue. The lowest specified compensable evaluation for shoulder motion under the DC is 20 percent.

*Example 2*: Assume the same facts as in Example 1, but the diagnosis is traumatic arthritis of the shoulder based on x-rays. Assign a 20-percent evaluation under 38 CFR 4.71a, DC 5010-5201 with application of 38 CFR 4.59. The ROM does not meet the criteria for a 20-percent evaluation under 38 CFR 4.71a, DC 5201 because arm motion is not limited at shoulder height. However, pursuant to 38 CFR 4.59 there is actually painful motion and joint or periarticular pathology (arthritis). Therefore, the intention of the rating schedule is that the decision maker will assign the minimum compensable evaluation provided under the DC appropriate to the disability at issue. The lowest specified compensable evaluation for shoulder motion under 38 CFR 4.71a, DC 5201 is 20 percent.

Although the diagnosis was traumatic arthritis, using 38 CFR 4.71a, DC 5010-5201 is more advantageous to the Veteran. However, in some cases, a 10-percent evaluation under the arthritis criteria may be appropriate. See Example 3.

*Example 3*: Assume the same facts as in Example 2 except that there was no pain on motion. There was a minor amount of swelling of the shoulder. Assign a 10-percent evaluation under 38 CFR 4.71a, DC 5010. There is x-ray evidence of traumatic arthritis and motion that is noncompensable under the applicable DC. There is no evidence of painful motion, so 38 CFR 4.59 is not applicable. Under 38 CFR 4.71a, DC 5010, traumatic arthritis is rated using the criteria of 38 CFR 4.71a, DC 5003, which requires that LOM be "objectively confirmed" by findings such as swelling, spasm, or satisfactory evidence of painful motion. In this case there was objective evidence supporting the LOM – namely the minor swelling of the shoulder.

**n. Examples— Considering Non-objective Pain Under 38 CFR 4.59**

*Example 1*: On examination, a claimant reports current symptoms of regular pain of the right knee (particularly when fully straightening the knee) that is worsened with increased activity. The examiner finds normal ROM without pain on examination. Repetitive motion testing produces no evidence of pain or loss of motion. The assessment is right knee strain. Assign a 10-percent evaluation under 38 CFR 4.71a, DC 5261. The claimant's reports of joint pain are found to be credible. There is no basis to reject the complaints of pain as lacking in credibility. 38 CFR 4.59 does not require objective evidence of painful motion. The claimant's statement establishes that there is actually painful motion of the joint, even though it was not objectively verified on VA examination.

*Example 2*:  On examination, a claimant reports constant pain of the left elbow (particularly when bending the arm).  The examiner finds normal ROM without pain on examination. Repetitive motion testing produces no evidence of pain or loss of motion.  There is no swelling or spasm. The assessment is degenerative arthritis of the left elbow corroborated by x-rays.  Assign a 10-percent evaluation under 38 CFR 4.71a, DC 5003-5206.  The claimant's reports of joint pain are found to be credible.  There is no basis to reject the complaints of pain as lacking in credibility.  Although 38 CFR 4.71a, DC 5003 requires noncompensable LOM and objective confirmation of LOM by spasm, swelling, or satisfactory evidence of painful motion, 38 CFR 4.59 provides an alternative basis for a compensable evaluation and does not require objective evidence of painful motion.  The claimant's statement establishes that there is actually painful motion of the joint, even though pain was not objectively verified on VA examination.

*Example 3*:  Start with the same facts as Example 2.  However, in this example, claimant states on exam that he has had significant pain on elbow motion consistently for the last year and particularly in the last week.  However, treatment records from the past year show normal, painless range of elbow motion and no history of pain at rest, or on motion.  Notably, in a VA outpatient report from two days before the VA examination, the claimant told his treating doctor that his elbow was not painful and had not been painful at all in the last year.  Continue the zero-percent evaluation.  Although the Veteran reported elbow pain on examination, review of the evidence as a whole satisfactorily demonstrates that the Veteran's complaints of painful motion were not credible.  Elbow motion is not found to be actually painful.

**o. Example— Considering Pain With Passive ROM Under 38 CFR 4.59**

Service connection (SC) is established for left rotator cuff impingement.  The Veteran reports shoulder pain when lifting the left arm – particularly with repetitive motion of the arm at or above shoulder height.  The Veteran reported a feeling of weakness with repeated over the head motions like painting.  On examination the Veteran had full active forward elevation, abduction and external and internal rotation of the shoulder including on repeated motion.  There was no report of pain with active motion.  Passive ROM testing for impingement including the Hawkin's Sign was positive and reproduced impingement with the guided movements at shoulder height.  Assign a 20-percent evaluation under 38 CFR 4.71a, DC 5201.  The Hawkin's Sign is a test for pain on passive ROM.  Under 38 CFR 4.59 the shoulder is actually painful to passive ROM and there is joint or periarticular pathology (rotator cuff impingement).  The intention of the rating schedule is that the decision maker will assign the minimum compensable evaluation provided under the DC appropriate to the disability at issue.  The lowest specified compensable evaluation for limited ROM of the shoulder under the DC is 20 percent.

*Note*:  Medical Electronic Performance Support System (EPSS) provides that a rotator cuff tear should be rated by analogy to 38 CFR 4.71a, DC 5203 (clavicle or scapula, impingement of) because the rotator cuff holds the

humeral head in the glenoid fossa of the scapula and consists of the muscles around the scapula. However 38 CFR 4.71a, DC 5203 in turn provides that rather than rating impairment of the scapula by dislocation, nonunion, or malunion it may also be rated "on impairment of function of the contiguous joint." Medical EPSS notes that rotator cuff impingement is characterized by pain and weakness with motions at or above shoulder height and advises that there may be ~~limitation of motion~~LOM of the arm for the purposes of 38 CFR 4.71a, DC 5201 in cases of rotator cuff disease.

---

**p̶j̶. Evaluating Painful Motion of Minor Joints or Joint Groups Under 38 CFR 4.59**

The determining factor as to whether a minimum compensable evaluation may be assigned under 38 CFR 4.59 is whether the appropriate corresponding DC for the joint or periarticular region involved includes a compensable evaluation, as demonstrated in *Sowers v. McDonald*, 27 Vet.App. 472 (2016).

38 CFR 4.59 does not include a specific provision limiting application to major joints or provisions for how to consider groups of minor joints. Thus, major joint involvement or multiple minor joint involvement is not a factor in determining whether a minimum compensable evaluation may be assigned under 38 CFR 4.59.

The following principles apply when evaluating painful motion of the minor joints of the hands and feet:

- 38 CFR 4.71a, DC 5228 and 5229 allow for compensable evaluations for LOM of the thumb, index finger, and long finger. Consequently, compensable evaluations are warranted for painful motion of each of these fingers. Separate evaluations must be assigned for each SC digit evaluated under these DCs affected by painful motion.

*~~Examples~~*~~:~~
~~Hallux valgus with painful motion of the first toe is most appropriately evaluated under 38 CFR 4.71a, DC 5280. The minimum compensable evaluation for this DC is 10 percent. Therefore, a 10-percent evaluation is warranted for painful motion of the first toe.~~
~~Residuals of fracture of the little finger with painful motion is most appropriately evaluated under 38 CFR 4.71a, DC 5230. The only possible evaluation under this DC is a zero percent. Therefore, a compensable evaluation cannot be assigned for painful motion of the little finger.~~

- ~~Painful motion due to fracture of the index or long finger is most appropriately evaluated under 38 CFR 4.71a, DC 5229. The minimum compensable evaluation for this DC is 10 percent. Therefore, a 10-percent evaluation is available for painful motion of the index finger and an additional 10-percent evaluation is warranted for painful motion of the long finger, both under 38 CFR 4.71a, DC 5229~~Painful motion of multiple toes of one foot due to injuries is most appropriately evaluated under 38 CFR 4.71a, DC 5284 since there is no specific code for evaluation of injuries of single toes. A single evaluation is warranted for a single foot, whether it is affected by one or more painful toes or other painful joints of the foot. The minimum compensable evaluation for this DC is 10 percent. Therefore, a

single 10-percent evaluation is warranted for painful motion of one of more toes or other joints in a foot due to injury.

– Do not routinely utilize 38 CFR 4.71a, DC 5280 to evaluate painful motion of the first toe.

– Assignment of a 10-percent evaluation for painful motion of the first toe under 38 CFR 4.71a, DC 5280 is appropriate only when the disability being evaluated is hallux valgus or another disability that is most appropriately analogously evaluated as hallux valgus (as required in the *Sowers* holding).

*Note*: The definition of joint that is reliant on the distinction of major and minor joints at 38 CFR 4.45(f) is applicable for the purpose of rating arthritis but is *not* applicable to 38 CFR 4.59.

*References*: For more information on
- the application of 38 CFR 4.45(f) for major and minor joints, see *Spicer v. Shinseki*, 752 F.3d 1367 (2014), and
- evaluating disabilities of the fingers, see M21-1, Part III, Subpart iv, 4.A.4.e-h3.n, and
- evaluating disabilities of the feet, see M21-1, Part III, Subpart iv, 4.A.7.

---

**q. Examples—Painful Motion of Minor Joints**

*Example 1*: Hallux valgus with painful motion of the first toe is most appropriately evaluated under 38 CFR 4.71a, DC 5280. The minimum compensable evaluation for this DC is 10 percent. Therefore, a 10-percent evaluation is warranted for painful motion of the first toe. This is applicable only when the disability evaluated is hallux valgus or another disability warranting analogous evaluation under this DC.

*Example 2*: Residuals of fracture of the little finger with painful motion is most appropriately evaluated under 38 CFR 4.71a, DC 5230. The only possible evaluation under this DC is a zero percent. Therefore, a compensable evaluation cannot be assigned for painful motion of the little finger.

*Example 3*: Painful motion due to fracture of the index or long finger is most appropriately evaluated under 38 CFR 4.71a, DC 5229. The minimum compensable evaluation for this DC is 10 percent. Therefore, a 10-percent evaluation is available for painful motion of the index finger and an additional 10-percent evaluation is warranted for painful motion of the long finger, each under 38 CFR 4.71a, DC 5229.

---

**r. Example—Painful Motion and DC 5276**

*Situation*: SC is warranted for flat feet under DC 5276. The clinical evidence shows complete relief of symptoms, including foot pain, with arch supports. However, the record also contains credible lay reports of pain.

*Outcome*: Although no more than a zero-percent evaluation is warranted under 38 CFR 4.71a, DC 5276 on the basis of complete symptom relief due to

an orthotic device, application of 38 CFR 4.59 warrants assignment of a 10-percent evaluation.

***Rationale***:
- Subjective, credible reports of painful motion trigger application of 38 CFR 4.59 pursuant to the *Petitti* holding.
- The criteria for assignment of the minimum compensable evaluation under 38 CFR 4.59 are entirely independent of the criteria for evaluation under the DC. Thus, the relief of symptoms of pain is immaterial to assignment of the minimum compensable evaluation for painful motion under 38 CFR 4.59 for pes planus or other analogously rated disabilities.
- Additionally, the *Southall-Norman* holding requires VA to apply 38 CFR 4.59 to all musculoskeletal codes involving joint or periarticular pathology to include even those, such as 38 CFR 4.71a, DC 5276, that do not specifically consider LOM.

***Note***: The minimum compensable evaluation under 38 CFR 4.71a, DC 5276 is a single 10 percent whether for unilateral or bilateral pes planus. Accordingly, assignment of a single 10-percent evaluation for painful motion due to pes planus is warranted per 38 CFR 4.59 regardless of whether the painful motion is unilateral or bilateral.

| **s. Evaluation Builder Workaround for Painful Motion of the Fingers** | Until the Evaluation Builder can be updated to reflect the policy and procedural changes affecting evaluation of painful motion of the fingers, decision makers are responsible for ensuring that proper disability evaluations are assigned for painful motion of the fingers. |
| --- | --- |
| | The workaround provided below will assist decision makers in properly evaluating finger disabilities. |

| **Step** | **Action** |
| --- | --- |
| 1 | When a separate evaluation for painful motion of the thumb or fingers is warranted, as discussed at M21-1, Part III, Subpart iv, 4. A.1.p, do not utilize the Evaluation Builder to evaluate the fingers. Instead, utilize the *Disability Decision Information - manual entry* option in the Veterans Benefits Management System – Rating (VBMS-R). Enter the appropriate disability evaluation information for painful motion of the affected digit(s). |
| 2 | In the rating analysis, include the following language to explain the assignment of a 10-percent evaluation for painful motion of the thumb, index finger, or long finger: <br><br> *We have assigned a 10 percent evaluation based on:* <br> • *Painful motion of the [input name of affected digit].* <br><br> *38 CFR §4.59 allows consideration of functional loss due to painful motion to be rated to the minimum compensable rating for the affected disability. Since you demonstrate* |

| | | |
|---|---|---|
| | | *painful motion, a minimum compensable evaluation of 10 percent is assigned.* |
| | 3 | Modify the text below to include only the criteria that is relevant to the fact pattern being addressed and incorporate into the rating narrative as the next higher evaluation criteria. |
| | | *A higher evaluation of 20 percent is not warranted unless there is:*
• *Limited motion of the thumb: with a gap of more than two inches (5.1 cm.) between the thumb pad and the fingers, with the thumb attempting to oppose the fingers; or,*
• *Favorable ankylosis involving the index finger and any other finger; or,*
• *Favorable ankylosis involving the long, ring and little fingers; or,*
• *Unfavorable ankylosis involving the thumb; or,*
• *Unfavorable ankylosis involving the long and ring fingers; or,*
• *Unfavorable ankylosis involving the long and little fingers; or,*
• *Unfavorable ankylosis involving the ring and little fingers; or,*
• *Amputation of the thumb at distal joint or through distal phalanx; or,*
• *Amputation of the index finger without metacarpal resection, at proximal interphalangeal joint or proximal thereto; or,*
• *Amputation of the long, ring or middle finger with metacarpal resection (more than one-half the bone lost).*

*In some situations, evaluation of disabilities of the hand requires multiple digits to be combined into a single diagnostic code. Therefore, some higher evaluation criteria listed above include all possible higher digit-combination criteria.* |

**t. Evaluation Builder Workaround for Painful Motion of the Feet**

Until the Evaluation Builder can be updated to reflect the policy and procedural changes affecting evaluation of painful motion of the feet, decision makers are responsible for ensuring that proper disability evaluations are assigned for painful motion of the feet.

The workaround provided below will assist decision makers in properly evaluating foot disabilities.

| Step | Action |
|---|---|
| 1 | When an evaluation for painful motion due to a foot disability evaluated under 38 CFR 4.71a, DC 5276-5284 is warranted, as |

| | | |
|---|---|---|
| | | discussed at M21-1, Part III, Subpart iv, 4. A.1.p, do not utilize the Evaluation Builder to evaluate the painful motion of the foot. Instead, utilize the *Disability Decision Information - manual entry* option in VBMS-R. Enter the appropriate disability decision information for the foot condition. |
| | 2 | In the rating analysis, include the following language to explain the assignment of a 10-percent evaluation for painful motion due to the foot disability: <br><br> *We have assigned a 10 percent evaluation based on:* <br> • *Painful motion due to [*input name of disability*].* <br><br> *38 CFR §4.59 allows consideration of functional loss due to painful motion to be rated to the minimum compensable rating for the affected disability. Since you demonstrate painful motion, a minimum compensable evaluation of 10 percent is assigned.* |
| | 3 | Utilize the Legacy Evaluation Builder to generate the appropriate next higher evaluation criteria for the selected DC. |

# 2. Evaluating Joint Conditions and Functional Loss

**Introduction**

This topic contains information on evaluating joint conditions and functional loss, including

- assigning multiple LOM evaluations for a joint
- assigning a separate noncompensable evaluation when schedular zero-percent criteria are not specified
- considering pain when assigning multiple LOM evaluations for a joint
- example of compensable limitation of two joint motions
- example of compensable limitation of one motion with pain in another motion
- example of noncompensable limitation of two motions with pain
- example of evaluating a joint with full ROM and functional loss due to pain
- example of evaluating a joint with LOM and functional loss due to pain
- example of evaluating joints with arthritis by x-ray evidence only with other joint(s) affected by non-arthritic condition
- definition of
  - major joints
  - minor joints, and
  - minor joint groups, and
- importance of accurate measurements in joint cases, and
- ankylosis of the joints.

**Change Date**

October 24, 2017 April 13, 2018

**a. Assigning Multiple LOM Evaluations for a Joint**

In VAOPGCPREC 9-2004, the Office of General Counsel (OGC) held that separate evaluations under 38 CFR 4.71a, DC 5260, (limitation of knee flexion) and 38 CFR 4.71a, DC 5261, (limitation of knee extension) can be assigned without pyramiding. Despite the fact that knee flexion and extension both occur in the same plane of motion, limitation of flexion (bending the knee) and limitation of extension (straightening the knee) represent distinct disabilities.

***Important***:
- The same principle and handling apply ***only*** to
  - qualifying elbow and forearm movement DCs, flexion (38 CFR 4.71a, DC 5206), extension (38 CFR 4.71a, DC 5207), and impairment of either supination or pronation (38 CFR 4.71a, DC 5213), and
  - qualifying hip movement DCs, extension (38 CFR 4.71a, DC 5251), flexion (38 CFR 4.71a, DC 5252), and abduction, adduction or rotation (38 CFR 4.71a, DC 5253).
- Always ensure that multiple evaluations do not violate the amputation rule in 38 CFR 4.68.

*Note*:  The Federal Circuit has definitively ruled that multiple evaluations for the shoulder under 38 CFR 4.71a, DC 5201, are not permitted.  In *Yonek v. Shinseki*, 722 F.3d 1355 (Fed. Cir. 2013) the court held that a Veteran is entitled to a single rating under 38 CFR 4.71a, DC 5201, even though a shoulder disability results in LOM in both flexion (raising the arm in front of the body) and abduction (raising the arm away from the side of the body).

*References*:  For more information on
- pyramiding of evaluations, see
  - 38 CFR 4.14, and
  - *Esteban v. Brown*, 6 Vet.App. 259 (1994)
- painful motion in multiple evaluations for joint LOM, see M21-1, Part III, Subpart iv, 4.A.2.c
- assignment of separate evaluations for disabilities of the elbow, forearm, and wrist, see M21-1, Part III, Subpart iv, 4.A.3.c, and
- examples of actual LOM of two knee motions, see M21-1, Part III, Subpart iv, 4.A.2.d.

---

**b.  Assigning a Separate Noncompensable Evaluation When Schedular Zero-Percent Criteria Are Not Specified**

When considering a separate evaluation for a motion of a joint specified in M21-1, Part III, Subpart iv, 4.A.2.a, where zero-percent evaluation criteria are not provided by the DC, *any* LOM for that specific movement falling short of criteria for a compensable level of evaluation will be assigned a separate zero-percent evaluation.

38 CFR 4.31 provides that in every instance where the schedule does not provide a zero-percent evaluation for a DC, a zero-percent evaluation shall be assigned when the requirements for a compensable evaluation are not met.

The motions include

- 38 CFR 4.71a, DC 5207, limitation of extension of the elbow
- 38 CFR 4.71a, DC 5213, impairment of supination and pronation of the forearm
- 38 CFR 4.71a, DC 5251, limitation of extension of the hip
- 38 CFR 4.71a, DC 5252, limitation of flexion of the hip, and
- 38 CFR 4.71a, DC 5253, impairment of rotation, adduction, or abduction of the hip.

*Example*:  Examination shows flexion of the hip limited to 60 degrees and extension limited to 5 degrees.  Normal hip ROM is from zero degrees (fully extended) to 125 degrees (fully flexed).  The limitation of extension to 5 degrees is rated 10 percent under 38 CFR 4.71a, DC 5251.  38 CFR 4.71a, DC 5252 (limitation of flexion) does not list criteria for a zero-percent evaluation but a 10-percent evaluation requires flexion limited to 45 degrees.  Because there is limited flexion not meeting the 10-percent criteria and there is no defined schedular zero-percent evaluation criteria, a zero-percent evaluation is warranted for limited flexion of the hip under 38 CFR 4.71a, DC

5252.

**c. Considering Pain When Assigning Multiple LOM Evaluations for a Joint**

When considering the role of pain in evaluations for multiple motions of a single joint, the following guidelines apply.

- When more than one qualifying joint motion is actually limited to a compensable degree and there is painful but otherwise noncompensable limitation of the complementary movement(s), ***only one compensable evaluation can be assigned***.
  - *Mitchell v. Shinseki*, 25 Vet.App. 32 (2011) reinforced that painful motion is the equivalent of limited motion only based on the specific language and structure of 38 CFR 4.71a, DC 5003, not for the purpose of 38 CFR 4.71a, DC 5260, and 38 CFR 4.71a, 5261. For arthritis, if one motion is actually compensable under its 52XX-series DC, then a 10-percent evaluation under 38 CFR 4.71a, DC 5003, is not available and the complementary motion cannot be treated as limited at the point where it is painful.
  - 38 CFR 4.59 does not permit separate compensable evaluations for *each* painful joint *motion*. It only provides that VA policy is to recognize actually painful motion as entitled to at least the minimum compensable evaluation for the *joint*.
- When each qualifying joint motion is painful but motion is not actually limited to a compensable degree under its applicable 52XX-series DC, ***only one compensable evaluation can be assigned***.
  - Assigning multiple compensable evaluations for pain is pyramiding.
  - A joint affected by arthritis established by x-ray may be evaluated as 10-percent disabling under 38 CFR 4.71a, DC 5003.
  - For common joint conditions that are not evaluated under the arthritis criteria such as a knee strain or chondromalacia patella, a 10-percent evaluation can be assigned for the joint based on pain on motion under 38 CFR 4.59. Do not apply instructions from Note (1) under 38 CFR 4.71a, DC 5003, for non-arthritic conditions, since the instructions are strictly limited to arthritic conditions. See example in M21-1, Part III, Subpart iv, 4.A.2.i.

***References***: For more information on
- pyramiding of evaluations, see
  - 38 CFR 4.14, and
  - *Esteban v. Brown*, 6 Vet.App. 259 (1994)
- assigning multiple evaluations for a single joint, see M21-1, Part III, Subpart iv, 4.A.2.a, and
- examples of evaluations for which one or both joint motions are not actually limited to a compensable degree but there is painful motion, see M21-1, Part III, Subpart iv, 4.A.2.e and f.

**d. Example 1:**

***Situation***: Evaluation of chronic knee strain with the following examination

| | |
|---|---|
| **Compensable Limitation of Two Joint Motions** | findings: |

- Flexion is limited to 45 degrees.
- Extension is limited by 10 degrees.
- There is no painful motion.
- There is no additional limitation of flexion or extension on additional repetitions or during flare-ups.

*Result*:  Assign a 10-percent evaluation under 38 CFR 4.71a, DC 5260, and a separate 10-percent evaluation under 38 CFR 4.71a, DC 5261.

*Explanation*:  Each disability (limitation of flexion and limitation of extension) warrants a separate evaluation and the evaluations are for distinct disability.

---

**e. Example 2: Compensable Limitation of One Motion With Pain in Another Motion**

*Situation*:  Evaluation of knee tenosynovitis with the following examination findings:

- Flexion is limited to 45 degrees with pain at that point and no additional loss with repetitive motion.
- Extension is full to the 0-degree position, but active extension is limited by pain to 5 degrees.

*Result*:  Assign a 10-percent evaluation under 38 CFR 4.71a, DC 5260 and a noncompensable evaluation under 38 CFR 4.71a, DC 5261.

*Explanation*:
- Flexion is compensable under 38 CFR 4.71a, DC 5260, but extension remains limited to a noncompensable degree under 38 CFR 4.71a, DC 5261.
- Under *Mitchell v. Shinseki*, 25 Vet.App. 32 (2011), the painful extension could only be considered limited for the purpose of whether a 10-percent evaluation can be assigned for the joint under 38 CFR 4.71a, DC 5003, which is not applicable in this example because a compensable evaluation was already assigned for flexion under 38 CFR 4.71a, DC 5260.
- 38 CFR 4.59 does not support a separate compensable evaluation for painful extension.  The regulation states that the intention of the rating schedule is to recognize actually painful joints due to healed injury as entitled to at least the minimum compensable evaluation for the joint, not for each painful movement.
- If the fact pattern involved chondromalacia patella or a knee strain rather than tenosynovitis, the result would be the same.

---

**f. Example 3: Noncompensable Limitation of Two Motions With Pain**

*Situation*:  Evaluation of knee arthritis shown on x-ray with the following examination findings:

- Flexion is limited to 135 degrees with pain at that point.

- Extension is full to the 0-degree position with pain at that point.
- There is no additional loss of flexion or extension on repetitive motion.

**Result**:  Assign one 10-percent evaluation for the knee under 38 CFR 4.71a, DC 5003.

**Explanation**:
- There is limitation of major joint motion to a noncompensable degree under 38 CFR 4.71a, DC 5260, and 38 CFR 4.71a, DC 5261, x-ray evidence of arthritis and satisfactory evidence of painful motion.  Painful motion is limited motion for the purpose of applying 38 CFR 4.71a, DC 5003.  Therefore, a 10-percent evaluation is warranted for the joint.
- Assigning two compensable evaluations, each for pain, would be pyramiding.
- Neither 38 CFR 4.71a, DC 5003, nor 38 CFR 4.59 permits separate 10-percent evaluations for painful flexion and extension; they provide for a 10-percent evaluation for a joint.
- If the fact pattern involved chondromalacia patella or a knee strain rather than arthritis, a 10-percent evaluation, not separate evaluations, would still be warranted.  However, the authority would be 38 CFR 4.59 and 38 CFR 4.71a, DC 5260 would be used rather than 38 CFR 4.71a, DC 5003.

---

**g.  Example of Evaluating a Joint with Full ROM and Functional Loss Due to Pain**

**Situation**:  Evaluation of a knee condition with normal initial ROM and additional functional loss indicated on *DeLuca* and *Mitchell* assessments.

- Examination reveals normal ROM for extension of the knee, but pain on motion is present.
- In applying the *DeLuca* repetitive use test, the examiner determines that after repetitive use extension of the knee is additionally limited, and the post-test ROM is to 10 degrees due to pain.
- The examiner provides a *Mitchell* assessment that during flare-ups the extension of the knee would be additionally limited to 15 degrees due to pain.

**Result**:  Assign one 20-percent disability evaluation under 38 CFR 4.71a, DC 5261 for limited extension of the knee.

**Explanation**:  15-degree limitation of extension, expressed in the *Mitchell* opinion, is the most advantageous assessment of functional loss for extension of the knee in this scenario.  Therefore, the knee will be evaluated based on extension limited to 15 degrees, resulting in a 20-percent evaluation under 38 CFR 4.71a, DC 5261.

**References**:  For more information on
- the *Deluca* and *Mitchell* holdings, see M21-1, Part III, Subpart iv, 4.A.1.c and e
- assessing medical evidence in conjunction with the *DeLuca* and *Mitchell*

holdings, see M21-1, Part III, Subpart iv, 4.A.1.k~~j~~, and
- entering *DeLuca* and *Mitchell* findings in the Evaluation Builder, see M21-1, Part III, Subpart iv, 4.A.1.~~l~~k.

| | |
|---|---|
| **h. Example of Evaluating a Joint With LOM and Functional Loss Due to Pain** | ***Situation***:  Evaluation of a knee condition with limited initial ROM and additional functional loss indicated on *DeLuca* and *Mitchell* assessments.<br><br>- Flexion of the knee is limited to 70 degrees with pain on motion during initial examination.<br>- In applying the *DeLuca* repetitive use test, the examiner determines that after repetitive use test flexion of the knee is additionally limited, and the post-test ROM is 50 degrees as a result of pain with repetitive use.<br>- The examiner provides a *Mitchell* assessment that during flare-ups the estimated ROM for flexion of the knee would be 30 degrees due to pain.<br><br>***Result***:  Assign one 20-percent disability evaluation under 38 CFR 4.71a, DC 5260 for limited flexion of the knee.<br><br>***Explanation***:  Flexion of the knee would be assessed at 30 degrees, as the ROM estimated in the *Mitchell* assessment is the most advantageous representation of the Veteran's limitation of flexion.<br><br>***References***:  For more information on<br>- the *Deluca* and *Mitchell* holdings, see M21-1, Part III, Subpart iv, 4.A.1.c and e<br>- assessing medical evidence in conjunction with the *DeLuca* and *Mitchell* holdings, see M21-1, Part III, Subpart iv, 4.A.1.j~~k~~, and<br>- entering *DeLuca* and *Mitchell* findings in the Evaluation Builder, see M21-1, Part III, Subpart iv, 4.A.1.~~l~~k. |
| **i. Example of Evaluating Joints With Arthritis by X-Ray Evidence Only With Other Joint(s) Affected by Non-arthritic Condition** | ***Example***:  A Veteran is rated 10 percent for bilateral arthritis of the elbows confirmed by x-ray evidence, without limited or painful motion or incapacitating exacerbations.  Veteran subsequently files a claim for SC for chondromalacia of the right knee and is awarded a 20-percent evaluation based on VA examination, which revealed limitation of flexion of the right knee to 30 degrees.<br><br>***Analysis***:  A 10-percent evaluation for bilateral arthritis of the elbows and a separate 20-percent evaluation for right knee chondromalacia is justified.  In this case, the rating does not violate Note (1) under 38 CFR 4.71a, DC 5003, because the knee condition is not an arthritic condition.<br><br>***Reference***:  For additional information on ratings not permissible under Note (1) under 38 CFR 4.71a, DC 5003, see M21-1, Part III, Subpart iv, 4.B~~A~~.4~~9~~.d. |
| **j. Definition:** | The term ***major joint*** means |

**Major Joints**

- a shoulder
- an elbow
- a wrist
- a hip
- a knee, or
- an ankle.

*Note*:  The use of the terms *major* and *minor* joint in [38 CFR 4.45(f)](#) applies solely to the evaluation of joint conditions affected by arthritis as discussed in *Spicer v. Shinseki*, 752 F.3d 1367 (2014).

*Reference*:  For more information on major joints, see [38 CFR 4.45(f).](#)

---

**k.  Definition: Minor Joints**

The term ***minor joint*** means

- an interphalangeal joint (of the hand or foot)
- a metacarpal joint (hand)
- a metatarsal joint (foot)
- a carpal joint (hand)
- a tarsal joint (foot)
- cervical vertebrae
- dorsal vertebrae
- lumbar vertebrae
- the lumbosacral articulation, or
- a sacroiliac joint.

*Note*:  The use of the terms *major* and *minor* joint in [38 CFR 4.45(f)](#) applies solely to the evaluation of joint conditions affected by arthritis as discussed in *Spicer v. Shinseki*, 752 F.3d 1367 (2014).

*References*:  For more information on
- the definition of a minor joint, see [38 CFR 4.45(f)](#)
- the definition of minor joint groups, see M21-1, Part III, Subpart iv, 4.A.2.l
- considering minor joints under [38 CFR 4.59](#), see M21-1, Part III, Subpart iv, 4.A.1.~~p~~j
- the application of [38 CFR 4.45(f)](#) for major and minor joints, see *Spicer v. Shinseki*, 752 F.3d 1367 (2014)
- the joints of the hand see M21-1, Part III, Subpart iv, 4.A.~~3.f and g~~4.a-b, and
- identifying the digits of the foot, see M21-1, Part III, Subpart iv, 4.A.7.b~~4.r~~.

---

**l.  Definition: Minor Joint Groups**

A ***minor joint group*** means

- multiple involvements of the interphalangeal, metacarpal and carpal joints of the same upper extremity, namely, combinations of
  – distal interphalangeal (DIP) joints

- proximal interphalangeal (PIP) joints
- metacarpophalangeal (MCP) joints, and/or
- carpometacarpal (CMC) joints
- multiple involvements of the interphalangeal, metatarsal and tarsal joints of the same lower extremity, namely, combinations of
  - interphalangeal (IP) joints
  - metatarsophalangeal (MTP) joints, and/or
  - transverse tarsal joints
- the cervical vertebrae
- the dorsal (thoracic) vertebrae
- the lumbar vertebrae or
- the lumbosacral articulation together with both sacroiliac joints.

*Note*:  The use of the terms *major* and *minor* joint in 38 CFR 4.45(f) applies solely to the evaluation of joint conditions affected by arthritis as discussed in *Spicer v. Shinseki*, 752 F.3d 1367 (2014).

*References*:  For more information on
- the definition of minor joint groups, see 38 CFR 4.45(f)
- considering minor joints under 38 CFR 4.59, see M21-1, Part III, Subpart iv, 4.A.1.p̶j̶
- the application of 38 CFR 4.45(f) for major and minor joints, see *Spicer v. Shinseki*, 752 F.3d 1367 (2014)
- evaluations for the fingers, see M21-1, Part III, Subpart iv, 4.A.3̶.n̶4.e-h
- evaluating arthritis of the minor joints of the toes, see M21-1, Part III, Subpart iv, 4.A.4̶7.d, and
- arthritis where a compensable evaluation cannot be assigned under another DC, see M21-1, Part III, Subpart iv, 5̶.A̶.7̶4.B.2.b.

| | |
|---|---|
| **m. Importance of Accurate Measurements in Joint Cases** | Accurate measurements are very important in joint cases.  VA examinations must measure joint motion with a goniometer. |

A number of d̶Disability b̶Benefits q̶Questionnaires (DBQs) relating to joints (*Hip and Thigh Conditions*, *Knee and Lower Leg Conditions*, *Ankle Conditions*, *Back (Thoracolumbar Spine) Conditions*, *Neck (Cervical Spine) Conditions*, *Shoulder and Arm Conditions*, *Elbow and Forearm Conditions*, *Wrist Conditions, and Hand and Finger Conditions*) require use of a goniometer.

*Important*:  There is a presumption that examiners will conduct examinations in line with examination standards.  Accordingly, treat examinations measurements on examinations that require a goniometer as having been taken using the device unless there is clear evidence that a goniometer was not used.  Do not seek clarification of DBQs requiring goniometer use, or return the examination as insufficient, merely because the report does not explicitly refer to goniometer use.

*References*: For more information on
- the importance of accurate measurement of joints, see 38 CFR 4.46, and
- determining the sufficiency of examinations, see M21-1, Part III, Subpart iv, 3.D.3.

**n.  Ankylosis of the Joints**

*Ankylosis* is a condition of, or term used for the sign/symptom of, abnormal stiffness, immobility, or abnormal bending of a joint.  It is a stiffness or immobility in a joint caused by bones fusing as a result of disease or injury or by intentional fusion through surgery.

*Favorable ankyloses* is fixation of a joint in a neutral position (at zero degrees).

*Unfavorable ankyloses* is fixation of a joint in flexion or extension that results in significant functional impairment.

# 3. Evaluating Musculoskeletal Disabilities of the ~~Upper Extremities~~ Arms

| | |
|---|---|
| **Introduction** | This topic contains information on evaluating musculoskeletal disabilities of the ~~upper extremities~~ arms, including |

- considering separate evaluations for disabilities of the shoulder and arm
- example of separate evaluations for disabilities of the shoulder and arm
- assigning separate evaluations for disabilities of the elbow, forearm, and wrist
- example of separate evaluations for multiple disabilities of the elbow, forearm, and wrist, and
- considering impairment of supination and pronation of the forearm.
- ~~identifying digits of the hand~~
- ~~anatomy of the hand~~
- ~~anatomical position of the hand and fingers~~
- ~~ROM of the index, long, ring, and little fingers~~
- ~~rating Dupuytren's contracture of the hand~~
- ~~evaluating amputations of multiple fingers~~
- ~~evaluating amputations of single fingers~~
- ~~evaluating ankylosis of one or more fingers, and~~
- ~~compensable evaluations for the fingers.~~

| | |
|---|---|
| **Change Date** | ~~October 24, 2017~~ April 13, 2018 |

| | |
|---|---|
| **a. Considering Separate Evaluations for Disabilities of the Shoulder and Arm** | Separate evaluations may be given for disabilities of the shoulder and arm under 38 CFR 4.71a DCs 5201, 5202, or 5203 if the manifestations represent separate and distinct symptomatology that are neither duplicative nor overlapping.<br><br>***Reference***:  For additional information concerning separate and distinct symptomatology, refer to |

- 38 CFR 4.14, and
- *Esteban v. Brown*, 6 Vet.App. 259 (1994).

| | |
|---|---|
| **b. Example of Separate Evaluations for Disabilities of the Shoulder and Arm** | ***Situation***:  A Veteran was involved in an automobile accident that resulted in multiple injuries to the upper extremities.  The Veteran sustained the following injuries |

- a humeral fracture resulting in restriction of arm motion at shoulder level, and
- a clavicular fracture resulting in malunion of the clavicle.

**Result**:
- assign a 20-percent evaluation for the impairment of the humerus under 38 CFR 4.71a, DC 5202-5201, and
- assign a separate 10-percent evaluation for malunion of the clavicle under 38 CFR 4.71a, DC 5203.

**Notes**:
- The hyphenated evaluation DC is assigned under 38 CFR 4.71a, DC 5202-5201 because the humerus impairment affects ROM.
- The separate evaluation for the clavicle disability is warranted because this disability does not affect ROM.

**Exception**:  Multiple evaluations cannot be assigned under 38 CFR 4.71a, DC 5201 for limited flexion and abduction of the shoulder.

**Reference**:  For additional information on evaluating shoulder conditions, see *Yonek v. Shinseki,* 722 F.3d 1355 (Fed. Cir. 2013).

---

**c.  Assigning Separate Evaluations for Disabilities of the Elbow, Forearm, and Wrist**

Impairments of the elbow, forearm, and wrist will be assigned separate disability evaluations.  The motions of these joints are all viewed as clinically separate and distinct.  Assign separate evaluations for impairment under the following DCs:

- elbow
  – flexion under 38 CFR 4.71a, DC 5206, or
  – extension under 38 CFR 4.71a, DC 5207
- forearm supination and pronation under 38 CFR 4.71a, DC 5213, and
- wrist flexion or ankylosis under 38 CFR 4.71a, DC 5214 or 38 CFR 4.71a, DC 5215.

**Notes**:
- 38 CFR 4.59 may be applied separately to the elbow, the forearm, and the wrist to result in potentially three separate evaluations for painful motion when the evidence otherwise supports such a finding.  However, 38 CFR 4.59 may only be applied once to the elbow and may not be separately applied to both elbow flexion and elbow extension.
- When examination or other evidence denotes pain present in the joint or periarticular region but does not delineate the specific motions in which pain is present *and* there is a potential for a separate evaluation under 38 CFR 4.59 as discussed in M21-1, Part III, Subpart iv, 4.A.1, obtain a medical opinion to determine which motions are painful.  When the examiner cannot delineate which motions are associated with pain, resolve doubt in favor of the Veteran and consider painful motion to be present in the separate plane such as to allow assignment of the separate minimum compensable evaluation under 38 CFR 4.59.

**Reference**:  For additional information on assigning separate evaluations for

elbow motion, see M21-1, Part III, Subpart iv. 4.A.2.a.

**d. Example of Separate Evaluations for Disabilities of the Elbow, Forearm, and Wrist**

*Situation*:  A Veteran sustained multiple injuries to the right upper extremity in a vehicle rollover accident.  The following impairments are due to the SC injuries:

- elbow flexion limited to 90 degrees
- elbow extension limited to 45 degrees
- full ROM on supination and pronation with painful supination, and
- full ROM of the wrist with pain on dorsiflexion.

*Result*:  Assign the following disability evaluations
- 20 percent for limited elbow flexion under 38 CFR 4.71a, DC 5206
- 10 percent for limited elbow extension under 38 CFR 4.71a, DC 5207
- 10 percent for painful forearm supination under 38 CFR 4.71a, DC 5213, and
- 10 percent for painful wrist motion under 38 CFR 4.71a, DC 5215.

*Explanation*:
- Compensable LOM of elbow flexion and extension is present.  Separate evaluations are warranted for elbow flexion and extension.
- Motion of the forearm is separate and distinct from elbow motion.  Therefore, a separate evaluation is warranted for painful supination.
- Motion of the wrist is separate and distinct from forearm motion.  Therefore, a separate evaluation is warranted for painful motion of the wrist.

*Note*:  If elbow flexion is limited to 100 degrees and elbow extension is limited to 45 degrees, assign a single 20-percent disability evaluation under 38 CFR 4.71a, DC 5208.

*References*:  For more information on
- separate evaluations for motion of a single joint, see
  – VAOPGCPREC 9-2004, and
  – M21-1, Part III, Subpart iv, 4.A.2.a
- separate evaluations for the elbow, forearm, and wrist, see M21-1, Part III, Subpart iv, 4.A.3.c
- evaluating painful motion of a joint, see
  – 38 CFR 4.59, and
  – M21-1, Part III, Subpart iv, 4.A.1
- considering painful motion when assigning multiple LOM evaluations for a joint, see M21-1, Part III, Subpart iv, 4.A.2.c, and
- considering impairment of supination and pronation of the forearm, see M21-1, Part III, Subpart iv, 4.A.3.e.

**e. Considering Impairment of**

When preparing rating decisions involving impairment of supination and pronation of the forearm, consider the following facts:

**Supination and Pronation of the Forearm**

- Full pronation is the position of the hand flat on a table.
- Full supination is the position of the hand palm up.
- When examining limitation of pronation, the
  - arc is from full supination to full pronation, and
  - middle of the arc is the position of the hand, palm vertical to the table.

Assign the lowest, 20-percent evaluation when pronation cannot be accomplished through more than the first three-quarters of the arc from full supination.

Do *not* assign a compensable evaluation for both limitation of pronation and limitation of supination of the same extremity.

***Reference***:  For more information on considering painful motion when assigning multiple LOM evaluations for a joint, see M21-1, Part III, Subpart iv, 4.A.2.c.

# 4. Evaluating Musculoskeletal Disabilities of the Hands

**Introduction** | This topic contains information on evaluating musculoskeletal disabilities of the hands, including

- identifying digits of the hand
- anatomy of the hand
- anatomical position of the hand and fingers
- ROM of the index, long, ring, and little fingers
- evaluating amputations of multiple fingers
- evaluating amputations of single fingers
- evaluating ankylosis of one or more fingers
- compensable evaluations for the fingers, and
- rating Dupuytren's contracture of the hand.

**Change Date** | April 13, 2018

**a.f. Identifying Digits of the Hand** | Follow the guidelines listed below to accurately specify the injured digits of the hand.

- The digits of the hand are identified as
  – thumb
  – index
  – long
  – ring, or
  – little.
- Do not use numerical designations for either the fingers or the joints of the fingers.
- Each digit, except the thumb, includes three phalanges
  – the proximal phalanx (closest to the wrist)
  – the middle phalanx, and
  – the distal phalanx (closest to the tip of the finger).
- The joint between the proximal and middle phalanges is called the *proximal interphalangeal* or *PIP* joint.
- The joint between the middle and distal phalanges is called the *distal interphalangeal* or *DIP* joint.
- The thumb has only two phalanges, the proximal phalanx and the distal phalanx. Therefore, each thumb has only a single joint, called the *interphalangeal* or *IP* joint.
- The joints connecting the phalanges in the hands to the metacarpals are the *metacarpophalangeal* or *MCP* joints.
- Designate either right or left for the digits of the hand.

*Note*: If the location of the injury is unclear, obtain x-rays to clarify the exact

point of injury.

*References*:  For
- more information on determining dominant handedness, see 38 CFR 4.69, and
- an exhibit of the anatomy of the hand, see M21-1, Part III, Subpart iv, 4.A.4.b~~3.g~~.

**bg.  Anatomy of the Hand**

The following image is a reproduction of Plate III following 38 CFR 4.71a, DC 5156.  It illustrates the bones of the hand, as well as the PIP and DIP joints.



**ch.  Anatomical Position of the Hand and Fingers**

The normal anatomical position of the hand (called the position of function of the hand in the rating schedule) and fingers is with the

- wrist dorsiflexed 20 to 30 degrees
- MCP and PIP joints flexed to 30 degrees, and
- thumb abducted and rotated so that the thumb pad faces the finger pads.

**Reference**:  For more information on the normal anatomical position of the hand and fingers, see note (1) preceding 38 CFR 4.71a, DC 5216.

---

**i.d.  ROM of the Index, Long, Ring, and Little Fingers**

For the index, long, ring, and little fingers, zero degrees of flexion represents the fingers fully extended, making a straight line with the rest of the hand.

For these digits, the
• MCP joint has a range of zero to 90 degrees of flexion
• PIP joint has a range of zero to 100 degrees of flexion, and
• DIP joint has a range of zero to 70 or 80 degrees of flexion.

**Reference**:  For more information on the ROM of the index, long, ring, and little fingers, see note (1) preceding 38 CFR 4.71a, DC 5216.

---

**e.k.  Evaluating Amputations of Multiple Fingers**

The evaluation levels for amputations of multiple fingers are contained in 38 CFR 4.71a, DC 5126 to 5151.

Consider and apply the following principles as applicable when evaluating amputations of multiple fingers:

• Amputations other than at the PIP joints or through the proximal phalanges will be rated as ankylosis of the fingers.
  – Amputations at distal joints, or through distal phalanges (other than negligible losses) will be rated as favorable ankylosis of the fingers.
  – Amputation through middle phalanges will be rated as unfavorable ankylosis of the fingers.
• If there is amputation or resection of metacarpal bones (where more than one-half the bone is lost) in multiple fingers injuries add (not combine) 10 percent to the specified evaluation for the finger amputations subject to the amputation rule (at the forearm level).
• When an evaluation is assigned under 38 CFR 4.71a, DC 5126 to 5130 there will also be entitlement to special monthly compensation.
• Loss of use of the hand exists when no effective function remains other than that which would be equally well served by an amputation stump with a suitable prosthetic appliance.

---

**f.l.  Evaluating Amputations of Single Fingers**

The rating schedule provisions for amputations of single fingers are at 38 CFR 4.71a, DC 5152 to 5156.

---

**g.m.  Evaluating Ankylosis of One or More Fingers**

The rating schedule provisions for ankyloses of one or more fingers are at 38 CFR 4.71a, DC 5216 to 5227.

When considering an evaluation for ankylosis of the index, long, ring or little

finger, evaluate as:

- *favorable ankylosis* if **either** the MCP **or** PIP joint is ankylosed, **and** there is a gap of two inches (5.1 cm.) **or less** between the fingertip(s) and the proximal transverse crease of the palm, with the finger(s) flexed to the extent possible
- *unfavorable ankylosis* if
  – **either** the MCP **or** PIP joint is ankylosed, **and** there is a gap of **more than** two inches (5.1 cm.) between the fingertip(s) and the proximal transverse crease of the palm, with the finger(s) flexed to the extent possible, **or**
  – **both** the MCP **and** PIP joints of a digit are ankylosed (even if each joint is individually fixed in a favorable position), **or**
- *amputation without metacarpal resection at the PIP joint or proximal thereto* ([38 CFR 4.71a, DC 5153 to 5156)](#) if both the MCP and PIP joints of a digit are ankylosed, **and** either is in extension or full flexion, **or** there is rotation or angulation of a bone.

When considering an evaluation for ankylosis of the thumb, evaluate as:

- *favorable ankylosis* if **either** the carpometacarpal **or** IP joint is ankylosed, **and** there is a gap of two inches (5.1 cm.) **or less** between the thumb pad and fingers with the thumb attempting to oppose the fingers
- *unfavorable ankylosis* if
  – **either** the carpometacarpal **or** IP joint is ankylosed, **and** there is a gap of **more than** two inches (5.1 cm.) between the thumbpad and the fingers, with the thumb attempting to oppose the fingers, **or**
  – **both** the capometacarpal **and** IP joints are ankylosed (even if each joint is individually fixed in a favorable position), **or**
- *amputation at the carpometacarpal joint or joints or through proximal phalange* ([38 CFR 4.71a, DC 5152)](#) if both the carpometacarpal and IP joints are ankylosed, **and** either is in extension or full flexion, **or** there is rotation or angulation of a bone.

***Note***:  Only joints in the position specified in M21-1, Part III, Subpart iv, 4.A.4.c-d3.h-i are considered in a favorable position.

***Reference***:  For more information on evaluation of ankylosis of the fingers, see the notes prior to [38 CFR 4.71a, DC 5216](#).

| **nh.** **Compensable Evaluations for the Fingers** | When considering evaluations for the fingers based on LOM, a compensable evaluation can be assigned for any of the following: |
|---|---|

- LOM of the thumb as specified in [38 CFR 4.71a, DC 5228](#).
- LOM of the index or long finger as specified in [38 CFR 4.71a, DC 5229.](#)
- X-ray evidence of arthritis or other condition rated under the criteria of [38 CFR 4.71a, DC 5003](#), affecting a *group* of minor joints of the fingers of *one* hand.  There must be

- noncompensable LOM in more than one of the joints comprising the group of affected minor joints, *and*
- findings such as swelling, muscle spasm or satisfactory evidence of painful motion in the affected minor joints of the joint group.
- X-ray-*only* evidence of arthritis (where there is no LOM) under the criteria of 38 CFR 4.71a, DC 5003, affecting *two or more groups* of minor joints – namely the fingers of *both* hands or a group of minor joints in one hand in combination with another group of minor joints.
- Painful motion of the thumb, index finger, or long finger as directed at M21-1, Part III, Subpart iv, 4.a.1.p.

*Note*: The Federal Circuit held in *Spicer v. Shinseki*, 752 F.3d 1367 (Fed. Cir. 2014) that when evaluating arthritis of the hand the minor joint *group* of IP joints of a hand is compensably disabled *only when two or more* joints in the group are affected by LOM. Refer to M21-1, Part III, Subpart iv, 4.A.2.j-k for more information on the applicability of the *Spicer* holding.

*References*: For more information on
- identifying the digits of the hand and the finger joints, see M21-1, Part III, Subpart iv, 4.A.3.f4.a
- anatomy of the hand, see M21-1, Part III, Subpart iv, 4.A.3.g4.b
- the definition of minor joint, see M21-1, Part III, Subpart iv, 4.A.2.k
- the definition of a group of minor joints, see M21-1, Part III, Subpart iv, 4.A.2.l
- ROM of the index, long, ring and little fingers, see M21-1, Part III, Subpart iv, 4.A.4.d3.i
- assigning evaluations under 38 CFR 4.71a, DC 5003 when a compensable rating based on LOM cannot be assigned under another DC, see M21-1, Part III, Subpart iv, 4.A.8B.3.b, and
- applying 38 CFR 4.59 to minor joints, see M21-1, Part III, Subpart iv, 4.A.1.pj.

| **ji. Rating Dupuytren's Contracture of the Hand** | The rating schedule does not specifically list Dupuytren's contracture as a disease entity; therefore, assign an evaluation on the basis of limitation of finger movement. |

# 54.  Evaluating Musculoskeletal Disabilities of the Spine and Lower Extremities

**Introduction**

This topic contains information on evaluating musculoskeletal disabilities of the spine and lower extremities, including

- evaluating manifestations of spine diseases and injuries
- definition of incapacitating episode of IVDS
- example of evaluating IVDS, and
- evaluating ankylosing spondylitis.
- evaluations for knee replacement
- evaluating noncompensable knee conditions
- definition of lateral instability and subluxation of the knee
- separate evaluations for knee instability and LOM
- separate evaluations – LOM and meniscus disabilities
- separate evaluations, knee instability and meniscus disabilities
- separate evaluations – genu recurvatum
- evaluating shin splints
- example 1, evaluating shin splints
- example 2, evaluating spin splints
- moderate and marked LOM of the ankle
- considering ankle instability
- evaluating plantar fasciitis
- identifying the digits of the foot
- definition of metatarsalgia or Morton's disease
- evaluating metatarsalgia or Morton's disease
- pyramiding of metatarsalgia and either plantar fasciitis or pes planus
- evaluating arthritis of the minor joints of the toes, and
- selecting a DC for foot disabilities.

**Change Date**

October 24, 2017April 13, 2018

**a.  Evaluating Manifestations of Spine Diseases and Injuries**

Evaluate diseases and injuries of the spine based on the criteria listed in the 38 CFR 4.71a, General Rating Formula for Diseases and Injuries of the Spine (General Rating Formula).  Under this criteria, evaluate conditions based on chronic orthopedic manifestations (for example, painful muscle spasm or LOM) and any associated neurological manifestations (for example, footdrop, muscle atrophy, or sensory loss) by assigning separate evaluations for the orthopedic and neurological manifestations.

Evaluate intervertebral disc syndrome (IVDS) under 38 CFR 4.71a, DC 5243, either based on the General Rating Formula or the Formula for Rating IVDS Based on Incapacitating Episodes (Incapacitating Episode Formula), whichever formula results in the higher evaluation when all disabilities are

combined under [38 CFR 4.25](#).

Variations of diagnostic terminology exist for IVDS.  When used in the clinical setting, the following terminology is consistent with the general designation of IVDS:

- slipped or herniated disc
- ruptured disc
- prolapsed disc
- bulging or protruded disc
- degenerative disc disease
- sciatica
- discogenic pain syndrome
- herniated nucleus pulposus, and
- pinched nerve.

*Notes*:
- When an SC thoracolumbar disability is present and objective neurological abnormalities or radiculopathy are diagnosed but the medical evidence does not identify a specific nerve root, rate the lower extremity radiculopathy under the sciatic nerve, [38 CFR 4.124a, DC 8520](#).
- If an evaluation is assigned based on incapacitating episodes, a separate evaluation may not be assigned for LOM, radiculopathy, or any other associated objective neurological abnormality as it would constitute pyramiding.
- Spinal fusion is a type of fixation of the spine.  Evaluation based on ankylosis of the spine due to fusion is only warranted when the fixation affects the entire thoracolumbar or cervical spine segment.  Fusion of only a portion of the cervical or thoracolumbar spine segment should be evaluated based on range or motion or IVDS as warranted by the evidence.

*Important*:
- Because spinal disease can cause objective neurological abnormalities, onset of a neurological complication represents medical progression or worsening of the spinal disease.  For that reason and because neurological complications of spinal disease are contemplated in the evaluation criteria for spinal conditions under [38 CFR 4.71a](#), a claim asserting new complications of spinal disease is a claim for increase rather than a claim for secondary SC.  Therefore when assigning effective dates for new neurological spinal complications, consider effective date provisions specifically for increases.  The intention is to treat spinal complications cases in a way that is consistent with the handling of diabetes complications as set forth in M21-1, Part III, Subpart iv, 4.MF.1 and 2.
- Apply the previous provisions of [38 CFR 3.157 (b)](#) (prior to March 24, 2015) when determining the effective date for neurological abnormalities of the spine that are identified by requisite records prior to March 24, 2015.
    - *Example*:  Veteran has been SC for degenerative disc disease (DDD) since 2012.  Upon review of a claim for increase received on June 2,

2015, it is noted in VA medical records that the Veteran received treatment for bladder impairment secondary to DDD on July 7, 2014. Because the VA medical records constitute a claim for increase under rules in effect prior to March 24, 2015, it is permissible to apply previous rules from 38 CFR 3.157 (b) in adjudicating the bladder impairment issue.

***References***:  For more information on
- assigning disability evaluations for
  – peripheral nerve disabilities to include radiculopathy, see M21-1, Part III, Subpart iv, 4.NG.4, and
  – progressive spinal muscular atrophy, see M21-1, Part III, Subpart iv, 4.NG.1.c, and
- historical application of
  – 38 CFR 4.40, and 38 CFR 4.45 to evaluations for IVDS, see VAOPGCPREC 36-1997, and
  – 38 CFR 4.71a, DC 5285, for demonstrable deformity of a vertebral body, refer to VAOPGCPREC 3-2006.

---

**b.  Definition: Incapacitating Episode of IVDS**

By definition, an incapacitating episode of IVDS requires bedrest prescribed by a physician.

In order to evaluate IVDS based on incapacitating episodes, there must be evidence the associated symptoms required bedrest as prescribed by a physician.  The medical evidence of prescribed bedrest must be

- of record in the claims folder, ***or***
- reviewed and described by an examiner completing a DBQ.

***Note***:  If the records do not adequately document prescribed bedrest, use the General Rating Formula to evaluate IVDS and advise the Veteran to submit medical evidence documenting the periods of incapacitating episodes requiring bedrest prescribed by a physician.

---

**c.  Example of Evaluating IVDS**

***Situation***:  A Veteran's IVDS is being evaluated.

- LOM warrants a 20-percent evaluation based under the general rating formula
- mild radiculopathy of the left lower extremity warrants a 10-percent evaluation as a neurological complication, and
- medical evidence shows incapacitating episodes requiring bedrest prescribed by a physician of four weeks duration over the past 12 months which would result in a 40-percent evaluation based on the incapacitating episode formula.

***Result***:  Assign a 40-percent evaluation based on incapacitating episodes.

*Explanation*:
- Evaluating IVDS using incapacitating episodes results in the highest evaluation.
- Since incapacitating episodes are used to evaluate IVDS, the associated LOM and neurological signs and symptoms will not be assigned a separate evaluation.

*References*:  For additional information on
- evaluating spinal conditions, see M21-1, Part III, Subpart iv, 4.A.54.a, and
- determining whether evidence is sufficient to evaluate based on incapacitating episodes of IVDS, see M21-1, Part III, Subpart iv, 4.A.54.b.

**d. Evaluating Ankylosing Spondylitis**

Ankylosing spondylitis may be evaluated as an active disease process or based upon LOM of the spine.

The table below describes appropriate action for evaluating ankylosing spondylitis.

| If ankylosing spondylitis is ... | Then ... |
|---|---|
| an active process | evaluate under 38 CFR 4.71a, DC 5009 (using the criteria in 38 CFR 4.71a, DC 5002). |
| inactive | - evaluate under 38 CFR 4.71a, DC 5240 based on chronic residuals affecting the spine, and<br>- separately evaluate other affected joints or body systems under the appropriate DC. |

# 6. Evaluating Musculoskeletal Disabilities of the Legs

| | |
|---|---|
| **Introduction** | This topic contains information on evaluating musculoskeletal disabilities of the lower extremities (not including the feet), including |

- evaluations for knee replacement
- evaluating noncompensable knee conditions
- definition of lateral instability and subluxation of the knee
- handling joint stability findings
- separate evaluations for knee instability and LOM
- separate evaluations of meniscal disabilities
- examples of evaluating meniscal disabilities
- evaluation builder workaround for meniscal disabilities
- separate evaluations – genu recurvatum
- evaluating shin splints
- example 1, evaluating shin splints
- example 2, evaluating shin splints
- moderate and marked LOM of the ankle, and
- considering ankle instability.

| | |
|---|---|
| **Change Date** | April 13, 2018 |

| | |
|---|---|
| **ae. Evaluations for Knee Replacement** | Total knee replacements are evaluated under 38 CFR 4.71a, DC 5055.<br><br>For guidance on rating action for claims involving partial knee replacement see the table below. |

| If a claim for evaluation of a partial knee replacement was ... | Then ... |
|---|---|
| filed and decided on or after July 16, 2015 | do not assign an evaluation under 38 CFR 4.71a, DC 5055.<br><br>*Explanation*: Effective July 16, 2015, 38 CFR 4.71a was revised to clarify in a note that the provisions of 38 CFR 4.71a, DC 5055 apply only to total knee replacement. |
| • filed before July 16, 2015, and<br>• pending (not finally adjudicated) on that date | the case must be evaluated under 38 CFR 4.71a, DC 5055 if this would be more favorable than another applicable DC.<br><br>*Explanation*: This result is required by |

| | |
|---|---|
| | • *Hudgens v. McDonald*, 823 F.3d 630 (Fed. Cir. 2016), and<br>• M21-1, Part III, Subpart iv, 5.C.7.l. |
| • filed before July 16, 2015, and<br>• finally adjudicated before that date | do not revise the decision as clearly and unmistakably erroneous whether it<br>• assigned an evaluation under 38 CFR 4.71a, DC 5055, or<br>• found that an evaluation could not be assigned under 38 CFR 4.71a, DC 5055.<br><br>***Explanation***: The regulation action effective July 16, 2015, explained that VA's long standing policy was that partial knee replacements could not be evaluated under 38 CFR 4.71a, DC 5055.  However, the Court in *Hudgens v. McDonald*, 823 F.3d 630 (Fed. Cir. 2016) found that prior to the revision the regulation was ambiguous as to whether it covered partial knee replacements and they noted conflicting decisions had been issued. |

***References***:  For more information on
- handling requests for separate ~~knee~~ evaluations ~~in cases~~ of instability following total knee replacement, see M21-1, Part III, Subpart iv, 4.A.64.h
- evaluations for partial knee replacements, see *Hudgens v. McDonald*, 823 F.3d 630 (Fed. Cir. 2016)
- evaluating evidence and assigning effective dates associated with precedential court decisions, see M21-1, Part III, Subpart iv, 5.C.7.l
- determining the effective date of a convalescence rating for a joint replacement, see M21-1, Part IV, Subpart ii, 2.J.4.ge, and
- rating issues for DCs, such as 38 CFR 4.71a, DC 5055, that provide for definite periods of convalescence, see M21-1, Part IV, Subpart ii, 2.J.5.

---

**fb.  Evaluating Noncompensable Knee Conditions**

Evaluate a noncompensable knee condition by analogy to 38 CFR 4.71a, DC 5257 if

- there is no associated arthritis
- the schedular criteria for a noncompensable evaluation under 38 CFR 4.71a, DC 5260 or DC 5261 are not met, *and*
- the condition cannot be appropriately evaluated under 38 CFR 4.71a, DC 5258, 5259, 5262, or 5263.

**References**:  For more information on
- using analogous DCs, see 38 CFR 4.20, and
- when to assign a zero-percent evaluation, see 38 CFR 4.31.

---

**c̶g. Definitions: Lateral Instability and Subluxation of the Knee**

**Lateral instability**, as referred to in 38 CFR 4.71a, DC 5257 includes evaluations based on posterior or anterior instability.

**Note**:  **Medial instability** is a direction of lateral instability, and when present due to SC knee injury, should be evaluated under 38 CFR 4.71a, DC 5257.

**Subluxation** refers to partial or incomplete dislocation of the knee joint (*tibiofemoral* dislocation/subluxation) or tendency for the patella to dislocate from its track (*patellar* dislocation/subluxation).

Evaluate either condition using 38 CFR 4.71a, DC 5257.  However, note the diagnostic criteria primarily contemplate patellar subluxation.  True knee joint subluxation and patellar subluxation are much different conditions.  Patellar subluxation is common and may be mild, moderate or severe.  True chronic joint subluxation is very rare and, when present, can be expected to be severe or even tantamount to loss of use.

---

**d. Handling Joint Stability Findings**

Apply the findings from joint stability testing reported by an examiner on the *Knee and Lower Leg Conditions Disability Benefits Questionnaire* as follows when evaluating recurrent subluxation or lateral instability under 38 CFR 4.71a, DC 5257.

| DBQ Finding | Correlated Level of Impairment |
|---|---|
| 1+ (0-5 millimeters) | slight |
| 2+ (5-10 millimeters) | moderate |
| 3+ (10-15 millimeters) | severe |

---

**e̶h. Separate Evaluations for Knee Instability and LOM**

A separate evaluation for knee instability may be assigned in addition to any evaluation(s) assigned based on limitation of knee motion.  OGC has issued Precedent Opinions that an evaluation under 38 CFR 4.71a, DC 5257, does not pyramid with evaluations based on LOM.

**Exception**:  Do not rate instability separately from a total knee replacement.
- The 30-percent and 100-percent evaluations under 38 CFR 4.71a, DC 5055, are minimum and maximum evaluations and, as such, encompass all identifiable residuals post knee replacement – including LOM, instability, and functional impairment.
- The 60-percent and intermediate evaluations, including the 60-percent criteria under 38 CFR 4.71a, DC 5055 as well as the alternative evaluations available under the designated DCs at 38 CFR 4.71a, DC 5256, 5261, or 5262, also contemplate the residuals of post-knee replacement including but not limited to instability.  by their plain text provide the exclusive methods

---

by which residuals can be evaluated at 40 or 50 percent and contemplate instability.

- Post arthroplasty, there may be instability with weakness (giving way) and pain.
- Note that the only way to obtain an evaluation in excess of 30 percent under [38 CFR 4.71a, DC 5262](#) (one of the specified bases for an intermediate evaluation under [38 CFR 4.71a, DC 5055](#)) is if there is nonunion with loose motion and need for a brace.  This clearly suggests instability is incorporated in the intermediate criteria.

***Important***:  The rating activity must pay close attention to the combined evaluation of the knee disability prior to replacement surgery and to follow all required due process and protected evaluation procedures.

***References***:  For more information on
- pyramiding and separating individual ~~decisions~~ findings in a rating decision, see M21-1, Part III, Subpart iv, ~~6.C.5~~5.B.2.b.~~d~~
- separate evaluation of knee instability, see
  – VAOPGCPREC 23-1997, and
  – VAOPGCPREC 9-1998, and
- due process issues pertinent to knee replacements including
  – change of DC for a protected disability evaluation, see
    ▪ [38 CFR 3.951](#)
    ▪ M21-1, Part III, Subpart iv, 8.C.1.k, and
    ▪ M21-1, Part IV, Subpart ii, 2.J.5, and
  – reduction procedures that would apply prior to assignment of a post-surgical minimum evaluation lower than the running award rate, see
    ▪ [38 CFR 3.105(e)](#)
    ▪ M21-1, Part III, Subpart iv, 8.D.1
    ▪ M21-1, Part IV, Subpart ii, 3.A.3, and
    ▪ M21-1, Part IV, Subpart ii, 2.J.

---

**f. Separate Evaluations** ~~– LOM and~~ **of** Menisc**al**~~us~~ Disabilities

Evaluation of a knee disability under [38 CFR 4.71a, DC 5257, DC 5260](#), or 5261 does not, as a matter of law, preclude separate evaluation of a meniscal disability of the same knee under

~~Do not assign separate evaluations for~~

~~● a meniscus disability~~
  ~~– [38 CFR 4.71a, DC 5258](#) (dislocated semilunar cartilage), or [38 CFR 4.71a, DC 5259](#) (symptomatic removal of semilunar cartilage)~~, ***and*** ~~LOM of the same knee~~
~~38 CFR 4.71a, DC 5260, (limitation of flexion) or~~
~~38 CFR 4.71a, DC 5261, (limitation of extension).~~

~~Explanation:  LOM of the knee is contemplated by the meniscus DCs. Although [38 CFR 4.71a, DC 5258](#), refers to "dislocated" cartilage and~~

~~"locking" of the knee the rating criteria contemplate LOM of the knee through impairment with use (namely pain and effusion).~~
– ~~38 CFR 4.71a, DC 5259, provides for a compensable evaluation for a "symptomatic" knee post removal of the cartilage. VAOPGCPREC 9-1998 states "DC 5259 requires consideration of 38 CFR 4.40 and 38 CFR 4.45 because removal of semilunar cartilage may result in complications producing loss of motion."~~

A meniscal disability may be rated separately under 38 CFR 4.71a, DC 5258/5259 apart from

- 38 CFR 4.71a, DC 5257 for manifestations of the knee disability other than recurrent subluxation and lateral instability, and/or
- 38 CFR 4.71a, DC 5260/5261 if a manifestation of the meniscal disability did not result in an elevation of the disability evaluation warranted under 38 CFR 4.71a, DC 5260/5261 via application of 38 CFR 4.40 and 38 CFR 4.45 pursuant to *DeLuca v. Brown*, 8 Vet.App. 202 (1995).

*Important*:
- Entitlement to a separate evaluation for the meniscal disability depends on whether the manifestations are utilized to assign an evaluation under a different DC. Evaluation of the same manifestation under multiple diagnoses is prohibited under 38 CFR 4.14. Thus, when all the symptoms of the meniscal disability are used to support elevation of an evaluation under 38 CFR 4.71a, DC 5260/5261 or assignment of an evaluation under 38 CFR 4.71a, DC 5257, a separate evaluation cannot be assigned under 38 CFR 4.71a, DC 5258/5259.
- The policy and procedures identified in this block reflect a change in policy resulting from the holding in *Lyles v. Shulkin*, 29 Vet.App. 107 (2017), effective November 29, 2017. Prior to the *Lyles* holding, separate evaluations for meniscal disabilities under 38 CFR 4.71a, DC 5258 or DC 5259 and other knee evaluations under 38 CFR 4.71a, DC 5257, 5260, or DC 5261 were prohibited. This is not considered a liberalizing change.

*References*: For more information on
- evaluation of meniscal disabilities, see *Lyles v. Shulkin*, 29 Vet.App. 107 (2017)
- examples of evaluation of meniscal disabilities, see M21-1, Part III, Subpart iv, 4.A.6.g, and
- the required Evaluation Builder workaround for proper evaluation of meniscal disabilities, see M21-1, Part III, Subpart iv, 4.A.6.h.

---

g~~j~~. ~~Separate Evaluations, Knee Instability and Meniscus Disabilities~~Examples—  ~~Do not assign separate evaluations for~~

- ~~subluxation or lateral instability under 38 CFR 4.71a, DC 5257, and~~
- ~~a meniscus disability~~
  – ~~38 CFR 4.71a, DC 5258, or~~

**Evaluating Meniscal Disabilities**

~~38 CFR 4.71a, DC 5259~~

~~*Explanation*: The criteria for both of those codes contemplate instability.~~
- ~~Dislocation and locking under 38 CFR 4.71a, DC 5258 is consistent with instability.~~
- ~~The broad terminology of "symptomatic" under 38 CFR 4.71a, DC 5259 also contemplates instability.~~

*Example 1*: A Veteran's left knee disability, which includes a meniscal condition, is evaluated as 30-percent disabling on the basis of limitation of extension under 38 CFR 4.71a, DC 5261. The knee also manifests pain, swelling, popping, locking, and grinding due to the meniscus disability. These symptoms, which are consistent with the manifestations identified under 38 CFR 4.40 and 38 CFR 4.45, were considered and did not result in a higher evaluation under 38 CFR 4.71a, DC 5261. Therefore, they may be considered for assignment of a separate evaluation under 38 CFR 4.71a, DC 5258/5259.

*Example 2*: The evaluations and fact pattern for Example 1 are the same *except* that the VA examiner indicates that the pain, swelling, popping, locking, and grinding of the knee, which results from the meniscal disability, result in additional limitation of extension to 30 degrees during flare-ups or with repeated use over a period of time, which warrants an elevation of the rating to 40-percent under 38 CFR 4.71a, DC 5261. A separate evaluation under 38 CFR 4.71a, DC 5258/5259 is not warranted for the symptoms of pain, swelling, popping, locking, and grinding since these symptoms were considered under 38 CFR 4.40 and 38 CFR 4.45 in accordance with the *DeLuca* holding to elevate the evaluation to 40-percent under 38 CFR 4.71a, DC 5261. Assignment of a separate evaluation under 38 CFR 4.71a, DC 5258/5259 would constitute pyramiding.

*Example 3*: A Veteran's left knee disability, which includes the meniscus, is evaluated as 30-percent disabling on the basis of limitation of extension under 38 CFR 4.71a, DC 5261. Pain is present due to the meniscus disability. A VA examiner indicated that pain during repetitive motion testing as well as functional loss due to pain during flare-ups additionally limit extension to 30 degrees, which results in elevation of the 30-percent evaluation under 38 CFR 4.71a, DC 5261 to 40-percent. A separate evaluation under 38 CFR 4.71a, DC 5258/5259 is not warranted for the symptoms of pain since it was considered under 38 CFR 4.40 and 38 CFR 4.45 in accordance with the *DeLuca* holding to elevate the evaluation to 40-percent under 38 CFR 4.71a, DC 5261. Assignment of a separate evaluation under 38 CFR 4.71a, DC 5258/5259 would constitute pyramiding.

*Example 4*: A Veteran's right knee disability is evaluated as 20-percent disabling on the basis of limitation of extension. This disability includes arthritis of the joint and a post-operative meniscal condition. The knee also manifests pain, swelling, popping, locking, and grinding due to both arthritis and the meniscal condition. A VA examiner found that repetitive motion testing additionally limited extension by five degrees, from 15 to 20 degrees,

due to pain. The consideration of pain on motion, which is a manifestation identified under 38 CFR 4.40 and 38 CFR 4.45, results in elevation of the evaluation under 38 CFR 4.71a, DC 5261 to 30-percent. Since the swelling, popping, locking, and grinding, which were at least in part due to the meniscal condition, were not considered in awarding a higher evaluation under 38 CFR 4.71a, DC 5261 with application of 38 CFR 4.40 and 38 CFR 4.45, a separate evaluation may be awarded for the meniscus removal.

*Example 5*: Examination of the left knee disability reveals 2+ medial laxity and a history of meniscectomy with residual symptoms of stiffness, crepitus, and pain without effusion or locking. ROM is full with no additional functional impairment following repeated ROM testing. Since the stiffness, crepitus, and pain are separate symptoms and not used to support an evaluation under 38 CFR 4.71a, DC 5257/5260/5261 and the laxity is not used to support an evaluation for the meniscal symptoms, a 20-percent evaluation is warranted under 38 CFR 4.71a, DC 5257 with a separate 10-percent evaluation assigned under 38 CFR 4.71a, DC 5259.

| | |
|---|---|
| **h. Evaluation Builder Workaround for Meniscal Disabilities** | Until the Evaluation Builder can be updated to reflect the policy and procedural changes effected by the holding in *Lyles v. Shulkin*, 29 Vet.App. 107 (2017), decision makers are responsible for ensuring that proper disability evaluations are assigned for knee disabilities involving meniscal impairment. |

The workaround provided below will assist decision makers in properly evaluating meniscal disabilities.

| Step | Action |
|---|---|
| 1 | Analyze the medical evidence to determine whether symptoms of the meniscal disability exist and are not used to support an evaluation assigned under 38 CFR 4.71a, DC 5257/5260/5261. If symptoms of the meniscal disability exist and<br><br>• are *not* used to support an evaluation under 38 CFR 4.71a, DC 5257/5260/5261, proceed to Step 2, or<br>• are used to support an evaluation under 38 CFR 4.71a, DC 5257/5260/5261, enter all knee symptoms as a single decision point in the Evaluation Builder, as usual. No further special action is needed since a separate meniscal evaluation is not warranted. |
| 2 | The symptoms supporting the evaluation under 38 CFR 4.71a, DC 5258/5259 for the meniscal disability must be entered into the Evaluation Builder as a separate decision point from the remainder of the knee symptoms that are used to support the evaluation under 38 CFR 4.71a, DC 5257/5260/5261.<br><br>*Important*: Symptoms used to support an evaluation (including elevation of an evaluation under 38 CFR 4.40 and 38 CFR 4.45 in |

| | | |
|---|---|---|
| | | accordance with the *DeLuca* holding) under 38 CFR 4.71a, DC 5257/5260/5261 **cannot** be used to also support an evaluation under 38 CFR 4.71a, DC 5258/5259. |
| | 3 | Override the pyramiding conflict that is generated due to the assignment of separate evaluations under 38 CFR 4.71a, DC 5260/5261 and 38 CFR 4.71a, DC 5258/5259. In the justification field for the override, annotate that separate evaluations are warranted per the *Lyles* decision. |

**ik. Separate Evaluations – Genu Recurvatum**

When evaluating genu recurvatum, which involves hyperextension of the knee beyond zero degrees of extension, under 38 CFR 4.71a, DC 5263

- do *not also* evaluate separately under 38 CFR 4.71a, DC 5261, but
- *do* evaluate separately under other evaluations *if* manifestations that are not overlapping, such as limitation of flexion under 38 CFR 4.71a, DC 5260, are attributed to genu recurvatum, and
- do *not* evaluate separately under 38 CFR 4.71a, DC 5257; however, if instability is manifested from genu recurvatum at the "moderate" or "severe" level, evaluate under 38 CFR 4.71a, DC 5263-5257.

**jl. Evaluating Shin Splints**

Evaluate shin splints analogously with 38 CFR 4.71a, DC 5262. The table below explains the process and necessary considerations for evaluating shin splints.

| Step | Action |
|---|---|
| 1 | Is a chronic disability present? <br><br> • If *yes*, go to Step 2. <br> • If *no*, deny SC. |
| 2 | • Determine whether the shin splint disability affects the right, left, or bilateral extremity(ies). <br> • Go to Step 3. |
| 3 | • Determine whether shin splints affect the knee or the ankle. <br> • Go to Step 4. |
| 4 | Has SC been established for a knee or ankle joint condition affecting the same joint as the shin splints? <br><br> • If *yes*, <br> – grant SC for the shin splints <br> – assign a single evaluation for the symptoms of the shin splint condition with the symptoms caused by the other SC knee or ankle joint condition, and <br> – evaluate the predominant symptoms under the most favorable DC(s) for that joint. <br> ▪ If the shin splints are the predominant disability, go to Step 5. |

| | | ▪ If the other SC disability of the knee or ankle joint is the predominant disability, evaluate under the criteria for the other SC disability and go to Step 6. <br> • If *no*, <br> – award SC for the shin splints under <u>38 CFR 4.71a, DC 5299-5262</u>, and <br> – go to Step 5. <br><br> *Note*:  For all awards of SC for shin splints, in the DIAGNOSIS field in ~~the Veterans Benefits Management System - Rating~~ (VBMS-R) indicate <br> • which side (right or left) is affected, and <br> • whether there is knee or ankle involvement. <br><br> ***Example***:  *shin splints, right lower extremity, with ankle impairment.* |
|---|---|---|
| 5 | • Access the Musculoskeletal - Other calculator within VBMS-R. <br> • Choose SHIN SPLINTS from diagnosis drop down. <br> • Go to Step 6. |
| 6 | • Utilize information from the DBQ and/or other medical evidence of record to determine whether the associated knee or ankle symptoms are mild, moderate, or severe, and <br> • choose the corresponding level of symptoms. |

***Notes***:
- The term "shin splints" is synonymous with the term "medial tibial stress syndrome."  You may also see the related assessments "compartment syndrome" and/or "stress fractures" in treatment records.  Rate any of those diagnoses using the guidance in this block.
- Both the *Knee and Lower Leg Conditions Disability Benefits Questionnaire* and the *Ankle Disability Benefits Questionnaire* elicit workup of shin splints and stress fractures.  Each asks whether the knee or ankle is predominantly affected and asks the examiner to use the alternate DBQ as appropriate.

***References***:  For more information on
- shin splints, stress fractures, and compartment syndrome, see the <u>Medical EPSS</u>, and
- determining the sufficiency of examinations, see M21-1, Part III, Subpart iv, 3.D.3.

---

**k~m~.  Example 1 – Evaluating Shin Splints**

***Situation***: The original claim is for SC for left leg shin splints. Records show complaints of shin pain in both legs starting during the period of active duty but on discharge only left tibia pain was reported.  A bone scan from close to discharge was negative.  X-rays were negative.  The diagnosis was recurrent mild left leg shin splints.

VA examination using the *Knee and Lower Leg Conditions Disability*

*Benefits Questionnaire* showed that the Veteran reported a history of left mid tibia pain. She reported that in connection with the shin pain she had developed some left knee pain on use – usually with protracted walking on hard surfaces wearing boots. X-rays of the shin and knee were normal. The left tibia was slightly tender to palpation. There was slightly painful left knee flexion at the end point. The assessment was left leg shin splints. The examiner characterized the condition as mild.

**Result**: Referring to the table in M21-1, Part III, Subpart iv, 4.A.6.j4.l, grant SC. Use 38 CFR 4.71a, DC 5299-5262. The description should be "shin splints, left lower extremity, with knee impairment." Assign a 10-percent evaluation for a mild condition.

---

**ln. Example 2 – Evaluating Shin Splints**

**Situation**: SC has been previously established for left ankle arthritis. A 10-percent evaluation was assigned for x-ray evidence of arthritis of the joint with painful motion. The current claim is for "ankle/left shin splints."

With regard to the tibia, records show complaints of left tibia pain with running during service. A bone scan in service treatment records showed minor stress fractures of the tibia. Initial assessments in service records were shin splints and left tibia stress fracture. Follow-up imaging showed that the stress fractures were healed. The discharge exam noted a history of left tibia stress fracture. The Veteran reported continued minor shin pain. The assessment was shin splints.

VA examination using the *Knee and Lower Leg Conditions Disability Benefits Questionnaire* showed that the Veteran reported a history of continued but worsened left middle to lower tibia pain since service. She said she continued to have left ankle pain on use as well as periodic twinges of pain in the left knee. X-rays of the tibia and knee were normal. X-rays of the ankle showed the SC left ankle arthritis. The tibia was moderately to significantly tender to palpation. There was pain with slight LOM of the left ankle. There was no LOM of the left knee or painful motion. The assessment was left leg shin splints with ankle and occasional knee pain, as well as left ankle arthritis. The examination found that the left ankle was more disabled than the knee. The shin splints were characterized as moderate.

**Result**: Referring to the table in M21-1, Part III, Subpart iv, 4.A.3.l6.j, grant SC for shin splints. Assign a single evaluation for the symptoms of the shin splints with the symptoms caused by the SC ankle arthritis and evaluate the predominant symptoms at 20 percent using 38 CFR 4.71a, DC 5299-5262. This would be the most favorable rating. Arthritis of the ankle joint with painful motion of the ankle would be rated only at 10 percent but shin splints with moderate ankle disability can be rated at 20 percent using the 38 CFR 4.71a, DC 5262 criteria. Change the description to "shin splints, left lower extremity, with ankle arthritis."

**m̶o̶. Moderate and Marked LOM of the Ankle**

Consider the following when evaluating LOM of the ankle under 38 CFR 4.71a, DC 5271:

- An example of moderate limitation of ankle motion is
  – less than 15 degrees dorsiflexion, or
  – less than 30 degrees plantar flexion.
- An example of marked LOM is
  – less than five degrees dorsiflexion, or
  – less than 10 degrees plantar flexion.

---

**n̶p̶. Considering Ankle Instability**

Do not assign separate evaluations for LOM and instability of the ankle.

DCs for the ankle, including 38 CFR 4.71a, DC 5271 and 38 CFR 4.71a, DC 5262, include broad language that does not explicitly include consideration of any particular ankle symptomatology.

---

# 7. Evaluating Musculoskeletal Disabilities of the Feet

**Introduction**

This topic contains information on evaluating musculoskeletal disabilities of the feet, including

- selecting a DC for foot disabilities
- identifying the digits of the foot
- assigning separate evaluations for multiple foot disabilities
- evaluating arthritis of the minor joints of the toes
- evaluating plantar fasciitis
- definition of metatarsalgia or Morton's disease
- evaluating metatarsalgia or Morton's disease, and
- pyramiding of metatarsalgia and either plantar fasciitis or pes planus.

**Change Date**

April 13, 2018

**~~w~~a. Selecting a DC for Foot Disabilities**

Foot injuries are rated under 38 CFR 4.71a, DC 5284. The application of this DC is limited to disabilities resulting from actual injuries to the foot, as opposed to disabilities caused by, for example, degenerative conditions. However, conditions that are not specifically listed under 38 CFR 4.71a may be rated by analogy under 38 CFR 4.71a, DC 5284~~DC 5284.~~

38 CFR 4.71a, DC 5284~~DC 5284~~ does not apply to the other eight conditions of the foot specifically listed under 38 CFR 4.71a, DCs 5276 through 5283. The listed conditions must be rated under the specified DCs and cannot be rated by analogy under 38 CFR 4.71a, DC 5284~~DC 5284~~.

In cases where a foot injury *and* either arthritis or another foot disability is involved

- consider functional impairment, and
- determine whether, depending on the nature of the disability and history of injury, it is more advantageous to evaluate the condition under 38 CFR 4.71a, DC 5284 or another DC.

***References***: For more information on
- limited applicability of 38 CFR 4.71a, DC 5284 to foot injuries, see *Yancy v. McDonald*, 27 Vet.App. 484 (2016)
- prohibition of evaluating specific foot disabilities otherwise listed in 38 CFR 4.71a analogously under 38 CFR 4.71a, DC 5284, see *Copeland v. McDonald*, 27 Vet.App. 333 (2015), and
- applying 38 CFR 4.59 to disabilities of minor joints, see M21-1, Part III, Subpart iv, 4.A.1.~~p~~j.

**~~a~~b. Identifying the Digits of the Foot**

Follow the guidelines listed below to accurately specify the injured digits of the foot.

- Refer to the digits of the foot as
  – first or great toe
  – second
  – third
  – fourth, or
  – fifth.
- Each digit, except the great toe, includes three phalanges
  – the proximal phalanx (closest to the ankle)
  – the middle phalanx, and
  – the distal phalanx (closest to the tip of the toe).
- The joint between the proximal and middle phalanges is called the ***proximal interphalangeal*** (PIP) joint.
- The joint between the middle and distal phalanges is called the ***distal interphalangeal*** (DIP) joint.
- The great toes each have only two phalanges, the proximal phalanx and the distal phalanx. Therefore, each great toe has only a single joint, called the ***interphalangeal*** (IP) joint.
- The joints connecting the phalanges in the feet to the metatarsals are the ***metatarsophalangeal*** (MTP) joints.
- Designate either right or left for the digits of the foot.

*Note*: If the location of the injury is unclear, obtain x-rays to clarify the exact point of injury.

**c. Assigning Separate Evaluations for Multiple Foot Disabilities**

38 CFR 4.14 requires that the evaluation of the same disability and/or the same manifestation under various diagnoses is to be avoided.

The compact anatomical structure of the foot as well as the inter-related physiological functioning may make it difficult to differentiate the etiology of certain disability symptoms. When multiple SC foot disabilities are present but the etiology of the symptoms cannot be separated, assign a single disability evaluation for the predominant symptoms.

If, however, the etiology of the symptoms can be delineated, separate disability evaluations may be assigned under multiple DCs for foot disabilities provided that the principles of 38 CFR 4.14 have not been violated.

*Reference*: For more information on evaluating SC and non-service-connected (NSC) symptoms that cannot be separated, see M21-1, Part III, Subpart iv, 5.B.2.c.

**~~v~~d. Evaluating Arthritis of the Minor Joints of the Toes**

For guidance on evaluating arthritis of a group of minor joints of the toes refer to the table below.

| If arthritis ... | Then ... |
|---|---|
| • affects a group of minor joints in one foot<br>• is documented by x-ray evidence<br>• results in LOM, **and**<br>• is confirmed by satisfactory evidence of painful motion, pain on use or other findings such as swelling | assign a 10-percent evaluation under 38 CFR 4.71a, DC 5003. |
| • affects minor joint groups in *both* feet, **and**<br>• is documented by x-ray evidence, **but**<br>• does not result in LOM | assign a 10-percent evaluation under 38 CFR 4.71a, DC 5003.<br><br>*Exception*:  Assign a 20-percent evaluation if there are occasional incapacitating exacerbations). |

*References*:  For more information on
- assigning evaluations under 38 CFR 4.71a, DC 5003 when a compensable rating cannot be assigned under a DC for LOM of a joint, see M21-1, Part III, Subpart iv, 4.~~A.8~~B.3.b, and
- treating motion as limited where it becomes painful for the purpose of applying 38 CFR 4.71a, DC 5003, pursuant to the holding in *Mitchell v. Shinseki*, 25 Vet.App. 32 (2011), see M21-1, Part III, Subpart iv, 4.A.1.e~~3.e~~.

---

**~~q~~e. Evaluating Plantar Fasciitis**

Evaluate plantar fasciitis analogous to pes planus, 38 CFR 4.71a, DC 5276.

The most common symptom seen with plantar fasciitis is heel pain.  The following considerations apply when evaluating the heel pain.

- Heel pain is consistent with the criteria for a moderate disability under 38 CFR 4.71a, DC 5276 based on pain on manipulation and use of the feet.
- Moderate disability under 38 CFR 4.71a, DC 5276 warrants assignment of a 10-percent evaluation for heel pain without application of 38 CFR 4.59.
- When painful motion with joint or periarticular pathology is present and is a symptom of the plantar fasciitis, 38 CFR 4.59 is applicable.  However, as previously noted, a 10-percent evaluation would most often be warranted under 38 CFR 4.71a, DC 5276 without consideration of 38 CFR 4.59.

*Note*:  When SC is established for pes planus and plantar fasciitis, evaluate the symptoms of both conditions together under 38 CFR 4.71a, DC 5276.

*Reference*:  For more information on rating by analogy, see

- M21-1, Part III, Subpart iv, 6.E.2, and
- M21-1, Part III, Subpart iv, 5.B.1.c.

| | |
|---|---|
| **sf. Definition of Metatarsalgia or Morton's Disease** | ***Metatarsalgia*** means pain in the forefoot – under the metatarsal heads.<br><br>***Morton's Disease*** or ***Morton's Neuroma*** refers to a painful lesion of a plantar interdigital nerve. |
| **tg. Evaluating Metatarsalgia or Morton's Disease** | Anterior metatarsalgia of any type, to include cases due to Morton's Disease, will be evaluated under 38 CFR 4.71a, DC 5279.<br><br>The DC provides for an evaluation of 10 percent regardless of whether the condition is unilateral or bilateral. |
| **hu. Pyramiding of Metatarsalgia and Either Plantar Fasciitis or Pes Planus** | Do not assign separate evaluations for metatarsalgia and plantar fasciitis or pes planus. The evaluation criteria are similar enough that providing separate evaluations will compensate the same facet of disability, violating the prohibition against pyramiding in 38 CFR 4.14.<br><br>A 10-percent evaluation under 38 CFR 4.71a, DC 5279 is assigned solely for having pain under the metatarsal heads which would necessarily mean pain with manipulation and use.<br><br>The criteria for pes planus or plantar fasciitis for a 10-percent evaluation in 38 CFR 4.71a, DC 5276 include "pain on manipulation and use of the feet, unilateral or bilateral." The criteria for higher evaluations including findings of findings such as accentuated pain on manipulation and use or extreme tenderness of the "plantar surfaces of the feet."<br><br>Combine the evaluations under 38 CFR 4.71a, DC 5276. Do not rate by analogy when there is an applicable DC. However if one or both conditions resulted from an injury to the foot, you may also assign an evaluation for the combined conditions under 38 CFR 4.71a, DC 5284. |

# 5. Congenital Musculoskeletal Conditions

**Introduction**   This topic contains information on congenital conditions, including

- recognizing variations in musculoskeletal development and appearance, and
- considering notable congenital or developmental defects.

**Change Date**   February 9, 2017

# 6. RA

---

**Introduction**    This topic contains information about RA, including

- characteristics of RA
- periods of flares and remissions of RA
- clinical signs of RA
- radiologic changes found in RA
- disability factors associated with RA, and
- points to consider in rating decisions involving joints affected by RA.

---

**Change Date**    May 11, 2015

---

**a. Characteristics of RA**    The following are characteristics of rheumatoid arthritis (RA), also diagnosed as atrophic or infectious arthritis, or arthritis deformans:

- the onset
  - occurs before middle age, and
  - may be acute, with a febrile attack, and
- the symptoms include a usually laterally symmetrical limitation of movement
  - first affecting PIP and MCP joints
  - next causing atrophy of muscles, deformities, contractures, subluxations, and
  - finally causing fibrous or bony ankylosis (abnormal adhesion of the bones of the joint).

*Important*:  Marie-Strumpell disease, also called rheumatoid spondylitis or ankylosing spondylitis, is *not* the same disease as RA.  RA and Marie-Strumpell disease have separate and distinct clinical manifestations and progress differently.

*Reference*:  For more information on evaluating ankylosing spondylitis, see M21-1, Part III, Subpart iv, 4.A.4.d.

---

**b. Periods of Flares and Remissions of RA**    The symptoms of RA come and go, depending on the degree of tissue inflammation.  When body tissues are inflamed, the disease is active.  When tissue inflammation subsides, the disease is inactive (in remission).

Remissions can occur spontaneously or with treatment, and can last weeks, months, or years.  During remissions, symptoms of the disease disappear, and patients generally feel well.  When the disease becomes active again (relapse), symptoms return.

*Note*: The return of disease activity and symptoms is called a flare. The course of RA varies from patient to patient, and periods of flares and remissions are typical.

---

**c. Clinical Signs of RA**

The table below contains information about the clinical signs of RA.

| Stage of Disease | Symptoms |
|---|---|
| Initial | • periarticular and articular swelling, often free fluid, with proliferation of the synovial membrane, and<br>• atrophy of the muscles.<br><br>*Note*: Atrophy is increased to wasting if the disease is unchecked. |
| Late | • deformities and contractures<br>• subluxations, or<br>• fibrous or bony ankylosis. |

---

**d. Radiologic Changes Found in RA**

The table below contains information about the radiologic changes found in RA.

| Stage of Disease | Radiologic Changes |
|---|---|
| Early | • slight diminished density of bone shadow, and<br>• increased density of articular soft parts without bony or cartilaginous changes of articular ends.<br><br>*Note*: RA and some other types of infectious arthritis do not require x-ray evidence of bone changes to substantiate the diagnosis, since x-rays do not always show their existence. |
| Late | • diminished density of bone shadow<br>• loss of bone substance or articular ends, and<br>• subluxation or ankylosis. |

---

**e. Disability Factors Associated With RA**

Give special attention to the following disability factors associated with RA in addition to, or in advance of, demonstrable x-ray changes:

• muscle spasms
• periarticular and articular soft tissue changes, such as
  – synovial hypertrophy
  – flexion contracture deformities
  – joint effusion, and
  – destruction of articular cartilage, and

- constitutional changes such as
  - emaciation
  - dryness of the eyes and mouth (Sjogren's syndrome)
  - pulmonary complications, such as inflammation of the lining of the lungs or lung tissue
  - anemia
  - enlargement of the spleen
  - muscular and bone atrophy
  - skin complications, such as nodules around the elbows or fingers
  - gastrointestinal symptoms
  - circulatory changes
  - imbalance in water metabolism, or dehydration
  - vascular changes
  - cardiac involvement, including pericarditis
  - dry joints
  - low renal function
  - postural deformities, and
  - low-grade edema of the extremities.

*Reference*:  For more information on the features of RA, see http://www.niams.nih.gov/Health_Info/Rheumatic_Disease/default.asp.

| | |
|---|---|
| **f.  Points to Consider in Rating Decisions Involving Joints Affected by RA** | In the DIAGNOSIS field of the rating decision, state which joints are affected by RA as evidenced by any of the following findings:<br><br>- synovial hypertrophy or joint effusion<br>- severe postural changes; scoliosis; flexion contracture deformities<br>- ankylosis or LOM of joint due to bony changes, and/or<br>- destruction of articular cartilage. |

# 7.  Degenerative Arthritis

| | |
|---|---|
| **Introduction** | This topic contains information about degenerative arthritis, including<br><br>• characteristics of degenerative arthritis<br>• diagnostic symptoms of degenerative arthritis<br>• radiologic changes found in degenerative arthritis<br>• symptoms of degenerative arthritis of the spine and pelvic joints, and<br>• points to consider in the rating decision for degenerative and traumatic arthritis. |
| **Change Date** | January 11, 2016 |
| **a. Characteristics of Degenerative Arthritis** | The following are characteristics of degenerative arthritis, also diagnosed as osteoarthritis or hypertrophic arthritis:<br><br>• The onset generally occurs after the age of 45.<br>• It has no relation to infection.<br>• It is asymmetrical (more pronounced on one side of the body than the other).<br>• There is limitation of movement in the late stages only. |
| **b. Diagnostic Symptoms of Degenerative Arthritis** | Diagnostic symptoms of degenerative arthritis include<br><br>• the presence of Heberden's nodes or calcific deposits in the terminal joints of the fingers with deformity<br>• ankylosis, in rare cases<br>• hyperostosis and irregular, notched articular surfaces of the joints<br>• destruction of cartilage<br>• bone eburnation, and<br>• the formation of osteophytes.<br><br>*Note*:  The flexion contracture deformities and severe constitutional symptoms described under RA do not usually occur in degenerative arthritis. |
| **c. Radiologic Changes Found in Degenerative Arthritis** | The table below contains information about the radiologic changes found in degenerative arthritis. |

| **Stage** | **Radiologic Changes** |
|---|---|
| Early | delicate spicules of calcium at the articular margins without |

| | |
|---|---|
| | • diminished density of bone shadow, and<br>• increased density of articular of parts. |
| Late | • ridging of articular margins<br>• hyperostosis<br>• irregular, notched articular surfaces, and<br>• ankylosis only in the spine. |

**d. Symptoms of Degenerative Arthritis of the Spine and Pelvic Joints**

Degenerative arthritis of the spine and pelvic joints is characterized clinically by the same general characteristics as arthritis of the major joints except that

• limitation of spine motion occurs early
• chest expansion and costovertebral articulations are not usually affected
• referred pain is commonly called "*intercostal neuralgia*" and "*sciatica*," and
• localized ankylosis may occur if spurs on bodies of vertebrae impinge.

**e. Points to Consider in the Rating Decision for Degenerative and Traumatic Arthritis**

Degenerative and traumatic arthritis require x-ray evidence of bone changes to substantiate the diagnosis.

*Note*: In evaluating arthritis of the spine, the principles for extending SC to joints affected by the subsequent development of degenerative arthritis (as contemplated under 38 CFR 4.71a, DC 5003), is not dependent on the choice of DC.

*Example*: Veteran is SC for degenerative arthritis of the spine under 38 CFR 4.71a, DC 5242 and subsequently develops degenerative arthritis in the right elbow, with no intercurrent cause noted. In this case, the principles of extending SC to joints, as contemplated in 38 CFR 4.71a, DC 5003, also apply even though the Veteran is rated under 38 CFR 4.71a, DC 5242. Thus, SC for arthritis of the right elbow may be established.

*Reference*: For more information on considering x-ray evidence when evaluating arthritis and non-specific joint pain, see
• 38 CFR 4.71a, DC 5003, and
• M21-1, Part III, Subpart iv, 3.D.4.i.

# 8. LOM in Arthritis Cases

**Introduction**   This topic contains information on LOM due to arthritis, including

- arthritis compensable under DCs based on ROM
- joint conditions not compensable under DCs not based on ROM
- reference for rating decisions involving LOM
- arthritis previously rated as a single disability
- using DCs 5013 through 5024 in rating decisions, and
- considering the effects of a change of diagnosis in arthritis cases.

**Change Date**   September 23, 2016

**a. Arthritis Compensable Under DCs Based on ROM**   For a joint or group of joints affected by degenerative arthritis (or a condition evaluated using the arthritis criteria such as traumatic arthritis), first attempt to assign an evaluation using the DC for ROM of the affected joint (38 CFR 4.71a, DC 5200 series).

When the requirements for compensable LOM of a joint are met under a DC other than 38 CFR 4.71a, DC 5003, hyphenate that DC in the conclusion with a preceding "5003-."

***Example***:  Degenerative arthritis of the knee manifested by limitation of knee extension justifying a 10-percent evaluation under 38 CFR 4.71a, DC 5261 would use the hyphenated DC "5003-5261."

***Exception***:  If other joints affected by arthritis are compensably evaluated in the same rating decision, use only the DC appropriate to these particular joints which supports the assigned evaluation and omit the modifying "5003."

**b. Joint Conditions Not Compensable Under DCs Not Based on ROM**   Whenever LOM due to arthritis is noncompensable under codes appropriate to a particular joint, assign 10 percent under 38 CFR 4.71a, DC 5003 for each major joint or group of minor joints affected by limited or painful motion as prescribed under 38 CFR 4.71a, DC 5003.

If there is no limited or painful motion, but there is x-ray evidence of degenerative arthritis, assign under 38 CFR 4.71a, DC 5003 either a 10-percent evaluation or a 20-percent evaluation for occasional incapacitating exacerbations, based on the involvement of two or more major joints or two or more groups of minor joints.

***Important***:  Do *not* combine under 38 CFR 4.25 a 10- or 20-percent evaluation that is based solely on x-ray findings with evaluations that are based on limited or painful motion.  See example in M21-1, Part III, Subpart

iv, 4.A.9.d.

*Reference*:  For more information on assigning a minimum evaluation based on painful motion as provided in 38 CFR 4.59 in cases rated under 38 CFR 4.71a, DC 5003, see M21-1, Part III, Subpart iv, 4.A.1.g.

| c. Reference: Rating Decisions Involving LOM | For more information on rating decisions involving LOM, see<br><br>• M21-1, Part III, Subpart iv, 4.A.8.e, and<br>• M21-1, Part III, Subpart iv, 4.A.9. |

| d. Arthritis Previously Rated as a Single Disability | The rating activity may encounter cases for which arthritis of multiple joints is rated as a single disability.<br><br>Use the information in the table below to process cases for which arthritis was previously evaluated as a single disability but the criteria for assignment of separate evaluations for affected joints was met at the time of the prior decision. |

| If … | Then … |
| --- | --- |
| • the separate evaluation of the arthritic disability results in no change in the combined degree previously assigned, and<br>• a rating decision is required | reevaluate using the current procedure with the same effective date as previously assigned. |
| reevaluating the arthritic joint separately results in an increased combined evaluation | apply 38 CFR 3.105(a) to retroactively increase the assigned evaluation. |
| reevaluating the arthritic joint separately results in a reduced combined evaluation | • request an examination, and<br>• if still appropriate, propose reduction under 38 CFR 3.105(a) and 38 CFR 3.105(e).<br><br>*Exception*:  Do not apply 38 CFR 3.105(a) if the assigned percentage is protected under 38 CFR 3.951.<br><br>*Reference*:  For more information on protected rating decisions, see M21-1, Part III, Subpart iv, 8.C. |

| e. Using DCs 5013 Through 5024 in Rating Decisions | Use the table below to evaluate cases that use 38 CFR 4.71a, DCs 5013 through 5024. |

| If the DC of the case is … | Then … |
|---|---|
| gout under 38 CFR 4.71a, DC 5017 | evaluate the case as RA, 38 CFR 4.71a, 5002. |
| • 38 CFR 4.71a, 5013 through 5016, and<br>• 38 CFR 4.71a, DC 5018 through 5024 | evaluate the case according to the criteria for limited motion or painful motion under 38 CFR 4.71a, DC 5003, degenerative arthritis.<br><br>*Note*:  The provisions under 38 CFR 4.71a, DC 5003, regarding a compensable minimum evaluation of 10 percent for limited or painful motion apply to these DCs and no others.<br><br>*Reference*:  For more information on evaluations of 10 and 20 percent based on x-ray findings, see 38 CFR 4.71a, DC 5003, Note (2). |

**f.  Considering the Effects of a Change in Diagnosis in Arthritis Cases**

A change of diagnosis among the various types of arthritis, particularly if joint disease has been recognized as SC for several years, has no significant bearing on the question of SC.

*Note*:  In older individuals, the effects of more than one type of joint disease may coexist.

*Reference*:  For information on evaluating RA, see 38 CFR 4.71a, DC 5002.

# 9. Examples of Rating Decisions for LOM in Arthritis Cases

**Introduction**   This exhibit contains four examples of rating decisions for LOM in arthritis cases including

- example of degenerative arthritis with separately compensable joints affected
- example of degenerative arthritis evaluated based on x-ray evidence only
- example of noncompensable degenerative arthritis of a single joint, and
- example of degenerative arthritis evaluated based on x-ray evidence only and another compensable evaluation.

**Change Date**   January 11, 2016

**a. Example of Degenerative Arthritis With Separately Compensable Joints Affected**

*Situation*:  The Veteran has residuals of degenerative arthritis with limitation of abduction of the right shoulder (major) to 90 degrees and limitation of flexion of the right knee to 45 degrees.

*Coded Conclusion*:
1. SC (VE INC)
5003-5201              Degenerative arthritis, right shoulder (dominant)
20% from 12-14-03

5260              Degenerative arthritis, right knee
10% from 12-14-03

COMB              30% from 12-14-03

*Rationale*:  The shoulder and knee separately meet compensable requirements under 38 CFR 4.71a, DCs 5201 and 38 CFR 4.71a, DC 5260, respectively.

**b. Example of Degenerative Arthritis Evaluated Based on X-Ray Evidence Only**

*Situation*:  The Veteran has x-ray evidence of degenerative arthritis of both knees without

- limited or painful motion of any of the affected joints, or
- incapacitating episodes.

*Coded Conclusion*:
1. SC (PTE INC)
5003              Degenerative arthritis of the knees, x-ray evidence

10% from 12-30-01

*Rationale*:  There is no limited or painful motion in either joint, but there is x-ray evidence of arthritis in more than one joint to warrant a 10-percent evaluation under 38 CFR 4.71a, DC 5003.

| | |
|---|---|
| **c.  Example of Noncompensable Degenerative Arthritis of a Single Joint** | *Situation*:  The Veteran has x-ray evidence of degenerative arthritis of the right knee without limited or painful motion. |

*Coded Conclusion*:
1. SC (PTE INC)
5003                    Degenerative arthritis, right knee, x-ray evidence only
0% from 12-30-01

*Rationale*:  There is no limited or painful motion in the right knee or x-ray evidence of arthritis in more than one joint to warrant a compensable evaluation under 38 CFR 4.71a, DC 5003.

| | |
|---|---|
| **d.  Example of Degenerative Arthritis Evaluated Based on X-Ray Evidence Only and Another Compensable Evaluation** | *Situation*:  The Veteran has x-ray evidence of degenerative arthritis of both knees without limited or painful motion or incapacitating exacerbations.  The Veteran also has residuals of degenerative arthritis with limitation of abduction of the right shoulder (major) to 90 degrees. |

*Coded Conclusion*:
1. SC (VE INC)
5003-5201              Degenerative arthritis, right shoulder (dominant)
20% from 12-14-03

5260                    Degenerative arthritis, right knee
0% from 12-14-03

5260                    Degenerative arthritis, left knee
0% from 12-14-03

COMB                   20% from 12-14-03

*Rationale*:  Since the shoulder condition meets compensable requirements under 38 CFR 4.71a, DCs 5201, each knee condition must be evaluated under separate DCs.  Based on Note (1) under 38 CFR 4.71a, DC 5003, ratings of

**Appx133**

arthritis based on x-ray findings only (without limited or painful motion or incapacitating exacerbations) *cannot* be combined with ratings of arthritis based on LOM.

# 10.  Osteomyelitis

| | |
|---|---|
| **Introduction** | This topic contains information about osteomyelitis, including<br><br>• requiring constitutional symptoms for assignment of a 100-percent or 60-percent evaluation under DC 5000<br>• historical evaluations for osteomyelitis<br>• assigning historical evaluations for osteomyelitis<br>• the reasons to discontinue a historical evaluation for osteomyelitis<br>• assigning a 10-percent evaluation for active osteomyelitis, and<br>• application of the amputation rule to evaluations for osteomyelitis. |
| **Change Date** | May 11, 2015 |
| **a.  Requiring Constitutional Symptoms for Assignment of a 100-Percent or 60-Percent Evaluation Under DC 5000** | Constitutional symptoms are a prerequisite to the assignment of either the 100-percent or 60-percent evaluations under 38 CFR 4.71a, DC 5000.<br><br>Since both the 60- and 100-percent evaluations are based on constitutional symptoms, neither is subject to the amputation rule.<br><br>*Reference*:  For more information on the amputation rule, see 38 CFR 4.68. |
| **b.  Historical Evaluations for Osteomyelitis** | Both the 10-percent evaluation and that part of the 20-percent evaluation that is based on "other evidence of active infection within the last five years" are<br><br>• historical evaluations, and<br>• based on recurrent episodes of osteomyelitis.<br><br>*Note*:  The 20-percent historical evaluation based on evidence of active infection within the past five years *must* be distinguished from the 20-percent evaluation authorized when there is a discharging sinus. |
| **c.  Assigning Historical Evaluations for Osteomyelitis** | An initial episode of active osteomyelitis is *not* a basis for either of the historical evaluations.<br><br>Assign the historical evaluation as follows<br><br>• When the first *recurrent* episode of osteomyelitis is shown<br> – assign a 20-percent historical evaluation, and<br> – extend the evaluation for five years from the date of examination showing the osteomyelitis to be inactive.<br>• Assign a closed evaluation at the expiration of the five-year extension.<br>• Assign the 10-percent historical evaluation only if there have been two or |

more recurrences of active osteomyelitis following the initial infection.

| | |
|---|---|
| **d. Reasons to Discontinue a Historical Evaluation for Osteomyelitis** | Do *not* discontinue the historical evaluation, even if treatment includes saucerization, sequestrectomy, or guttering, because the osteomyelitis is not considered cured.<br><br>*Exception*: If there has been removal or radical resection of the affected bone<br>• consider osteomyelitis cured, and<br>• discontinue the historical evaluation. |
| **e. Assigning a 10-Percent Evaluation for Active Osteomyelitis** | When the evaluation for amputation of an extremity or body part affected by osteomyelitis would be zero percent, assign a 10-percent evaluation if there is active osteomyelitis.<br><br>*References*: For more information on<br>• applying the amputation rule to evaluations for active osteomyelitis, see M21-1, Part III, Subpart iv, 4.A.10.f, and<br>• evaluating osteomyelitis, see 38 CFR 4.71a, DC 5000. |
| **f. Application of the Amputation Rule to Evaluations for Osteomyelitis** | Use the following table to determine how the amputation rule affects evaluations assigned for osteomyelitis. |

| If the osteomyelitis evaluation is ... | Then the amputation rule ... |
|---|---|
| 10 percent based on active osteomyelitis of a body part where the amputation evaluation would normally be zero percent | does not apply. |
| • 10 percent based on active osteomyelitis of a body part where the amputation evaluation would normally be zero percent, or<br>• 30 percent or less under 38 CFR 4.71a, DC 5000, *and*<br>• the 10-percent evaluation is combined with evaluations for<br> – ankylosis<br> – limited motion<br> – nonunion or malunion<br> – shortening, or<br> – other musculoskeletal impairment | applies to the combined evaluation. |
| 60 percent based on constitutional symptoms of osteomyelitis, per 38 | does not apply since the 60-percent evaluation is based on constitutional |

CFR 4.71a, DC 5000                              symptoms.

*Reference*:  For more information on the amputation rule, see
- 38 CFR 4.68, and
- M21-1, Part III, Subpart iv, 4.A.13.d.

# 11. Examples of the Proper Rating Procedure for Osteomyelitis

| | |
|---|---|
| **Introduction** | This exhibit contains eight examples of the proper procedure for rating osteomyelitis, including |

- example of evaluating osteomyelitis based on a history of a single active initial episode
- example of evaluating an active initial episode of osteomyelitis
- example of evaluating osteomyelitis following review exam for initial active episode
- example of evaluating osteomyelitis with current discharging sinus
- example of evaluating osteomyelitis with a historical evaluation following a single recurrence with scheduled reduction due to inactivity
- example of evaluating a recurrence of osteomyelitis
- example of evaluating osteomyelitis following second recurrence, and
- example of evaluating osteomyelitis following curative resection of affected bone.

| | |
|---|---|
| **Change Date** | May 11, 2015 |

| | |
|---|---|
| **a. Example of Evaluating Osteomyelitis Based on a History of a Single Active Initial Episode** | ***Situation***: The Veteran was diagnosed with osteomyelitis in service with discharging sinus. At separation from service the osteomyelitis was inactive with no involucrum or sequestrum. There is no evidence of recurrence. |

***Result***: As there has been no recurrence of active osteomyelitis following the initial episode in service, the historical evaluation of 20 percent is not for application. The requirements for a 20-percent evaluation based on activity are not met either.

***Coded Conclusion***:
1. SC (PTE INC)
5000                              Osteomyelitis, right tibia
0% from 12-2-93

| | |
|---|---|
| **b. Example of Evaluating an Active Initial Episode of Osteomyelitis** | ***Situation***: Same facts as example shown in M21-1, Part III, Subpart iv, 4.A.11.a, but the Veteran had a discharging sinus at the time of separation from service. |

***Result***: The Veteran meets the criteria for a 20-percent evaluation based on a discharging sinus. Schedule a future examination to ascertain the date of inactivity.

***Coded Conclusion***:

1. SC (PTE INC)
5000                          Osteomyelitis, right tibia, active
20% from 12-2-93

| | |
|---|---|
| **c. Example of Evaluating Osteomyelitis Following Review Exam for Initial Active Episode** | ***Situation***:  Same facts as example shown in M21-1, Part III, Subpart iv, 4.A.11.b.  Subsequent review examination reveals the sinus tract was healed and there is no other evidence of active infection.<br><br>***Result***:  Since the Veteran has not had a recurrent episode of osteomyelitis since service, a historical evaluation of 20 percent is not for application.  Take rating action under 38 CFR 3.105(e).<br><br>***Coded Conclusion***:<br>1. SC (PTE INC)<br>5000              Osteomyelitis, right tibia, inactive<br>20% from 12-2-93<br>0% from 3-1-95 |
| **d. Example of Evaluating Osteomyelitis With Current Discharging Sinus** | ***Situation***:  Same facts as example shown in M21-1, Part III, Subpart iv, 4.A.11.b.  The Veteran is hospitalized July 2l, 1996, with active osteomyelitis of the right tibia shown with discharging sinus.  There is no involucrum, sequestrum, or constitutional symptom.  Upon release from the hospital the discharging sinus is still present.<br><br>***Result***:  Assign the 20-percent evaluation based on evidence showing draining sinus from the proper effective date.  Schedule a future examination to ascertain date of inactivity.<br><br>***Coded Conclusion***:<br>1. SC (PTE INC)<br>5000              Osteomyelitis, right tibia, active<br>0% from 3-1-95<br>20% from 7-21-96 |
| **e. Example of Evaluating Osteomyelitis With a Historical Evaluation Following a Single Recurrence With Scheduled Reduction Due to Inactivity** | ***Situation***:  Same facts as example shown in M21-1, Part III, Subpart iv, 4.A.11.d.  A routine future examination was conducted on July 8, 1997, showing the osteomyelitis to be inactive.  There was no discharging sinus, no involucrum, sequestrum, or constitutional symptom.  The most recent episode of active osteomyelitis (July 21, 1996) constitutes the first "recurrent" episode of active osteomyelitis.<br><br>***Result***:  Continue the previously assigned 20-percent evaluation, which was awarded on the basis of discharging sinus as a historical evaluation for five years from the examination showing inactivity. |

*Coded Conclusion*:
1. SC (PTE INC)
5000                          Osteomyelitis, right tibia, inactive
20% from 7-21-96
0% from 7-8-02

| | |
|---|---|
| **f.  Example of Evaluating a Recurrence of Osteomyelitis** | *Situation*:  Same facts as example shown in M21-1, Part III, Subpart iv, 4.A.11.e.  In October 1999, the Veteran was again found to have active osteomyelitis with a discharging sinus, without involucrum, sequestrum, or constitutional symptoms. |

*Result*:  Continue the 20-percent evaluation.  Reevaluation is necessary to remove the future reduction to zero percent, and to schedule a future examination to establish the date of inactivity.

*Coded Conclusion*:
1. SC (PTE INC)
5000                          Osteomyelitis, right tibia, active
20% from 7-21-96

| | |
|---|---|
| **g.  Example of Evaluating Osteomyelitis Following Second Recurrence** | *Situation*:  Same facts as example shown in M21-1, Part III, Subpart iv, 4.A.11.f.  A review examination was conducted on April 8, 2000.  The examination showed the discharging sinus was inactive, and there was no other evidence of active osteomyelitis.  The most recent episode of osteomyelitis (October 1999) constitutes the second "recurrent" episode of active osteomyelitis. |

*Result*:  The historical evaluations of 20 and 10 percent both apply.

*Coded Conclusion*:
1. SC (PTE INC)
5000                          Osteomyelitis, right tibia, inactive
20% from 7-21-96
10% from 4-8-05

| | |
|---|---|
| **h.  Example of Evaluating Osteomyelitis Following Curative Resection of Affected Bone** | *Situation*:  Same facts as example shown in M21-1, Part III, Subpart iv, 4.A.11.g.  The Veteran was hospitalized June 10, 2002, with a recurrent episode of active osteomyelitis.  A radical resection of the right tibia was performed and at hospital discharge (June 21, 2002), the osteomyelitis was shown to be cured. |

*Result*:  Assign a temporary total evaluation of 100 percent under 38 CFR 4.30 with a 1-month period of convalescence.  Following application of 38 CFR 3.105(e), reduce the evaluation for osteomyelitis to zero percent as an evaluation for osteomyelitis will not be applied following cure by removal or radical resection of the affected bone.

*Coded Conclusion*:
1. SC (PTE INC)
5000                                     Osteomyelitis, right tibia, P.O.
20% from 7-21-96
100% from 6-10-02 (Par. 30)
20% from 8-1-02
0% from 10-1-02

# 12. Muscle Injuries

| | |
|---|---|
| **Introduction** | This topic contains information about rating muscle injuries, including |

- types of muscle injuries
- standard muscle strength grading system for examinations
- identification of muscle groups (MGs) in examination reports
- general criteria for muscle evaluations
- fractures associated with gunshot wound (GSW) and shell fragment wounds (SFW)
- determining whether 38 CFR 4.55 applies to muscle injuries
- applying 38 CFR 4.55 to muscle injuries
- evaluating joint manifestations and muscle damage acting on the same joint
- evaluating damage to multiple muscles within the same MG
- considering peripheral nerve involvement in muscle injuries
- evaluating muscle injuries with peripheral nerve conditions of different etiology
- evaluating scars associated with muscle injuries
- applying the amputation rule to muscle injuries, and
- evaluating muscle disabilities not involving shrapnel, GSWs, or other projectile-type injury.

| | |
|---|---|
| **Change Date** | October 24, 2017 |

| | |
|---|---|
| **a. Types of Muscle Injuries** | A missile that penetrates the body results in two problems |

- it destroys muscle tissue in its direct path by crushing it, then
- the temporary cavitation forces stretch the tissues adjacent to the missile track and result in additional injury or destruction.

Muscles are much more severely disrupted if multiple penetrating projectiles strike in close proximity to each other. Examples of this type of injury are

- explosive device injuries
- deforming or fragmenting rifle projectiles, or
- any rifle projectile that strikes bone.

For additional information regarding types of injuries, the effects of explosions and projectiles, and symptoms and complications, refer to the table below.

| Type of Injury | Initial Effects | Signs, Symptoms, and Complications |
|---|---|---|
| gunshots | Entrance and exit wounds result. The | • Exit wounds are |

| | | amount of damage and relative size of entrance and exit wounds depends on many factors such as | generally larger than entrance wounds, and |
| | | | • bullets are essentially sterile when they reach the body but carry particles into wound which could be sources of infection. |
| | | • caliber of bullet | |
| | | • distance from victim | |
| | | • organs, bone, blood vessels, and other structures hit. | |
| fragments from explosive devices | Most result in decreased tissue penetration compared to denser rifle bullets. | Multiple fragments in a localized area result in tissue disruption affecting a wide area. |
| tears and lacerations | Muscles that become isolated from nerve supply by lacerations will be non-functional. | • Torn muscle fibers heal with very dense scar tissue, but the nerve stimulation will not cross this barrier. |
| | | • Parts of muscle isolated from the nerve will most likely remain non-contractile resulting in a strength deficit proportional to amount of muscle tissue disrupted. |
| | | • Treatment for small tears is symptomatic. |
| | | • Large tears/lacerations may require reconstruction. |
| through and through wound | Injuring instrument enters and exits the body. | Two wounds result |
| | | • entrance wound, and |
| | | • exit wound. |

*References*:  For more information on
• muscle groups (MGs) and corresponding DCs, see 38 CFR 4.73
• anatomical regions of the body, see 38 CFR 4.55(b), and
• gunshot wounds (GSWs) with pleural cavity involvement, see 38 CFR 4.97, DC 6840-6845, Note (3).

| **b. Standard Muscle Strength Grading System for Examinations** | Refer to the following table for information about how muscle strength is evaluated on an examination. |

| Numeric Grade | Corresponding Strength Assessment | Indications on Exam |
|---|---|---|
| (0) | absent | no contraction felt |
| (1) | trace | muscle can be felt to tighten but no movement is produced |
| (2) | poor | muscle movement is produced against gravity but cannot overcome resistance |
| (3) | fair | muscle movement is produced against gravity but cannot overcome resistance |
| (4) | good | muscle movement is produced against resistance, however, less than normal resistance |
| (5) | normal | muscle movement can overcome a normal resistance |

**e. Identification of MG in Examination Reports**

The examination report must include information to adequately identify the MG affected by either

- specifically noting which MG is affected, or
- noting which muscles are involved so that the name of the muscles may be used to identify the MG affected.

**d. General Criteria for Muscle Evaluations**

Evaluation of muscle disabilities is the result of a multi-factorial consideration. However, there are hallmark traits that are suggestive of certain corresponding evaluations. Refer to the following table for additional information regarding these hallmark traits and the suggested corresponding disability evaluation.

| If the evidence shows a history of ... | Then consider evaluating the muscle injury as ... |
|---|---|
| open comminuted fracture *with* | severe. |
| • muscle damage, or<br>• tendon damage | *Note*: This level of impairment is specified by regulation at 38 CFR 4.56(a). |
| through and through or deep penetrating wound by small high velocity missile or large low velocity missile *with* | at least moderately severe. |
| • debridement<br>• prolonged infection, or<br>• sloughing of soft parts, and<br>• intermuscular scarring | |

|  | through and through injury *with muscle damage* | no less than moderate. |
|  |  | *Note*: This level of impairment is specified by regulation at 38 CFR 4.56(b). |
|  | retained fragments in muscle tissue | at least moderate. |
|  | deep penetrating wound *without* | at least moderate. |

- explosive effect of high velocity missile,
- residuals of debridement, or
- prolonged infection

*Important*: No single factor is controlling for the assignment of a disability evaluation for a muscle injury. The entire evidence picture must be taken into consideration.

*Reference*: For more information on assigning disability evaluations for muscle injuries, see

- *Tropf v. Nicholson*, 20 Vet.App. 317 (2006)
- *Robertson v. Brown*, 5 Vet.App. 70 (1993)
- *Jones v. Principi*, 18 Vet.App. 248 (2004), and
- 38 CFR 4.55.

| e. Fractures Associated With GSW/SFW | All fractures associated with a GSW and/or shell fragment wound (SFW) will be considered open because all of them involve an opening to the outside. Most GSW/SFW fractures are also comminuted due to the shattering nature of the injury. |

| f. Determining Whether 38 CFR 4.55 Applies to Muscle Injuries | 38 CFR 4.55 applies to certain combinations of muscle injuries and joint conditions. Consider the provisions of 38 CFR 4.55 if<br><br>- there are multiple MGs involved<br>- the MG acts on a joint or joints, and/or<br>- there is peripheral nerve damage to the same body part affected by the muscle. |

| g. Applying 38 CFR 4.55 to Muscle Injuries | If more than one MG is injured or affected or if the injured MG acts on a joint, conduct a preliminary review of the evidence to gather information needed to properly apply the provisions of 38 CFR 4.55. The information needed will include<br><br>- whether the affected MGs are in the same or different anatomic regions<br>- whether the MGs are acting on a single joint or multiple joints, and<br>- whether the joint or joints is/are ankylosed. |

After the preliminary review is complete, use the evidence gathered and apply the following table to determine how 38 CFR 4.55 affects the evaluation of the muscle injury.

| Step | Action |
|------|--------|
| 1 | Does the MG(s) act on an ankylosed joint? |
| | • If *yes*, go to Step 2. |
| | • If *no*, go to Step 4 |
| 2 | For MG(s) that act on an ankylosed joint, is the joint an ankylosed knee *and* is MG XIII disabled? |
| | • If *yes*, grant separate evaluations for the ankylosed knee and the MG XIII injury. For the MG XIII injury, assign the next lower level than that which would otherwise be assigned. Then go to Step 3. |
| | • If *no*, then is the ankylosed joint the shoulder *and* are MGs I and II *severely* disabled? |
| | – If *yes*, then assign a single evaluation for the muscle injury and the shoulder ankylosis under DC 5200. The evaluation will be at the level of unfavorable ankylosis. |
| | – If *no*, then no evaluation will be assigned for the muscle injury. The combined disability arising from the ankylosis and the muscle injury will be evaluated as ankylosis. |
| 3 | For the injury to MG XIII with an associated ankylosed knee, are there other MG injuries in the same anatomical region affecting the pelvic girdle and/or thigh? |
| | • If *no*, then no additional change to the evaluation for the muscle injury is warranted. |
| | • If *yes*, do the affected MG injuries act on the ankylosed knee? |
| | – If *yes*, then no separate evaluation for the muscle injury to a MG other than MG XIII can be assigned, as indicated in Step 2. |
| | – If *no*, then for the MG XIII injury that acts on the knee and the injury to another MG of the pelvic girdle and thigh acting on a different joint, is the different joint ankylosed? |
| | • If *yes*, then no separate evaluation can be assigned for the other MG injury of the pelvic girdle and thigh, as indicated in Step 2. No further action is warranted. |
| | • If *no*, then assign a single evaluation for the MG XIII injury and the injury to the other MG of the pelvic girdle and thigh anatomical region by determining the most severely injured MG and increasing by one level. |
| 4 | For muscle injury(ies) acting on unankylosed joint(s), is a single MG injury involved? |

- If *yes*, then grant a single evaluation for the muscle injury.
- If *no*, then are the MG injuries in the same anatomical region?
  - If *yes*, go to Step 5.
  - If *no*, go to Step 6

5      Do the MGs in the same anatomical region act on a single joint?

- If yes, are the MGs involved MG I and II acting on a shoulder joint?
  - If *yes*, then
    - assign separate disability evaluations for the MGs, but
    - the combined evaluation cannot exceed the evaluation for unfavorable ankylosis of the shoulder.
  - If *no*, then for the muscles in the same anatomical region acting on a single joint,
    - assign separate disability evaluations for the MGs, but
    - the combined evaluation must be less than the evaluation that would be normally assigned for unfavorable anklyosis of the joint involved.
- If *no*, for the MGs in the same anatomical region acting on different joints, are the MG injuries compensable?
  - If *yes*, then assign a single disability evaluation for the affected MGs by
    - determining the evaluation for the most severely injured MG, and
    - increasing by one level and using as the combined evaluation.
  - If *no*, then assign a noncompensable evaluation for the combined MG injuries.

6      For MG injuries in different anatomical areas, is a single unankylosed joint affected?

- If *yes*, are MG I and II affected and acting upon the shoulder?
  - If *yes*, then
    - assign separate disability evaluations for the muscle injuries, but
    - the combined evaluation cannot exceed the evaluation for unfavorable ankylosis of the shoulder.
  - If *no*, for the MG injuries in different anatomical areas affecting a single unankylosed joint (not including MG I and II acting on the shoulder)
    - assign separate disability evaluations for the muscle injuries, but
    - the combined evaluation must be lower than the evaluation that would be assigned for unfavorable ankylosis of the affected joint.
- If *no*, then for MG injuries in different anatomical areas acting on different unankylosed joints, assign separate disability evaluations for each MG injury.

**Appx147**

*References*:  For additional information on
- evaluating joint manifestations and muscle damage acting on the same joint, see M21-1, Part III, Subpart iv, 4.A.12.h, and
- evaluating peripheral nerve involvement in muscle injuries, see M21-1 Part III, Subpart iv, 4.A.12.j.

| | |
|---|---|
| **h.  Evaluating Joint Manifestations and Muscle Damage Acting on the Same Joint** | A separate evaluation for joint manifestations and muscle damage acting on the same joint are prohibited if both conditions result in the same symptoms.<br><br>Although LOM is not directly discussed in 38 CFR 4.56, the DC provisions within 38 CFR 4.73 describing the functions of various MGs are describing motion.<br><br><ul><li>The muscles move the joint.</li><li>If the joint manifestation is LOM, that manifestation is already compensated through the evaluation assigned by a muscle rating decision.</li><li>Evaluating the same symptoms under multiple DCs is prohibited by 38 CFR 4.14.</li></ul>*Note*:  Consider the degree of disability under the corresponding muscle DC and joint DC and assign the higher evaluation.<br><br>*Exception*:  Per 38 CFR 4.55(e)(1), if MG XIII is disabled and acts on an ankylosed knee, separate disability evaluations can be assigned for the muscle injury and the knee ankylosis.  However, the evaluation for the MG injury will be rated at the next lower level than that which would have otherwise been assigned.<br><br>*Reference*:  For additional information on applying 38 CFR 4.55 when evaluating muscle injuries and joint conditions, see M21-1, Part III, Subpart iv, 4.A.12.f-g. |
| **i.  Evaluating Damage to Multiple Muscles Within the Same MG** | A separate evaluation cannot be assigned for each muscle within a single MG.  Muscle damage to any of the muscles within the group must be included in a single evaluation assigned for the MG. |
| **j.  Considering Peripheral Nerve Involvement in Muscle Injuries** | When there is nerve damage associated with the muscle injury, use the following table to determine appropriate actions to take to evaluate the nerve damage and the muscle injury. |

| If ... | Then ... |
|---|---|
| - the nerve damage is in the same | assign a single evaluation for the |

**Appx148**

|  |  |
|---|---|
| body part as the muscle injury, *and* | combined impairment by determining whether the nerve code or the muscle code will result in a higher evaluation. Assign the higher evaluation. |
| • the muscle injury and the nerve damage affect the same functions of the affected body part | |
| | *Note*: If the muscle and nerve evaluations are equal, evaluate with the DC with the highest maximum evaluation available. |
| • the nerve damage is in the same body part as the muscle injury, *and* | assign separate evaluations for the nerve damage and the muscle injury. |
| • the muscle injury and the nerve damage affect entirely different functions of the affected body part | |

| | |
|---|---|
| **k. Evaluating Muscle Injuries with Peripheral Nerve Conditions of Different Etiology** | The provisions of 38 CFR 4.55 preclude the combining of a muscle injury evaluation with a peripheral nerve paralysis evaluation involving the same body part when the same functions are affected. A muscle injury and a peripheral nerve paralysis of the same body part, originating from separate etiologies, may not be rated separately.

• The exception to this rule is only when entirely different functions are affected.
• Etiology of the disability is irrelevant in rendering a determination regarding combining evaluations for muscle injuries and peripheral nerve paralysis.

*Example*: A Veteran is SC for GSW to the right leg MG XI at 10 percent. He develops SC diabetic peripheral neuropathy many years later. The peripheral neuropathy affects the external popliteal nerve. Since MG XI and the external popliteal nerve both control the same functions, dorsiflexion of the foot and extension of the toes, only a single disability evaluation can be assigned under either 38 CFR 4.73, DC 5311 or 38 CFR 4.73, DC 8521, whichever is more advantageous. |

| | |
|---|---|
| **l. Evaluating Scars Associated With Muscle Injuries** | Use the following table to determine appropriate action to take when evaluating scars associated with muscle injuries. |

| If ... | Then ... |
|---|---|
| there is scarring associated with the muscle injury | assign a separate evaluation for the scar, even if noncompensable. |
| there is painful or unstable scarring associated with the muscle injury | assign a separate compensable disability evaluation under 38 CFR 4.118, DC 7804. |

|  | there is scarring that results in functional loss under 38 CFR 4.118, DC 7805 that is compensable | do not assign a separate evaluation if the body part affected and the functional impairment resulting from the scar are the same as the part and function affected by the muscle injury. |

*Reference*:  For more information on assigning separate evaluations for the muscle injury and associated scarring, see
- *Esteban v. Brown*, 6 Vet.App. 259 (1994)
- *Jones v. Principi*, 18 Vet.App. 248 (2004), and
- 38 CFR 4.14.

| **m. Applying the Amputation Rule to Muscle Injuries** | The amputation rule applies to musculoskeletal conditions and any associated peripheral nerve injuries.  Therefore, when assigning separate evaluations for the muscle injury, peripheral nerve injury directly related to that muscle injury must be considered in applying the amputation rule.

*References*:  For more information on
- the amputation rule, see 38 CFR 4.68, and
- evaluating peripheral nerve disabilities associated with muscle injuries, see M21-1, Part III, Subpart iv, 4.A.12.j. |

| **n. Evaluating Muscle Disabilities Not Involving Shrapnel, GWSs, or Other Projectile-Type Injury** | Generally, apply 38 CFR 4.73 to muscle injuries such as those arising from shrapnel, GSWs, or other projectiles or similar foreign objects entering the muscle from outside the body since the criteria for the evaluation weigh heavily on the type of wound, treatment, and current manifestations of the wound.

Generally, a disability such as that arising from injuries such as muscle strains, tears not resulting from injury by a foreign object entering the muscle, or muscle atrophy due to a SC joint or nerve injury should be evaluated under an appropriate DC based on associated functional impairment. |

# 8~~13~~.  Miscellaneous Musculoskeletal Considerations

**Introduction**    This topic contains general guidance on evaluating musculoskeletal conditions, including

- SC for fractures
- SC for osteopenia
- evaluating fibromyalgia
- ~~applying the amputation rule~~
- considering conflicting decisions regarding loss of use (LOU) of an extremity~~, and~~
- applying the amputation rule
- ~~non-service-connected (~~NSC~~)~~ amputation eliminating a distal SC disability
- recognizing variations in musculoskeletal development and appearance, and
- considering notable congenital or developmental defects.

**Change Date**    ~~May 25, 2017~~April 13, 2018

**a.  SC for Fractures**    Decision makers must not automatically award SC for fracture or fracture residuals based on a mere service treatment record (STR) reference to a fracture.

- Where SC of a fracture or fracture residuals is *claimed*, SC will be established when sufficient evidence, such as x-rays, a surgical report, casting, or a physical evaluation board report, documents the fracture.
- If SC of a fracture has not been claimed and objective evidence such as x-ray report documents an in-service fracture, invite a claim for SC for the fracture.

The following considerations apply when granting SC for a fracture:

- SC will be established for a healed fracture even without current residual limited motion or functional impairment of a joint.
- Assign a DC consistent with the location of the fracture.  The fracture will be rated as noncompensable in the absence of any disabling manifestations.

*Reference*:  For more information about unclaimed chronic disabilities found in STRs, see M21-1, Part IV, Subpart ii, 2.A.1.

**b.  SC for Osteopenia**    Osteopenia is clinically defined as mild bone density loss that is often associated with the normal aging process.  Low bone density does not necessarily mean that an individual is losing bone, as this may be a normal variant.

Osteopenia is comparable to a laboratory finding which is not subject to SC compensation.

Use the ~~following~~ table <mark>below</mark> to determine the appropriate action to take when SC for osteopenia has been granted.

| If ... | Then ... |
|---|---|
| SC for osteopenia was granted by rating decision dated *prior to* December 19, 2013 (the date on which guidance was issued to clarify the proper procedures for considering SC for osteopenia) | • do not sever SC, as it was properly established based on guidance available at the time the decision was made, <br> • do not reduce the previously assigned evaluation unless the condition has improved, and <br> • consider claims for increased evaluation and schedule examination as warranted based on the facts of the case. <br><br> *Note*:  Provisions of 38 CFR 3.951 and 38 CFR 3.957 regarding protection of SC remain applicable. |
| SC for osteopenia was granted by rating decision dated *on or after* December 19, 2013 | propose to sever SC based on a finding of clear and unmistakable error. |

*Note*:  Osteoporosis, in contrast to osteopenia, is considered a disease entity characterized by severe bone loss that may interfere with mechanical support, structure, and function of the bone.  SC for osteoporosis under 38 CFR 4.71a, DC 5013 is warranted when the requirements are otherwise met.

**c. Evaluating Fibromyalgia**

The criteria for evaluation of fibromyalgia under 38 CFR 4.71a, DC 5025 does not exclude assignment of separate evaluations when disabilities are diagnosed secondary to fibromyalgia.  This includes, but is not limited to, disability diagnoses for which symptoms are included in the evaluation criteria under 38 CFR 4.71a, DC 5025, such as

- depression
- anxiety
- headache, and
- irritable bowel syndrome.

*Notes*:
- If signs and symptoms are not sufficient to warrant a diagnosis of a separate condition, then they are evaluated with the musculoskeletal pain and tender points under 38 CFR 4.71a, DC 5025.
- The same signs and symptoms cannot be used to assign separate evaluations

under different DCs, per [38 CFR 4.14](#).

***Reference***:  For more information on evaluating chronic pain syndrome (somatic symptom disorder), see M21-1, Part III, Subpart iv, 4.O~~H~~.1.j.

---

**~~d~~e. Considering Conflicting Decisions Regarding LOU of an Extremity**

Forward the claims folder to the Director, Compensation Service (211B), for an advisory opinion under M21-1, Part III, Subpart vi, 1.A.2.a to resolve a conflict if

- the Insurance Center determines LOU of two extremities prior to rating consideration involving the same issue, and
- the determination conflicts with the proposed rating decision.

***Note***:  This issue will generally be brought to the attention of the rating activity as a result of the type of personal injury, correspondence, or some indication in the claims folder that the insurance activity is involved.

---

**~~d~~e. Applying the Amputation Rule**

The combined evaluation for disabilities of an extremity shall not exceed the evaluation for the amputation at the elective level, were amputation to be performed.  The amputation rule is included in the musculoskeletal section of the rating schedule and, consequently, applies only to musculoskeletal disabilities and not to disabilities affecting other body systems.

***~~Exceptions~~Notes***:
- Any peripheral nerve injury associated with the musculoskeletal injury will be considered when applying the amputation rule.
- Actual amputation with associated painful neuroma will be evaluated at the next-higher site of elective reamputation.
- The amputation rule does not apply to evaluations of peripheral nerve disabilities of the extremities including, but not limited to, diabetic neuropathy, radiculopathy/sciatica due to a spinal disorder, or peripheral nerve injuries of non-musculoskeletal etiology.
- 
- ***~~Note~~***:  The amputation rule does not apply to bilateral evaluations under [38 CFR 4.71a, DCs 5276 to 5279](#) *except* when being compared to a bilateral lower extremity amputation.

***References***:  For more information on the
- amputation rule, see
  – [38 CFR 4.68](#), and
  – *[Moyer v. Derwinski](#)*, 2 Vet.App. 289 (1992)
- application of the amputation rule to rating decisions for osteomyelitis, see M21-1, Part III, Subpart iv, 4.~~A.10~~B.5.f
- application of the amputation rule to rating decisions for muscle injuries, see M21-1, Part III, Subpart iv, 4.~~A.12~~B.7.m, and

- VBMS-R amputation rule instructions, see the *VBMS-R Job Aid*.

---

**f. NSC Amputation Eliminating a Distal SC Disability**

For guidance on disability evaluation considerations when an ~~non-service-connected~~NSC disability results in amputation that eliminates a distal SC disability, see M21-1, Part III, Subpart iv, 5.B.3.~~c~~e.

**g~~a~~. Recognizing Variations in Musculoskeletal Development and Appearance**

Individuals vary greatly in their musculoskeletal development and appearance.  Functional variations are often seen and can be attributed to

- the type of individual, and
- his/her inherited or congenital variations from the normal.

---

**h~~b~~. Considering Notable Congenital or Developmental Defects**

Give careful attention to congenital or developmental defects such as

- absence of parts
- subluxation (partial dislocation of a joint)
- deformity or exostosis (bony overgrowth) of parts, and/or
- accessory or supernumerary (in excess of the normal number) parts.

Note congenital defects of the spine, especially

- spondylolysis
- spina bifida
- unstable or exaggerated lumbosacral joints or angle, or
- incomplete sacralization.

*Notes*:
- Do not automatically classify spondylolisthesis as a congenital condition, although it is commonly associated with a congenital defect.
- Do not automatically classify joint subluxation as a developmental or congenital condition.
- Do not overlook congenital diastasis of the rectus abdominus, hernia of the diaphragm, and the various myotonias.

*References*:  For more information on
- congenital or developmental defects, see
  – 38 CFR 4.9, and
  – M21-1, Part IV, Subpart ii, 2.B.6, and
- knee joint and patellar subluxation, see M21-1, Part III, Subpart iv, 4.A.~~4.g~~6.c-d.

---

**Appx154**

# ADDENDUM
## PURSUANT TO FEDERAL RULE OF
## APPELLATE PROCEDURE 28(f)

## § 551.  Definitions

For the purpose of the subchapter—

* * *

(4) "rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing;

(5) "rule making" means agency process for formulating, amending, or repealing a rule;

* * *

(13) "agency action" includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act; and

* * *

**§ 552. Public information; agency rules, opinions, orders, records, and proceedings**

(a)   Each agency shall make available to the public information as follows:

(1)   Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—

(A) descriptions of its central and field organization and the established places at which, the employees (and in the case of a uniformed service, the members) from whom, and the methods whereby, the public may obtain information, make submittals or requests, or obtain decisions;

(B) statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal and informal procedures available;

(C) rules of procedure, descriptions of forms available or the places at which forms may be obtained, and instructions as to the scope and contents of all papers, reports, or examinations;

(D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; and

(E) each amendment, revision, or repeal of the foregoing.

Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published.  For the purpose of this paragraph, matter reasonably available to the class of persons affected thereby is deemed published in the Federal Register when incorporated by reference therein with the approval of the Director of the Federal Register.

(2)   Each agency, in accordance with published rules, shall make available for public inspection in an electronic format—

(A) final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases;

(B) those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register;

(C) administrative staff manuals and instructions to staff that affect a member of the public;

(D) copies of all records, regardless of form or format—

    (i) that have been released to any person under paragraph (3); and

    (ii)(I) that because of the nature of their subject matter, the agency determines have become or are likely to become the subject of subsequent requests for substantially the same records; or

    (II) that have been requested 3 or more times; and

(E) a general index of the records referred to under subparagraph (D);

unless the materials are promptly published and copies offered for sale. For records created on or after November 1, 1996, within one year after such date, each agency shall make such records available, including by computer telecommunications or, if computer telecommunications means have not been established by the agency, by other electronic means. To the extent required to prevent a clearly unwarranted invasion of personal privacy, an agency may delete identifying details when it makes available or publishes an opinion, statement of policy, interpretation, staff manual, instruction, or copies of records referred to in subparagraph (D). However, in each case the justification for the deletion shall be explained fully in writing, and the extent of such deletion shall be indicated on the portion of the record which is made available or published, unless including that indication would harm an interest protected by the exemption in subsection (b) under which the deletion is made. If technically feasible, the extent of the deletion shall be indicated at the place in the record where the deletion was made. Each agency shall also maintain and make available for public inspection in an electronic format current indexes providing identifying information for the public as to any matter issued, adopted, or promulgated after July 4, 1967, and required by this paragraph to be made available or published. Each agency shall promptly publish, quarterly or more frequently, and distribute (by sale or otherwise) copies of each index or supplements thereto unless it determines by order published in the Federal Register that the publication would be unnecessary and impracticable, in which case the agency shall nonetheless provide copies of such index on request at a cost not to exceed the direct cost of duplication. Each agency shall make the index referred to in subparagraph (E) available by computer telecommunications by December 31, 1999. A final order, opinion, statement of policy, interpretation, or staff manual or instruction that affects a member of the public may be relied on, used, or cited as precedent by an agency against a party other than an agency only if—

    (i) it has been indexed and either made available or published as provided by this paragraph; or

(ii) the party has actual and timely notice of the terms thereof.

(3)(A) Except with respect to the records made available under paragraphs (1) and (2) of this subsection, and except as provided in subparagraph (E), each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person.

(B) In making any record available to a person under this paragraph, an agency shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format. Each agency shall make reasonable efforts to maintain its records in forms or formats that are reproducible for purposes of this section.

(C) In responding under this paragraph to a request for records, an agency shall make reasonable efforts to search for the records in electronic form or format, except when such efforts would significantly interfere with the operation of the agency's automated information system.

(D) For purposes of this paragraph, the term "search" means to review, manually or by automated means, agency records for the purpose of locating those records which are responsive to a request.

(E) An agency, or part of an agency, that is an element of the intelligence community (as that term is defined in section 3(4) of the National Security Act of 1947 (50 U.S.C. 401a(4))) shall not make any record available under this paragraph to—

(i) any government entity, other than a State, territory, commonwealth, or district of the United States, or any subdivision thereof; or

(ii) a representative of a government entity described in clause (i).

* * *

## § 553.  Rule making

(a) This section applies, according to the provisions thereof, except to the extent that there is involved—

(1) a military or foreign affairs function of the United States; or

(2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law.  The notice shall include—

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

Except when notice or hearing is required by statute, this subsection does not apply—

(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation.  After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.  When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—

(1) a substantive rule which grants or recognizes an exemption or relieves a restriction;

(2) interpretative rules and statements of policy; or

(3) as otherwise provided by the agency for good cause found and published with the rule.

(e) Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.

## § 801.  Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(2)(A) The Comptroller General shall provide a report on each major rule to the committees of jurisdiction in each House of the Congress by the end of 15 calendar days after the submission or publication date as provided in section 802(b)(2). The report of the Comptroller General shall include an assessment of the agency's compliance with procedural steps required by paragraph (1)(B).

(B) Federal agencies shall cooperate with the Comptroller General by providing information relevant to the Comptroller General's report under subparagraph (A).

(3) A major rule relating to a report submitted under paragraph (1) shall take effect on the latest of—

(A) the later of the date occurring 60 days after the date on which—

(i) the Congress receives the report submitted under paragraph (1); or

(ii) the rule is published in the Federal Register, if so published;

(B) if the Congress passes a joint resolution of disapproval described in section 802 relating to the rule, and the President signs a veto of such resolution, the earlier date—

(i) on which either House of Congress votes and fails to override the veto of the President; or

(ii) occurring 30 session days after the date on which the Congress received the veto and objections of the President; or

(C) the date the rule would have otherwise taken effect, if not for this section (unless a joint resolution of disapproval under section 802 is enacted).

(4) Except for a major rule, a rule shall take effect as otherwise provided by law after submission to Congress under paragraph (1).

(5) Notwithstanding paragraph (3), the effective date of a rule shall not be delayed by operation of this chapter beyond the date on which either House of Congress votes to reject a joint resolution of disapproval under section 802.

(b)(1) A rule shall not take effect (or continue), if the Congress enacts a joint resolution of disapproval, described under section 802, of the rule.

(2) A rule that does not take effect (or does not continue) under paragraph (1) may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule.

(c)(1) Notwithstanding any other provision of this section (except subject to paragraph (3)), a rule that would not take effect by reason of subsection (a)(3) may take effect, if the President makes a determination under paragraph (2) and submits written notice of such determination to the Congress.

(2) Paragraph (1) applies to a determination made by the President by Executive order that the rule should take effect because such rule is--

(A) necessary because of an imminent threat to health or safety or other emergency;

(B) necessary for the enforcement of criminal laws;

(C) necessary for national security; or

(D) issued pursuant to any statute implementing an international trade agreement.

(3) An exercise by the President of the authority under this subsection shall have no effect on the procedures under section 802 or the effect of a joint resolution of disapproval under this section.

(d)(1) In addition to the opportunity for review otherwise provided under this chapter, in the case of any rule for which a report was submitted in accordance with subsection (a)(1)(A) during the period beginning on the date occurring—

(A) in the case of the Senate, 60 session days, or

(B) in the case of the House of Representatives, 60 legislative days,

before the date the Congress adjourns a session of Congress through the date on which the same or succeeding Congress first convenes its next session, section 802 shall apply to such rule in the succeeding session of Congress.

(2)(A) In applying section 802 for purposes of such additional review, a rule described under paragraph (1) shall be treated as though--

(i) such rule were published in the Federal Register (as a rule that shall take effect) on—

(I) in the case of the Senate, the 15th session day, or

(II) in the case of the House of Representatives, the 15th legislative day,

after the succeeding session of Congress first convenes; and

(ii) a report on such rule were submitted to Congress under subsection (a)(1) on such date.

(B) Nothing in this paragraph shall be construed to affect the requirement under subsection (a)(1) that a report shall be submitted to Congress before a rule can take effect.

(3) A rule described under paragraph (1) shall take effect as otherwise provided by law (including other subsections of this section).

(e)(1) For purposes of this subsection, section 802 shall also apply to any major rule promulgated between March 1, 1996, and the date of the enactment of this chapter.

(2) In applying section 802 for purposes of Congressional review, a rule described under paragraph (1) shall be treated as though—

(A) such rule were published in the Federal Register on the date of enactment of this chapter; and

(B) a report on such rule were submitted to Congress under subsection (a)(1) on such date.

(3) The effectiveness of a rule described under paragraph (1) shall be as otherwise provided by law, unless the rule is made of no force or effect under section 802.

(f) Any rule that takes effect and later is made of no force or effect by enactment of a joint resolution under section 802 shall be treated as though such rule had never taken effect.

(g) If the Congress does not enact a joint resolution of disapproval under section 802 respecting a rule, no court or agency may infer any intent of the Congress from any action or inaction of the Congress with regard to such rule, related statute, or joint resolution of disapproval.

## § 804.  Definitions

For purposes of this Chapter—

(1) The term "Federal agency" means any agency as that term is defined in section 551(1).

(2) The term "major rule" means any rule that the Administrator of the Office of Information and Regulatory Affairs of the Office of Management and Budget finds has resulted in or is likely to result in—

(A) an annual effect on the economy of $100,000,000 or more;

(B) a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions; or

(C) significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets.

The term does not include any rule promulgated under the Telecommunications Act of 1996 and the amendments made by that Act.

(3) The term "rule" has the meaning given such term in section 551, except that such term does not include—

(A) any rule of particular applicability, including a rule that approves or prescribes for the future rates, wages, prices, services, or allowances therefor, corporate or financial structures, reorganizations, mergers, or acquisitions thereof, or accounting practices or disclosures bearing on any of the foregoing;

(B) any rule relating to agency management or personnel; or

(C) any rule of agency organization, procedure, or practice that does not substantially affect the rights or obligations of non-agency parties.

## § 2071. Rule-making power generally

(a) The Supreme Court and all courts established by Act of Congress may from time to time prescribe rules for the conduct of their business. Such rules shall be consistent with Acts of Congress and rules of practice and procedure prescribed under section 2072 of this title.

(b) Any rule prescribed by a court, other than the Supreme Court, under subsection (a) shall be prescribed only after giving appropriate public notice and an opportunity for comment. Such rule shall take effect upon the date specified by the prescribing court and shall have such effect on pending proceedings as the prescribing court may order.

(c)(1) A rule of a district court prescribed under subsection (a) shall remain in effect unless modified or abrogated by the judicial council of the relevant circuit.

(2) Any other rule prescribed by a court other than the Supreme Court under subsection (a) shall remain in effect unless modified or abrogated by the Judicial Conference.

(d) Copies of rules prescribed under subsection (a) by a district court shall be furnished to the judicial council, and copies of all rules prescribed by a court other than the Supreme Court under subsection (a) shall be furnished to the Director of the Administrative Office of the United States Courts and made available to the public.

(e) If the prescribing court determines that there is an immediate need for a rule, such court may proceed under this section without public notice and opportunity for comment, but such court shall promptly thereafter afford such notice and opportunity for comment.

(f) No rule may be prescribed by a district court other than under this section.

## § 2072.  Rules of procedure and evidence; power to prescribe

(a) The Supreme Court shall have the power to prescribe general rules of practice and procedure and rules of evidence for cases in the United States district courts (including proceedings before magistrate judges thereof) and courts of appeals.

(b) Such rules shall not abridge, enlarge or modify any substantive right. All laws in conflict with such rules shall be of no further force or effect after such rules have taken effect.

(c) Such rules may define when a ruling of a district court is final for the purposes of appeal under section 1291 of this title.

## § 2401.  Time for commencing action against United States

(a) Except as provided by chapter 71 of title 41, every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues. The action of any person under legal disability or beyond the seas at the time the claim accrues may be commenced within three years after the disability ceases.

(b) A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

## § 502.  Judicial review of rules and regulations

An action of the Secretary to which section 552(a)(1) or 553 of title 5 (or both) refers is subject to judicial review.  Such review shall be in accordance with chapter 7 of title 5 and may be sought only in the United States Court of Appeals for the Federal Circuit.  However, if such review is sought in connection with an appeal brought under the provisions of chapter 72 of this title, the provisions of that chapter shall apply rather than the provisions of chapter 7 of title 5.

**Federal Register Act, Pub. L. No. 74-220, §§ 5-6, 49 Stat. 500 (1935)**

AN ACT

To provide for the custody of Federal proclamations, orders, regulations, notices, and other documents, and for the prompt and uniform printing and distribution thereof.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the Archivist of the United States acting through a division established by him in the National Archives Establishment, hereinafter referred to as the "Division", is charged with the custody and, together with the Public Printer, with the prompt and uniform printing and distribution of the documents required or authorized to be published section 5. There shall be at the head of the Division a director, appointed by the President, who shall act under the general direction of the Archivist of the United States in carrying out the provisions of this Act and the regulations prescribed hereunder, who shall receive a salary, to be fixed by the President, not to exceed $5,000 a year.

\* \* \*

SEC. 5. (a) There shall be published in the Federal Register (1) all Presidential proclamations and Executive orders, except such as have no general applicability and legal effect or are effective only against Federal agencies or persons in their capacity as officers, agents, or employees thereof; (2) such documents or classes of documents as the President shall determine from time to time have general applicability and legal effect; and (3) such documents or classes of documents as may be required so to be published by Act of the Congress: *Provided*, That for the purposes of this Act every document or order which shall prescribe a penalty shall be deemed to have  general applicability and legal effect.

(b) In addition to the foregoing there shall also be published in  the Federal Register such other documents or classes of documents as may be authorized to be published pursuant hereto by regulations prescribed hereunder with the approval of the President, but in no case shall comments or news items of any character whatsoever be authorized to be published in the Federal Register.

SEC. 6. There is established a permanent Administrative Committee of three members consisting of the Archivist or Acting Archivist, who shall be chairman, an officer of the Department of Justice designated by the Attorney General, and the Public Printer or Acting Public Printer.  The Director of the Division shall act as secretary of the committee. The committee shall prescribe, with the approval of the President, regulations for carrying out the provisions of this Act.  Such regulations shall provide, among other things: (a) The manner of certification of copies required

to be certified under section 2, which certification may be permitted to be based upon confirmed communications from outside of the District of Columbia; (b) the documents which shall be authorized pursuant to section 5 (b) to be published in the Federal Register; (c) the manner and form in which the Federal Register shall be printed, reprinted, compiled, indexed, bound, and distributed; (d) the number of copies of the Federal Register, which shall be printed, reprinted, and compiled, the number which shall be distributed without charge to Members of Congress, officers and employees of the United States, or any Federal agency for their official use, and the number which shall be available for distribution to the public; and (e) the prices to be charged for individual copies of, and subscriptions to, the Federal Register and reprints and bound volumes thereof.

* * *

## Act to Amend the Federal Register Act, Pub. L. No. 75-158, § 11(a), 50 Stat. 304 (1937)

AN ACT
To amend the Federal Register Act.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That section 11 of the Federal Register Act, approved July 26, 1935 (49 Stat. 500), is hereby amended to read as follows:

"SEC. 11. (a) On July 1, 1938, and on the same date of every fifth year thereafter, each agency of the Government shall have prepared and shall file with the Administrative Committee a complete codification of all documents which, in the opinion of the agency, have general applicability and legal effect and which have been issued or promulgated by such agency and are in force and effect and relied upon by the agency as authority for, or invoked or used by it in the discharge of, any of its functions or activities on June 1, 1938. The Committee shall, within ninety days thereafter, report thereon to the President, who may authorize and direct the publication of such codification in special or supplemental editions of the Federal Register.

"(b) There is hereby established a Codification Board, which shall consist of six members: The Director of the Division of the Federal Register, chairman ex officio; three attorneys of the Department of Justice, designated by the Attorney General; and two attorneys of the Division of the Federal Register, designated by the Archivist. The Board shall supervise and coordinate the form, style, arrangement, and indexing of the codifications of the various agencies.

"(c) The codified documents of the several agencies published in the supplemental edition of the Federal Register pursuant to the provisions of subsection (a) hereof, as amended by documents subsequently filed with the Division. and published in the daily issues of the Federal Register, shall be prima-facie evidence of the text of such documents and of the fact that they are in full force and effect on and after the date of publication thereof.

"(d) The Administrative Committee shall prescribe, with the approval of the President, regulations for carrying out the provisions of this section."

Approved, June 19, 1937.

\* \* \*

## § 1.1  Definitions.

As used in this chapter, unless the context requires otherwise—

Administrative Committee means the Administrative Committee of the Federal Register established under section 1506 of title 44, United States Code;

Agency means each authority, whether or not within or subject to review by another agency, of the United States, other than the Congress, the courts, the District of Columbia, the Commonwealth of Puerto Rico, and the territories and possessions of the United States;

Document includes any Presidential proclamation or Executive order, and any rule, regulation, order, certificate, code of fair competition, license, notice, or similar instrument issued, prescribed, or promulgated by an agency;

Document having general applicability and legal effect means any document issued under proper authority prescribing a penalty or course of conduct, conferring a right, privilege, authority, or immunity, or imposing an obligation, and relevant or applicable to the general public, members of a class, or persons in a locality, as distinguished from named individuals or organizations; and

Filing means making a document available for public inspection at the Office of the Federal Register during official business hours. A document is filed only after it has been received, processed and assigned a publication date according to the schedule in part 17 of this chapter.

Regulation and rule have the same meaning.

# FEDERAL RULE OF APPELLATE PROCEDURE 15

**Review or Enforcement of an Agency Order**

**(a) Petition for Review; Joint Petition.**

    (1) Review of an agency order is commenced by filing, within the time prescribed by law, a petition for review with the clerk of a court of appeals authorized to review the agency order. If their interests make joinder practicable, two or more persons may join in a petition to the same court to review the same order .

    (2) The petition must:

        (A) name each party seeking review either in the caption or the body of the petition-using such terms as "et al.," "petitioners," or "respondents" does not effectively name the parties;

        (B) name the agency as a respondent ( even though not named in the petition, the United States is a respondent if required by statute); and

        (C) specify the order or part t hereof to be reviewed.

    (3) Form 3 in the Appendix of Forms is a suggested form of a petition for review.

    (4) In this rule "agency" includes an agency, board, commission, or officer ; "petition for review" includes a petition to enjoin, suspend, modify, or otherwise review, or a notice of appeal, whichever form is indicated by the applicable statute.

**(b) Application or Cross-Application to Enforce an Order; Answer; Default.**

    (1) An application to enforce an agency order must be filed with the clerk of a court of appeals authorized to enforce the order. If a petition is filed to review an agency order that the court may enforce, a party opposing the petition may file a cross-application for enforcement.

    (2) Within 21 days after the application for enforcement is filed, the respondent must serve on the applicant an answer to the application and file it with the clerk. If the respondent fails to answer in time, the court will enter judgment for the relief requested.

    (3) The application must contain a concise statement of the proceedings in which the order was entered, the facts upon which venue is based, and the relief requested.

**(c) Service of the Petition or Application.**

The circuit clerk must serve a copy of the petition for review, or an application or cross-application to enforce an agency order, on each respondent as prescribed by Rule 3(d), unless a different manner of service is prescribed by statute. At the time of filing, the petitioner must:

(1) serve, or have served, a copy on each party admitted to participate in the agency proceedings, except for the respondents;

(2) file with the clerk a list of those so served; and

(3) give the clerk enough copies of the petition or application to serve each respondent.

**(d) Intervention.**

Unless a statute provides another method, a person who wants to intervene in a proceeding under this rule must file a motion for leave to intervene with the circuit clerk and serve a copy on all parties. The motion-or other notice of intervention authorized by statute-must be filed within 30 days after the petition for review is filed and must contain a concise statement of the interest of the moving party and the grounds for intervention.

**(e) Payment of Fees.**

When filing any separate or joint petition for review in a court of appeals, the petitioner must pay the circuit clerk all required fee.

# FEDERAL CIRCUIT RULE 47.12

**Action for Judicial Review Under 38 U.S.C. § 502**

**(a) Time for Filing.**

An action for judicial review under 38 U.S.C. § 502 of a rule and regulation of the Department of Veterans Affairs must be filed with the clerk of court within 60 days after issuance of the rule or regulation or denial of a request for amendment or waiver of the rule or regulation.

**(b) Parties.**

Only a person or persons adversely affected by the rule or regulation or the rulemaking process may bring an action for judicial review. The Secretary of Veterans Affairs must be named the respondent.

**(c) Contents.**

The action for judicial review must describe how the person or persons bringing the action are adversely affected and must specifically identify either:

(1) the rule, regulation, opinion, or order of the Department of Veterans Affairs separately stated and published in the Federal Register pursuant to 5 U.S.C. § 552(a)(1) on which judicial review is sought; or

(2) the notice-and-comment rulemaking process by the Department of Veterans Affairs pursuant to 5 U.S.C. § 553 on which judicial review is sought.

**(d) Procedure.**

Except as provided in this rule, the procedures applicable to an action for judicial review under 38 U.S.C. § 502 are the same as those for a petition for review under Federal Rule of Appellate Procedure 15.